NATALIE K. WIGHT, OSB #035576
United States Attorney
District of Oregon
**JEFFREY S. SWEET, OSB #994183**
Jeff.Sweet@usdoj.gov
**NATHAN J. LICHVARCIK**
Nathan.j.Lichvarcik@usdoj.gov
**MARCO A. BOCCATO, OSB #103437**
Marco.Boccato@usdoj.gov
Assistant United States Attorneys
405 East 8th Avenue, Suite 2400
Eugene, Oregon 97401
Telephone: (541) 465-6771
Attorneys for the United States of America

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 1:23-cr-00254-MC |
| v. | **GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS COUNT THREE** |
| **NEGASI ISHAIAH ZUBERI, aka JUSTIN JOSHUA HYCHE,** | |
| **Defendant.** | |

Defendant Negasi Zuberi used his car, his phone, an internet mapping service, and an ATM to carry out his kidnapping and rape of Adult Victim 2 (AV2) in Klamath Falls, Oregon. For that he is charged with one count of kidnapping, 18 U.S.C. § 1201. This Court has jurisdiction over that federal crime.

### A.     FACTS

Mr. Zuberi approached AV2 outside of a bar in Klamath Falls. It was early in the morning on May 6, 2023. She was stranded without a ride and was standing outside considering how to get home.

Mr. Zuberi—who she did not know—tried to start up a conversation. He asked for her phone number. She initially declined but ultimately gave it to him hoping that would make him leave her alone. She walked down the street looking for her friends, and Mr. Zuberi joined her. She remembers him offering her a ride and remembers waking up in his car not knowing how she got there.



She awoke to Mr. Zuberi driving fast in downtown Klamath Falls. She asked if he was driving her to her friend's house; he said yes. Mr. Zuberi had Google Maps open on his phone and was trying to convince her they were on their way there but he got lost. His iCloud account has a screenshot of Google Maps open on his phone with a time of 1:20 a.m.[1] The screenshot was taken on May 6, 2023, and the distance it shows is consistent with the distance from the point in the map back to downtown Klamath Falls.

They drove for a long time, and he told her if she just listened to his instructions she wouldn't get hurt. She started to have a panic attack and asked him to pull over. When he did, she tried to open the door and jump out of the car but he sped up.

Later, he pulled over in an area surrounded by fields. They were too far from any houses for anyone to hear her scream but she did anyway. Angry, Mr.

---

[1] The government cannot say that what the screenshot captures was shown to AV2, or whether it depicts a location to which Mr. Zuberi was intending to go. However, based on the timing, the government believes that AV2 was with Mr. Zuberi in his car at the time the screenshot was taken.

**Government's Response to Defendant's Motion to Dismiss Count Three**        **Page 2**

Zuberi got out and came over to her, holding a black and yellow taser.² She tried to hold the door closed but he was too strong. She tried to block the taser with her purse but failed. The taser hit her on the side of the ribs, making her scream even louder.



Mr. Zuberi punched her in the face, head, and ribs. She tried to fight back but he grabbed a pistol from under the driver's seat and used two pairs of handcuffs, one silver and one black, to bind both her wrists and ankles.³ He warned that he would shoot her if she did anything stupid like that again and fired a shot out the window to show her the gun was real. The spent shell casing fell on her leg and burned her.⁴





He began driving again. At some point, he covered her face with the hood of a backward-facing sweatshirt and a blanket, making it hard for her to breathe.

---

² In July 2023, the FBI searched Mr. Zuberi's trailer and found the black and yellow taser depicted here. His DNA was on the taser.
³ The FBI also found in the trailer a pair of silver handcuffs and a black pair, shown here. One pair had AV2 and Mr. Zuberi's DNA on it.
⁴ In July 2023, the FBI found a spent 9mm shell casing on the floor of Mr. Zuberi's Honda Pilot, which fits the description of the car AV2 said he used to kidnap her.

He drove to his house and backed his car into the garage. She saw a pile of cinderblocks.[5] He said there was no way she can get out—the garage door was locked, the main door was locked and the window was sealed—and he didn't care if she screamed because no one could hear her.



Mr. Zuberi kept her in the car for a few hours. He only let her out to urinate in a bucket and when he took her into the house and then back to the car; he kept her restrained throughout. He took AV2's phone and removed the battery. He wrapped the phone in tinfoil to—according to him—prevent the signal from getting out.

He asked why she had screamed and tried to run away; she said she was scared because he kidnapped her. He asked if she would have sex with him if she wasn't scared, and she said no, "I'm handcuffed in the back of your car. You need to let me go. This isn't okay. You can't just take people."

While captive in the garage, Mr. Zuberi beat her. He hit her with the back of his hand. He hit her in the head with his pistol. He asked if she needed to be reminded that the gun was

---

[5] Mr. Zuberi's iCloud account contained a photograph, taken on April 14, 2023, of a stack of cinderblocks in the garage of his residence at 1336 Eldorado Ave., Klamath Falls, Oregon. Part of that photograph is included above.

real and put the barrel against her teeth. He said if she would have just listened to him, she wouldn't have gotten hurt and wouldn't be in this situation. He said that if she just wanted him, she wouldn't get hurt any more, and asked again if she wanted to have sex with him. Handcuffed, beaten, and told repeatedly that she couldn't escape, AV2 finally said yes.

Mr. Zuberi raped her, and asked if she liked him now. He said he had two men coming over to have fun with her, a comment he later said was a lie to see her reaction. He said she was going to make a lot of money for him, but mused that he didn't know if he was going to keep her or where he would put her.

He raped her multiple times all the while confining her to the car. He went through her purse and took a picture of her driver's license. He said if she called the police, he could find her family, he would kill her and her loved ones, and he would ruin her entire life. He said that if he was in a police shootout, he would use her as a human shield and they would go out together.

The government also has evidence that Mr. Zuberi used his cellphone during this crime and recovered a video file from his iCloud account proving that use. A description of the video is provided in the government's addendum to its severance motion response. This fact shows that the data was uploaded over the internet.

Finally, AV2 convinced Mr. Zuberi to let her go—not out of mercy for her but because she told him her dog was sick and needed care. He had her put the sweatshirt on again so she couldn't see. He kept apologizing for what he did to her face and said he would pay for it. She refused his money but he insisted. He drove to a nearby Chase Bank and got out of the car, telling her not to try anything. He withdrew $300 from the ATM and gave it to her.[6] He

---

[6] Bank records show that Mr. Zuberi's account had an ATM withdrawal on May 6, 2023, at 1:36 p.m.; his account reflects a debit of $303.50.

dropped her off near her house. The government expects that additional details, and information regarding the chronology of events, will be provided at trial.

Defendant is charged with kidnapping AV2 on May 6, 2023, in violation of 18 U.S.C. § 1201(a)(1). The superseding indictment states that "in committing and furthering the commission of the offense, [defendant] used a means, facility, and instrumentality of interstate or foreign commerce, including a vehicle and a cell phone." ECF No. 51.

Defendant now moves to dismiss this charge.

**B.     ARGUMENT**

Defendant argues that there is no federal jurisdiction over a kidnapping that does not cross state lines. Many courts have already reviewed and rejected this same argument. The federal kidnapping statute is a proper exercise of Congress's Commerce Clause authority and defendant's motion should be denied.

> **1.     The federal kidnapping statute falls within Congress's authority to regulate activities using instrumentalities of interstate commerce.**

Congress amended the federal kidnapping statue in 2006, as part of the Adam Walsh Act.[7] It expanded the statute's reach beyond cases where a victim is moved across state lines, to include cases in which the kidnapper "uses the mail or any means, facility or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense." 18 U.S.C. § 1201(a)(1). The amendment was a direct response to the increased risks of online child predation, but Congress wrote more broadly, using the scope of its authority. *See* Michele Martinez Campbell, *The Kids are Online: The Internet, the Commerce Clause, and the*

---

[7] Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 587 (codified as amended in scattered sections of U.S. Code Titles 18 and 42).

*Amended Federal Kidnapping Act*, 14 U. Pa. J. Const. L. 215, 240 (2011) (discussing legislative history).

The Commerce Clause authorizes Congress to regulate three broad categories of activity: (1) the use of channels of interstate commerce; (2) the use of instrumentalities of interstate commerce; and (3) other activities found to have a "substantial relation" to interstate commerce. *United States v. Lopez*, 514 U.S. 549, 558–59 (1995). Congress acted under the second category in amending the kidnapping statute.[8]

Defendant asks the Court to read the statute as an exercise of the third category of Commerce power. But Congress could not have chosen more obvious phrasing to invoke its authority over instrumentalities. *See United States v. Dela Cruz*, 358 F.3d 623, 625 (9th Cir. 2004) (interpreting 18 U.S.C. § 844(e)'s regulation of "the mail, telephone, telegraph, or other instrument" of commerce as an instrumentality regulation); *see also United States v. Glover*, 672 F.Supp.3d 1072, 1085 (D. Or. 2023) (relying on *Dela Cruz* in holding the same for § 1201(a)).

Congress's authority to regulate instrumentalities of interstate commerce is plenary. *Cleveland v. United States*, 329 U.S. 14, 19 (1946). Both channels and instrumentalities "are the ingredients of interstate commerce itself," making Congress's ability to regulate them "self-evident." *Gonzales v. Raich*, 545 U.S. 1, 34 (2005) (Scalia, J. concurring). Congress can regulate their use "even though the threat may come only from intrastate activities." *Lopez*, 514

---

[8] Channels are "the interstate transportation routes through which persons and goods move," our highways, railroads, navigable waters, airspace, and telecommunications networks. *United States v. Morrison*, 529 U.S. 598, 613 n.5 (2000) (quote omitted); *United States v. Ballinger*, 395 F.3d 1218, 1225–26 (11th Cir. 2005). Instrumentalities are "the people and things themselves moving in commerce, including automobiles, airplanes, boats, and shipments of goods," as well as "pagers, telephones, and mobile phones." *Id.* (collecting cases).

**Government's Response to Defendant's Motion to Dismiss Count Three**      **Page 7**

U.S. at 558; *cf. id.* ("'[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.'") (quoting *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256 (1964)).

### 2. Nearly every court to address challenges to the amended statute agrees on its constitutionality.

The Sixth and Second Circuits have each made short work of constitutional challenges to § 1201 like what defendant raises here. In *United States v. Dais*, 559 F. App'x. 438, 441, 445 (6th Cir. 2014), the Sixth Circuit affirmed a conviction based on the kidnappers having their victim call his mother on a cellphone to ask for a ransom payment. Rejecting the same "third category" argument made here, the court upheld the statute under Congress's power to regulate instrumentalities and applied its precedent that "cellular telephones, even in the absence of evidence that they were used to make interstate calls, have been held to be instrumentalities of interstate commerce." *Id.* (citing *United States v. Weathers*, 169 F.3d 336, 341 (6th Cir. 1999)). The Second Circuit followed suit in *United States v. Chambers*, 681 F. App'x. 72, 80–81 (2d Cir. 2017) ("the challenged law here is properly evaluated under the second, not third, category, *i.e.*, 'instrumentalities of interstate commerce.'").

Other circuits have agreed that when instrumentalities are used to commit a kidnapping— even when all of the activity remains wholly local—it is within Congress's power to act.

In *United States v. Protho*, 41 F.4th 812, 827–29 (7th Cir. 2022), the defendant grabbed a 10-year-old girl as she walked home from school, drove her into an alley, and sexually assaulted her in his truck. He was charged with kidnapping based on his use of his truck to achieve the crime. He argued that "an automobile can only qualify as an instrumentality of interstate commerce when evidence shows that the specific automobile at issue was, at some point, used

for that purpose." *Id.* at 828. The Seventh Circuit disagreed. "[I]t's the *nature* of the regulated object's class (here, automobiles) rather than the particular *use* of one member of that class (Protho's Ford Explorer) that matters." *Id.* (emphasis in original). It went on to cite a litany of cases holding that cars are instrumentalities of interstate commerce. *Id.* at 829; *but see United States v. Mitchell*, No. CR 22-01545-TUC-RM, 2024 U.S. Dist. LEXIS 36968, *45–46 (D. Az. 2024) (holding that cars must be analyzed case-by-case to decide if they are instrumentalities).

The Sixth Circuit agreed with *Protho* in *United States v. Windham*, 53 F.4th 1006, 1013 (6th Cir. 2022). "[T]he federal kidnapping statute refers to instrumentalities '*of* interstate or foreign commerce.' The issue is therefore whether cars and cell phones are instrumentalities of interstate commerce, *not* whether they were used interstate." *Id.* (citing 18 U.S.C. § 1201(a)) (emphasis in original). *See also United States v. Morgan*, 748 F.3d 1024 (10th Cir. 2014) (affirming § 1201(a) convictions and holding that the district court correctly instructed the jury as a matter of law that the internet, cellphones, and GPS devices are instrumentalities of interstate commerce).

### 3. The particular instrumentality used is not an element of the offense.

Mr. Zuberi argues that if the kidnapping charge goes through to trial, the government should be limited to the instrumentalities cited in the indictment. That is not legally true. Although the jurisdictional nexus is an element that must be pleaded and proved, the specific instrumentality used is not.

Generally, an indictment "is sufficient if it sets forth the elements of the charged offense" giving the defendant fair notice of the charges against him. *United States v. Rodriguez*, 360 F.3d 949, 958 (9th Cir. 2004) (quote omitted). The interstate-commerce element for federal kidnapping is that defendant "use[d] . . . any means, facility, or instrumentality of interstate or

foreign commerce in committing or in furtherance of the commission of the offense." 18 U.S.C. § 1201. Which instrumentality he used is not a necessary element.

The Ninth Circuit held as much in the context of the Hobbs Act's jurisdictional element. To charge a defendant with Hobbs Act robbery, an indictment must allege two elements—the robbery and the interstate nexus. *Rodriguez*, 360 F.3d at 958. While "the interstate commerce nexus is an element that 'must be proved at trial[,] . . . it need not . . . be expressly described in the indictment.'" *Id.*

The government should not be limited to the instrumentalities listed as examples in the indictment—vehicle and cellphone. Mr. Zuberi is on full notice through the discovery, and this response, that the government has evidence that he also used an ATM and internet mapping service while kidnapping AV2.[9]

The government does ask that a special verdict form be used to ensure unanimity in the jury's decision about which instrumentalities it finds. There is little, but still some, debate among courts about whether particular items are instrumentalities for purposes of the kidnapping statute. *Compare Protho*, 41 F.4th at 828–29 (cars, as a class, are instrumentalities), *with Mitchell*, No. CR 22-01545-TUC-RM, 2024 U.S. Dist. LEXIS 36968, *45–46 (D. Az. 2024) (disagreeing). Because of that, the government thinks it prudent to ask the jury to be specific in its findings on the topic. It will submit a proposed verdict form in due course.

\\\
\\\
\\\

---

[9] If the Court requires that the facilities be listed in the indictment, the government may seek to supersede in compliance. Because of the notice given here, that should not be grounds for delay.

C.   CONCLUSION

For the reasons stated above, the Court should deny defendant's motion.

Dated: May 20, 2024

Respectfully submitted,

NATALIE K. WIGHT
United States Attorney

/s/ *Suzanne Miles*
SUZANNE MILES
Assistant United States Attorney