NATALIE K. WIGHT, OSB #035576
United States Attorney
District of Oregon
**JEFFREY S. SWEET, OSB #994183**
Jeff.Sweet@usdoj.gov
**NATHAN J. LICHVARCIK**
Nathan.j.Lichvarcik@usdoj.gov
**MARCO A. BOCCATO, OSB #103437**
Marco.Boccato@usdoj.gov
Assistant United States Attorneys
405 East 8th Avenue, Suite 2400
Eugene, Oregon 97401
Telephone: (541) 465-6771
Attorneys for the United States of America

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 1:23-cr-00254-MC |
| v. | **GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS** |
| **NEGASI ISHAIAH ZUBERI, aka JUSTIN JOSHUA HYCHE,** | **FOR DESTRUCTION OF EVIDENCE** |
| Defendant. | |

Defendant Negasi Zuberi moves to dismiss the indictment because his concrete cell was destroyed and "no effort was made to maintain or otherwise document the construction of the cell[.]" ECF No. 71 at p. 3. That motion should be denied. The FBI acted in good faith in allowing the homeowners to dismantle the cell on their property after two search warrants had been executed and significant evidence had been collected. Contrary to Mr. Zuberi's assertions, the documentation of the cell is extensive, and includes:

**Government's Response to Defendant's Motion to Dismiss re: Evidence Destruction   Page 1**

- At least 250 photographs of the cell, both inside and out, showing a variety of vantage points;

- Nearly twenty minutes of video footage from multiple cameras memorializing the cell and garage, again from various angles inside and outside the cell; and

- Receipts for many of the materials used to construct the cell, showing what Mr. Zuberi purchased, the price he paid, and the quantity, as well as surveillance video of Mr. Zuberi purchasing them.

The cell was deconstructed by a contractor with 35 years of construction experience, who spent over five hours with his son and a sledgehammer. They documented the demolition with their own photographs, and accounted for the time spent dismantling and disposing of the 10,000-pound concrete structure.

There is nothing exculpatory about the five-ton concrete cell that Mr. Zuberi used to trap Adult Victim 1 (AV1). That she escaped the cell says more about the fear and panic she felt after being kidnapped, raped, and imprisoned, than anything else.

A. **FACTS**

1. **July 16th Search of the Cell**

On July 16, 2023, Klamath County police obtained and executed a search warrant for Mr. Zuberi's residence. The primary agencies executing the state search warrant were the Klamath Falls Police Department (KFPD) and the Oregon State Police (OSP). They took over 200 pictures of just the cell. Three officers also captured footage of the cell and garage on their body cameras. The photos taken of the cell during the July 16th search are included as Exhibit 1. The body camera videos are filed under seal as Exhibit 2, and include four videos numbered 1-1, 1-2, 3, and 4.

In one body camera video (videos 1-1 and 1-2), the cell and garage are recorded for about ten minutes (00:55:00–00:58:49 and 01:06:30–01:13:40). In another officer's body camera video, video 2, the cell and garage are recorded for around three minutes (0:55:50–0:58:39). In the third body camera video, video 3, the cell and garage are recorded for around three minutes (0:55:35–0:58:55). Below are screen shots from the three body cameras showing the interior cell door:



an exterior wall, and the exterior door opening out:




KFPD also requested the assistance of OSP's Bend Forensic Laboratory to assist with the search and "to document and examine the cinderblock room located within the residence

**Government's Response to Defendant's Motion to Dismiss re: Evidence Destruction    Page 3**

garage." A copy of the OSB report is filed under seal as Exhibit 3. The report describes the materials used to construct the cell, it contains the interior measurements, and lists items within it and biological evidence found in the cell and the property.

Police took pictures of the cell from a variety of angles:



**Government's Response to Defendant's Motion to Dismiss re: Evidence Destruction   Page 4**

They took numerous photos of the ceiling and roof of the cell. Below are four:






They also documented areas in the garage near the cell, including a table just outside, which appears to contain many construction items including a drill and caulking guns:



**Government's Response to Defendant's Motion to Dismiss re: Evidence Destruction  Page 5**

Below is another photo of that table. It includes placards from OSP's Bend Forensic office identifying the location of handcuffs, a water bottle, and keys.



OSP's Bend Forensic office took photos inside the cell.



**Government's Response to Defendant's Motion to Dismiss re: Evidence Destruction   Page 6**

Including this photo showing the two doors for entry into the cell:



To escape, AV1 repeatedly punched the metal door to create a small hole in the mesh. She was then able to rip the mesh off the upper portion of the black metal door and climbed through the horizontal opening. That black metal door is preserved as evidence and defense has had an opportunity to inspect it. Neither door included an interior handle, and both doors had deadbolts which required keys from both sides.

Several blood stains were found within the cell. DNA swabs were collected and the blood was later identified as AV1's.



## 2. July 19th Search of the Cell

On July 19, 2023, the FBI executed a federal search warrant to search the property and took an additional thirty-five pictures of the cell and garage. These are filed under seal as Exhibit 4. The FBI also took two videos of the cell; one that was 33 seconds and the other that was 1 minute and 52 seconds. The videos are included as Exhibit 5. In addition to taking pictures and video, the FBI measured the cell and examined its construction:




They removed drywall (and then insulation) to better understand how the cell was constructed:




**Government's Response to Defendant's Motion to Dismiss re: Evidence Destruction    Page 8**

Law enforcement determined the exterior dimensions of the cell were as follows: 125.5 inches long, 98.75 inches wide, and 84.5 inches tall, and the interior dimensions were: 101 inches long, 78 inches wide, and 84.5 inches tall. The entryway was approximately 30 inches wide.

The cell was constructed with commercially available cinder blocks that were stacked vertically. Based on law enforcement observations, a grey construction adhesive was used as a type of mortar. The cell was framed with 2x4s, and between those 2x4s was insulation. Drywall was hung in the interior of the cell. The seams were sealed with spackle. The roof consisted of large pieces of engineered wood.

### 3.  Deconstruction of the Cell

On July 19, 2023, an FBI agent interviewed the property owners. They explained that Mr. Zuberi moved into the property on February 1, 2023. During the recorded interview, the property owners asked whether they could dismantle the cell. The FBI agent told the property owners they could. The two-minute audio clip is attached hereto as Exhibit 6, and incorporated by reference herein (filed under seal). The exchange proceeded as follows:

| | |
|---|---|
| **Owner 1**: | And can we dismantle that thing [cell]? |
| **Agent:** | Absolutely, it's your home. |
| **Owner 1:** | At this point now we can do that? |
| **Agent:** | We've done everything we need. |
| **Owner 1:** | Do we have to wait until the 72-hour notice to get– |
| **Agent:** | Whatever, yeah, whatever rules– |
| **Owner 1:** | Yeah, so we can't– |
| **Agent:** | I can't say "yeah", but |
| **Owner 1:** | But here's the deal – |

**Government's Response to Defendant's Motion to Dismiss re: Evidence Destruction  Page 9**

| | |
|---|---|
| **Agent:** | But our evidence collection is complete. |
| **Owner 1:** | If [Alycia Westfall] is in there, well we've got the new key and we've locked her basically out of that garage and I think for safety purposes with the children and stuff. Nobody should be in there. |
| **Agent:** | Yeah |
| **Owner 1:** | I think we just keep that door locked till, till we get possession, and then we can dismantle it. |
| **Owner 2:** | [unintelligible] I think I caught most of the conversation, but we're OK with doing anything we want as far as clean-up goes? |
| **Agent:** | Absolutely, yeah, yeah. We are done with our evidence collection. We have done everything we needed to do. When we left today, we will not be coming back. That's the intent. |

When discussing the difficulty of dismantling the cell, the agent stated construction glue was used and the property owner indicated seeing something similar. That exchange was also recorded, and proceeded as follows:

| | |
|---|---|
| **Owner 1:** | Is it easy to take apart? Or did he— |
| **Owner 2:** | Did he use construction, did he use construction glue on all the joints? |
| **Agent:** | Yeah. |
| **Owner 2:** | We kind of thought we could see some mastic of some kind. |
| **Agent:** | I would hire someone to break that thing apart[.] |

On July 24, 2023, the property owners deconstructed the cell. They provided a summary to law enforcement of the time it took to deconstruct and dispose of the cell. The summary in its entirety is filed under seal as Exhibit 7.

//

//

//

**Government's Response to Defendant's Motion to Dismiss re: Evidence Destruction** <span>Page 10</span>

A snippet is here:



They also took a few photos. These photos are filed under seal as Exhibit 8. These photos show the deconstruction, including the property owner taking down the cell with a sledgehammer.

**Government's Response to Defendant's Motion to Dismiss re: Evidence Destruction** **Page 11**

The photo on the right shows that some of the concrete blocks remain attached to each other, even after being knocked down. This is consistent with statements by the law enforcement and the property owner that the blocks were connected to each other by some sort of construction adhesive.

The next day, the property owners took the cell materials to the dump. At the dump, the materials were weighed, and totaled over 10,000 pounds. The dump receipts are filed under seal as Exhibit 9.

| Origin | Materials & Services | Quantity | Unit | Rate/Unit | Amount |
|---|---|---|---|---|---|
| NA/Not Applicable | 100% of CONCRETE/CLEAN CONCl | 4.31 | TON | $6.70/TN | $28.88 |

| Origin | Materials & Services | Quantity | Unit | Rate/Unit | Amount |
|---|---|---|---|---|---|
| NA/Not Applicable | 100% of DEMO/DEMO PER TON | 0.88 | TON | $74.00/TN | $65.12 |

### 4. Other Evidence of Construction of the Cell

Through follow-up subpoenas and search warrants, law enforcement gained insight into what materials Mr. Zuberi used to construct the cell and how he constructed the cell. Law enforcement recovered about eight photos from Mr. Zuberi's digital device/iCloud. Mr. Zuberi took a picture of concrete anchors and used what appears to be a phone application to conduct measurements. Below are photos of the concrete anchors and the cell in various phases of construction from Mr. Zuberi digital device/iCloud. Relevant photos from Zuberi's digital device/iCloud are included as Exhibit 10.







Law enforcement also recovered seven Home Depot receipts, which were located in the property, the Altima, and the Honda Pilot. The seven receipts in their entirety are filed under seal as Exhibit 11. Below are two, showing purchases of cinderblocks and a deadbolt.

**Government's Response to Defendant's Motion to Dismiss re: Evidence DestructionPage 13**



The FBI determined that roughly 286 concrete blocks were used to construct the cell. At an estimated 30-35 pounds each, this is consistent with the dump receipts received from the property owners. The Home Depot receipts only account for a small portion of the total number of blocks used to construct the cell.

Law enforcement also reviewed video surveillance from Home Depot. From February 2023, to July 2, 2023, the video surveillance shows numerous trips to Home Depot where Mr. Zuberi appears to have been purchasing items for the cell. The purchases are summarized below, and are assoiciated with Mr. Zuberi's name and vendor number:

|   | Date and Time of Purchase | What was Purchased | Cost |
|---|---|---|---|
| 1 | May 17, 2023 @ 2:52 PM | 1 Anvil smooth rod caulk gun / hex wire netting / 12 concrete blocks | $52.16 |
| 2 | May 19, 2023 @ 4:57 PM | Arrow 3/8" T50 Staples 1250 PK | $4.97 |
| 3 | May 21, 2023 @ 1:51 PM | 2X4 - 96" Prime KD-HT Whitewood Stud | $3.35 |
| 4 | May 28, 2023 @ 2:13 PM | 6' Step ladder and 250lb of concrete blocks | $84.88 |
| 5 | May 29, 2023 @ 3:21 PM | 1 Drywall screw / 15 prime whitewood stud / 2 USG moldtough UL drywall | $99.68 |

**Government's Response to Defendant's Motion to Dismiss re: Evidence Destruction Page 14**

| 6 | May 29, 2023 @ 3:48 PM | Tapcon 3/16 star flad HD 75 PK | $29.47 |
| --- | --- | --- | --- |
| 7 | May 29, 2023 @ 5:45 PM | 1 3/4 Poly Insul 6PK/2 Thermafiber fire and sound guard | $145.58 |
| 8 | June 2, 2023 @ 4:11 PM | 3 7/16 4X8 OSB | $34.50 |
| 9 | June 24, 2023 @ 3:48 PM | 1 Thermafiber Fire and Sound guard / 1 hardware mesh / 5 2X4 stud | $101.16 |
| 10 | June 25, 2023 @ 7:21 PM | 1 Thermafiber Fire and Sound guard / 6 2X4 whitewood stud | $87.08 |
| 11 | June 29, 2023 @ 7:52 PM | 4 Drywall / 1 sanding respirator / 1 knife / 1 self drilling 8X3 / 1 75PK tapcon star flat | $131.02 |
| 12 | June 30, 2023 @ 12:03 PM | 1 sanding respirator N95 2PK / 20 concrete blocks | $44.87 |
| 13 | June 30, 2023 @ 1:02 PM | 4 concrete blocks | $7.48 |
| 14 | June 30, 2023 @ 8:40 PM | 1 Diablo 7-1/4" 36T wood and metal CSB | $22.97 |
| 15 | July 2, 2023 @ 3:18 PM | 1 Roll Insulation / 1 builder shim / 1 32" white light and sound reducing INT/2 2X4 | $60.87 |
| 16 | July 2, 2023 @ 3:28 PM | 1 Defiant ABZ deadbolt DBL CYL | $16.47 |

Mr. Zuberi generally traveled to Home Depot alone.







But on one occasion he brought Alycia Westfall.



**Government's Response to Defendant's Motion to Dismiss re: Evidence DestructionPage 16**

B. **ANALYSIS**

"In order for destruction of evidence to rise to the level of a constitutional violation, a party must make two showings. First, that the government acted in bad faith," which turns on whether it knew "of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013). "Second, that the missing evidence is 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *Id.* (quoting *California v. Trombetta*, 467 U.S. 479, 489 (1984)).

Mr. Zuberi argues that an intact cell would have been potentially useful to his defense. He contends that the government has evidence that Mr. Zuberi intended to build a secure structure. But because the cell was dismantled, and the government did not "document how it was constructed or how secure it was," Mr. Zuberi argues that he does not have what he needs to test whether "the structure that existed actually was secure." ECF. No. 71 at 5.

1. **Comparable evidence is available.**

Taking Mr. Zuberi's second burden first, there is enough existing available evidence for Mr. Zuberi to make his point. There is a mass of evidence about the structure of this cell, primarily gathered from two search warrants on the property and Home Depot records. The government has pictures, videos, measurements, and receipts that document the cell's construction and deconstruction.

Mr. Zuberi focuses on the purported ease with which the property owners were able to dismantle the cell. That was not videotaped. But there are photos, notes about the process, and the weight records available. The government anticipates calling the property owners at trial, and Mr. Zuberi can cross-examine them or call the owners as defense witnesses and get their

account through testimony. *Cf. Trombetta*, 467 U.S. at 490 (cross-examination is a reasonable alternative means of getting comparable evidence in impeachment context); *cf. United States v. Zaragoza-Moreira*, 780 F.3d 971, 981–82 (9th Cir. 2015) (forcing defendant to testify in her own defense is not comparable to destroyed video of border-crossing interview).

In *United States v. Cooper*, 983 F.2d 928 (9th Cir. 1993), the defendants were charged with manufacturing methamphetamine, but the government destroyed the lab equipment they allegedly used to do it. The defendants contended that their equipment was not physically capable of making the drug; that they ran a legitimate small chemical laboratory business that made fuel additives and other legal chemical products. As no traces of methamphetamine or precursors chemicals were found on any glassware or equipment, the capability of the equipment was critical, exculpatory evidence that could not be substituted. Although the government provided a witness who had originally designed the specific piece of equipment at issue thirty years prior, he did not know whether the defendants' piece was made to specifications or had been altered in its decades of use. *Id.* at 930–31.

In contrast, in *Trombetta*, the Court found no due process issue with not preserving breath samples in drunk driving cases. The state made its machines' calibration records available and any defendant alleging operator error was free to cross-examine the administrating officer. 467 U.S. at 490. That, the Court said, was a sufficient substitute.

This case is much different than *Cooper*. In *Cooper*, no methamphetamine was found on the lab equipment. Here, AV1's blood was found throughout the cell she miraculously escaped from. We know what Mr. Zuberi used the cell for—to trap AV1. Mr. Zuberi's ability to commit the charged crimes does not hinge on the specifications of this cell. The cell did not need to be indestructible to play its role, after all, AV1 clawed her way out. The photos and video, the

**Government's Response to Defendant's Motion to Dismiss re: Evidence DestructionPage 18**

records of what materials were used, and the available testimony is enough for Mr. Zuberi to probe AV1's account of her capture and the government's evidence of the evolving arc of his criminal plan.

### 2. The potential utility of an intact cell is questionable.

Even if this alternative evidence is somehow deficient, Mr. Zuberi cannot carry the first part of his burden. To show that the government acted in bad faith, Mr. Zuberi must show that the government had "knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed, because without knowledge of the potential usefulness of the evidence, the evidence could not have been destroyed in bad faith." *Zaragoza-Moreira*, 780 F.3d at 977.

The exculpatory value that Mr. Zuberi attributes to this cell is not readily apparent now, nor would it have been apparent to law enforcement at the time. He focuses on the stability of the structure and purpose for which it was built. It's true that the government has text messages—which were found months after the cell was demolished—showing that Mr. Zuberi sought advice on how to build a strong structure, asking if a person could destroy it with their hands, and that he had drawings for another, underground structure. That evidence tends to show that Mr. Zuberi plotted out his crimes and built this cell for the very purpose it served—to imprison another human being.

The critical fact, however, is not whether Mr. Zuberi built this structure intending it to be a cell, the critical fact is that he used it as one. Even if giving the jury access to the actual cell would convince them that he built it for some innocent purpose, he is charged with kidnapping because of what he did with it; and, for what he did to AV1 before she ever stepped foot inside.

What the police found, as shown by the pictures, was a blood-stained, sound-dampened, windowless, 6.5x8.5-foot cinderblock room, double-doored, double-deadbolted, with no handle

**Government's Response to Defendant's Motion to Dismiss re: Evidence DestructionPage 19**

on the inside. The exculpatory value of leaving the cell intact is not obvious, even now that Mr. Zuberi tries to explain it. *See Sivilla*, 714 F.3d at 1172 (exculpatory value of preserving the defendant's Jeep used during drug smuggling was not apparent after evidentiary photos were taken).

The police released the property after they searched it twice and took photos and video of the scene. Mr. Zuberi has not established any bad faith on the government's part.

### C. CONCLUSION

The Court should deny this motion to dismiss.

Dated: May 20, 2024

Respectfully submitted,

NATALIE K. WIGHT
United States Attorney

/s/ *Marco A. Boccato*
MARCO A. BOCCATO
Assistant United States Attorney
