1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF OREGON

3                        MEDFORD DIVISION

4

5

   UNITED STATES OF AMERICA,          )
6                                      )
                        Plaintiff,     )  No. 1:23-cr-00254-MC
7                                      )
             v.                        )  June 20, 2024
8                                      )
   NEGASI ZUBERI,                      )  Medford, Oregon
9                                      )
                        Defendant.     )
10

11

12

13

14

15                 **TRANSCRIPT OF PROCEEDINGS**

16                     (Discovery Hearing)

17

18        BEFORE THE HONORABLE MICHAEL J. MCSHANE

19        UNITED STATES DISTRICT COURT CHIEF JUDGE

20

21

22

23
   **COURT REPORTER:**
24 Kellie M. Humiston, RMR, CRR
   (503) 326-8186
25 Kellie_Humiston@ord.uscourts.gov

1          **A P P E A R A N C E S - i**

2

3     FOR THE PLAINTIFF:
                              U.S. ATTORNEY'S OFFICE
4                             By:  Jeffrey S. Sweet
                              405 E. Eight Avenue
5                             Suite 2400
                              Eugene, OR 97401
6

7     FOR THE PLAINTIFF:
                              U.S. ATTORNEY'S OFFICE
8                             By:  Marco Boccato
                              310 W. Sixth Street
9                             Medford, OR 97501

10    FOR THE PLAINTIFF:
                              U.S. ATTORNEY'S OFFICE
11                            By:  Nathan J. Lichvarcik
                              405 E. Eight Avenue
12                            Suite 2400
                              Eugene, OR 97401
13

14    FOR THE PLAINTIFF:
                              U.S. ATTORNEY'S OFFICE
15                            By:  Suzanne A. Miles
                              1000 SW Third Avenue
16                            Suite 600
                              Portland, OR 97204
17

18

19

20

21

22

23

24

25

1              **A P P E A R A N C E S - ii**

2

3    FOR THE DEFENDANT:

                            U.S. ATTORNEY'S OFFICE
4                           By:  Amy E. Potter
                            405 E. Eighth Street
5                           Suite 2400
                            Eugene, OR 97401
6

7    FOR THE DEFENDANT:

                            LAW OFFICES OF MICHAEL P.
8                           BERTHOLF
                            By:  Michael P. Bertholf
9                           108 Mistletoe Street
                            Medford, OR 97501
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **INDEX**

2                                                        **PAGE NO.**

3   **PROCEEDINGS:**

4   Defendant's motion to remove shackles            6

5   Defendant's motion for *Franks* hearing          10

6   Defendant's motion to suppress                   34

7   Defendant's motion to dismiss                    132

8   Defendant's motion to dismiss                    156

9   Defendant's motion to sever                      159

10

11  **GOVERNMENT'S WITNESSES:**

12  CHRIS ZUPAN
            Direct                                   37
13          Cross                                    90
            Redirect                                 95
14
    JESSE SNYDER
15          Direct                                   98
            Cross                                    111
16          Redirect                                 119

17  TRAVIS GLUESENKAMP
            Direct                                   133
18          Cross                                    144
            Redirect                                 149

19

20  **DEFENDANT'S WITNESSES:**

21   (None)

22

23

24

25

```
 1                   (June 20, 2024, 9:05 a.m.)
 2                        P R O C E E D I N G S
 3
 4            THE COURT:  Okay.  Just a reminder, our court reporter
 5   is obviously remote, so if you could keep your microphones on and
 6   stay close to the microphone as you speak, that would be helpful,
 7   but with that, let's go on the record.
 8            And, Rebecca, if you'd like to call the case.
 9            THE COURTROOM DEPUTY:  United States District Court is
10   now in session, the Honorable Michael J. McShane presiding.  The
11   case on the calendar is United States of America vs. Negasi
12   Zuberi, Case Number 1:23-cr-00254-MC.
13            THE COURT:  All right.  Let's have the attorneys
14   introduce themselves for the record.  Let's start with the
15   Government.
16            MR. SWEET:  Good morning, Your Honor.  For the United
17   States, we have AUSAs Jeff Sweet, Suzanne Miles, Marco Boccato,
18   and Nathan Lichvarcik.
19            THE COURT:  All right.  Thank you.
20            And for the defense.
21            MS. POTTER:  Good morning, Your Honor.  Amy Potter on
22   behalf of Mr. Zuberi.  He is present in the courtroom.  Michael
23   Bertholf is also representing.
24            And this is Cheryl Oakley.  She's a paralegal from my
25   law firm who's assisting us today.
```

1          THE COURT:  Okay.  Great.  Thank you, and welcome.

2          Mr. Zuberi, good morning.

3          THE DEFENDANT:  Morning.

4          THE COURT:  All right.  I know the parties have kind of

5   talked about a -- how they'd like to proceed today.  And if I

6   understand right, we're going to proceed first with the motion

7   for a *Franks* hearing, but are there any preliminary matters we

8   need to discuss first from the Government?

9          MR. SWEET:  No, Your Honor.

10          THE COURT:  The defense?

11              **DEFENDANT'S MOTION TO REMOVE SHACKLES**

12          MS. POTTER:  Yes, Your Honor.  We want to make a formal

13   objection on the record to Mr. Zuberi being shackled.  In terms

14   of the case law, the most pertinent case has actually been

15   vacated, but I think it still is persuasive, and it's *United*

16   *States vs. Sanchez-Gomez*, 859 F.3d 649, and that's the case that

17   dealt with routine shackling in the Southern District of

18   California.  It was later vacated by the Supreme Court on

19   standing grounds.  However, the case stands for the principle

20   that the Court needs to make an individualized determination, so

21   we would like the Court to make that determination.  We object.

22          The only other thing I'll offer, I know the Government

23   has presented excerpts of the calls.  Ms. Oakley and I spent a

24   long time listening to some of those calls.  I think in context,

25   Mr. Zuberi was certainly frustrated with some of the information

1  he was provided.  Those calls represent that frustration.  We

2  don't have any reason to believe that there's an actual threat in

3  this courtroom.  So that's all we would say, Your Honor.

4  THE COURT:  Okay.  Does the Government wish to be heard

5  on that matter?

6  MR. LICHVARCIK:  Briefly, Judge.  Ms. Potter is correct

7  that *Sanchez-Garcia* has been vacated.  The Government's position

8  is that takes us back to *United States vs. Howard*, which is 480

9  F.3d 1005, a Ninth Circuit case.  And using restraints on

10  defendants does not -- during non-jury pretrial proceedings does

11  not violate constitutional rights.  The U.S. Marshals Service

12  certainly has discretion to keep a safe courtroom and the Court

13  independently has its discretion to do the same.

14  I also concur with Ms. Potter the individual assessment

15  here is worth stating on the record.  We did submit some jail

16  calls that raise security concerns.  To be clear, we didn't ask

17  that he be shackled, but we left that decision to the appropriate

18  group, and that is the U.S. Marshals Service.  I understand

19  they've made the independent decision to have him shackled.

20  And then just so the record's clear, my understanding

21  is that his legs are shackled and that one arm is, but that he

22  also has one arm free to be able to use a pen and write.

23  THE COURT:  All right.  Thank you.

24  Mr. Zuberi, it's not my general practice to have

25  individuals shackled during any proceedings unless I'm concerned

1    about the safety of people in the courtroom or the person

2    themselves, and certainly if this case goes to trial, we need to

3    have a further discussion about how we're going to resolve that

4    issue.

5         Today, though, I am concerned about the safety of

6    people in the courtroom.  I have read the excerpts that were

7    provided from your phone calls.  Those phone calls, for better or

8    for worse, appear to express an interest in some sort of

9    explosion or outburst during the hearing if things did not go

10   your way.  A lot of that was directed at your attorneys.  And I

11   am mindful of the fact that defense attorneys are, in fact, often

12   the first person that is the subject of violence by their

13   clients, and they're very close to you.  You've also threatened

14   violence towards yourself.

15        And, you know, we can spend more time trying to assess

16   whether those were statements of frustration or true statements,

17   but given that they were made and we're here today, it is my

18   belief that the safety of the folks around you require you to be

19   shackled.

20        Again, I don't necessarily believe that needs to happen

21   at trial if we go to trial, but today I have instructed the

22   marshals that you should be fully shackled.  My understanding is

23   they have freed one your hands, I assume your writing hand, so

24   that you can take notes, and that was acceptable to me.

25        Is there anything else that needs to go on the record?

1          MR. LICHVARCIK:  No, Your Honor.

2          MS. POTTER:  No, Your Honor.

3          THE COURT:  Okay.  Any other preliminary matters from

4    the defense?

5          MS. POTTER:  No, Your Honor.  Well, the only thing, we

6    have already agreed to pre-admit exhibits, so we'd move to

7    pre-admit all the defense exhibits.  I assume the Government will

8    do the same.

9          And we just wanted to confirm, there were a -- there

10   was an audio of a jail call that was submitted with the *Franks*

11   hearing, that the Court has listened to that and we don't need to

12   play that in court, and that the videos that were submitted have

13   also been reviewed.

14         THE COURT:  I was not able to listen, unfortunately, on

15   my iPad to that call.

16         MS. POTTER:  Okay.

17         THE COURT:  So I believe Ms. Pew had told me it would

18   be played in the courtroom --

19         MS. POTTER:  Okay.  We can -- we can certainly do that.

20         THE COURT:  -- if I understood that conversation, but I

21   will need to listen to that separately.

22         MS. POTTER:  Okay.

23         MR. SWEET:  Your Honor, the Government would also ask

24   that all of its exhibits be admitted as well, the ones that have

25   been filed already as well as the supplemental ones.  And

1    Mr. Boccato will have -- has also tendered four paper copies as
2    well and at the appropriate time will give the numbers for those
3    and ask that those be admitted as well.
4            THE COURT:  All right.  So all defense exhibits, which
5    I believe are Exhibits 1 through 7 in my binder, and Government
6    exhibits, which are 1 through 11, will be received.
7            MR. SWEET:  And, Your Honor, if I may, 1 through 11 --
8            THE COURT:  And then we have under seal some additional
9    exhibits.  Is that correct?
10           MR. SWEET:  Yes.  1 through 11 relates to the motion
11   for destruct -- motion to dismiss for destruction of evidence.
12   And there is also -- for the motion to suppress the Altima, there
13   are 1 through 7 right now.
14           THE COURT:  Yes.  I'm sorry.  I'm just looking at the
15   first and the last.
16           MR. SWEET:  Thank you, Your Honor.
17           THE COURT:  Okay.  Got it.  Thank you.  All those will
18   be admitted into evidence.  Thanks.
19                   **DEFENDANT'S MOTION FOR FRANKS HEARING**
20           THE COURT:  All right.  With regard to the *Franks*
21   hearing, then, does the Government wish to be heard first?
22           MR. SWEET:  Your Honor, I'm happy to go first.  The
23   burden is on the defense, so I'm happy to.
24           THE COURT:  I do so few *Franks* hearings.  This is,
25   like, I think, the -- maybe the second one I've done in ten

1   years.

2           So let's start, then, with the defense.  The burden is

3   on the defense.  And, Ms. Potter, let me hear from you.

4           I guess one of the things that stands out to me is

5   maybe the most obvious argument that the Government's going to

6   make is that every time that an inaccuracy or maybe something

7   that was omitted was included or something that was incorrect was

8   removed, probable cause was still found.  So it makes for a

9   difficult argument that it was material to probable cause when

10  things are removed and Judge Clarke continued to find probable

11  cause based on the evidence before him.

12          MS. POTTER:  I certainly acknowledge, Your Honor,

13  that's the worst fact in this motion for me.  I guess can I -- I

14  will address that, but can I back up just a little bit?

15          THE COURT:  Yes.

16          MS. POTTER:  So, first of all, I think putting it in

17  perspective, what we're asking for in the *Franks* hearing is not a

18  finding from this Court that the warrants (indiscernible)

19  probable cause.  We're asking for a hearing in order to challenge

20  the validity of those warrants; that is, to cross-examine the

21  affiant, Special Agent Gluesenkamp.  And when we do that, I agree

22  with the Court, there are two things we have to show:

23  intentionally or recklessly false or misleading statements, and

24  that they were material.

25          In this case, there are multiple admissions.  As the

1    Court notes, eventually those admissions are added in and Judge

2    Clarke signs off on the warrants; however, that is as the case is

3    progressing and additional information is being found and added.

4    So I don't think that's dispositive.  I understand where the

5    Court's coming from from that, but I don't think it's

6    dispositive.

7            I think the other issue with these warrants,

8    particularly when you're focused on the Altima and the trailer in

9    particular, those warrants essentially are just a search for any

10   kind of evidence because someone might have been in a location.

11   That is a conclusion, it's relying on Special Agent Gluesenkamp's

12   training and experience and his, you know, investigative

13   knowledge.  It is a -- not a fact supporting probable cause, it's

14   a conclusion of the agent that supports probable cause.  And when

15   that is the key to finding a warrant, the facts are all the more

16   critical to the magistrate judge.  So when there are errors in

17   those warrants, that's more troubling than even a later warrant

18   where there's actual facts, for example, in an iCloud warrant

19   when you have actual facts of the use of the iCloud.

20           So -- and I'm well aware that the Court has read all of

21   the briefings, seen the charts, but just some of the critical

22   omissions, particularly when, again, we're focused on the Altima

23   and the trailer, which, again, will be part of a separate motion,

24   so I know we're kind of veering in, but for purposes of the

25   *Franks*, those were also the critical warrants where the omissions

1    are the most important.  We've got an inaccuracy -- or a failure
2    to include AV-1's criminal history, inaccurate statements about
3    what AV-1 said, failure to include very significant information
4    about AV-2's credibility.  There is a point where they say for
5    both the Altima and the trailer they're looking for AV-1's
6    cellphone.  That was already in the Pilot.  So that that was not
7    something that was not found at that point.  It was in the Pilot.
8            And then -- and this goes to the call, which I could --
9    I guess I could play at this point.  In the call, particularly
10   for the trailer, they say that Mr. Zuberi -- or Adult Witness 1,
11   Ms. Westfall, says something about it, asked if it's in his name.
12   And in the warrant, it says, "He said 'yes.'"  He doesn't say,
13   "Yes."  And, again, they acknowledge that in the motions later.
14   He says, "Bruh," and then he tells her to be quiet.
15           And I think if the Court wants, we can play that right
16   now.
17           THE COURT:  Yes.  Let's do that.
18           MS. POTTER:  Okay.  And we're just going to play the
19   portion -- it's going to be a little bit of a lead-in, but we're
20   not going to play the entire call.
21           (Playing audio)
22           MS. POTTER:  So, Your Honor, that's the pertinent part.
23   Again, he never says, "Yes, it is," and there's no discussion of
24   the trailer whatsoever.
25           I think we'll discuss this more as we get into the

1    question of the Altima and the inevitable discovery, but that is

2    another error in the warrant, and it's -- I don't -- none of

3    these -- we're not arguing intentional.  It's reckless.

4            To the extent that there's some leniency given in the

5    first two warrants because it's a rush, there's no len- --

6    there's no rush anymore.  They hold on to the car for a couple of

7    days before they get that warrant, then they have a few more days

8    before the trailer, all during which there was time to read the

9    full reports and include all of that information.

10           I understand Judge Clarke did sign off once those

11   inaccuracies were included, but I think when you look at the

12   initial warrants, particularly the Altima and the trailer, it is

13   material, they were recklessly omitted, and we should be entitled

14   to at least challenge that through a cross-examination of the

15   affiant.

16           So unless the Court has further questions.

17           THE COURT:  I don't.

18           MS. POTTER:  Okay.

19           THE COURT:  All right.  For the Government.

20           MR. SWEET:  Thank you, Your Honor.  Your Honor,

21   everything that the defense challenges can either be added to

22   this affidavit or struck from the affidavit, and none of it will

23   change the determination of probable cause that the magistrate

24   judge initially made.

25           Your Honor, the defense -- the burden is on the

1    defense.  They have to make a substantial showing.  They have to

2    show both materiality and deliberate or reckless omission or a

3    false statement.  They can prove neither, let alone both.

4          I do want to -- I do want to back up a little bit, Your

5    Honor, and go to the very beginning, because these warrants are

6    valid because of the core probable cause that is in them.  We

7    start with AV-1, a woman who reports engaging in commercial sex

8    work, which is disclosed to the reviewing magistrate, engaging in

9    commercial sex work.  She encounters Mr. Zuberi in a commercial

10   sex act, and he then pretends to be a police officer, threatens

11   her with a taser, a gun, kidnaps her, puts her in handcuffs,

12   transports her to Oregon, sexually assaults her, takes her to his

13   house and imprisons her in a cinderblock cell in the garage, from

14   which she literally beats her way out, leaving her blood behind,

15   runs into the street yelling for help, where she's picked up by a

16   passerby, who says, "There's a woman yelling for help in the

17   street who I picked up."

18         She then gives multiple detailed versions -- or

19   multiple -- she explains this to law enforcement repeatedly.  She

20   describes the house.  She confirms the house.  The witness who

21   picked her up also said the area where she picked her up was

22   in -- I believe it was Painter and Eldorado Street.  So that

23   information, Your Honor, is corroborated.

24         She's not a CI.  She's not a confidential source or an

25   informant.  She's not an ex-spouse.  She's not anyone who has a

1    bias.  She's a victim.  Just like a bank teller has an interest

2    in identifying the perpetrator, not currying favor with the

3    Government, the same is true for Adult Victim 1.

4           And that, Your Honor, that is all before we corroborate

5    all the rest of her information through a search warrant, because

6    law enforcement then does a search warrant on Mr. Zuberi's house.

7    They find the cell that she described.  They find the victim's

8    purse in the garage.  They find a box or a case that matches the

9    exact make, model, and serial number of the firearm that she took

10   from Mr. Zuberi.

11          And, Your Honor, her description of Mr. Zuberi is

12   consistent with that of the resident at that house.  Paperwork

13   identifying Mr. Zuberi is found at the house.  And then it's easy

14   to overlook this, Judge, but Mr. Zuberi, he then flees.  He's not

15   at the house when law enforcement does a search warrant that

16   night.

17          First he's -- his phone, I should say, spends the night

18   in Tulelake, California, which is not a major rest stop for most

19   people to go stay at, especially when they live nearby in Klamath

20   Falls.

21          And then the next day, he goes to Reno.  And when

22   contacted by law enforcement, he puts his -- he has his child on

23   his lap, he refuses to exit, he cuts himself so he's bleeding

24   profusely, and then he attempts to destroy his phone.  All of

25   that contributes to probable cause, Your Honor.

1          And, Your Honor, that core set of facts right there,

2     that is going to result in a search warrant being signed every

3     single time, just that.

4          And because this crime shows premeditation, because it

5     shows planning, it also means that Mr. Zuberi is going to leave a

6     trail of evidence behind him wherever he goes in any place

7     associated with him, and that warrant is going to be signed not

8     just for his house, but it's going to be signed for his person;

9     his DNA; his digital devices; his social media accounts; a

10    storage unit; if he had a safety deposit box, it would be signed

11    for that; his other property.  All of those warrants are going to

12    get signed based on just that, Your Honor.

13         And all of that, that's before Adult Victim 2.  We

14    haven't talked about Adult Victim 2.  We haven't talked about the

15    lies that the mother of his child -- children made.  We haven't

16    talked about the car shuffle in Merrill, Oregon.  We haven't

17    talked about the driver's license or Social Security card of a

18    former neighbor of his that was in his house.  We haven't talked

19    about the "Operation Take Over" note.

20         That is going to get signed and those are going to

21    survive, Your Honor.  I'm not saying those warrants prevail

22    because of good faith.  I'm saying they prevail because of the

23    core, raw probable cause in each and every one of them.

24         And, Your Honor, for the first warrant, which

25    admittedly has less corroboration, because they hadn't

1    gone and -- let me back up.

2          The first warrant for the residence, Your Honor, by

3    Klamath Falls PD, that has less corroboration, because they

4    haven't gotten in the house.  The victim is actually named in

5    there.  Her name is set forth.  Her identity is known.  Her date

6    of birth is provided.  So you have that detailed information.

7          Your Honor, the probable cause set forth far exceeds

8    the required standard of a fair probability.  And what we have to

9    show is there is a fair probability that a crime was committed

10   and that evidence would be located, evidence could be located in

11   these locations.  And what we have here, Judge, is the crime, the

12   criminal conduct here was very expansive.  So the evidence the

13   Government is looking for is expansive as well.

14         The defense takes a much narrower focus, you know,

15   could the -- where would the taser have been, was this already

16   found.

17         Judge, evidence can be a button, it can be an earring,

18   it can be a fiber, it can be a single strand of hair, it can be a

19   semen stain, it can be blood that was transferred, DNA that was

20   dropped, it can be a piece of paper in his wallet, it can be a

21   receipt, it can be a credit card purchase for $70 of coffee, it

22   can be -- it can be deleted videos on his iCloud, it can be text

23   messages.  Evidence -- the evidence that the FBI was looking for

24   was expansive.  They had probable cause, strong probable cause,

25   not just of the crimes, but that lots of evidence was everywhere.

1          I know the defense says it's sort of a scattershot

2     approach.  Your Honor, if we found a houseboat on Klamath Lake

3     associated with Mr. Zuberi tomorrow, we would be writing a

4     warrant for that, and if we could associate him to that, that

5     warrant would be getting signed just on what we knew back then,

6     not even on what we know right now.

7          It is the defense burden.  They do have to make a

8     substantial showing.  Your Honor, none of these are material.

9     These can all be added or cut.

10          We can't speculate as to recklessness.  This isn't a

11     fishing expedition.  I know they said they're just trying to get

12     a hearing, but *Franks* isn't an opportunity to flyspeck the

13     affidavit, it's not an opportunity to get the agent on the stand

14     and see if what is a mistake can be kind of portrayed as

15     recklessness.

16          And, Judge, I think the defense -- I'm not going to

17     address each of them.  The defense raises 15 main challenges.

18     Briefly, I'd like to split them into three categories.  First,

19     there's a whole group of them.  They're not *Franks*.  They're

20     really sufficiency of probable cause.  They're complaining about

21     inculpatory information, which is not included, and they're

22     saying that that constitutes an omission.

23          If we don't include the "Operation Take Over" note or

24     the handcuffs found next to the cell, we just don't get to use

25     it.  That's not an omission by the affiant.  So a group of those,

1   Your Honor, they're simply not *Franks* and they don't have a place

2   in a *Franks* hearing.

3           Then there are others that, I'm sorry, they're wrong or

4   they're irrelevant.  And that jail call, Your Honor, here's a big

5   thing about that jail call.  Not only can the Court listen to

6   it -- and I do think before the Court would make a ruling on

7   listening to it, I think the Court would need to back up and

8   listen to it earlier, because it starts talking about a financial

9   account and then it switches to what we later know is the

10  trailer.  There is a brief mention of Chime and then Mr. Zuberi

11  talks about a passport.

12          Here's the thing, Judge.  There is no interpretation

13  that was required by the affiant, because what the FBI did with

14  that jail call is they called AAA Discount Storage and they --

15  who said Mr. Zuberi rents Space RV-106 at our storage facility,

16  and his code is, in fact, the code that the Court just heard,

17  star 2153 pound.

18          So there's no mystery.  There's no interpretation.

19  There's no subjective intent.  That's simply wrong to say that

20  that's relying on the affiant's subjective intent.

21          The affiant's training and experience is relevant, but

22  it's completely logical.  When he's talking about, "I have

23  probable cause to believe evidence can be transferred," Judge, it

24  is no mystery that blood, semen, DNA, can be dragged with clothes

25  or from a person and transported to another place.  This -- this

1    is not some obscure, arcane science that we're asking the affiant

2    to -- that we're relying heavily on the affiant's experience.

3            The final thing, Your Honor, is I do want to talk -- I

4    do want to talk about the errors.  I have to make -- I have to

5    make a correction, Your Honor, because in here, I said that

6    regarding a Honda Pilot search warrant, the reviewing magistrate,

7    not only did he have what Special Agent Gluesenkamp wrote out

8    about "Operation Take Over", that the magistrate could have

9    looked at the photos themselves.  That was incorrect, Judge.  The

10   photos of those notes were actually in a seized digital device

11   warrant.  They're also in our -- they're also in our responses,

12   but that reviewing magistrate didn't have those.  That was an

13   error.  I apologize for that.

14           Errors do happen, Your Honor.  This is a broad,

15   expansive, fast-moving investigation.  And I know it's easy to

16   say go back in time and look at something that you already did.

17   Judge, there's a reason that if there's a mistake in the law on

18   this *Franks* response, probably three responses ago and three

19   responses from now, those same errors might be in there, because

20   we do use "go bys."  We use what we did before.  And an

21   investigation is looking forward.  There's new information about

22   victims.  There is a lot happening here fast.

23           These weren't the only search warrants being done.

24   These are the only search warrants being challenged.  There are

25   other search warrants that were happening.  There was a lot of

1    investigative activity that was going on.

2            I'm nearing the end, Your Honor, but I do want to

3    say --

4            THE COURT:  Slow down just a little bit for our court

5    reporter, though, Mr. Sweet.

6            MR. SWEET:  Yeah.  I will, Your Honor.  I -- I

7    appreciate that, as does she, I'm sure.

8            Your Honor, in the seized digital device affidavit,

9    Special Agent Gluesenkamp went to pains to not just correct, but

10   in most cases explain, "This is how this happened.  This is what

11   I was told.  I wrote it down.  It was wrong."  In multiple

12   situations, he explains how it was that those errors happened.

13   So we have that information.

14           Your Honor, the fact that Judge Clarke signed those is

15   relevant in two ways.  One, it's -- it is relevant to

16   materiality, but this detailed correction and explanation, it

17   also goes to whether this is a mistake or whether it's

18   recklessness, because the affiant went to pains.  It is a couple

19   pages of setting forth this information, Your Honor.  So there

20   is -- there was no deliberate there -- omission.  There was no

21   reckless inclusion.

22           Were there mistakes?  Yes.  And, frankly, Your Honor,

23   some of the mistakes were complicated.  One of the mistakes --

24   one of the things that was intended to be included was something

25   that turned out to be wrong.

1          THE COURT:  Right.

2          MR. SWEET:  And, Judge, once it's actually spelled out

3     and explained, it's much stronger than what was originally going

4     to be there, because the information was -- in one of the things

5     was AV-2 initially said that it was somebody else that kidnapped

6     her, because she was so terrified of Mr. Zuberi and what he would

7     do to her and her family, that she lied to the hospital staff.

8     Judge, once all that is laid out, it is even stronger.

9          So, Your Honor --

10         THE COURT:  Let me ask.  Adult Victim 2, there is a lot

11    of focus on information about her that was not included.  In my

12    mind, and I just want to know your thoughts, that all of the

13    information about Adult Victim 2 could be excised and we would

14    still have a basic set of core probable cause, as you've referred

15    to that as.

16         MR. SWEET:  Absolutely, Your Honor.  Absolutely.  The

17    core investigation at this stage was on Adult Victim 1, who had

18    just been kidnapped, just escaped.  Information was developing.

19    They did make a connection to a two-month older investigation.

20    It is -- it is relevant.  They included some information on it.

21         THE COURT:  But is there anything about their

22    interaction with Adult Victim 2 that led them to a specific

23    warrant?

24         MR. SWEET:  No, Your Honor.  Every -- everything from

25    the -- everything from the -- she's not included in the Klamath

1    Falls house warrant, but the -- the follow-up search warrant for

2    the Altima, the house, the Honda Pilot, the historical geo,

3    digital devices, no, Your Honor, like, you -- she could be cut

4    from the probable cause determination completely, and just based

5    on what we have, not only would they get approved, those warrants

6    were all being -- all of those warrants had an interstate

7    kidnapping, which is for AV-1, Judge, every single one of them.

8          So, yes, you'll see sometimes an Attachment B

9    information relating to AV-2 or hate crime, but the core of the

10   warrants, all of them, is focused on AV-2.

11         THE COURT:  Okay.

12         MR. SWEET:  And so because of that, Your Honor, it

13   isn't material.  The defense hasn't met their burden, they

14   haven't made a showing of recklessness.  There is information

15   before the Court in the record as to how these mistakes happened.

16   And that's what they are:  they're mistakes.

17         I'm happy to address any questions that the Court has,

18   otherwise, we'd ask the Court --

19         THE COURT:  Just to clarify for the record, I don't

20   know if -- I was looking for it.  Maybe it's an exhibit that I

21   did not see, but there is a focus at one point on the criminal

22   history of Adult Victim 1.  I would think generally that would be

23   irrelevant to a probable cause finding unless there's something

24   remarkable in that criminal history.  Is the criminal history in

25   the record?

1          MR. SWEET:  It is, Your Honor.  That is in a sealed

2    supplement to the *Franks* response, Your Honor.  And it is with a

3    few other things.  I can -- I can hand a copy to the Court,

4    because her criminal history -- which is very limited and

5    really mainly juvenile --

6          THE COURT:  I mean, unless it includes filing a false

7    police report or something like that, I don't know if I need to

8    hear much more, but from what I understand, it is pretty benign

9    and (pause) --

10          MR. SWEET:  Yes, Your Honor.  And I do just want to

11    confirm that the Court has the sealed response to the *Franks.*

12    And I don't want to put the Court --

13          THE COURT:  I do.  I do.

14          MR. SWEET:  Okay.  Yes, Your Honor.  Then that's on

15    page 2 at the top, very limited.  It's not a perjury, it's not a

16    false information.  And given her status, given the overwhelming

17    information in the investigation, we believe that it is

18    immaterial and it's -- if the Court has any other questions, I'm

19    happy to address them, but we believe they haven't met their

20    burden and the motion should be denied.

21          THE COURT:  All right.  Thank you.

22          Any reply?

23          MS. POTTER:  Just very briefly, Your Honor.  The first

24    thing I want to just address, which is actually not relevant to

25    *Franks*, but it's come up repeatedly and I think it's very

1    important to Mr. Zuberi, is the question of the use of the child

2    during the arrest.  We will eventually get there I think probably

3    in the next round of motions when we move to exclude, but just

4    for the record, he was not using his son as a human shield.  He

5    was not trying to put his son in danger.  And I just want to

6    table that, but it's important for Mr. Zuberi to --

7         THE COURT:  I did not understand the presence of his

8    child was such that he was using his child as a hostage.  That

9    wasn't my reading of the facts.

10        MS. POTTER:  Okay.

11        THE COURT:  Maybe other facts will come out.  I think

12   there's always a concern when a child is present, but I think

13   that's as far as it went.

14        MS. POTTER:  Okay.  I just wanted to put that on the

15   record, Your Honor.

16        So we do have the burden, but we don't have to show

17   clear proof.  And, again, all we're asking for is a hearing.  We

18   do not have to prove that there's no probable cause.

19        There was a lot of argument about the probable cause,

20   and my motion goes into it, too, because there are different

21   things that the warrants are searching for.  I acknowledge that

22   the warrant for the house is going to be very, very difficult.  I

23   think when you get to the Altima, you know, the discussion of

24   AV-2, specifically the Altima warrant references the possibility

25   that AV-2's biological material could be in the Altima.  There's

1    a lot more conjecture about the Altima because of -- we'll get to

2    this.  So I'm not going to fully address our arguments on

3    probable cause, because we're going to put a pin on that and do

4    it after the witnesses, but it is important for purposes of the

5    *Franks* hearing that each warrant stand alone, not be seen as the

6    entire investigation, and there are differences.  And I believe

7    we have shown that there are material omissions or mistakes in at

8    least some of those warrants, and we're entitled to a *Franks*

9    hearing.

10         I think -- I'm just looking to make sure there's

11    nothing else.  If there's nothing else, Your Honor, we would

12    submit on our briefs.

13         THE COURT:  No.  I mean, I agree with you.  There were

14    some mistakes, but in seeking a *Franks* hearing, you are required

15    to make a substantial showing that the affiant intentionally or

16    recklessly made a false or misleading statement or omissions in

17    seeking the warrant, and you must show the false or misleading

18    statements or omissions were material to a finding of probable

19    cause.

20         Before I go through the specifics that you raise, I

21    would say, you know, there is a set of what the Government refers

22    to as core facts here that are really not in dispute that are

23    consistent throughout the warrants, and those are the fact that a

24    woman escaped from a house belonging to Mr. Zuberi, identified

25    Mr. Zuberi, Mr. Zuberi is associated with the house, with certain

1   cars, with certain trailers, and the scope of the basic crime of

2   kidnapping and sexual assault are such that it would be

3   reasonable to search every single vehicle, trailer, residence

4   associated with Mr. Zuberi, and that's what occurred here.

5          I think there was a lot of additional information that

6   was coming in quickly, and certainly the law enforcement learned

7   about Adult Victim 2 and her allegations, which added to the

8   probable cause, but also added to almost the certainty in all of

9   these kinds of investigations that certain mistakes in

10  representing facts will happen.

11         Some of the mistakes are simply, you know,

12  miscommunications between, for instance, Adult Victim 2 and

13  perhaps the law enforcement officer who'd been interviewing her,

14  and then information is then passed on to the law enforcement

15  officers getting the warrants in this case, and those kinds of

16  mistakes are understandable, but they're not necessarily

17  intentional.  They can be unfortunate, but they aren't

18  necessarily material.

19         So if we look at the specific areas where there is a

20  complaint, there are five warrants, at least, issued in this

21  case.  They certainly include the July 16th, 2024, Klamath police

22  request for a warrant to search the home.  There's the July 18th,

23  2024, request by the FBI for a warrant to search the home again.

24  There's the search warrant for the Nissan Altima, the search

25  warrant for the trailer, the search warrant for the cellphone

1   data.

2           There are certain mistakes that -- that do flow through

3   each warrant, but, again, none of them appear to be intentional

4   or purposely misleading.

5           One of the first areas that the defense raises is that

6   Adult Victim 1's criminal history is not included in the

7   affidavits.  The defense provides no information that would

8   suggest Adult Victim 1's criminal history is tied to her capacity

9   for truth telling.  Even when included in the later affidavits,

10  Judge Clarke approved the warrants.

11          The fact that law enforcement began to include Adult

12  Victim 1's criminal history as the case developed shows that they

13  were not acting in bad faith, that they were trying to get all

14  information necessary to the court.  And the fact that Judge

15  Clarke, when made aware of the criminal history, found probable

16  cause in later warrants shows that the information was not

17  material to a finding of probable cause.

18          Then there are inaccuracies regarding observations of

19  Adult Victim 1 regarding body armor and police badges.  Somehow

20  some information came to the affiants that she had -- Adult

21  Victim 1 had seen body armor, police badges.  There was certainly

22  statements made by Adult Victim 1 that the defendant purported to

23  be a police officer, but this does not rise to the level of

24  intentional or reckless statements.  It's simply a mistake.

25          When removed in later affidavits, probable cause was

1　still found.  It was not material to a finding of probable cause.

2　　　　There is a specific focus on evidence of the presence

3　of an identification of a deceased person found in the home.  I

4　mean, this evidence has no material bearing on the finding of

5　probable cause.  To be honest, it really doesn't add anything to

6　any case that's being investigated.  I don't think it implies

7　very much.  Certainly it does not, I think, imply what the

8　defense would suggest, is that somehow Judge Clarke would be led

9　to believe that Mr. Zuberi had murdered the person whose ID this

10　belonged to.  This was later dropped from affidavits, and I

11　think, again, that shows that the police were honing in on, you

12　know, continuing to do their best in good faith to get only

13　material evidence to Judge Clarke.

14　　　　There is a focus on a failure to explain by, I think in

15　this case, the FBI why previous searches were not sufficient

16　in -- with respect to evidence found in the house or the vehicle.

17　　　　I think given the nature of this investigation, the

18　ongoing nature of the investigation, it would not be unusual for

19　the federal law enforcement officials to seek their own warrant,

20　to continue to search for some of the minutia of evidence that

21　may not always be apparent on an initial search by local law

22　enforcement.

23　　　　I think at this point, they had more information and I

24　think -- I think it would have been incompetence had they not

25　gone back and done a further search.  And clearly if Judge Clarke

1    had felt that, you know, the rights of the homeowner were being

2    violated by repeated searches of the home, he could have stopped

3    that second search from occurring, but obviously Judge Clarke

4    continued to find there was probable cause to get into the home,

5    and I believe the car as well, and allow the FBI to do their job.

6          There's a focus on inconsistencies in Adult Victim 2's

7    report to law enforcement as well as the failure to include Adult

8    Victim 2's mental health issues.

9          Again, when these inconsistencies were found, they

10    were -- they were excluded from later warrants where that

11    information, you know, was not present, and the probable cause

12    was still found, but really the core of this, I just don't think

13    any of the information involving Adult Victim 2 really adds to

14    that -- you know, the core crime involving Adult Victim 1 that's

15    being immediately investigated.  All of the information as to

16    Adult Victim 2 could be excised from the affidavits, and the

17    information surrounding Adult Victim 1 would be enough to support

18    probable cause in all of the warrants.

19          The rest of the alleged deficiencies seem to focus on

20    law enforcement's assessment of the evidence.  For instance, the

21    officers draw the conclusion that the Altima was abandoned and

22    that Mr. Zuberi would have access to the Altima and that items

23    could have been placed in the Altima by Mr. Zuberi.

24          I mean, that seems like a pretty reasonable assumption

25    given the nature of this case, given the fact that Mr. Zuberi's,

1    I believe, wife was meeting him in that vehicle, was lying to the

2    police about where he was.  That vehicle is a very key piece

3    of -- of the investigation, and it would be incompetence, quite

4    frankly, for law enforcement not to search that vehicle.  I think

5    it would have been shocking if they had not searched a vehicle,

6    not just associated with -- it wasn't, like, you know, parked in

7    another state.  It's -- it's kind of being used in the -- what

8    appears to be the flight to some degree of -- of Mr. Zuberi.

9         You know, the fact that they did not mention in a phone

10   call he talked about a bank account, I really don't know the

11   relevance of that.  He also talked about a trailer code, and that

12   part was significant for them to search the vehicle associated --

13   or a trailer associated with Mr. Zuberi.

14        So the defense has not met their burden in showing that

15   these were intentional or reckless omissions or inclusions in the

16   affidavit.  They have not shown that any of these omissions or

17   mistakes with regard to facts were material to a finding of

18   probable cause.  So I am denying the motion to hold a *Franks*

19   hearing.

20        Is there any other areas where the parties want me to

21   be more specific as to my findings?

22        MR. SWEET:  Thanks, Your Honor.  Two small things.

23   One, when the Court went through the list of search warrants, one

24   of the ones that was challenged was also the Honda Pilot, which

25   was reviewed by --

1          THE COURT:  Yes.

2          MR. SWEET:  I just wanted to make sure that was added

3    to the list.

4          THE COURT:  Thank you.  Thank you for clarifying that.

5          MR. SWEET:  Thank you, Your Honor.  And then the -- and

6    then the other one was when the Court discussed the information

7    regarding Adult Victim 2, the mental health and inconsistencies,

8    I may have misheard the Court.  I think the Court may have said

9    that information was maybe removed from future affidavits, but

10   the correcting information was added --

11         THE COURT:  Yes.

12         MR. SWEET:  -- to future affidavits.

13         THE COURT:  I think that's what I meant to say from my

14   notes, but even my notes were confusing me a little bit there.

15         MR. SWEET:  Thank you, Your Honor.

16         THE COURT:  All right.  Anything from the defense?

17         MS. POTTER:  Yes.  Just one moment, Your Honor.  Well,

18   one thing.  I want to clarify that the code is a gate code.

19   It's -- there's no code to the trailer.  It's the gate to the

20   storage unit.

21         THE COURT:  Yes.

22         MS. POTTER:  I believe the Court may have said 2024.

23   It's actually 2023.

24         And we would just put on the record that AV-2's

25   criminal history is important, because that could come in in

1    trial in terms of AV-2's -- all that could come in at trial.  I

2    know the Court's already made a finding.  We're just putting that

3    on the record.

4            THE COURT:  Okay.  I mean, it may or may not come in at

5    trial, but admissibility is not necessarily the key to probable

6    cause, so (pause) --

7            MS. POTTER:  I understand, Your Honor.

8            THE COURT:  All right.  So where are we going to -- I

9    believe the next item on the agenda put forth by the parties was

10   maybe the motion to suppress the Altima?

11           MS. POTTER:  Yes, Your Honor, that is what we intended

12   to (pause) --

13                    **DEFENDANT'S MOTION TO SUPPRESS**

14           THE COURT:  Any preliminary statements before we start

15   hearing from witnesses?

16           MS. POTTER:  Not from the defense, Your Honor.

17           MS. MILES:  Yes, Your Honor.

18           THE COURT:  Okay.

19           MS. MILES:  I think, as with most Fourth Amendment

20   issues, this one can be kind of a "choose your own adventure."

21   So there's multiple ways that the Court can rule on this motion,

22   so I just thought we could walk through those before we put the

23   witnesses on.

24           THE COURT:  Okay.

25           MS. MILES:  The first and easiest way that the Court

1    can deny this motion is by relying on the search warrant alone.

2    The search warrant provided probable cause to search this Altima.

3    It established sufficient facts.  Your Honor has already reviewed

4    many of them.  At core, it's that the Altima was registered to

5    the defendant, that Ms. Westfall lived in the home with the

6    defendant, that that home was the locus of his crimes here.

7    Ms. Westfall had access to that Altima and was seen using it that

8    day.  And then you add on to that -- so that gives him access to

9    begin with, and then you add on to that the fact that she used

10   that car to meet him in what ultimately was the flight to Reno,

11   as well as her false statements to police indicating that she was

12   aiding him in fleeing, all of that provides probable cause.  And

13   so with the sufficiency of that warrant, that provides probable

14   cause to search the car.

15            And under *Segura*, the police are enabled to seize a

16   vehicle for a reasonable amount of time in order to obtain a

17   warrant, and that's exactly what they did here.  And so that

18   would be sufficient grounds to deny the warrant there.

19            The secondary grounds that this Court can look at is

20   that all of this could have been justified under the automobile

21   exception even if we put the warrant aside.  And that actually

22   includes quite a few facts that were not contained in the

23   warrant, which sufficiently, I mean, it bolsters PC quite a bit.

24   And so that's where we're going to have a witness testifying --

25            THE COURT:  Okay.

1          MS. MILES:  -- and I think that we can go into that

2     now.

3          And then just thirdly, even if neither of those things

4     was enough, then I do think that there's enough on the record or

5     here for the Court to consider inevitable discovery as a backup

6     argument.

7          THE COURT:  Okay.

8          MS. MILES:  So I think with that and that framing, it

9     makes sense for us to go into the evidentiary portion of this and

10    call the witnesses.

11         THE COURT:  Okay.  If you'd like to call your first --

12    actually, we're going to take a five-minute break, if that's

13    okay.  We'll be in recess for five minutes.

14         (Recess:  9:53 - 9:59)

15         THE COURT:  Okay.  First witness, then, for the

16    Government.

17         MR. BOCCATO:  The Government calls Detective Sergeant

18    Chris Zupan.

19         THE COURT:  Okay.  Sir, if you'd like to step up to the

20    witness stand.  Over here.  It's a little bit of a maze.  The

21    first test is just to make it to the witness stand through all

22    the stuff here.

23         Go ahead and step on up.  And if you'd raise your right

24    hand.

25    /////

1                          **CHRIS ZUPAN**

2       after having been duly sworn under oath, was examined and

3                          testified as follows:

4              THE COURT:  Go ahead and have a seat.  Our court

5    reporter is remote, so we just are trying to remind people to

6    speak up, speak slowly, and speak into the microphone.

7              If you could start by stating your first and last name,

8    spelling both for us.

9              THE WITNESS:  Chris Zupan; C-H-R-I-S, last name, Zupan,

10   Z-U-P-A-N.

11             THE COURT:  Thank you, Detective Sergeant.

12                       **DIRECT EXAMINATION**

13   BY MR. BOCCATO:

14   Q.   Detective Sergeant Chris Zupan, where do you work?

15   A.   Klamath Falls Police Department.

16   Q.   How long have you worked for Klamath Falls?

17   A.   Approximately 27 years.  Well, eight years with the County

18   and then the rest with the City.

19   Q.   And what's your current job responsibilities with Klamath

20   Falls?

21   A.   I oversee our detective division.

22   Q.   And how long have you been doing that?

23   A.   Approximately two and a half years.

24   Q.   And were you overseeing the detective division at the time

25   of this case?

1  A.  Yes, I was.

2  Q.  All right.  Before becoming a detective sergeant, what other

3  responsibilities have you had with Klamath Falls?

4  A.  I've worked -- spent about ten years of my career working

5  narcotics, supervising the narcotics team.  I was a patrol

6  sergeant.  I worked street crimes, worked gang task force,

7  regular patrol, marine patrol.  I think that's about it.

8  Q.  And then when you were working for the County, what were

9  your job responsibilities there?

10  A.  I was a patrol deputy, a marine deputy, and a -- worked for

11  the narcotics task force there as well.

12  Q.  What kind of training generally did you receive to become a

13  law enforcement officer?

14  A.  Basic police academy.  At the time I went, it was eight

15  weeks long.  And then through the last 27 years, I've got over

16  3,000 documented hours through DPSST in regards to

17  investigations, everything from minor harassment investigations

18  to large level homicide investigations.

19  Q.  And before you became a law enforcement officer, what did

20  you do?

21  A.  I spent four years in the United States Marine Corps.

22  Q.  When did you first become involved in this case?

23  A.  July 15th of 2023.

24  Q.  How did you get involved, a phone call or dispatch?

25  A.  Phone call.

1   Q.   Tell me a little bit about that.

2   A.   I was at home, and received a phone call from Trahern Fox,

3   one of our patrol sergeants, explaining to me that they had a

4   female at the hospital who had -- was alleging had been kidnapped

5   and raped; asked for the assistance from our detective division,

6   at which time I contacted Detective Loudermilk to be the lead on

7   the investigation and asked him to contact Sergeant Fox to see

8   what they needed.

9   Q.   What did you do then?

10  A.   Stood by and answered phone calls from detectives and

11  Sergeant Fox, who was updating me.

12  Q.   At some point did you respond out to the call?

13  A.   Yes, I did.  After Detective Loudermilk got out there, made

14  it up to the hospital and began some interviews, then started

15  working the investigation, he contacted me and let me know that

16  they were starting to corroborate some of the stuff that the

17  female was saying.  So at that time, I contacted another -- who

18  was actually our school resource officer, but he also helps with

19  the detective division, as he spent six years with San Diego

20  Police Department as a detective as well.  I called him out to

21  assist and then I also came out.

22  Q.   Where did -- so where did you go out to initially?

23  A.   Initially I went to the police department, if I recall.

24  Q.   Okay.  And what did you learn upon arriving at the police

25  department?

1   A.   So once I got to the police department, I contacted Oregon

2   State Police and asked if they would also assist in the

3   investigation just because of the multitude of trying to get

4   people interviewed, finding locations.  So I got some assistance

5   from Brendan Doherty from the Oregon State Police.

6         We set up a command post at the police department,

7   which upstairs, we have a -- what we call as the major crime team

8   room.  It consists of a long table, chairs all the way around,

9   multiple computers, TV screens, white boards, just an area where

10   we've got a centralized location where information can be shared

11   and called in to.

12         At that time, I asked Detective Young -- or asked the

13   individuals at the hospital, after I received the information

14   that this female had been kidnapped out of Seattle and brought

15   down to Klamath Falls, for them to transport her back to the

16   police department for another interview.

17   Q.   Did you ever go out and meet with the victim yourself?

18   A.   I did once she arrived at the police department.

19   Q.   Did you sit in to a portion of that interview?

20   A.   Yes, I did.

21   Q.   Tell me roughly what you learned at that point in time so

22   far.

23   A.   So I met the female at the front interview lobby, interview

24   room at the police department, along with Tyler Young, the

25   detective I spoke of earlier.  Adult Victim 1 -- yeah.  Adult

1    Victim 1 started explaining to us that she was a prostitute up in

2    the Seattle area and had been working the night of, I believe it

3    was, July 14th at the time. She met an individual, pulled up,

4    and agreed to give him full service, which consisted of oral and

5    sexual acts in trade for money.

6    Q. And just as you kind of go through this, your testimony,

7    when you talk about Adult Victim 1, please refer to her as just

8    Adult Victim 1 or AV-1, if that's okay.

9    A. Yes, sir.

10    Q. All right. So continue on.

11    A. So AV-1 asked the individual if they wanted to go to a hotel

12    or a -- or stay in a vehicle, which at the time, they determined

13    to stay in the vehicle. They drove around the corner. She

14    performed sexual acts on him in return for money. The individual

15    gave her money and then advised her he was an undercover police

16    officer and she was -- he was involved in a sting, advised her

17    that he was going to take her to a holding facility somewhere --

18          THE COURT: Can I have you slow down just a little bit

19    for our court reporter and for my note-taking?

20          THE WITNESS: Yes, Your Honor.

21          The -- he then took her in the vehicle, placed the

22    money in her purse, asked her to get in the back of the vehicle,

23    and they began driving southbound.

24          At one point in time, he asked her to lay down in the

25    vehicle, I don't recall exactly what time, but they continued

1 southbound. There was conversation along the way. He had made

2 several statements at the time he had a taser. She had seen a

3 gun at one point in time. He had made multiple statements that

4 he was doing an undercover, he was going to take her to a

5 location where she was going to be locked up, and then possibly

6 free to leave at some point once they process her.

7 She said she cooperated on the way. They continued to

8 drive. Once they got to Olympia, they stopped, where I believe

9 somebody got out and went to the restroom.

10 They continued southbound until approximately two hours

11 and four minutes away from Klamath Falls. In the midst of that

12 other six hours, she said there was just a lot of conversation,

13 her trying to calm him down, her in the back of the vehicle

14 handcuffed and restrained.

15 Once they receive -- the two hours and four minutes

16 away from Klamath Falls, she knew this because they pulled over

17 on the side of the road, where the male told her that he needed

18 to use the restroom. So he pulled off to the side of the road,

19 and during that time, his cellphone was on and she was able to

20 look over and see that it said two hours and four minutes until

21 the destination of the arrival.

22 So the male exited the vehicle, got out, went to the

23 bathroom. He then asked her to perform oral sex again on him and

24 then asked for -- or told her to bend over so that he could then

25 perform sexual acts on her. She advised that he tried to stick

1    it in her anus, and she asked him, "No, no."  He then put his

2    penis in her vagina and raped her a second time, or -- once they

3    were done, she finished, got back into the vehicle, and they

4    continued southbound.

5    Q.    So just to clarify, the two hours and four minutes from

6    Klamath Falls, approximately where would that be?

7    A.    Based on GPS and the research we did, it would have been

8    around Oakridge, Oregon.

9    Q.    So what happened next based on what she told you?

10    A.    I would like to back up, if I might.  One of the big things

11    was when they were in Seattle, the condom had broken during their

12    first sexual act.  There was some talk about if she had STDs or

13    whatnot.  And she cleaned herself up with a towel that the

14    individual gave her to clean up with, the semen that was left

15    inside of her.

16    So they continued on southbound from what we believe

17    was the area of Oakridge, Oregon, until she advised the male that

18    she needed to use the restroom.  So she remembered pulling

19    into -- he had asked her to get in the backseat and cover up with

20    a blanket, but when they pulled into the parking lot, she

21    recalled looking at -- up and seeing a Love's sign, like a Love's

22    truck stop sign, which is just north of Klamath -- on the

23    outskirts of Klamath Falls.

24    Once she was there, she never was able to get out and

25    go to the restroom.  They were there for a short period of time,

1    and then they continued to another location.

2              AV-1 said that they traveled for anywhere from five to

3    ten more minutes and arrived at a residence.  The male handcuffed

4    her to a metal object inside of the car and put a -- prior to --

5    sorry.  Prior to leaving Love's, he had given her some clothes to

6    put on, and one of which was a hooded sweatshirt that he asked

7    her to put on backwards so that the hood would then cover her

8    face.

9              She had the hood on backwards.  And he had went into

10   the house, came back out, they pulled into a garage.  She

11   recognized it as a garage.  He took her out of the vehicle and

12   placed her into what she called was -- was a cell in the -- in

13   the garage.

14   Q.   Did she explain that she -- like, the vehicle pulled into

15   the garage?

16   A.   Yes.

17   Q.   Did she talk about -- tell you or any other officers how she

18   was restrained while in the vehicle?

19   A.   Yes.  She -- she had standardized -- what she described to

20   us were standardized leg irons and handcuffs.

21   Q.   Can you describe her size and stature a little bit?

22   A.   Yeah.  AV-1's extremely tiny; probably 5-foot-4, maybe a

23   hundred pounds.

24             THE COURT:  Could you clarify?  I mean, you said leg

25   irons and handcuffs throughout this -- this whole episode, during

1   some of these sexual encounters?  Do you --

2          THE WITNESS:  If I recall without looking at my report,

3   she was in leg irons and handcuffs during the trip from Seattle

4   to Klamath Falls.

5          THE COURT:  Okay.  Thank you.

6          THE WITNESS:  In her belief, she was under arrest from

7   the initial time he said it was an undercover sting.

8   BY MR. BOCCATO:

9   Q.   Did she ever describe a taser or anything like that?

10  A.   She did.  She described it as a black taser with maybe a

11  little yellow on it.  Other things she also described was that he

12  had made mention that her cell -- he had wrapped her cellphone in

13  foil so that it would get no reception.  She also said there

14  was -- and there was talk of a device where he said her cellphone

15  won't work because there's a jamming device, and she recalled

16  seeing some type of an object with several antennas coming off of

17  it which would block cellphone reception.

18  Q.   So what happened after AV-1 got to the cell?

19  A.   AV-1 was placed into a cell.  She was told that she would

20  just be there for a little while.  The male individual left her

21  in the cell, then came back.

22          She was complaining because of how hot it was in there.

23  She said that it was, like -- what she told us, it was, like,

24  95 degrees in there.  Mind you, this is midsummer in Klamath

25  Falls.

1     He brought her a bottle of water and a blanket for

2  being in there, because it was hot, because she complained of it

3  being hot, and then at one point told her she was going to be in

4  there a little while and she should probably just take a nap, and

5  locked the door -- locked -- locked both doors, leaving her

6  locked inside of the cell.

7  Q.   Did she describe the structure of the cell or what it looked

8  like?

9  A.   Yes, she did.  She said that there was white walls, there

10  was a white chair inside the cell, a bottle of water, a fan, a

11  light hanging from the -- one single light bulb hanging from the

12  top of the cell.  There was a security-type door on the inside

13  with no door handle on it.

14     She described him initially trying to lock the door and

15  was unable to, so he grabbed a drill from somewhere -- left and

16  came back with a drill and fixed the locking mechanism or the

17  part of the door jam so that he could get it locked.  She

18  described him locking it with a set of keys, which there were

19  several keys on a key ring, and then closing the outward door on

20  top of that one.

21  Q.   Did she describe what she did once she got in the cell?

22  A.   Yes.  She initially said she was in panic.  She hadn't made

23  a lot of noise initially until after she had fallen asleep and

24  taken a nap.  When she woke up, she explained to us that reality

25  had set in to her that she was being kidnapped, and she began

1    yelling and screaming and beating on the door trying to get out.

2    Q.    How -- was she ever able to get out?

3    A.    Yes, she was.

4    Q.    How did she describe to you how she was able to get out?

5    A.    So I'll further explain the entrance and exit into this

6    concrete structure.  If I were to describe it as the Number 1

7    side being where the door was, which faced the garage door, it

8    was on the -- the left side of the garage.  It's an outward

9    opening from left to right wooden door with, like, a plastic

10   plexiglas window in it covered in foam and some type of material.

11           So once that swung open, the inward door, she described

12   it as a metal security screen door, which is approximately half

13   an inch to an inch square metal tubing standardized slats going

14   up and down and then two slats in the middle approximately six to

15   eight inches apart, which is covered in a metal mesh, metal

16   screen.

17           She said she started punching through the slats towards

18   the metal mesh and continued to punch it and punch it until it

19   finally -- she realized it broke loose, which gave her hope to

20   maybe get out of there.  She had tried pulling on the bottom of

21   the door.  That didn't work, but once the screen broke loose, she

22   was able to fold it down, and then started punching on the

23   outward door and ripping the foam off of it until that finally

24   broke open, and then she crawled through the small horizontal

25   slat that was in the screen door.

1    Q.    I'm going to show you what's been marked as Government's

2    Exhibit Number 10.  Can you identify that for me?  And I can hand

3    you a paper copy as well.

4    A.    That's good enough.  That's AV-1's right hand.

5    Q.    AV-1.

6    A.    I'm sorry.  AV-1's right hand.

7    Q.    All right.  What did that picture --

8          THE COURT:  I will ask the court reporter to strike the

9    name of AV-1 from any transcript.

10         MR. BOCCATO:  Thank you, Your Honor.

11   Q.    What did that picture show to you or demonstrate to you?

12   A.    It --

13   Q.    What does this picture (pause) --

14   A.    It showed me all the skin pulled off of her knuckles, the

15   bruising, and dried blood.  If somebody were to be holding a fist

16   and punching, the damage would be done to those knuckles, which

17   is consistent with what the mesh of the screen door would have

18   done if somebody would have been punching it.

19   Q.    What did (pause) -- and did you see her knuckles when you

20   were in her -- her hands when you were physically meeting with

21   her?

22   A.    Yes, I did.

23   Q.    So what (pause) -- and is this same picture, is this -- is

24   this picture a fair and accurate depiction of what you saw that

25   day?

1   A.   Yes, it is.

2   Q.   So -- and I'm not sure exactly where I interrupted you, so I

3   apologize, but after she was able to punch through, what happened

4   next?

5   A.   So once the door was open, she realized that she was in the

6   garage.  She recognized the vehicle that she had been transported

7   in was still in the -- parked inside the garage.  She got inside

8   of the vehicle and noticed contents of her purse laying in there,

9   and then remembered that the individual had a gun.  She looked

10  through and found the gun on the floorboard, grabbed the gun, and

11  then exited through the man door of that garage that led to a

12  front courtyard.

13       Once she was in the front courtyard, she described

14  jumping a five to six-foot wooden fence, landing in the driveway

15  of the residence, where there was -- she recalled seeing a white

16  four-door vehicle, and then ran out to the street and started

17  screaming and yelling for help before a female -- the first

18  vehicle that pulled by was an older female, who picked her up and

19  transported her out of the area.

20  Q.   And I may have missed it.  How did she describe -- AV-1, how

21  did she describe getting out -- getting through the white door?

22  A.   The man door in the garage?

23  Q.   Not the man door in the garage, but there were two doors in

24  the cell.

25  A.   I apologize.  She -- so once she was able to remove the

1   screening from the metal security door, she was punching just

2   through the slats at the white outward door.  I don't recall

3   whether she kicked it.  I just remember her saying she was

4   hitting it and pounding on it until it finally broke -- broke

5   loose.

6   Q.   All right.  I'm showing you what's been marked as

7   Government's Exhibit 11.  Can you identify this exhibit for me?

8   A.   Yes.  That's the residence on Eldorado that the

9   investigation was surrounded around.

10  Q.   Did you have an opportunity to go to that residence?

11  A.   Yes, I did.

12  Q.   Is that a true and accurate depiction of the residence

13  around the time of the incident?

14  A.   Yes, it is.

15  Q.   And what were some of the consistencies with her story and

16  your observations of the residence?

17  A.   So she started -- she described the residence.  She knew the

18  area that it was at.  She described it as a house with no grass

19  in the front yard; that it had, like, a rock front yard and that

20  there was a fence with vertical fencing going around the front

21  yard; that there was two garage doors on the left side of the

22  property; there was a man door that led out onto the front patio;

23  that the fencing surrounded the front patio of the house.

24  Q.   So after she escaped the residence, what happened next?

25  A.   She was -- once she was picked up from the other female,

1    that female contacted 911, at which time the sheriff's office

2    responded based on the location that the -- the female caller was

3    calling from at the time, and they responded to Kentucky Fried

4    Chicken, where she was initially interviewed by Sergeant Duval.

5    Q.    And what was she wearing and what did she have on her

6    property -- on her person?

7    A.    I don't recall.  I -- I didn't see her initially.

8    Q.    Did she have anything with her when she was contacted?

9    A.    She had -- yes.  She had a Springfield XD 9mm handgun.

10   Q.    And you said -- did she -- when she exited the residence,

11   did she see a white sedan?

12   A.    Yes, she did.

13   Q.    Did she remember the make and model of that?

14   A.    I don't recall.

15   Q.    So what was -- what did you do next with your part of the

16   investigation?

17   A.    At that point would have been about the time that I -- she

18   got transported up to the hospital.  That's when I got the phone

19   call at my house what was going on and started responding that

20   way.

21   Q.    Where did AV-1 go after the hospital?  Where was her next

22   destination, I guess?

23   A.    The police department.

24   Q.    Did she ever go to the scene of the residence?

25   A.    Yes.

1    Q.    Okay.  Did she go there after the police department?

2    A.    Yes.

3    Q.    All right.  And was she able to -- you know, what was the

4    purpose of taking her there?

5    A.    To be able to identify the residence where she came from.

6    Officers knew where she got picked up from, so they knew the area

7    that she was at, responded back to that area, and she pointed out

8    the house that was just shown to me as the house where this

9    occurred.

10   Q.    Was she able to identify the residence?

11   A.    Yes, she was.

12   Q.    Okay.  And then did she go back to the police department

13   after that?

14   A.    She was transported over to Medford, Oregon, for a SANE

15   exam.  At the time, we didn't have any SANE nurses available at

16   the Sky Lakes Medical Center, so the decision was made for her to

17   be transported over to Medford by one of our female officers to

18   be able to get an exam done.

19   Q.    While -- did officer -- were officers stationed at the

20   residence?

21   A.    Yes.  As soon as we learned that that was the location that

22   this occurred, we put officers on scene, I believe it was Officer

23   Trippett and Officer Gilmore, staged at both the front and the

24   back of the residence to assure -- I will back up.

25            I know officers went to that location initially,

1    knocked on the door prior to us putting -- as soon as they

2    learned that was the location, knocked on the door, received no

3    answer.  The door was slightly ajar when they got there.  There

4    was no sign of anybody being there, so at that point, we just put

5    officers on the front and the back of the house to assure that

6    nobody was coming or going from the residence.

7    Q.   And going back to the residence itself and I guess going

8    back to Exhibit 11, which I'll put back up, was there anything

9    unique about this particular residence on Eldorado Street that

10    was different than maybe other residences there?

11    A.   Yes.  This residence is very unique because it's actually in

12    violation of city code.  City code does not allow rock front

13    yards in that area of Klamath Falls or crushed granite, however

14    you want to describe it, or having a large fence encapsulating

15    the front of the residence.  So it was later learned that this is

16    actually owned by our --

17    Q.   Well, that's --

18    A.   Okay.  And so we were able to have contact.  But, yeah,

19    there's no other residences that have the crushed granite front

20    yards in that area.

21    Q.   And was AV-1 kind of able to accurately describe that?

22    A.   Yes, she was.

23    Q.   So tell us a little bit what happened at the residence.

24    Tell us a little bit what happened at the residence after AV-1

25    left and law enforcement was stationed there.

1   A.   So we had an officer standing by.  Officer -- Detective

2   Loudermilk began writing the search warrant for the residence.  I

3   responded up to Love's to see if I could get video surveillance

4   of the vehicle or the individuals at Love's.  After speaking with

5   the individuals there, I grabbed some drinks to bring to the two

6   guys that were sitting on the house.  So I responded back to the

7   residence and met with Officer Trippett and Officer Gilmore.

8          While I was in the front of the residence, a vehicle

9   pulled into the driveway, and at the same time, another vehicle

10   started driving by slowly with a dark complected female, who was

11   a female who I had learned earlier they believed continued to

12   walk by the residence.  So I waved her over and asked if she

13   would talk to me.  She said she would.  I asked if she would pull

14   her car into the driveway, which she did, and pulled into

15   actually the neighbor's driveway, because there were spots

16   blocking the driveway of the residence that she had shown me.  So

17   she pulled me into the friendly neighbor's driveway.  I called

18   for more officers, because at the time, we didn't know who was

19   going to be in those vehicles.

20          Did you have a question?

21   Q.   Which vehicle was that?

22   A.   That was the white sedan, the Nissan Altima.

23   Q.   Okay.  Prior to this, did you learn -- or did you learn or

24   review in reports that the Nissan Altima or -- the Nissan Altima

25   had been at the residence previously?

1  A.   I learned from other officers who interviewed neighbors,

2  yes.

3  Q.   What did -- what did -- what did they learn?

4  A.   That one of the neighbors witnessed, after hearing a female

5  scream, a female -- the female I contacted get into that white

6  Nissan Altima with the two children.

7  Q.   Did the neighbor see anything else?

8  A.   Yeah.  After she got into that vehicle, that vehicle left,

9  and approximately a minute later, the Honda Pilot left the

10  location.

11  Q.   Did any neighbors talk about the Nissan Altima being parked

12  at the residence previously?

13  A.   Yes.  The female to the south had mentioned that she drives

14  that car, and the male to the north said that it was parked

15  there.

16          THE COURT:  Can I just clarify one -- you've talked

17  about a white sedan.  Is that the Nissan Altima?

18          THE WITNESS:  Yes, it is, Your Honor.

19          THE COURT:  Thank you.

20  Q.   So with the white Nissan Altima, who did you end up

21  determining later was driving it?

22  A.   Can I refer to my report?  I just -- names are -- I'm poor

23  with names.  Alycia Westfall Zuberi.

24  Q.   Did you interview her?

25  A.   I did.

1   Q.   Okay.  Was that interview kind of recorded on a body cam?

2   A.   Yes, it was.

3   Q.   What did she tell you?

4   A.   Initially, I -- I didn't want to tell her what was going on,

5   so I just began asking her who lived at the residence.  She told

6   me that it's a -- it's a landlord -- or tenant-type issue.  She

7   just rents a room there.  She doesn't really know who lives at

8   the residence.  Gave me a couple names of some people, said that

9   there was a fat guy; and she doesn't talk to anybody, that she

10  just has a room and stays there.

11          I asked her if she -- if there's any other dark

12  complected males there.  She said, yeah, there's this guy,

13  Sakima.  I asked her about him.  She said she didn't really know

14  him, she doesn't really talk to him.  She just rents a room.  She

15  was very evasive in the questions I was asking.

16  Q.   What did she say her name was initially?

17  A.   When I initially asked her, she said it was Alycia and began

18  to say Westfall, and then changed to Zuberi.  The officer was

19  familiar with her who I was with, and he then said, "It's Alycia

20  Westfall," and gave a date of birth, and, "Correct?"

21          And she said, "Yes, that's me."

22  Q.   Did she say anything about Mr. Zuberi being the father of

23  her children?

24  A.   No, she did not.  I actually asked her who -- or Officer

25  Trippett asked her who the father of her children were or who the

1   dad was, and she said she doesn't know who the father was and

2   that they had two different fathers.

3   Q.   And where were the kids during this?

4   A.   They were in the back -- sleeping in the back of the Nissan

5   Altima.

6   Q.   Was she -- based on your training and experience, did she

7   appear to be forthright with you during that interview?

8   A.   Not in the least bit.

9   Q.   What -- what facts made you think that she wasn't

10  forthcoming?

11  A.   The fact that we had already had a conversation with -- one

12  of our officers had already had a conversation with the neighbor

13  and knew that they were in a relationship, possibly married.  The

14  neighbor had mentioned the male, Mr. Zuberi, at the time, he had

15  a handgun and she had shown him -- or shown the neighbor a

16  picture of this handgun that he had had.

17          I asked her if she -- if he had any weapons or

18  handguns.  She said, "No," and completely disassociating herself

19  with having a relationship with him.

20          I asked her if they were in a relationship.  She said,

21  "No.  No.  People think we are.  No, but we're not.  It's

22  complicated."

23          I just -- I never got a straight answer out of her

24  about any of the questions I asked.

25  Q.   Did -- did you later learn that some of her statements were,

1  I guess, inconsistent with facts that you learned from other law

2  enforcement officers or neighbors?

3  A.   Yes, I did.

4  Q.   What were some of those facts?

5  A.   The fact that her and Mr. Zuberi were alleged to have been

6  married; that he was the father of both the kids that were in the

7  back of the vehicle; that she didn't just rent a room there, she

8  actually stayed in the same room as him, her kids had a separate

9  room; that the vehicle that she was driving belonged to

10  Mr. Zuberi, was registered to him; the firearms piece of it.

11  Q.   Did you ask her about access to the garage?

12  A.   Yes, I did.

13  Q.   What did she say?

14  A.   She told me she has no access to the garage, that she only

15  has access to her room, the kitchen, and living room.

16  Q.   When was the last time she said that she saw Zuberi?

17  A.   Saturday, so approximately four days earlier.  She said

18  Wednesday.  This all was occurring on, I believe, a Saturday.

19  She said she hadn't seen him in four or five days.

20  Q.   What did she say about how her space -- or how her space in

21  the residence was set up?

22  A.   She said she stayed in a room with her kids.

23  Q.   Did you later participate in a search warrant at the

24  residence?

25  A.   Yes, I did.

1  Q.   What did you -- what did you observe at that residence

2  regarding how everything was set up?

3  A.   In the upstairs portion of the residence was a large master

4  bedroom.  Right next to that was a second smaller bedroom.  In

5  that second smaller bedroom was a set of bunk beds obviously made

6  up in child-like comforters and decorations.  There's no female

7  clothing in that small room where the children-type stuff was,

8  but there was a multitude of female clothing as well as

9  identifiable pieces of paperwork in the same room that we located

10  all of Mr. Zuberi's property.

11  Q.   Did she ever -- did you ask her how she paid -- did you ask

12  her if she paid rent?

13  A.   I did.

14  Q.   What was her response?

15  A.   She told me she paid $750 rent.  I asked her if she worked.

16  She told me she does not.  I asked her how she paid rent, and she

17  stated, "I'm a girl.  Duh."

18  Q.   During your interview, did Officer Gilmore, who was standing

19  next -- was Officer Gilmore standing next to her during --

20  A.   Yes, he was, because he had the body camera.

21  Q.   Did he confront her about walking back and forth?

22  A.   Yes, he did.

23  Q.   What was her response to that?

24  A.   She admitted that she did -- she was walking back and forth.

25  We asked her how she got there.  She told us that was for us to

1   figure out, she didn't get dropped off, nobody brought her there.

2   Q.   Where did she say that she was that day when you asked?

3   A.   She said she was home all day and then went to Wal-Mart.

4   When she left, she had left to go to Wal-Mart.  I believe it was

5   Wal-Mart.  She was on her couch teaching her kids how to eat.

6   Q.   At some point in the interview, did you kind of stop it and

7   then move on to other parts of the investigation?

8   A.   Yes, I did.

9   Q.   Why did you do that?

10  A.   Because I was asking the same questions over and over and

11  getting answers that were inconsistent already.  And after years

12  of doing this, it was becoming a waste of my time to continue to

13  talk to her.

14  Q.   What did you do next after that?

15  A.   (No audible response).

16  Q.   Or did you interview neighbors to the north?

17  A.   Yes.  And that was actually during -- when I broke

18  conversation with her initially, Officer Gilmore continued to

19  talk to her.  Or was it Officer Trippett?  Officer Gilmore

20  continued to talk to her or Officer Trippett, because I wanted to

21  clarify what the neighbor had told officer -- one of the officers

22  earlier about her leaving, and so I went and spoke to him.

23  That's when he informed me that he watched her get in the

24  passenger seat of the vehicle with the two kids and leave and

25  then the -- another vehicle leaving shortly after.

1 Q. How many times did -- based on, you know, your observations

2 and speaking with other officers and reviewing reports, how many

3 times did Ms. Westfall come to the residence or come by the

4 residence that day?

5 A. A minimum of three, if not more. At one point she went to

6 the back of the residence. So to be able to describe it,

7 obviously the front of the residence is on Eldorado Avenue. In

8 the back of the residence, there's an alley that travels in

9 between blocks and then a large park behind that, so there's

10 alley access to the residence.

11         At one point, she even went to the back of the

12 residence and tried walking up, and the officer at the back told

13 her again, "Hey, you can't come in the house," like, "You're not

14 coming back in the house."

15 Q. Did you even tell her that she could not go into the house?

16 A. Yes, I did.

17 Q. Based on your training and experience and what you knew at

18 this point in time, what do you think Ms. Westfall was trying to

19 do?

20 A. I believe she was trying to get in there to get anything out

21 of there that she needed to get out of there that she didn't want

22 us to locate.

23 Q. So you talked a little bit about Detective Loudermilk

24 working to obtain a search warrant?

25 A. Yes.

1  Q.   Tell us a little bit about kind of the process for obtaining

2  that warrant and how it went forward from there.

3  A.   For us, our judges aren't fond of, like, telephonic

4  warrants, so he will sit in the major crime team room at one of

5  the computers and work on his information that's coming in and

6  getting passed on to him and also his own information.

7         Once all the information is obtained, that search

8  warrant and affidavit goes to one of our deputy district

9  attorneys, if not our district attorney, depending on who's

10  available.  They will review it and review the probable cause.

11         Being that it was a Saturday, he then had to go to a

12  judge's residence to be able to get that search warrant signed.

13  Q.   When did the search warrant eventually get signed?

14  A.   Early a.m. hours on -- like, just after mid -- I believe it

15  was just after midnight on the 16th.

16  Q.   When did you -- when did law enforcement execute that

17  warrant?

18  A.   I think at approximately 12:30, 12:45 in the morning.  I can

19  give you the exact time if I can look at my report, but it was in

20  the late hours of midnight.

21  Q.   And I think the reports are set forth in exhibits, so we

22  have that in the record.

23         Who assisted in that initial search?

24  A.   A multitude of officers from the Klamath Falls Police

25  Department.

1    Q.   And obviously a lot was located, but could you tell me some

2    of the items that were located during that search?

3    A.   Obviously items that showed documents -- documents, bills,

4    things showing identifiers of Mr. Zuberi, Ms. Westfall, and other

5    tenants at the location.  Found a bulletproof vest or a

6    throw-over vest with multiple AR-15 magazines inside, police

7    patches, handcuffs, ankle -- or shackles, ankle cuffs, the drill

8    that she had mentioned that he had to fix the door with.  We

9    located the cell in the garage that I described earlier, more

10   ammunition.  We located a handgun box to a Springfield XD, which

11   later confirmed and matched the handgun that we recovered from

12   her that she said she took out of the vehicle.  And that box was

13   located in the master bedroom of the residence.

14        We located a purse in the corner of the garage that had

15   AV-1's -- the same last name as AV-1, a credit card that had the

16   same last name as AV-1 in it, and a condom; a set of keys that

17   was next to the cell on the desk.

18        I'm sure I'm missing something based off my own memory,

19   but (pause) --

20   Q.   All right.  Well, let's -- I'm going to go over a few

21   pictures with you.  These have -- are part of exhibit -- the

22   first set of pictures are part of Exhibit 1-1 of the motion to

23   destroy -- motion to dismiss regarding the cell.  So --

24        MR. BOCCATO:  And, Rebecca, is there a way to shrink

25   this image, like, a little bit?

1          THE COURTROOM DEPUTY:   (Indiscernible).

2          MR. BOCCATO:  Oh, there we go.  Thank you.

3   BY MR. BOCCATO:

4   Q.   So this has been marked as Exhibit 1-1, page 2 of 121.  Can

5   you identify that item for me, that picture for me?

6   A.   Yeah.  That's the cell structure that we located in the

7   garage.

8   Q.   With regard to that cell structure, was there sufficient

9   room to park a vehicle to the right of that cell structure?

10  A.   Yes.  Yes, there was.  So to put it in perspective, as we're

11  looking at this picture --

12          Are you able to see the picture?

13          THE COURT:  Yes.

14  A.   If you look to the left of it, here's where the garage door

15  opening is, and then right here is the man door that comes out of

16  the garage.  So in front of the structure, there's -- there would

17  be the left garage door if you were looking at the residence, and

18  then on the right garage door, it opens up into this space where

19  somebody could pull a vehicle in.

20  Q.   And you're able to actually touch that screen.  Can you see

21  if that works, if you can pick a color and --

22  A.   Oh, okay.  What would you like to know?  Oh, so the door --

23  the door exiting the garage would be right here, garage doors

24  would come across here with a pillar in the middle separating the

25  two garage doors.  Obviously a little bit further out past that

1   property that you can see.

2   Q.   All right.  During the execution of the search warrant, were

3   you present?

4   A.   Yes, I was.

5   Q.   And was this a true and accurate depiction of the cell that

6   day?

7   A.   Yes, it was.

8   Q.   Kind of an interesting question:  Did you push on the cell

9   at all?

10   A.   I did.

11   Q.   Where did you push on the cell?

12   A.   Right in the center right here.

13   Q.   Why did you do that?

14   A.   To be honest, just out of curiosity.  I -- I build stuff,

15   and so when I saw how that it -- how it was built and it was

16   built improperly, in my mind, in order to build a structure like

17   that, so I was kind of curious to know, like, if it would

18   withstand -- how sturdy it was going to be with the bricks

19   straight up and down.

20   Q.   How hard did you end up pushing on that cell?

21   A.   I pushed pretty hard.

22   Q.   And I guess for the record, how tall are you and how much do

23   you weigh?

24   A.   About six-three, 200.

25   Q.   Were you able to -- well, did the cell move, did it budge?

1   A.   It didn't move at all.

2   Q.   All right.  I'm showing you now what's been marked as

3   Exhibit 1-1, page 8 of 21.  Is there a way for you to delete --

4        THE COURT:  Rebecca, can you clear the markings?  There

5   we go.

6   Q.   Can you identify this picture for me?

7   A.   Yes.  So this is a table that's located -- if you're looking

8   at the entrance to the cell where the door was open, this is

9   located just to the left of it up against the most southern wall

10  of the garage.  So this you could -- you can see is the -- if I

11  were to call the door side Number 1 side, this is the Number 1

12  side of the cell.  The door's just to the right of that ladder.

13  Q.   Is there anything consistent -- or anything in this picture

14  that stands out to you?

15  A.   Yeah.  There's the shackles or handcuffs right here.

16  There's the drill.  I can't see it in this picture.  There was a

17  set of keys that was on there at the time.  So items that AV-1

18  described.

19  Q.   Going back to the previous exhibit, where did AV-1 -- how

20  did AV-1 describe the garage and the interior of the garage?

21  A.   She described it as the cell being on the left side, the

22  vehicle was parked on the right side.

23  Q.   And was your observation -- were your observations of the

24  garage consistent with AV-1's description?

25  A.   Absolutely.

1   Q.   Showing you what's been marked as Exhibit 1-1, page 17 of

2   121.  Can you identify this picture for me?

3   A.   Yeah.  That's the inside of the cell.

4   Q.   Did you have a chance to look at the inside of the cell

5   during the search warrant execution?

6   A.   Yes, I did.

7   Q.   And is that essentially the same way the cell looked when

8   you were there?

9   A.   Yeah.  That's an exact depiction of what it was prior to

10  anybody -- prior to anybody entering in there.

11  Q.   When -- when AV-1 was interviewed, what did she say -- how

12  did she describe the contents of that cell or the interior of the

13  cell?

14  A.   She said -- as I recall, she said about the walls, I believe

15  she said the walls were white, like it wasn't -- I remember her

16  making the comment that it looked like it wasn't finished yet,

17  which would be consistent with spackle and unfinished Sheetrock.

18  She said there was a white chair in there, and then mentioned

19  that he had brought her water and that there was a light hanging.

20  Q.   So is that all consistent -- the contents of the cell was

21  consistent with her description?

22  A.   Yes, it is.

23  Q.   Did she also talk about the temperature of the cell at all?

24  A.   Yes.

25  Q.   What was the temperature -- what did she say about the

1   temperature of the cell?

2   A.   She said the temperature was 95 degrees.

3   Q.   What were your -- how did you feel the cell was

4   temperature-wise when you were in there?

5   A.   It was hot, like, extremely hot.

6   Q.   Did she mention a fan or anything like that?

7   A.   I believe she said he brought her a fan because she was

8   complaining about the heat.

9   Q.   What kind of water was in that -- what kind of water bottle

10  was that?

11  A.   So I found it kind of interesting.  When we were initially

12  interviewing AV-1 -- I'm sorry.

13  Q.   AV-1?

14  A.   When we were -- not AV-1.  I apologize.

15       When we were initially interviewing Alycia Westfall

16  Zuberi, we had asked her if she wanted a thing of water, because

17  she said she was thirsty.  And she said, "No.  I don't want your

18  guys's water.  I drink good water."  And so she retrieved a

19  bottle of Fuji water out of her front passenger floorboard of the

20  white Altima, and to the point that Officer Trippett had even

21  made a comment that, "Oh, you like the good water."

22       So I found it interesting that there was a bottle of

23  Fuji water inside of the cell along with another bottle -- gallon

24  jug of water.

25  Q.   I'm showing you what's been marked as Government's

1    Exhibit 1-1, page 38 of 121.  Can you identify that picture for
2    me?
3    A.    Yes.  That's a purse that was located on top of a suitcase
4    in the back right corner of the garage.  If you were looking at
5    the garage from the front two bay doors, it was in the back right
6    corner, which would have been in front of, like, where a vehicle
7    could have parked.
8    Q.    Is that an accurate -- an accurate -- is this picture an
9    accurate depiction of what you saw the day the search warrant was
10   executed?
11   A.    Yes, it is.
12   Q.    All right.  Was that purse -- the contents of that purse,
13   was that later searched?
14   A.    Yes, it was.
15   Q.    What was found inside of it?
16   A.    That was when we located the credit card with the same last
17   name as AV-1 as well as a condom.
18   Q.    All right.  I'm going to show you a related picture, which
19   is marked Exhibit 1-2, page 10 of 122.  Can you identify that
20   picture for me as well?
21   A.    Yeah.  That's the same purse that was in the last photo just
22   after we opened it.  You can see there's -- in the upper right
23   corner, there's a Visa card.
24   Q.    Has the name and kind of the personal identifying
25   information on that Visa card been redacted?

1   A.   Yes.

2   Q.   You also see, like, a -- like, a yellow "I" there.  What are

3   those placards?

4   A.   So we generally, when there's items that need to be seized,

5   we'll place placards by them, photograph them so that we know we

6   can identify them later and -- later in the report on who found

7   them.

8   Q.   Is that something that the OSP kind of evidence team does as

9   well?

10  A.   Yes.

11  Q.   Okay.  At some -- and just kind of jump ahead briefly before

12  we go through everything.  Did you or someone else in your office

13  reach out to OSP about their evidence team coming down?

14  A.   Yes, I did.

15  Q.   Why did you do that?

16  A.   Because when we -- we have an evidence tech in our office

17  that we use for seizure of evidence at times and sometimes

18  collecting of maybe buccal swabs or fingerprints, but when it

19  comes to any type of major investigation where the possibility of

20  DNA, blood -- DNA evidence, blood evidence, fingerprint evidence

21  is going to be relevant, we'll generally call OSP's crime lab

22  because they have better equipment, better tools, better

23  knowledge on how to do this stuff properly so that we don't

24  destroy or lose evidence.

25  Q.   And going back to the exhibit on the screen, what -- did a

1    name stand out to you on that card or other people in the -- in

2    the investigation?

3    A.    Yes.  It had the same last name as AV-1.

4    Q.    Showing you what's been marked as State's Exhibit 1-1,

5    page 48 of 121.  Can you identify that exhibit for me?

6    A.    That's the entrance into the cell.

7    Q.    Is that in substantially the same condition that you

8    observed it when you executed the search warrant?

9    A.    Yes.

10   Q.    What's going on with that screen door?

11   A.    The thing that I noticed is that the mesh screen right here

12   is bent down.  And generally that folds all the way up and covers

13   this area here as well.  I noticed that the Sheetrock right here

14   has been busted out, which is common.  The deadbolt's still open

15   on the door, indicating to me that that door wasn't opened with a

16   key.  Somebody had to have struck it or busted it open, causing

17   the deadbolt to blow through the Sheetrock right there.

18   Q.    Can you identify on that picture where -- you know, where

19   AV-1 escaped from that -- through that door?

20   A.    Yes.  One -- so if you can see these two vertical slats

21   right here, she came through right here.

22   Q.    And based on her size, would she have been able to get

23   through that?

24   A.    Yes.

25   Q.    Was this door consistent with her descriptions of the door

1    when she was interviewed by law enforcement?

2    A.    Yes, it was.

3    Q.    Were her injuries consistent with this door?

4    A.    Yes.  Yes, they were.  She even had some bruising on her

5    hips, which she said was -- where she described the bruising was

6    from her trying to squeeze through that small hole in the door.

7    Q.    Oh, before I move on, describe the locking mechanisms on

8    these two doors.  And I think I have some other pictures I can

9    follow up with as well, but --

10    A.    This one's okay.  You can see on the main door right here

11    that there's no doorknob, it's just strictly just a deadbolt

12    lock, which utilizes a key to open and close or lock and unlock.

13          On the screen door, you can see the two last right

14    here, they're not very good pictures, down below would generally

15    be what would be a handle to open that door.  It was open, so

16    there was no door handle.  It was just an empty hole.

17          And the second one up was similar to this one here

18    where it was -- you had to have a key to unlock and lock it.

19    There was no mechanism of operation to be able to open -- open

20    the latch.

21    Q.    Were there any handles on those doors?

22    A.    No, there was not.

23    Q.    So if the doors were locked and someone is inside the cell,

24    how would they get out?

25    A.    They wouldn't.

1  Q.  Based on that, what did you think the structure was?

2  A.  I believed it was built to hold somebody against their will.

3  Q.  Can you identify this picture for me?

4  A.  Yeah.  That's a close-up of the screen door.  So if you look

5  at this -- this metal material here, which covers the entirety of

6  the screen, you can see that it's rough and jagged and made of a

7  metal construction, which would be consistent with all -- with

8  the damage done to her knuckles if somebody was to be punching

9  it.  And it was also rolled down, where the bend in it right --

10  this is a crease where you would then fold it back up and it

11  would cover the entirety of the door.

12  Q.  All right.  And just for the record, Government's

13  Exhibit 1-1, page 15 of 121, is that consistent with what you saw

14  the day of this search warrant execution?

15  A.  Yes, it is.

16  Q.  Showing you what's been marked Government's Exhibit 1-1,

17  page 65 of 121.  Can you identify this picture for me?

18  A.  Yeah.  Again, that's an entrance into the cell and that's

19  the door, the security door that led into the cell.

20  Q.  And, again, is that consistent with what you saw the day of

21  the search warrant execution?

22  A.  Yes, it is.

23  Q.  I'm showing you what is marked as Government's Exhibit 1-1,

24  page 77 of 121.  I know you mentioned this briefly, but can you

25  identify this for me?

1   A.   Yeah.  That's the lock and -- locking mechanism on the

2   security screen door that was shown in the past several pictures.

3   Q.   Is that in the same condition as what it was the day of the

4   search warrant execution?

5   A.   Yes, it is.

6   Q.   Next I'm showing you what's been marked as Government's

7   Exhibit 1-1, page 111 of 121.  All right.  Can you identify this

8   picture for me?

9   A.   That's a picture of the security screen door from inside the

10  cell looking outward.

11  Q.   Okay.  Same condition as during the execution of the search

12  warrant?

13  A.   Yes, it is.

14  Q.   All right.  So can you kind of describe what is that kind of

15  metal cascading thing?

16  A.   Are you referring to this section here?

17  Q.   Yes.

18  A.   Okay.  That's where -- where the mesh -- the metal mesh

19  material would have been all the way up on the door and folded

20  downward is if somebody were to push it from the inside out

21  pushing it down.

22  Q.   All right.  I'm showing you what's been marked as

23  Government's Exhibit 1-2, page 4 of 122.  Can you identify this

24  picture for me?

25  A.   Yeah.  That's a set of keys that was located on the desk

1    just to the left of the door, of the cell.

2    Q.   Are those in the same condition as they were during the

3    execution of that search warrant?

4    A.   Yes, they are.

5    Q.   Was that placard added later?

6    A.   Yes, it was.

7    Q.   And were the keys significant to you?

8    A.   Yes, they were.

9    Q.   How so?

10   A.   Due to the fact that she had mentioned he had a keys -- a

11   bunch of keys on the key ring that he used to lock the door after

12   fixing the latch with the drill.

13   Q.   Are those keys consistent with her description?

14   A.   Yes.

15   Q.   I'm now showing you what's been marked as Government's

16   Exhibit 1-2, page 6 of 122.  Can you identify this picture for

17   me?

18   A.   Yes.  That's a set of leg irons and handcuffs located on the

19   same table as the keys to the left of the -- the door to the --

20   to the structure or cell.

21   Q.   Was that placard added later?

22   A.   Yes, it was.

23   Q.   Other than the placard, were these -- this leg irons and

24   handcuffs, were they in the same condition as they were during

25   the execution of the search warrant?

1   A.   Yes, they were.

2   Q.   Were these significant to you?

3   A.   Yes, they were.

4   Q.   How so?

5   A.   They were items described by AV-1 used while she was being

6   transported from Seattle to Klamath Falls, Oregon.

7   Q.   Did law enforcement locate any writings or other items in

8   Zuberi's residence?

9   A.   Yes, we did.

10  Q.   What did you locate?

11  A.   We located one that was labeled "Operation Take Over", or --

12  "take over" or "take down".  I believe it was "take over".  On

13  that, it made mention of leaving cellphones at home.  There was

14  mention of making sure that the person doesn't have any family so

15  that there's no investigation.

16          We located a hand drawing of -- he had some notes

17  describing how to build an underground structure approximately a

18  hundred feet deep, explaining using concrete, keeping the

19  concrete waterproofed, and essentially plans to build an

20  underground structure.

21  Q.   I'm showing you what's been marked as Government's Exhibit,

22  first, 12.  Can you identify this photograph for me?

23  A.   Yeah.  That was the handwritten notes that were located in

24  the bedroom, the master bedroom of the house.

25  Q.   Can you -- I know it's relatively short.  Could you just

1    read that into the record?

2    A.    "Operation Take Over", and then bullet points:  leave phone

3    at home, make sure they don't have a bunch of people in their

4    life, you don't want any type of investigation.

5    Q.    Is this an accurate depiction of the notes that were seized

6    from Mr. Zuberi's residence?

7    A.    Yes, it is.

8    Q.    I'm going to show another picture.  It's been marked as

9    Government's Exhibit 13.  Can you identify this picture for me?

10   A.    Yeah.  That's the hand drawing that we located in a notebook

11   in the master bedroom of the residence.

12   Q.    Can you read some of the writing on this picture as well?

13   A.    Yeah.  At the top portion, it says, "Dig a hole straight

14   down 100 feet" with a drawing depicting a ground level and a

15   large drop going down, and then at the bottom level of a floor,

16   some type of what looks like maybe describing a heating -- some

17   type of heating.

18          Then at the bottom it reads, "concrete blocks, rubber

19   coat, foam insulation, waterproof concrete."

20   Q.    Is this image -- or is this photograph an accurate depiction

21   of the notes that were seized from the residence?

22   A.    Yes, it is.

23          MR. BOCCATO:  All right.  And at this point, I just

24   want to -- I think I've offered Government's Exhibits 10, 11, 12,

25   and 13.  They were not initially admitted.  I'd like to move to

1   admit those so they're on the record.

2           THE COURT:  They're already admitted, I believe.

3           MR. BOCCATO:  Okay.  Perfect.  Thank you, Your Honor.

4   BY MR. BOCCATO:

5   Q.   What do these notes mean to you?

6   A.   When I look at this drawing, it's a depiction of some type

7   of an underground bunker and how to build an underground bunker.

8   Q.   What did the "Operation Take Over" notes mean to you?

9   A.   Those depicted basically formulating a plan on committing a

10   crime, of making sure that your phone's not at your house so that

11   you can't be tracked.  And the only thing that I can make out of

12   the other portion, is finding a victim that doesn't have anybody

13   so that nobody's going to call the police if they were missing,

14   lost.

15   Q.   At this point in time, were you also aware that there may

16   have been a second victim involving Mr. Zuberi?

17   A.   Yes, I was.

18   Q.   With all this information about the second victim, the

19   concrete structure in the garage, and these notes, and AV-1's

20   story, did you have concern that this might not be an isolated

21   incident?

22   A.   Yes, I did.

23   Q.   Did you believe that there was some planning and preparation

24   that went into this incident?

25   A.   Absolutely I did.

1   Q.   And I just want to kind of touch back on something.  You

2   said earlier that Ms. Westfall and Mr. Zuberi are married?  Did

3   you note that?

4   A.   Yes.  That's my understanding.

5   Q.   Did it -- did you later learn that they are not actually

6   legally married?

7   A.   I -- I can't say that I did know that.  I knew that we

8   believed that they were married, but whether they were actually

9   married or not, I guess I (pause) --

10  Q.   Okay.  At some point in time after the execution of the

11  search warrant, did Detective Loudermilk have a conversation with

12  Ms. Westfall?

13  A.   Yes, he did.

14  Q.   What was the purpose of that conversation?

15  A.   Which -- which conversation are you referring to?

16  Q.   A telephone conversation.

17  A.   On the following day?

18  Q.   Yes.

19  A.   He was trying to find out where Mr. Zuberi was or where she

20  was at.

21  Q.   Okay.  What did -- and I think that was on the 16th?

22  A.   Yes, it was.

23  Q.   What was the -- or what did Ms. Westfall tell Detective

24  Loudermilk?

25  A.   Well, he first spoke with a neighbor, who had said that

1    he -- she rented her a room at the Maverick Motel for the night

2    since she wasn't going to be able to be at her house.

3            Loudermilk went by the hotel and learned that she had

4    checked out at 10:00 a.m., so that's when he tried to call her.

5    At that time, he was going to let her know that we were finished

6    with the search warrant and that she could respond back to the

7    residence.  He let her know -- asked her where she was at.  She

8    had told him that she was in Medford, Oregon, at the time and

9    that she wasn't in town to come talk to him.

10   Q.   You said Detective Loudermilk drove by the Maverick Motel?

11   A.   Yes, he did.

12   Q.   Did he see the Altima at that time?

13   A.   No, he did not.

14   Q.   Did someone drive by the Maverick Motel and check on the

15   Altima?

16   A.   Possibly.

17   Q.   Okay.  At some juncture, did you reach out or did someone

18   reach out to the FBI regarding this case?

19   A.   Yes, I did.

20   Q.   Was that you or someone else in your office?

21   A.   I did.

22   Q.   Why did you reach out to the FBI?

23   A.   Come Sunday, once the major -- or once the Oregon State

24   Police crime lab got there, we realized that there was a second

25   victim that an officer had taken a report on a couple months

1    earlier.  Just the scope of this investigation was not beyond our

2    capabilities, but expounded on the resources that we would be

3    able to allocate to it.  It was -- our chief of police showed up

4    to the crime scene and I sat with him at a meeting, and in

5    discussing it, we knew we probably needed some help in working

6    towards locating Mr. Zuberi at that time, knowing that he was

7    probably no longer in Klamath Falls, so we decided to reach out

8    to the FBI.  Ryan Dwyer out of -- I believe he's the RAC or the

9    SAC out of Eugene to see if they would have interest in helping

10   us out.

11   Q.   Did the FBI end up coming out and responding?

12   A.   Yes, they did.

13   Q.   Do you have Detective -- we'll jump back a little.

14        Do you have Detective Loudermilk's report up there with

15   you?

16   A.   I do.

17   Q.   Can you go to -- do you have a Bates-stamped copy or just a

18   regular copy?

19   A.   I have just a regular copy.  I'm pretty familiar with his

20   report.  What are (pause) --

21   Q.   Can you go to -- it's a lengthy report.  So there's a

22   par- -- there's a page where just above the paragraph that goes,

23   "I returned to the scene at approximately 9:00 a.m. and took over

24   scene security once the Oregon State crime lab forensic

25   scientists arrived."

1          MS. POTTER:  Your Honor, just for the record, can we --

2     is this an -- did you say this is an exhibit or --

3          MR. BOCCATO:  This is a -- I'm sorry.  This is

4     page 648.  And let me -- on Loudermilk's report.  This would be

5     Exhibit 4.  I will double-check that, though.  Sorry.  Exhibit 3,

6     page 16 of 22.

7          THE WITNESS:  Oh, okay.

8          MR. BOCCATO:  And I can hand you a copy of that exhibit

9     as well.

10          THE WITNESS:  Okay.  I've got the paragraph that says,

11     "I returned".  Sorry.  I printed off all my reports at once, so I

12     have pages up to, like, a hundred, but I'm at the paragraph where

13     it says, "I returned to the scene at approximately 9:00 a.m."

14     BY MR. BOCCATO:

15     Q.    If you look -- I guess review the three or four sentences

16     above that starting with, you know, "AV-1 had described" and then

17     kind of read down.

18     A.    Okay.  Yeah.  The neighbor informed him that the -- she had

19     rented the room for him at the Maverick.  He did drive by and

20     witness the white four-door Nissan Altima at the hotel.

21     Q.    Did he also determine that -- who it was registered to?

22     A.    Yes.  We learned it was registered to a Justin Joshua

23     Kouassi, which we also learned was an alias to Sakima Zuberi.

24     Q.    Thank you.  And -- and, again, I think you mentioned this

25     earlier, what was Detective Loudermilk's role in the

1   investigation?

2   A.   Detective Loudermilk was the lead investigator.  But if I

3   can explain, how we work as a major crime team, the lead

4   investigator sometimes is mostly prioritized with doing the

5   search warrants, organizing things, and then the main interview

6   of a suspect in our general investigation, so they're often

7   inside the major crime team room with us making decisions on

8   things and not so much in the field.

9            Loudermilk likes to work, so, like, when he drove by

10  the hotel, that was more at a time when we were taking off to get

11  some sleep for the night.  He wanted to go by there to see if the

12  vehicle was there prior to going home.

13  Q.   All right.  And so going back to the FBI arriving, did

14  someone from the FBI generate cellphone pings regarding

15  Mr. Zuberi?

16  A.   Yes, they did.

17  Q.   What did you learn regarding those cellphone pings?

18  A.   We learned that -- that currently he was in Reno, Nevada.

19  Past pings showed that he was up in the Seattle area.  It showed

20  a stop outside -- approximately two hours outside of Klamath

21  Falls, consistent with AV-1's description of them stopping.  It

22  showed a ping at Love's Travel Stop, consistent with what AV-1

23  had said.

24           It showed that evening of the 15th, him -- pings

25  staying in Tulelake, California, for the night and then pinging

1   up in Merrill, Oregon, that morning and then currently in Reno,

2   Nevada.

3   Q.   Okay.  Did -- during this time frame, did someone -- did

4   someone go to Merrill, Oregon, to check on things?

5   A.   Yes.  Detective Snyder drove down there to look to see if

6   any of the vehicles or they -- any of the vehicles or Zuberi or

7   his wife was down there.

8   Q.   Did Detective Snyder reach out to you about what he saw in

9   Merrill?

10  A.   Yes, he did.

11  Q.   What did he tell you?

12  A.   He advised that he located the 2018 Nissan Altima.  He also

13  was working with the service station where it was parked to

14  obtain surveillance.  In the surveillance, he saw both Mr. Zuberi

15  and Ms. Zuberi entering and exiting the vehicle.

16  Q.   Did you later learn that Mr. Zuberi had been arrested in

17  Reno, Nevada?

18  A.   Yes, I did.

19  Q.   Was it after a -- sort of a standoff?

20  A.   Yes.  We kept in contact with Reno Police Department.

21  Because of what we had going on in the major crime team room, I

22  asked the chief -- our chief of police if he would contact them

23  and start working on making arrangements to go out to where the

24  phone was pinging to try to see if we could take him into

25  custody.

1          They called back several -- or once they located the

2     vehicle, they informed us they located the vehicle and then

3     called back to let us know that they were in a standoff with

4     Mr. Zuberi, who was holding his child in front of him as a shield

5     from the police.

6     Q.   And at this juncture, did you believe that you had probable

7     cause to arrest Mr. Zuberi?

8     A.   Yes, we did.

9     Q.   When did you actually make that determination?

10    A.   We put out probable cause that -- the night of July 15th --

11    or I should -- the early morning of July 16th, if I recall.  If I

12    could refer to my notes, I could tell you the exact time -- or

13    the report.

14         Officer Loudermilk put out probable cause for arrest,

15    it was the late evening of the 15th, for Mr. Zuberi.

16    Q.   So when you were getting updates about Merrill and what was

17    found there and you were seeing updates from Reno, can you kind

18    of paint the picture of what -- I guess what your command post

19    looked like and who was there?

20    A.   Things that -- once we knew that they were having a standoff

21    with Mr. Zuberi, things kind of slowed down in the command post

22    and we were all mostly sitting there with anxiety just to

23    determine what had happened and make sure.

24    Q.   Who was all present there in the room?

25    A.   At that time, I believe it was Chief Rob Dentinger, myself,

1   Agent Gluesenkamp, another FBI agent, and possibly Joel

2   Loudermilk.

3   Q.   Were people kind of coming and going from that room?

4   A.   Yes.

5   Q.   Was that a room where people were sharing information and

6   working together?

7   A.   Yes.

8   Q.   Were there times where people would, you know, take a

9   cellphone and you would listen to a call, like, on speaker?

10  A.   Yeah.  It's a little chaotic in there at times.  So we've

11  actually got a phone number specific for our major crime team

12  room that comes through on a speaker, which works well most of

13  the time, but it worked better ten years ago prior to the avid

14  use of cellphones.

15          So now, generally people want to use a cellphone and

16  just call in, call one person.  So now you're trying to put it on

17  speaker phone so other people can hear it, and directing them to

18  call that mainline.  And you've got people coming from the

19  outside coming in trying to relay information to people inside of

20  there, so at times it's hard to understand what's coming in.  And

21  I may be the only person to be able to get that piece of

22  information that I'm trying to share it with other people in the

23  room.  Sometimes we can all hear it.

24  Q.   So after you learned -- who did you learn that Mr. Zuberi

25  was down with while in Reno, Nevada?

1    A.    That -- who did I learn that from?

2    Q.    Where -- who was Mr. Zuberi with in Reno, Nevada?

3    A.    Ms. Westfall and the two kids.

4    Q.    Was that inconsistent with the information Detective

5    Loudermilk received that they were in Medford?

6    A.    Yes, it is.

7    Q.    Did someone make arrangements to tow the white Nissan

8    Altima?

9    A.    Yes, we did.

10   Q.    Who made those arrangements?

11   A.    I made the arrangements.

12   Q.    Where was the vehicle towed to?

13   A.    The vehicle was towed to our secure parking lot at the

14   police department.

15   Q.    Was anything done to the Altima to prevent it from being

16   tampered with?

17   A.    Yeah.  We placed evidence tape over the door jams to assure

18   that nobody could enter into the vehicle.

19   Q.    And was it decided that the FBI would do a follow-up warrant

20   on that Altima?

21   A.    Yes, it was.

22   Q.    And just to clarify, what happened first, the -- or what

23   happened first, the detention of Mr. Zuberi or the seizure of the

24   Altima?

25   A.    Oh, I'd have to look back in my reports.  I don't -- I don't

 1   know that I documented his time of arrest.  That would be in the

 2   Reno Police Department, but I believe he was taken into custody

 3   prior to the vehicle being seized.

 4   Q.   I guess was the standoff -- did that take place before you

 5   made the call to seize the Altima?

 6   A.   I believe so, yes.  Yes, it did.  It was starting to -- it

 7   was becoming dark out, I believe, when we seized the Altima.

 8   Q.   All right.

 9   A.   Yes.  So in reviewing my report, it shows that Mr. Zuberi

10   was taken into custody in Reno and then arrangements -- after

11   that, arrangements were made with M&C Towing to tow the vehicle.

12   Q.   Why did you think it was important to seize this Altima?

13   A.   Because we couldn't leave it on scene out in Merrill.

14   Merrill's about 20 minutes from Klamath Falls in a small little

15   town.  We were running out of resources, so there was no way we

16   could leave somebody sitting on it.  Unfortunately, currently we

17   only have one reserve with our department, which is what we

18   usually use to sit somebody on something.

19          There was concerns because Ms. Westfall was still out

20   that she could get back to the vehicle and try to get to it,

21   especially after her trying to come back to the house multiple

22   times.

23   Q.   So -- and you thought -- when you say you were worried

24   about, you know, resources and the resource issue, did you think

25   it was important to get this vehicle and see what's inside?

1   A.   Yes.

2   Q.   All right.  Why is that?

3   A.   There was still evidence that we didn't recover at the

4   house.  We were -- or in -- as known, inside of the vehicle he

5   was in at the time.

6   Q.   What evidence were you missing at that point in time?

7   A.   The -- we were still missing AV-1's cellphone; the foil that

8   he allegedly wrapped the cellphone in; the cellphone jammer; the

9   taser, as well as a taser she described that she had in her

10  purse; the sweatshirt that she was covered with; his items of his

11  clothing to include some, what she described are slides, like,

12  Adidas-type slides that you slide your feet in, with polka dots

13  on them, sort of polka type -- polka dot-type design.

14  Q.   Were you still looking for any receipts regarding their

15  trip?  Had you recovered all of those?

16  A.   No, we had not.

17          MR. BOCCATO:  No further questions, Your Honor.  Thank

18  you.

19          THE COURT:  All right.  Cross-examination.

20          MS. POTTER:  Thank you, Your Honor.  Your Honor, could

21  we have a brief break for Mr. Zuberi?

22          THE COURT:  Yes.

23          MS. POTTER:  Okay.  Thank you.

24          THE COURT:  If I could just have a quick little

25  conversation with the attorneys at sidebar.

1          (Recess:  11:18 - 11:33)

2          THE COURT:  We'll return, then, to cross-examination.

3          Oh, I'm sorry.  Is everybody here?

4          MS. POTTER:  No, Your Honor.

5          THE COURT:  That's fine.  That's fine.  Take your time.

6          MS. POTTER:  I was just addressing one thing.

7          (Pause in proceedings)

8                          **CROSS-EXAMINATION**

9   BY MS. POTTER:

10  Q.   Good morning again, Detective Sergeant Zupan.  I just have a

11  few questions.

12          So you received the initial call about 12:15 p.m. on

13  July 15th.  Is that correct?

14  A.   Yes, ma'am.

15  Q.   Okay.  And shortly thereafter, you knew that AV-1 was a

16  prostitute, correct?

17  A.   Yes, I did.

18  Q.   Okay.  Did you -- you did not run her criminal history at

19  that point?

20  A.   No, I did not.

21  Q.   You participated in the interview with AV-1 at that time?

22  A.   Yes, I did.

23  Q.   And you never asked her about her prior history?

24  A.   No, I did not.

25  Q.   You talked about your -- you interviewed Alycia Westfall as

1  well, correct?

2  A.   Yes, I did.

3  Q.   All right.  And at some point in one of the reports, it

4  indicates that a neighbor saw her get in the passenger seat of

5  the Altima and drive away.  Is that correct?

6  A.   Yes.

7  Q.   Did you ask her who was driving the Altima at that point?

8  A.   Yes.  She was evasive towards our questioning.

9  Q.   And after that, the neighbor said the Honda Pilot left?

10  A.   Yes.

11  Q.   And was that -- I think you might have used "east" and

12  "west."  That's not really my -- my bailiwick, but was that the

13  neighbor to the left?  I'm trying to avoid the names for --

14  A.   Yes.  So I actually learned from talking to one of the

15  individuals that interviewed the neighbor, I'd say it would be --

16  if you were looking at the house to the right --

17  Q.   Okay.

18  A.   -- is the male and the friendly of -- of --

19  Q.   The one to the left?

20  A.   -- of the wife is to the left.

21  Q.   Okay.  And in terms of -- oh, go ahead.  Sorry.

22  A.   I was going to say, I actually learned from either Trippett

23  or the other one that he had said that the Pilot left a minute

24  later.  He didn't tell me that.  I learned from the other

25  officer.

1  Q.   Perfect.  Thank you.  In terms of -- you also learned about

2  the interview of the neighbor to the left?

3  A.   Yes, I did.

4  Q.   And that neighbor said that the Honda Pilot used to be

5  parked in the garage, correct?

6  A.   I believe so.

7  Q.   And that he no longer parked the Honda Pilot in the garage,

8  correct?

9  A.   Correct.

10 Q.   Turning to July 16th, you -- you were the one who asked for

11 help from the FBI, correct?

12 A.   Yes.

13 Q.   And that was after the search of the house had been

14 completed?

15 A.   Yes.

16 Q.   And at that point, you didn't know where Mr. Zuberi was?

17 A.   Correct.

18 Q.   You asked the FBI to do a phone ping, correct?

19 A.   Yes.

20 Q.   At that point, who was leading the investigation?

21 A.   I would say it was a co-investigation.  I don't think -- I

22 mean, more so the FBI was starting to -- to take more of a role,

23 but it was still a co-investigation.  They were probably taking

24 the lead, more of the lead role.

25 Q.   So from that point forward, every step you made, you

1  consulted with the FBI, correct?

2  A.  I would say yes.

3  Q.  I want to actually go back to -- actually, I'm sorry.

4       In terms of going back to the -- in terms of before the

5  search warrant was executed, so going back in time, how many

6  officers were providing security at the house?

7  A.  Two.

8  Q.  And how long were they there?

9  A.  I -- I can't answer that.  We rotated.  I know through the

10  night, other officers went out and swapped out with them.  At one

11  point one of the nights, myself and other detectives did

12  four-hour blocks.

13  Q.  And you said that Ms. Westfall attempted to come back three

14  times.

15  A.  At least three, yes.

16  Q.  She never was able to get into the house, was she?

17  A.  No, she was not.

18  Q.  In terms of the FBI phone pings, you said they were able to

19  use a ping of Mr. Zuberi's cellphone to learn that he had stopped

20  about two and a half hours outside of Klamath?

21  A.  If I recall, yes.

22  Q.  And so he had a cellphone with him that entire time?

23  A.  Apparently.

24  Q.  Okay.  During the entire search, you never found any

25  underground structures, did you?

1   A.   No, we did not.

2   Q.   So turning to the Altima, you seized the Altima at FBI's

3   request, correct?

4   A.   Yes.

5   Q.   And at the time, you under -- you believed it was abandoned?

6   A.   Yes.

7   Q.   And did you report that to the FBI, that it had been

8   abandoned?

9   A.   As far as reported, I mean, I let them know that Snyder was

10  down there and that the vehicle was parked at the gas station.

11  Q.   And do you know what time Officer -- or sorry, Detective

12  Snyder arrived in Merrill?

13  A.   It was early evening.  I don't know if I have -- it would

14  have to be in his report.  I wouldn't have documented it on mine.

15  Q.   Okay.  When you spoke with Detective Snyder, did he tell you

16  whether he had reviewed any surveillance?

17  A.   Yes, he did.

18  Q.   And did he say approximately how long he had reviewed it,

19  like, how many minutes of surveillance he reviewed?

20  A.   I don't -- no, he didn't tell me how long.

21  Q.   And you didn't -- it was -- and the intention is the FBI was

22  going to obtain the search warrant for the Altima?

23  A.   Correct.

24  Q.   And at what point did you tell the FBI that you missed items

25  in the initial search of the house?

1   A.    Probably in the over brief when Agent Gluesenkamp showed up

2   to assist.  We explained to them what we had recovered, what we

3   saw, and what we didn't.

4   Q.    And in terms of, again, with the Altima, you said one of the

5   other reasons other than the abandonment was that -- your concern

6   that Ms. Westfall might return to the vehicle, correct?

7   A.    Correct.

8   Q.    Had -- when you were -- you were in consultation with the

9   police officers in Reno, correct?

10  A.    My chief was, yeah.

11  Q.    And Ms. Westfall was present in Reno when the arrest

12  occurred?

13  A.    Yes, to the point that we actually received a phone call

14  from her phone, Officer Loudermilk did, and it was a police

15  officer from Reno using her phone.

16  Q.    Okay.  So when you seized the Altima, you knew Ms. Westfall

17  was in Reno, Nevada?

18  A.    Yes.

19          MS. POTTER:  Your Honor, I have nothing else.  Nothing

20  further.

21          THE COURT:  All right.  Any redirect?

22          MR. BOCCATO:  Just briefly, Your Honor.

23                    **REDIRECT EXAMINATION**

24  BY MR. BOCCATO:

25  Q.    You said there was an over brief involving Special Agent

1    Gluesenkamp?

2    A.    When he got there, we discussed the case, yes.

3    Q.    Okay.  Did you kind of -- what does the term "over brief" --

4    I've never heard that term.  What does that mean to you?

5    A.    Just briefed what -- I mean, he came on board, and I

6    explained to him kind of where it started, where we were at, what

7    we'd done in the investigation.

8    Q.    And who was else -- who else was there during that over

9    brief?

10   A.    I don't know if Agent Dwyer was there yet, and I believe

11   there was another FBI agent there.

12   Q.    Was Detective Loudermilk available or (pause) --

13   A.    I don't recall whether he was there during that time sitting

14   in the room.

15   Q.    And would KFPD have seized the Altima if the FBI didn't?

16   A.    Yes.

17   Q.    And Ms. Potter asked you briefly about running the victim's

18   CCH.  Did you have any reason to question the veracity of her

19   story?

20   A.    No.

21           MR. BOCCATO:  No further questions, Your Honor.

22           THE COURT:  All right.  Thank you very much.  You are

23   free to go.

24           Do you have further witnesses?

25           MR. BOCCATO:  Thank you, Your Honor.  The Government

1    would like to call Detective Snyder to the stand.

2              THE COURT:  Thank you.  Actually, could I clarify one

3    question I had?

4              THE WITNESS:  Yes, Your Honor.

5              THE COURT:  When Mr. Zuberi and Ms. Westfall are in

6    Merrill, Oregon, did you say that somebody was observing them and

7    the vehicle, and they were entering and exiting the vehicle or

8    (pause) --

9              THE WITNESS:  Detective Snyder, who is coming in next.

10             THE COURT:  Okay.  Thank you.  Okay.  So that's going

11   to answer that question.  Thank you very much.

12             THE WITNESS:  Thanks, Your Honor.

13             THE COURT:  All right, sir.  If you'd come up to the

14   witness stand and remain standing for just a moment.  If you'd

15   like to raise your right hand.

16                          **JESSE SNYDER**

17        after having been duly sworn under oath, was examined and

18                          testified as follows:

19             THE COURT:  If you'd like to have a seat.  We do have a

20   remote court reporter who's reporting from Portland, so it is

21   important to make sure you're speaking into the microphone, maybe

22   a little more slowly if you're a fast talker, and speaking up,

23   but if you could start by stating your first and last name and

24   spell both for us.

25             THE WITNESS:  Yes.  My name is Jesse Snyder, and that's

1    J-E-S-S-E, S-N-Y-D-E-R.

2              THE COURT:  All right.  Thank you.

3                        **DIRECT EXAMINATION**

4    BY MR. BOCCATO:

5    Q.    Special Agent -- or Detective Snyder, can you -- where do

6    you work?

7    A.    I work for the Klamath Falls Police Department.

8    Q.    And how long have you worked for KFPD?

9    A.    October will be 12 years.

10   Q.    What do you do for KFPD right now?

11   A.    I'm currently a detective there.

12   Q.    Have you always done that for KFPD?

13   A.    No.  So I've been in detectives for just over four years

14   now.

15   Q.    And just to -- obviously just for the record, "KFPD" stands

16   for?

17   A.    Klamath Falls Police Department.

18   Q.    Tell me a little bit about your training to become a law

19   enforcement officer.

20   A.    So I attended -- well, before I was a sworn full-time

21   officer, I was a reserve officer for about a year.  I went

22   through an interagency academy, which is a small academy based on

23   the state academy at DPSST.  Once I got hired, I went to DPSST

24   16-week training, come back to the police department after

25   academy and finished my field training.

1   Q.   When did you first become involved in the Zuberi

2   investigation?

3   A.   It would have been on July 16th, which is a Sunday, normal

4   day off for me.  I got a phone call from Detective Sergeant Chris

5   Zupan to come in and assist.

6   Q.   What did he ask you to do?

7   A.   So my first assignment was to go to the address on North

8   Eldorado and basically just survey it from outside on the street

9   to make sure nobody entered the property.

10  Q.   How long were you there for?

11  A.   I was -- got there at approximately 6:00 a.m. and I left at

12  approximately 9:30 a.m. when I was relieved by Sergeant Zupan and

13  Detective Loudermilk.

14  Q.   Were you asked again to -- or were you asked to respond to

15  KFPD by Detective Sergeant Zupan later that day?

16  A.   I was.

17  Q.   Approximately what time was that?

18  A.   Approximately 5:00 p.m.

19  Q.   Who was all there when you arrived?

20  A.   I arrived at the police department, went to the major crime

21  team room.  I couldn't say exactly who all was there.  There were

22  several people in there.  We had different agencies from the --

23  we had the Klamath Falls Police Department, some folks from the

24  FBI, some folks from the sheriff's office, and Oregon State

25  Police.

1  Q.   Were you briefed on the investigation when you got there?

2  A.   Yes.  I was briefed briefly on some aspects of it through

3  Sergeant Zupan and, I believe, one of the FBI agents.

4  Q.   Did you learn that Mr. Zuberi and Ms. Westfall were in

5  possession of vehicles?

6  A.   Yes, I -- yes, I was advised of that.

7  Q.   Which vehicles did you learn they were in possession of?

8  A.   So I was advised that Mr. Zuberi was in possession of a gray

9  Honda Pilot with, I believe, Colorado plates, and Ms. Westfall

10  was known to be in possession of a white Nissan Altima with Utah

11  plates.

12  Q.   Did you learn that phone pings had been done on Mr. Zuberi's

13  phone?

14  A.   Yes.

15  Q.   What -- what had you gathered from those phone pings?

16  A.   So the phone pings showed -- so it showed that the phone

17  ping hit in Merrill, Oregon, which is about 25 miles away from

18  Klamath Falls - I'm familiar with the town and the area - that

19  the phone ping hit in that area that morning some time around

20  9:20, 9:30 a.m., and it -- the phone pings were there longer than

21  if somebody was just driving through the town.

22  Q.   Okay.  And just to give us a little bit of a geography

23  lesson, where is Merrill versus Klamath Falls versus Reno?

24  A.   So if you're in Klamath Falls and you're traveling to Reno,

25  Merrill would be approximately 25 miles to the south of Klamath

1    Falls, which it would be the route that you would take -- the

2    quickest route if you were going to go to Reno from Klamath

3    Falls.

4    Q.   While you were there, did you also learn where Mr. Zuberi

5    and Ms. Westfall were?

6    A.   Yes.  I learned that they were in Reno, I believe at a

7    Wal-Mart parking lot.

8    Q.   Did you learn what vehicle they were in?

9    A.   Yes.  I was told that they were in the gray Honda Pilot.

10   Q.   So what was your role when you were there in the major

11   crimes room?

12   A.   My role basically was kind of waiting for a job.  I was

13   sitting kind of waiting, and I realized, you know, that the phone

14   was pinging there, there in Reno.  I asked Sergeant Zupan, hey,

15   can I run out to Merrill and just check that area to look for the

16   other car, the white Nissan.

17   Q.   When did you respond out there?

18   A.   I arrived out to the Merrill area at approximately 6:45 p.m.

19   Q.   What did you see when you -- where -- where in Merrill did

20   you arrive?

21   A.   So being familiar with the area, I knew that there was the

22   Mobil gas station and there's the Fastbreak Convenience Store

23   with the gas station, which if -- most people if they're going to

24   stop in Merrill, that would be the place to stop.

25              I arrived there.  I went to the -- I didn't see the

1   white Nissan in the front of the building, because I could see

2   that as I was driving there, so I immediately kind of drove to

3   the back to the north side of the store, which would be the north

4   parking lot, and immediately saw the white Nissan with Utah

5   plates.

6   Q.   Did you reach out to Sergeant Zupan to let him know that you

7   saw the white Nissan?

8   A.   Yes.  As soon as I saw it, I called and let him know that

9   the vehicle was there.

10  Q.   Did you see any surveillance cameras outside of the store?

11  A.   Yes.

12  Q.   What did you do with that information?

13  A.   So once I saw the surveillance cameras, I went inside the

14  store to inquire who had access to review any video surveillance

15  that might be there.

16  Q.   While you were at the scene, what did you observe?

17  A.   At the --

18  Q.   Were you able to access the surveillance cameras?

19  A.   Yes.  They called, I believe it was, an assistant manager or

20  manager that had to come in, I believe from her home, to access

21  the cameras so that I could look at the footage.

22  Q.   And while you were in Merrill, what did you observe that

23  day?

24  A.   So I observed on the video cameras -- I -- from the cameras

25  facing the north, which would be the back parking lot where I

1 found the Nissan, I see the -- first I see the gray Honda Pilot

2 pull in. Short time later, I would say 20, 30 minutes later,

3 maybe half an hour, I'd have to refer to my notes to be sure, but

4 I believe I then saw the white Nissan Altima pulls in to the gas

5 station to the same north parking lot.

6 Q. What else did you see with regard to the -- well, what else

7 did you see on the surveillance camera that day when you were in

8 Merrill?

9 A. So I see a male that matches Mr. Zuberi's description get

10 out of the Honda after it comes in. A short time later, then I

11 observe a female matching Ms. Westfall's description get out of

12 the white Nissan Altima. She at one point goes to the -- there's

13 a store face -- there's a door facing the north parking lot that

14 enters the store and there's a garbage can right next to that

15 door. Looked like she threw something away in the garbage can.

16 Short time later, I do see it looked like they're both

17 at the Nissan Altima. Looks like the trunk was opened and closed

18 multiple times.

19 And later at one point, I see who I believed to be

20 Mr. Zuberi get in the Nissan Altima, move it from where it was

21 originally parked and then park it in the location where I found

22 it.

23 Q. All right. Does this video on screen, does that ring a bell

24 to you or is that --

25 A. Yes. That would -- that would have been one that I reviewed

1   while I was there.  This is the north parking lot behind the

2   store.

3   Q.   Okay.  I'm going to hit "Play" on this right now and I'm

4   going to speed it up slightly.

5           And who is that that just walked by on camera?

6   A.   That's who I believe to have been Mr. Zuberi.

7   Q.   And that white vehicle that just came by, what -- what

8   white -- what vehicle was that?

9   A.   That would have been the white Nissan Altima.  And I see it

10  kind of stops here in the back.

11  Q.   Who did you believe that was walking from the vehicle?

12  A.   I believe that to be Ms. Westfall.

13  Q.   Okay.  So there's a marking ability on here.  Could you mark

14  where you believe you see the -- you saw the Nissan Altima?

15  A.   Do I touch the screen?

16  Q.   Yeah.

17  A.   Okay.

18          MR. BOCCATO:  All right.  I don't know if you can see

19  the mark.

20          THE WITNESS:  I can circle it.

21          THE COURT:  I can see it, but -- here we go.

22          MR. BOCCATO:  Okay.

23          THE COURT:  Yep.  I can see it.

24          MR. BOCCATO:  Okay.  Oh, perfect.  I can't see it on my

25  laptop.  That's -- that's what I'm doing wrong.

1    BY MR. BOCCATO:

2    Q.   All right.  So -- and I'm just going to rewind this briefly.

3         So who did you believe that was again -- or can you

4    mark where you believe Ms. Westfall was putting something in the

5    trash?

6         All right.  Did you -- and approximately what time was

7    that on the time stamp?

8    A.   Could I refer to my report?

9    Q.   Yeah.  Or you can refer to the exhibit.

10   A.   Oh.  9:57 a.m.

11   Q.   And where in this video is Ms. Westfall?

12   A.   She would be that I -- where I circled here at the bottom.

13   Q.   And we're trying to build a record.

14   A.   Oh, so --

15   Q.   Was she in the right-hand corner of the video?

16   A.   Yes.

17   Q.   And where in the video is the Altima at this point in time?

18   A.   So the Altima would be kind of in the -- if I'm looking at

19   it, the upper right-hand corner.

20   Q.   And you were physically at the -- were you physically at

21   this gas station?

22   A.   Yes.

23   Q.   And were you able to see a trash can there where she walked

24   to?

25   A.   Yes.

1    Q.   I'm going to just scroll back a little bit.  So looking at

2    the -- can you mark on this exhibit, you know, where you see the

3    Nissan -- where you believe you saw the Nissan Altima?

4    A.   It would be right in the middle of the screen.

5    Q.   And based on that exhibit, what time was the Nissan

6    Altima -- what time did it come into the parking lot?

7    A.   9:53 a.m.

8              MR. BOCCATO:  Okay.  And these videos that I'm going to

9    play right now could be found in Exhibit -- Exhibit 8.  We have

10   CDs that contain all these videos.  I don't believe there's any

11   objection to their admission in the record.

12             MS. POTTER:  No objection.

13             THE COURT:  They're in.  Thank you.

14   BY MR. BOCCATO:

15   Q.   So before we discuss this, can you mark where you see the

16   Nissan Altima in this exhibit?

17   A.   Yes.

18   Q.   And what time are we at right now?

19   A.   10:06 a.m.

20   Q.   This is -- this is exhibit -- or we're referring to -- I

21   think if you look at the top right -- left-hand corner, is that

22   Exhibit 8-9 or --

23   A.   Yes.  Yep.

24   Q.   And the one we just referred to would have been 8-7.

25             So does -- from your review of this surveillance

1   footage, from when it initially came into the parking lot and

2   parked, and at this point, had the -- did the Nissan Altima move

3   at all?

4   A.   Not up to this point.

5   Q.   So what do you observe happening inside the Altima?

6   A.   So I observed both of them going to the trunk area and going

7   from, like, the interior of the car to the trunk area, and the

8   trunk opens, closes a few times.

9   Q.   Can you tell us what -- or I'm showing you what's been

10  marked as Exhibit 8-10.  Can you mark on this one as well, I

11  guess it might already be marked, where the Altima is?

12  A.   Yes.

13  Q.   At what time frame does -- when does this exhibit start?

14  A.   10:07 a.m.

15  Q.   And, again, is the Altima in the same place it's been since

16  when it parked in the parking lot?

17  A.   Yes.

18  Q.   I'll play this.  And are you still seeing individuals at the

19  back of the vehicle going in and out of the trunk?

20  A.   Yes.

21  Q.   And I'll just pause it right now.  Does that appear to be

22  10:08:24, Mr. Zuberi going into the trunk?

23  A.   Yes.

24  Q.   So at what -- what's happening right now?

25  A.   So that's where I believe -- so Mr. Zuberi got into the

1   driver's seat of the Nissan Altima and then they move it over to

2   a different parking spot.

3   Q.   And what time is it right now on the video?

4   A.   10:08 a.m.

5   Q.   And what's happened now, based on your review of the video?

6   A.   So this is where Mr. Zuberi exits the Nissan Altima.

7   Q.   Okay.  And can you just give us, like, a precise timestamp

8   and what's happening on the video?

9   A.   10:08 a.m.  The Nissan Altima is parked by Mr. Zuberi in, I

10  guess, the north parking lot into the parking spot where I

11  located the Nissan Altima.

12  Q.   Is it 10:08 -- sorry -- 10:08:56?

13  A.   10:08 and, yes, 56.

14  Q.   And what's happening now right at 10:09:09 in the video?

15  A.   At 10:09:09, that's when Mr. Zuberi would have exited the

16  Nissan Altima and he's walking across the parking lot to --

17  towards, like, the north -- northeast side of the convenience

18  store.

19  Q.   So with this information, what did you do at the convenience

20  store?

21  A.   So I contacted Detective Zupan again and let him know what I

22  observed in the video surveillance.

23  Q.   Okay.  Oh, and that last video we looked at, I'm sorry, I

24  just want to include that, is that marked as, you can see the

25  upper left-hand corner, Exhibit 8-10?

1    A.    Yes, it is.

2    Q.    What did you tell Detective Sergeant Zupan?

3    A.    So I kind of -- I explained to him what I saw in the video

4    kind of just like we went through, that I saw the Nissan Altima

5    pull up -- or I guess previously I had watched the Honda Pilot

6    pull into the parking lot and later saw the Nissan Altima pull

7    into the parking lot.  I see Ms. Westfall put something in the

8    garbage can.  Explained to him that then Mr. Zuberi parks the

9    vehicle and left it, and it's in -- the location that I saw in

10   the video is where I found the vehicle.

11   Q.    Did you actually check the garbage can?

12   A.    I did.  I checked the garbage can that was where I thought I

13   saw her put something in it.  I observed that it looked to be

14   empty.  I was advised that when they empty the garbage cans -- I

15   asked the store staff what they do with it.  And there was a

16   large dumpster again in that north parking lot against the fence

17   where they empty the contents into that large dumpster.

18   Q.    How far would that large dumpster have been from where the

19   Altima was initially parked?

20   A.    Where it was initially parked, it would have been directly

21   in front of the Altima.

22   Q.    Did you check the dumpster at all?

23   A.    I did.  I went through the large dumpster, went through

24   quite a bit of garbage through there.  Didn't locate anything at

25   that time that I thought was -- would be evidence.

1  Q.   Did you eventually find a lot of food and --

2  A.   Yes.  Yeah.  There was a -- inside the convenience store,

3  there's, like, the fast food little deli, so there was a lot of

4  debris and garbage from that, so it's kind of hard to sift

5  through.

6  Q.   Did a -- did a tow truck eventually respond to the gas

7  station?

8  A.   Yes.

9  Q.   Do you know who called that tow truck or who made the

10  decision to call that tow truck?

11  A.   I asked Sergeant Zupan if he wanted to have it towed.  He

12  said yes, have it towed.  I believe I would have at that point

13  contacted our dispatch, asked for a tow truck to respond.

14  Q.   Is it possible that Sergeant Zupan could have contacted the

15  dispatch about getting the tow truck?

16  A.   Very possible.  I don't recall if I contacted the dispatcher

17  or if he contacted the tow truck.

18  Q.   And when did the tow truck finally arrive?

19  A.   I believe it was 7:45 p.m.

20  Q.   Can you confirm in your report exactly when it arrived?

21  A.   At 7:30 p.m.

22  Q.   And then what happened after that?

23  A.   After that, I continued to look through the dumpsters.  Or I

24  guess before -- once the tow truck came, he took possession of

25  the car.  I contacted Sergeant Zupan.  I asked him if he wanted

1  me to follow, and then -- followed in so it could get secured in

2  the police department's parking lot.  He said he's standing by

3  for them and that he would take care of that.

4  Q.   Who -- do you know who put the -- eventually put evidence

5  tape on the vehicle?

6  A.   I do not.

7          MR. BOCCATO:  I think we're -- no further questions.

8          THE COURT:  All right.  Any cross-examination?  We'll

9  take a break when we finish up with this witness.

10          MS. POTTER:  Okay.  Thank you, Your Honor.

11                      **CROSS-EXAMINATION**

12  BY MS. POTTER:

13  Q.   Good morning, Detective Snyder.

14  A.   Good morning.

15  Q.   So you first got involved in this in the very early morning

16  of July 16, correct?

17  A.   Yes.

18  Q.   All right.  And you were there for about three and a half

19  hours before you were relieved?

20  A.   Yes.

21  Q.   And then you went home or did something else unrelated and

22  came back at 5:00 p.m.?

23  A.   Yes.

24  Q.   And is it at 5:00 p.m. that you first heard about the

25  Altima?

1   A.   I believe so.

2   Q.   And you said sergeant -- was it Detective Sergeant Zupan who

3   told you that a cellphone had pinged in Merrill, Oregon?

4   A.   I can't recall who told me about the ping.

5   Q.   At that time, did Sergeant Zupan ask you to go to Merrill?

6   A.   No.  I offered.

7   Q.   So at that point, no one was pushing to go to Merrill to

8   retrieve the car?

9   A.   Not that I recall, no.

10  Q.   So you arrived at the gas station at 6:45?

11  A.   Yes.

12  Q.   You saw the vehicle?

13  A.   Yes.

14  Q.   You called Sergeant Zupan?

15  A.   Yes.

16  Q.   How long was that call?

17  A.   I -- I would only be guessing if I said.  I don't think it

18  was very long.

19  Q.   Minute or two?

20  A.   At the most.

21  Q.   Then you parked your car?

22  A.   I would have -- I would have already been parked when I

23  called him, I believe.

24  Q.   So you parked your car, you called Sergeant Zupan.  Then you

25  get out of your car and you go into the Fastbreak?

1  A.    I don't remember if I went in right -- immediately or not.

2  Q.    Shortly thereafter, you go into the Fastbreak and you ask to

3  see the surveillance?

4  A.    Yes.

5  Q.    And at that point, you're told they need to call a manager

6  to do that?

7  A.    Yes.

8  Q.    How long did it take for the manager to get there?

9  A.    I honestly don't remember.  It wasn't an extremely long

10  amount of time.

11  Q.    Maybe five -- five to ten minutes?

12  A.    I would say 10 to 20 minutes.

13  Q.    So 10 to 20 minutes for the manager to arrive.  During that

14  time, do you talk to the store clerk?

15  A.    I don't think I did.  I think I talked to her when I first

16  went in there to inquire about the video, and then she was going

17  to contact the manager, and I waited.

18  Q.    So you weren't doing any investigation for that 10 to 20

19  minutes?

20  A.    Yeah.  I believe I went back outside in the parking lot, was

21  at my car.  I believe I looked inside the car.

22  Q.    Did you see anything inside the car?

23  A.    No.

24  Q.    So 10 to 20 minutes later, the store manager arrives.  How

25  long does it take for them to set up the surveillance for you to

1   watch?

2   A.   Again, it would be guessing.  I don't remember, but I want

3   to say probably, again, ten -- maybe ten minutes at the most.

4   Q.   How many videos did you watch?  Like, how many angles?

5   There are multiple angles, correct?

6   A.   I -- yeah.  And I believe I watched two of them while I was

7   there, the one from the north parking lot and one from the --

8   would have been on the east side of the store.

9   Q.   Okay.  So then is the north parking lot the one we just

10  watched?

11  A.   Yes.

12  Q.   Did you watch every single one of those while you were in

13  the convenience store?

14  A.   No.

15  Q.   No.  Do you recall which one of those you watched when you

16  were in the convenience store?

17  A.   The ones that we just reviewed are the ones that I watched

18  while I was at the store.

19  Q.   Okay.  So every single one he showed you, you watched in the

20  convenience store?

21  A.   Yes.

22  Q.   Were there any others that you watched in the convenience

23  store?

24  A.   I don't believe so.  I think there were other ones that I

25  watched that we didn't see, but it was from the -- yes, from the

1  east side of the store.

2  Q.   At any point did you ask the store manager if Mr. Zuberi had

3  come into the store?

4  A.   I do not believe I did.

5  Q.   Did you ever ask anyone if they had given permission to park

6  the car there?

7  A.   I don't think I asked that.

8  Q.   So about how long were you watching the videos before you

9  called Sergeant Zupan?

10  A.   Sorry.  The times are hard for me to remember, like, how

11  long I was in there in each spot, but --

12  Q.   Yeah.  I understand approximate --

13  A.   -- I was probably watching it for, I don't know, 15 minutes

14  would be a guess.

15  Q.   Okay.  So you watch it for 15 minutes and then you call

16  Sergeant Zupan.  And what do you ask Sergeant Zupan at that

17  point?

18  A.   I think that's probably the time that I would have asked him

19  if he wanted the car towed.

20  Q.   Did you tell Sergeant Zupan that the car had been abandoned?

21  A.   I don't remember if I told him that or if it was just

22  implied.

23  Q.   But you never checked on whether anybody had given

24  permission to park the car?

25  A.   I did not.

1  Q.   Where was the tow truck coming from?

2  A.   It would have been coming from Klamath Falls.

3  Q.   And correct me if I'm wrong.  You said that was 25 minutes

4  away?

5  A.   It's approximately 25 miles give or take, so (pause) --

6  Q.   Okay.  So just so I have the timeline, you arrived at 6:45.

7  A.   Yes.

8  Q.   Took you about five minutes, let's just say, to call

9  Sergeant Zupan -- park your car, call Sergeant Zupan, and go into

10  the store.

11  A.   Yes.

12  Q.   Took another 10 to 20 minutes for the manager to arrive.

13  A.   Yeah.

14  Q.   And then another ten minutes to watch the videos.

15  A.   Yeah.

16  Q.   And then you called Sergeant Zupan again?

17  A.   Yes.

18  Q.   He says he wants the car towed?

19  A.   Yes.

20  Q.   And then the tow truck arrives at 7:30 from 25 miles away?

21  A.   Yes.  I -- yeah.  Like I said, on my times, I wasn't sure.

22  Q.   But the 7:30 you're sure of because it's in the report,

23  correct?

24  A.   Yes.  I would be sure that 7:30 is when the tow truck

25  arrived.

1   Q.   So the tow truck needed to be called probably no later than

2   7:05?

3   A.   That would seem correct, yes.

4   Q.   Okay.  So within 20 minutes of arrival, you had called

5   Sergeant Zupan and told him -- asked him if he wanted the car

6   towed?

7   A.   I must have.

8   Q.   You did -- you said you looked in the dumpster for trash?

9   A.   Yes.

10   Q.   But you didn't do a complete search?

11   A.   No.

12   Q.   Then later, you actually reviewed more of the surveillance

13   video, correct?

14   A.   Yes.

15   Q.   And you noticed that you might have missed things?

16   A.   Yes.

17   Q.   What is it you thought you missed?

18   A.   I did not know what I would have missed.  I saw it looked

19   like something was taken from the trunk and put into the dumpster

20   directly, but I don't know what that would have been.

21   Q.   And you went back out there (pause) --

22   A.   To the --

23   Q.   -- again?

24   A.   To the dumpster?  No, I didn't.  Not after -- by that time

25   that I -- by the time I watched the video and saw that, the

1    dumpster would have been taken to the landfill.

2    Q.    And at no time did you ask them to hold off on dumping the

3    dumpster while you continued your investigation?

4    A.    I did not.

5    Q.    And going back, you said you talked to Sergeant Zupan.  At

6    that point, did you understand that the FBI was actively involved

7    in the investigation?

8    A.    Yes.

9    Q.    Did the FBI request that the car be towed?

10   A.    I don't know.

11   Q.    Did you look in the garbage can before or after you called

12   Sergeant Zupan about towing the vehicle?

13   A.    I believe it would have been after.

14   Q.    At no time on the video did you see Mr. Zuberi place

15   anything in the car, did you?

16   A.    No.

17            MS. POTTER:  All right.  No further questions, Your

18   Honor.

19            THE COURT:  Would you have been capable from your view

20   on the video seeing him either removing or placing things in the

21   car?

22            THE WITNESS:  No.  I -- it was hard to see what was

23   going -- especially the video I was watching at the store, it was

24   pretty -- a small screen and hard to see.

25            THE COURT:  You saw the trunk opening?

1           THE WITNESS:  Yes.

2           THE COURT:  All right.  Any redirect?

3                    **REDIRECT EXAMINATION**

4    BY MR. BOCCATO:

5    Q.   And you saw -- did you see what appeared to be Zuberi's

6    partner walk to the trash can?

7    A.   Yes.

8    Q.   Is that the reason you searched the trash?

9    A.   Yes.

10   Q.   So would you have searched the trash if you hadn't seen her

11   walk to the trash can?

12   A.   No, I don't think I would have.

13   Q.   And did you see the Altima come into the parking lot?

14   A.   Yes.

15   Q.   And did you see the Altima move to the new location?

16   A.   Yes.

17   Q.   And did you see somebody who didn't appear to be Zuberi's

18   partner walking away from the Altima?

19   A.   Yes.

20   Q.   Did you -- based on your knowledge of the investigation, did

21   you believe that was Mr. Zuberi?

22   A.   Yes.

23           MR. BOCCATO:  No further questions.

24           THE COURT:  All right.  Thank you very much.

25           Folks, we'll break for lunch, how about till 1:30 if

1   that works for everybody.

2          Do we have more witnesses, then, with regard to this

3   motion?

4          MS. MILES:  No, Your Honor.  No more witnesses with

5   regard to this witness.

6          THE COURT:  All right.  Okay.  We'll hear argument,

7   then, on the motion at 1:30.  Thank you.

8          MR. SWEET:  Your Honor, can I ask the defense, is there

9   any objection to the witnesses be excused by the defense?

10          THE COURT:  Not at all.

11          MR. SWEET:  Then we would ask that they be excused.

12          THE COURT:  They're excused.

13          MR. SWEET:  Thank you.

14          (Recess:  12:18 - 1:35)

15          THE COURT:  Okay.  My understanding, at least with

16   regard to the motion to suppress evidence of the search of the

17   Altima, is that we've heard all of the evidence.  Did the parties

18   want to make argument on that case now?  All right.  Okay.  Let's

19   hear from the Government.

20          MR. BOCCATO:  Thank you, Your Honor.  There are

21   multiple ways to justify the search --

22          (Interruption by the reporter for clarification)

23          MR. BOCCATO:  Your Honor, there are multiple grounds to

24   affirm or not strike the search and seizure of the Altima.  First

25   off, we have the four corners of the warrant and the affidavit

1    that provides sufficient probable cause.

2         The second ground is good faith.  We have -- clearly

3    have good faith.  None of the exceptions to good faith apply.  We

4    have good faith in this case.

5         Third, we have the automobile exception, which

6    justifies both the search and seizure of the Altima.  In our

7    briefing, we talk a little bit about inevitable discovery, and

8    maybe fifth, we can even start talking about abandonment.  I'm

9    not going to argue abandonment here, because it's our fifth

10   argument.  We're not conceding it, but it's certainly not one

11   we're relying on.

12        I do want to talk a little bit about the probable cause

13   that existed that justified the search and seizure in this case

14   outside of the warrant.  When law enforcement investigated this

15   case, this was a serious case, a significant case.  We had a

16   victim who talked about -- discussed a horrific incident, a

17   horrific attack, assault, and her story was essentially

18   corroborated on a number of grounds.  The Court heard those

19   grounds where it was corroborated.  I'm not going to repeat those

20   right now.  We have a situation where the victim's story was

21   completely and utterly corroborated.

22        After that, we have just the information that this was

23   not a simple thing.  This involved a trip all the way from

24   Klamath Falls to Seattle and back, involved the creation of a

25   concrete structure that he spent hours and weeks and days to put

1    together.  This is not an isolated incident, but instead an act

2    that required significant planning, preparation, and organization

3    to put together.  Then you couple that with the simple fact that

4    Zuberi was the registered owner of this vehicle.  Frankly, that

5    gets you to probable cause, but we have so much more than that.

6            And after that, we know the vehicle's connection to the

7    house.  We know that the victim saw the vehicle at the house.  We

8    know that neighbors saw the vehicle at the house.  We know the

9    vehicle was back and forth from the house throughout the

10   incident.  That also gets us to probable cause, just weighing

11   down the strength of our probable cause.

12           Third, if you want to add more, just take in

13   Ms. Westfall herself, her lies to law enforcement, her deception,

14   her failure to answer questions forthright, coming back and forth

15   to the house multiple, multiple times for reasons that are

16   unclear, but as the agent test- -- or the officer testified,

17   potentially to take evidence or move evidence or interfere with

18   the case.

19           I'll note that the warrant for the Altima does not --

20   isn't simply for kidnapping, but also for obstruction.  We know

21   that Ms. Westfall lied.  She said that she was going to --

22           THE COURT:  Help me out.  What is the evidence of

23   obstruction you'd be hoping to find in a search of the vehicle?

24           MR. BOCCATO:  So I think with the search of the vehicle

25   itself with obstruction, it's the moving of evidence, the hiding

1  of evidence, really just any facts that would show the taking of

2  evidence away, I mean, really just Ms. Westfall's actions of

3  leaving or -- leaving the vehicle in a faraway location separated

4  from the residence.  I think there's clearly probable cause that

5  there was possible evidence of obstruction in that vehicle.

6           So then if you go beyond Ms. Westfall and her lies to

7  law enforcement, the fourth argument is then you include

8  Mr. Zuberi in there, his access and activity with the Altima

9  itself.  You see him on video driving the Altima, moving it from

10  one part of the parking lot to another, opening and closing or

11  being with the Altima while it was -- with the trunk open.

12  Mr. Zuberi not -- had access and an opportunity to manipulate the

13  Altima and its contents, and it wasn't during some benign period

14  of time.  He had that access and opportunity during his flight

15  from Klamath Falls to Reno, Nevada.

16           So, Your Honor, we think that there was significant

17  probable cause in this case, the warrant can be justified, or the

18  search and seizure can be justified on multiple grounds and we

19  would like you to deny the motion to suppress.  Thank you.

20           THE COURT:  All right.  Thank you.

21           All right.  Ms. Potter -- Ms. Potter, let me just

22  clarify.  It seems that defense is not arguing there's no

23  probable cause to believe a crime has been committed.  The focus

24  of this motion is that despite probable cause to believe a crime

25  has been committed and would support the search of the residence,

1    there's nothing to associate that crime with this vehicle.

2        MS. POTTER:  This particular vehicle, yes, Your Honor.

3    So I guess where I would start is, you're right.  Ms. Westfall

4    had the car, she tried to get back in the house, she couldn't,

5    she was gone before they ever got there.  There's no -- there's

6    nothing -- the most she did was throw away a bag.  That's where

7    the evidence would have been, is the bag of trash.

8        What you see in the video is the door open and the

9    trunk open, and it appears that they may be moving stuff, but

10    there's no evidence that he's putting anything into the trunk,

11    that Mr. Zuberi is -- or the trunk -- the Altima.  I apologize.

12        So basically the warrant boils down to if you possibly

13    had access to a vehicle and you're accused of this crime, the

14    police can search it.  And that's all they have, that, you know,

15    maybe there's DNA, even though neither of the victims had

16    anything to do with that car.

17        And Mr. Zuberi would dispute that he was taking flight.

18    There's no evidence that he was fleeing.

19        So they focus a lot on his access and activity, but

20    there really isn't a tremendous amount of access.  The person who

21    had access was Ms. Westfall.  And the notion that there's

22    evidence of obstruction of justice because she lied about knowing

23    him, there's no other evidence that she was doing anything.

24    Maybe she wanted to get in the house, who knows, but she never

25    could.

1   So she was apparently on a trip to Wal-Mart when she

2   came back and the police were there.  So everything was still

3   there, was still in the house.  She didn't have an opportunity to

4   move it.  There's simply -- there was no probable cause to seize

5   it and there was no probable cause for the warrant.

6   And the key piece of evidence from the Altima is the

7   receipt that ties to the trailer.  And that's really where this

8   should end up.  The Altima doesn't -- other than that, there's

9   really not anything else we're fighting about in the Altima, but

10  that gets you to the trailer, and the key is that the trailer

11  then should be suppressed, because there's -- the trailer

12  basically falls for the same reason the Altima does unless they

13  can tie it to that receipt, because the jail call, there's never

14  any mention of a trailer.  There is a mention of a code, but they

15  have no idea what that was absent the receipt.  They say, "Well,

16  eventually in September, we might have figured it out," but

17  that's a long time removed from the jail call where this code was

18  purportedly mentioned.

19  So at the end of the day, it's not enough to simply say

20  because someone had access to something, you get to search it.

21  That's what these two warrants boil down to, and we believe they

22  should be suppressed.

23  THE COURT:  Okay.  All right.  First I'll note that the

24  challenge is not to -- you know, the probable cause to search the

25  home, there's not a challenge that the police did not have

1    probable cause to believe a crime has been committed.  Clearly

2    based on their interview with Adult Victim 1 and the subsequent

3    corroboration of a lot of her testimony, there was clearly

4    probable cause to believe that the crimes of kidnapping and

5    sexual assault had occurred.

6           The question here is whether probable cause existed to

7    believe that the evidence of the crime or crimes would be

8    found -- whether it would be reasonable to be found in the Nissan

9    Altima.

10          There is probable cause to believe that evidence of the

11   crimes would be found in the Nissan Altima.  The Nissan Altima

12   does have a connection to the residence, to Mr. Zuberi, and to

13   his flight such that it would only make sense for law enforcement

14   to search this vehicle.

15          First, the vehicle was registered to Mr. Zuberi;

16   second, it was seen by Adult Victim 1 at the residence at the

17   time she was escaping the residence; it was seen by neighbors at

18   the residence; it was being driven by Ms. Westfall, who appeared

19   to be trying to retrieve things from the house or at least was

20   driving, I guess, repeatedly about the house, trying -- you know,

21   after the crime and after Mr. Zuberi had left the house.

22          It's clear that Ms. Westfall was assisting in

23   Mr. Zuberi's flight from Oregon.  She lied about her relationship

24   with him.  She lied about his relationship with his own children.

25   She lied about the knowledge of his whereabouts.  And she lied

1   ultimately about the -- her own whereabouts, saying she was in

2   Medford when, in fact, she was in Reno with Mr. Zuberi.

3           She met Mr. Zuberi in Merrill, Oregon, in the Nissan

4   Altima.  Mr. Zuberi was observed via video entering and exiting

5   the vehicle.  It was observed that they were opening and closing

6   the trunk repeatedly.  Mr. Zuberi is seen driving the Nissan

7   Altima to its ultimate parking spot.  It is telling that they

8   parked next to a dumpster, and it did appear that something was

9   being thrown away in a garbage can by Ms. Westfall.

10          The police had not found certain evidence that they

11  were certainly hoping to be find -- hoping to find based on their

12  interview with Adult Victim 1, and all of these were things that

13  could easily be held in a vehicle such as the Nissan Altima.

14  Certainly they could be thrown away, too, but I don't think the

15  police have to say, "Well, you know, they were throwing things

16  away, they were near a dumpster.  I guess it's all gone.  Let's

17  not conduct a search."

18          I think it was reasonable for them to look for evidence

19  of the crime in the Nissan Altima, and that would include Adult

20  Victim 1's cellphone that they had not found, the foil that was

21  used to, I guess, encapsulate the cellphone.  I don't know if

22  that actually works or not, but it's something that occurred.

23  There was the cellphone jammer.  There were tasers that were

24  referenced by Adult Victim 1.  There were sweatshirts that were,

25  I think, referenced by both adult victims that were used to kind

1   of put a hood over their face.  They were certainly looking for

2   receipts.

3           And the other thing I would say is that, you know, this

4   is not a -- this isn't like a bank robbery that occurred over a

5   15-minute period where the expectations would not be that the

6   bank robber, who maybe rented a storage locker a year ago, would

7   necessarily have evidence of bank robbery there.

8           This is a series of events.  The crime itself appears

9   to be -- it appears to involve a series of planning and scheming

10  over a long period of time in which a lot of things would have

11  occurred in terms of construction, scoping out who the possible

12  victims might be, buying things, creating things.

13          You know, it's a pretty wide-ranging investigation, and

14  I think this is a case where anything, really, belonging to

15  Mr. Zuberi would rightfully be searched for evidence of this

16  long-term planning and scheming.  And clearly things had moved

17  over a long period of time.  I mean, for instance, you know,

18  Adult Victim 1 saw a very different setup in the garage than

19  Adult Victim 2 saw, because this did take some planning and

20  scheming and construction and building and thinking and storing

21  and moving things.

22          So the very fact that Ms. Westfall may have been in

23  possession of the vehicle shortly after the alleged crime does

24  not mean that Mr. Zuberi would not have had access to the vehicle

25  before the alleged crime.  He certainly had access to it in

1    Merrill after the alleged crime.

2           So there is probable cause to believe that there would

3    be evidence of the crimes in the Nissan Altima, so I'm denying

4    the motion for that reason.

5           You know, with regard to the other reasons, I mean, the

6    automobile exception clearly applies.  There's probable cause to

7    believe that evidence would be found in the vehicle.  The vehicle

8    has been left in a small town away from Klamath Falls, away from

9    Reno, but, I mean, the idea that the police -- law enforcement

10   would simply leave it parked at a convenience store gas station

11   in Merrill hoping that nobody would ever access it in order for

12   them to get a warrant makes no sense to me.  I think they could

13   have probably searched it in the parking lot if they'd wanted to,

14   but instead, they rightfully seized it, secured it, and got a

15   warrant.

16          I'm not sure if abandonment -- I'm not sure if I'm

17   willing to go as far as abandonment.  I think just because

18   somebody parked a car and went somewhere else, that doesn't mean

19   they've abandoned the vehicle, but certainly the automobile

20   exception does apply.

21          So for those two reasons, I'm denying the motion to

22   suppress.  Obviously that does allow the receipt to come in.  I

23   don't know if there's more evidence that folks want to present

24   with regard to the -- the locker.  How are we proceeding on that?

25          MS. POTTER:  I guess the only thing I would say, we --

1    and I understand the Court's ruled against me as to his access.

2    We would just say that's not enough, and I'll put that on the

3    record that we would argue it's not enough they simply had access

4    to the storage unit to justify the search even with the receipt.

5    And I'll just submit on that, Your Honor.

6         THE COURT:  Okay.  With regard, then, to the storage

7    locker, the Government's position on that?  I mean, we have the

8    receipt obviously, but I guess I've certainly found that this is

9    the kind of crime that took enough planning and scheming that

10   there would be an expectation that any kind of storage facility

11   associated with Mr. Zuberi would reasonably contain evidence of a

12   crime.  Does the Government want to put on more evidence

13   regarding that, or argument?

14        MS. MILES:  Your Honor, we had a separate search

15   warrant for the storage unit and for the trailer, and those were

16   addressed in the *Franks* motion, but were not separately -- there

17   was no suppression motion separately targeted at those.

18        THE COURT:  Okay.  There wasn't one on the trailer?

19   Maybe I misunderstood.

20        MR. SWEET:  There -- there was -- I'm sorry.  If the

21   question was was there a separate motion to suppress on the

22   trailer, yes, there --

23        THE COURT:  Is there a separate motion to suppress?

24        MS. MILES:  No.

25        THE COURT:  Sorry.  Maybe I thought I was hearing

1    Ms. Potter that they were also moving to suppress evidence found

2    in the trailer.

3            MS. POTTER:  Well, we were through the theory of the

4    Nissan, but you asked me, so I'm going to put it on the record,

5    but -- and I would just say it is -- we did offer -- it's

6    Exhibit 4 is the trailer search warrant.

7            THE COURT:  Well, finding that, you know, the -- the

8    receipt having been found legally that then led to the search of

9    the trailer, there would be no reason for me to suppress anything

10   further.  So the motion is denied.

11           All right.  So where are we going next?

12           MS. MILES:  Next, Your Honor, we'll go into the motion

13   to dismiss based on the destruction of evidence --

14           THE COURT:  Okay.

15           MS. MILES:  -- of the concrete structure in the garage.

16           THE COURT:  Does any side want to present evidence on

17   that?  I've certainly seen the exhibits, you know, photographs

18   and those types of things.  Is there evidence the Government

19   wishes to present on that?

20           MS. MILES:  Yes, Your Honor.  We intend to call Special

21   Agent Travis Gluesenkamp to the stand to talk about that.  I

22   don't know whether the defense has anything to say before we hear

23   the evidence.

24           THE COURT:  Okay.  Any preliminary matters with regard

25   to the destruction of evidence motion?

1          MR. BERTHOLF:  I don't think we're --

2          MS. POTTER:  No, Your Honor.

3          THE COURT:  Okay.

4          MR. BERTHOLF:  Ms. Potter will be arguing.  I'll be

5     cross-examining.

6          THE COURT:  Okay.  Do you want to call your first

7     witness, then.

8          MS. MILES:  Thank you.

9          THE COURT:  One other finding I just want to make on

10    the last motion.  I'm sorry that I'm interrupting, but I just had

11    remembered this over lunch.  The other piece that I think is

12    important in terms of why I don't think it's appropriate to

13    suppress evidence found in the Nissan Altima or ultimately the

14    locker, there were other people living in the house with

15    Mr. Zuberi.  There are children in the house.

16         It seems reasonable to me for -- given the planning and

17    scheming, that not everything associated with this crime would be

18    kept openly in a household with a lot of other people who would

19    be witnesses to what the heck is going on.  So I do think that

20    also leads to the reasonableness that the law enforcement had in

21    searching other vehicles and lockers associated with Mr. Zuberi.

22                   **DEFENDANT'S MOTION TO DISMISS**

23         THE COURT:  All right.  Our next witness, then.

24         Sir, if you'd like to walk around this wall to your

25    right, onto the bench, over to the witness stand to your left.

1    Remain standing for a moment.

2                          **TRAVIS GLUESENKAMP**

3        after having been duly sworn under oath, was examined and

4                              testified as follows:

5            THE COURT:  Thank you.  If you'd like to have a seat.

6    Our court reporter is working remotely from Portland, so if you

7    could keep your voice up, close to the microphone, and start by

8    stating your first and last name, spelling both.

9            THE WITNESS:  Travis Gluesenkamp; T-R-A-V-I-S,

10   G-L-U-E-S-E-N-K-A-M-P.

11           THE COURT:  Great.  Thank you.

12                        **DIRECT EXAMINATION**

13   BY MR. SWEET:

14   Q.    Are you employed as a special agent of the FBI?

15   A.    Yes.

16   Q.    How long have you been so employed?

17   A.    16 years.

18   Q.    Can you please briefly summarize your training and

19   experience?

20   A.    I attended the FBI academy in 2008.  After that, I was

21   assigned to the Portland field office, and I worked in Portland

22   for 11 years.  There, I handled domestic terrorism cases, bank

23   robberies, all crimes aboard aircraft.  And after that, I

24   transitioned to some administrative roles, being the SWAT team

25   leader and primary firearms instructor.

1  Q.  Are you currently the lead case agent for the FBI on the

2  Negasi Zuberi case?

3  A.  Yes.

4  Q.  On July 19th of 2023, did you obtain a search warrant for

5  the residence of 1336 Northeast Eldorado in Klamath Falls,

6  Oregon?

7  A.  Yes.

8  Q.  And was that Mr. Negasi Zuberi's residence?

9  A.  Yes.

10  Q.  Was that your first time entering the residence at 1336?

11  A.  Yes.

12  Q.  And did you -- what day did you execute the search warrant?

13  A.  On the morning of the 19th.

14  Q.  And prior to your entry, had you seen photographs from the

15  Klamath Falls search of the residence?

16  A.  Yes.

17  Q.  Had you seen photos of the cinderblock structure in the

18  garage?

19  A.  Yes.

20  Q.  Were you aware if -- that the Oregon State Police forensics

21  unit had also processed the cinderblock structure?

22  A.  Yes.

23  Q.  So during the FBI search on July 19th, did you document the

24  cinderblock structure?

25  A.  Yes.

1    Q.    What did you do, please?

2    A.    I measured it, photographed it, and took a video of it.

3    Q.    Did you go inside?

4    A.    Yes.

5    Q.    Did -- were you accompanied by other special agents who were

6    with you?

7    A.    Yes.

8    Q.    Prior to going inside, did you sort of check out the safety

9    of the structure?

10    A.    I didn't physically push on it or test it, but I just looked

11    at it, inspected the exterior, my concern making sure if it's

12    safe for anybody else to go inside.

13    Q.    So let's -- let's talk about the structure generally.

14    Starting from the outside of the structure and moving to the

15    inside, could you please describe your observations as to how it

16    was built?

17    A.    The exterior of the structure was made of cinderblocks.  The

18    cinderblocks were stacked vertically, meaning each block was

19    stacked sequentially on top of the other.  Typically with

20    construction, you typically see an interlocking of the blocks,

21    but that wasn't the case with this.  You could notice that there

22    was no mortar between or cement between the blocks, but you could

23    see a rubbery substance that looked like a construction adhesive

24    sticking out from inside the blocks.  And then they formed a

25    rectangle, and then there was a wood roof of some kind on top of

1    the structure.

2    Q.    Okay.  So if the outermost layer is the cinderblocks and

3    you're standing on the inside, what's the next layer in from the

4    cinderblocks?

5    A.    The next layer in from the cinderblocks was a 2x4 framed

6    interior with vertical studs and lateral studs.

7    Q.    And was there something in between the 2x4 studs?

8    A.    There was insulation that was installed in between each of

9    the 2x4 studs.

10   Q.    And so the insulation you're talking about here, is this

11   kind of the -- the pink Fiberglas-type insulation?

12   A.    There were a few different kinds.  There was -- I saw yellow

13   and pink.  So there was not the same brand used throughout.

14   Q.    But was it sort of the -- the puffy Fiberglas insulation?

15   A.    Yes.  And it was the thickness of a 2x4.  So it wasn't the

16   big thicker stuff you'd see in your basement.  It's going to be

17   the thinner stuff you see inside of walls.

18   Q.    So cinderblocks, Fiberglas insulation.  Then what?

19   A.    On top of the plywood studs was drywall.

20   Q.    And how was it -- describe that more, please.

21   A.    The drywall had been hung in a rough fashion, meaning the --

22   there were sections of the plywood that overlapped -- excuse

23   me -- sections of the drywall that overlapped other sections of

24   the drywall.  It wasn't fitted properly, so there would be, like,

25   a bulge in -- in the area where the wall -- the drywall was

1    overlapping each other.  And then the interior frame was not

2    square, and so it was a little wavy.  And so there was some bends

3    in the plywood to make it fit -- or excuse me, the drywall to

4    make it fit.

5    Q.    And was there mud in between the Sheetrock --

6    A.    Yes.  Somebody had applied -- or mud had been applied over

7    screw holes and then the seams where all of the drywall connected

8    to each other.

9    Q.    Was there anything on top of some of the drywall?

10    A.    There was a, what I would describe as, like, a Styrofoam

11    sheet that was glued in various spots inside of the -- the

12    structure that would -- didn't see any, like, real reason why it

13    was in one spot or wasn't in another spot.  It was just kind of

14    put up in different spots.

15    Q.    Did you find pre-packaged or unopened containers of that

16    material?

17    A.    Yes.

18    Q.    And was it marketed as a soundproofing material?

19    A.    Yes.

20    Q.    What about -- what about the roof, please?  Could you

21    describe the -- or the ceiling of the structure?

22    A.    The roof appeared to have -- was supported by 2x4s, and on

23    top of the 2x4s was screwed what's called OSB, or oriented strand

24    board.  It's like a particle board where pieces of plywood are

25    chipped up and then glued back together.  And then it looked like

1    there were other pieces of scrap wood on top of that, on top of

2    the OSB.

3    Q.    What about the doors?  Could you describe those, please?

4    A.    When I was there, a metal door, I was aware, had been there,

5    but it was no longer present, and so there was now a white door,

6    what I would describe as what you would find on the interior of a

7    house or, like, a bedroom.  That was on the exterior of the

8    structure.

9    Q.    What about -- describe how you would open or close that

10   door, please.

11   A.    There was no knob.  It had a dual-sided key lock, so both

12   sides required the use of a key either to get in or to get out.

13   Q.    Was that a deadbolt?

14   A.    Yes.

15   Q.    What about the floor?  Was there -- tell me about the floor,

16   please.

17   A.    The floor was just the garage floor.  It's just cement.

18   Nothing visible.

19   Q.    So there was nothing -- basically the cinderblocks all

20   around appeared to rest straight directly on the garage concrete

21   floor?

22   A.    Correct.

23   Q.    So at any time that you were in the cell or outside looking

24   at the cell, did you see anything that caused you to question

25   what Adult Victim 1 had told law enforcement about the cell?

1  A.   No.

2  Q.   So let's talk about -- about your impression.  Could you

3  describe your impression of it overall, please, in terms of the

4  build quality?

5  A.   It was of sound principle, but poor execution.  It -- it had

6  the appearance to me of like a teenager building a fort.  Sturdy

7  material were utilized, but they weren't hung in a straight

8  fashion.  And it's the old "measure twice, cut once" adage.  It

9  just didn't look like there was a skilled carpenter that had

10 assembled the thing, but the principles behind it were sound.

11 Q.   And the materials were sound?

12 A.   Yeah.  I mean, using the heavy cinderblock and the 2x4s the

13 way it was framed internally, it -- it had the earmarks of, like,

14 a refinished basement, how you would refinish a basement that's

15 in ground where you're putting a stud up against a concrete slab

16 backer.

17 Q.   In terms of your interaction with the structure, were you

18 working on it?

19 A.   Yes.

20 Q.   What did you do, please?

21 A.   My intent was evidence collection, so I was very carefully

22 removing or disassembling the cell with the intent to see what

23 was behind the walls.  Our concern was, was this the first person

24 that potentially had been inside here, and so we were looking to

25 see if there was any other evidence behind what had been hung up.

1   And so my interactions were more methodical, in that I'm trying

2   to cut and preserve what could be behind the drywall as opposed

3   to just ripping it off very indelicately.

4   Q.   Were you looking for blood or bodily fluids that might have

5   been behind that outermost layer of Sheetrock?

6   A.   Yes.

7   Q.   Did you find any?

8   A.   No.

9   Q.   How did you remove -- well, let me ask you this.  Did you

10  use sort of a saw and a crowbar to remove the Sheetrock?

11  A.   Yeah.  I used what's called an oscillating saw.  It has a

12  small straight sawblade that vibrates real fast, and it's used

13  for cutting drywall, so it allowed me to cut where the screws

14  would be so I'm not having to rip the screws off.  I'm able to

15  cut a piece of the drywall off each piece at a time as opposed to

16  ripping it out by hand.  And then I'd use a crowbar once we had

17  it off to then break it and pull it away and look behind it.

18  Q.   Would it have been hard to rip out just trying to use your

19  hands?

20  A.   It would have been very time-consuming, yeah.  It wouldn't

21  have felt good on your knuckles and fingers.

22  Q.   So if you didn't have a saw and you didn't have a crowbar,

23  it would have been a real challenge?

24  A.   Yes.

25  Q.   And that's just to remove the Sheetrock that we're talking

1  about?

2  A.   Correct.

3  Q.   Did you consider trying to remove the entire structure from

4  the residence?

5  A.   The first thought -- the first thought we got there is many

6  FBI agents are familiar with what happened with Ted Kaczynski's

7  shack in the woods, how they picked it up with a helicopter and

8  took it.  And so my first thought was, okay, is this something I

9  can feasibly take.  And very quickly we realized that this is not

10  something we can move.  I mean, we would have had to break it and

11  reassemble it somewhere else.  It was then a matter of where do I

12  put it, and then if I break it, how do I put it back together for

13  any kind of evidentiary value.  So we very quickly made the

14  decision that this is just not something we could physically

15  take.

16  Q.   Did you believe that it would have weighed thousands of

17  pounds?

18  A.   Yes.

19  Q.   As you're -- as you're in it and as you're interacting with

20  it, did it ever occur to you that there may be a challenge to the

21  structural integrity of that structure?

22  A.   Never.

23  Q.   So who ultimately did take down the cell?

24  A.   The property owner did.

25  Q.   And let's -- was that Kevin Westfall?

1   A.   Yes.

2   Q.   Okay.  And was he assisted by one of his adult sons?

3   A.   Yes.

4   Q.   Tell us about his -- his background, Mr. Westfall's

5   background, please.

6   A.   Mr. Westfall is a general contractor.  He reported to me

7   that he'd been so employed for 35 years.  He was a licensed

8   contractor in California for many years and then he's been a

9   licensed contractor in Oregon as well.

10  Q.   And did you -- have you interviewed Mr. Westfall several

11  times?

12  A.   Yes.

13  Q.   Did you interview him specifically regarding how he

14  dismantled and disposed of the structure?

15  A.   Yes.

16  Q.   Did he provide you some photographs and documentation?

17  A.   Yes.

18  Q.   Is -- is he available to testify regarding what he did?

19  A.   Yes.

20  Q.   So after the search warrant, and perhaps before, but did the

21  FBI work to locate records of purchases of items used to build

22  the structure?

23  A.   Yes.

24  Q.   Does that include by -- did you find some receipts during

25  the searches?

1  A.   Yes.  I was aware that receipts were located for Home Depot

2  during the course of searches, yes.

3  Q.   And did you also obtain, "you" being the FBI, purchase

4  records for Mr. Zuberi from Home Depot?

5  A.   Yes.

6  Q.   Did those records include the purchase of cinderblocks,

7  insulation, soundproofing, 2x4s, a deadbolt lock, and the -- the

8  OSB board that you referred to?

9  A.   Yes.

10       MR. SWEET:  I have nothing further.  Thank you.

11       THE COURT:  I'm going to ask a couple quick questions

12  and then we'll do cross-examination.  Were you able to determine

13  what kind of adhesive was used to secure the cinderblocks?

14       THE WITNESS:  Never any kind of definitive testing.  I

15  was familiar with construction adhesive, and it had all the

16  appearance of construction adhesive, like, it had been applied

17  with a calk gun, it had, like, a bead that was overflowing from

18  certain points, but we never physically tested what the actual

19  substance was.

20       THE COURT:  Okay.  And then was it independently wired

21  for anything like electricity, sound, video, anything?  There was

22  a fan in there, but I wasn't sure if that was an --

23       THE WITNESS:  There was an extension cord that had been

24  put in there, but there were no outlets or anything like that.

25       THE COURT:  Okay.  Based on what you've, you know,

1 recorded, looking at the receipts, could a contractor take a look

2 at what was created and recreate basically the same thing?

3    THE WITNESS:  I think with the videos and the photos we

4 have and the construction list, yes.

5    THE COURT:  All right.  Cross-examination.

6          **CROSS-EXAMINATION**

7 BY MR. BERTHOLF:

8 Q.   You indicated that you documented the structure in the

9 garage?

10 A.   Yes.

11 Q.   You took photographs?

12 A.   Yes.

13 Q.   And measurements?

14 A.   Yes.

15 Q.   Did you take or attempt to take the roof off?

16 A.   No.

17 Q.   Do you know what was in -- at the time that the Westfalls --

18 well, let's take a step back.

19    After you left the -- the search, the -- it was -- the

20 property was turned back over to the Westfalls at that point?

21 A.   I believe Mr. Zuberi's associate still had custody of the

22 residence, so I just met with him after the fact.

23 Q.   Okay.

24 A.   Yeah.

25 Q.   So at the point when they took over the property again as

1　property owners and the renters are gone, the Westfalls contacted

2　you regarding this structure in the garage?

3　A.　I don't recall the specific conversation, but it's possible,

4　yes.

5　Q.　And they asked if they could take the structure down?

6　A.　They had also asked me the day I interviewed them on the

7　19th.

8　Q.　Okay.

9　A.　Yeah.

10　Q.　And what did you tell them?

11　A.　I believe I made the -- I believe I told them that we had no

12　further interest in the location and that it was their property

13　and they were free to do as they chose to do.

14　Q.　And this was on the 19th?

15　A.　Correct.

16　Q.　Okay.  So at the time that you told the Westfalls that they

17　could do whatever they wanted with that structure, had you tried

18　to take the roof off of the structure?

19　A.　No.

20　Q.　Do you know how it was connected together?

21　A.　No.

22　Q.　Did you happen to look inside the cinder -- well, actually,

23　let's take a step back.  Let's just make our full record.

24　　　　　Tell us what a cinderblock is.  Describe what a

25　cinderblock actually is.

1    A.    A cinderblock is generally made of particulated concrete

2    that's formed into a mold, and so there is a large gap square in

3    the center of the concrete, so the block is not solid.

4    There's -- the cinderblock themselves retain the ability, if you

5    wanted to reinforce the wall further, to pour concrete inside of

6    the cinderblock wall, and so they have -- they're porous in that

7    respect.

8    Q.    Particulated concrete, what are you -- what's that?

9    A.    It's a mixture of sand and gravel that's then put into a

10   mold; a little different than a poured concrete slab.

11   Q.    Okay.  Did you happen to look inside these hollow parts on

12   the cinderblocks to see if there was any sort of structure in

13   there to help support it?

14   A.    No.

15   Q.    Did you do any measurements of force on the -- on the

16   cinderblocks?

17   A.    No.

18   Q.    You testified that the metal door that you were informed of

19   was no longer present?

20   A.    Correct.

21   Q.    And that was at the time that you did the search warrant?

22   A.    Correct.

23   Q.    Where was it at that time?

24   A.    It was in the custody of the Klamath Falls Police

25   Department.

1  Q.  All right.  Did you at that point go and look at the metal

2  door?

3  A.  No.

4  Q.  Did you go and look at the metal door prior to letting the

5  Westfalls know that they can do whatever they want with the

6  structure?

7  A.  No.

8        THE COURT:  Rebecca, do we know where we're getting

9  that kind of feedback?

10        (Discussion off the record)

11  BY MR. BERTHOLF:

12  Q.  All right.  Thank you.  You said the cinderblocks were

13  basically just stacked on the floor?

14  A.  Yes.

15  Q.  Did you look to see if there was any sort of adhesive or any

16  mortar that was holding the bottom of the cinderblocks to the

17  floor?

18  A.  It wasn't visible or readily apparent, no.

19  Q.  Okay.  In (pause) -- had you reviewed AV-1's statement to

20  the Klamath Falls police at the time that you executed the search

21  warrant?

22        MR. SWEET:  Objection, Your Honor.  I -- this is, A,

23  beyond the scope of direct, and I'm not sure how this is

24  relevant.

25        MR. BERTHOLF:  The -- if I --

1            THE COURT:  Go ahead.  I think it's -- I think we'll

2    get there.

3    BY MR. BERTHOLF:

4    Q.    The prosecution asked did it occur that there might -- did

5    it occur to you that there might be a challenge to what AV-1

6    said, a challenge to the integrity of the structure.

7            THE COURT:  I'll allow it.  Go ahead.

8    Q.    So had you reviewed AV-1's statement to Klamath Falls

9    police?

10   A.    No.  I had no physical report, no.

11   Q.    So why would you not think that there might not be a

12   challenge to the integrity of this structure -- well, actually,

13   let's take a step -- why are you even reviewing the structure if

14   you don't even know what AV-1's story is?

15   A.    At this point, what we had learned of AV-2 and we had

16   learned through a search of Mr. Zuberi's criminal history, we had

17   concerns that there were potential victims, and so our evidence

18   collection was going to be aimed at not only was something missed

19   for AV-1, but was there potentially an unknown victim at this

20   time that evidence could also be behind those walls as well.

21   Q.    And that makes sense for looking for evidence behind the

22   walls, but why then take measurements of the width and the length

23   of this structure when all you're looking for is evidence of

24   potential other victims?

25   A.    I think we want to appropriately document the structure.

1   We're still conducting a fresh -- fresh search in terms of what

2   the FBI's doing.  So, you know, that being a -- a piece of

3   evidence that's, you know, part of this case, it was, I felt,

4   prudent to measure it and document it appropriately.

5   Q.   Okay.  When you were looking at the purchase records from

6   Home Depot, did you see any mention of a construction adhesive?

7   A.   No.

8   Q.   Not in any of the receipts, either?

9   A.   None, no.

10  Q.   So, in fact, we don't have any real idea what that substance

11  was that was between the cinderblocks?

12  A.   Correct.

13         MR. BERTHOLF:  I think that's all.  Thank you very

14  much, Agent.

15         THE COURT:  Any redirect?

16         MR. SWEET:  Just a few quick questions, Your Honor.

17                    **REDIRECT EXAMINATION**

18  BY MR. SWEET:

19  Q.   So, Special Agent Gluesenkamp, just to be clear, the black

20  metal security door, is that in FBI custody now?

21  A.   It is, yes.

22  Q.   And in terms of the roof of the structure, are there some

23  pictures documenting its composition?

24  A.   Yes.  It was challenging to photograph, but, yes.

25  Q.   And you were asked regarding the interior of the

1    cinderblocks.  Have you seen a few photographs from the Westfalls

2    when they dismantled the cell?

3    A.    Yes.

4    Q.    Structure.  Excuse me.  And is that -- are you able to see

5    at least somewhat the interior, some of the cinderblocks?

6    A.    Yes.

7    Q.    Likewise, would they be able to -- would they be available

8    to testify regarding the composition of the roof?

9    A.    Yes.

10              MR. SWEET:  Thank you.  Nothing further, Your Honor.

11              THE COURT:  Could you clarify?  How high was the

12    ceiling?  Could you touch it from the interior if you had the --

13              THE WITNESS:  You could, yes.  It was the height of a

14    standard interior door.  So it's a little over six feet.

15              THE COURT:  Okay.  Somebody who might be small might

16    not be able to reach the (pause) --

17              THE WITNESS:  Even for me, just the weight of it, you

18    know, three pieces of OSB and particle board, and I'm six feet, I

19    don't -- it would be really challenging to generate enough force

20    to lift it off.

21              MR. SWEET:  Your Honor, to answer the Court's question,

22    I think if Special Agent Gluesenkamp --

23              THE COURT:  I'm sure it's somewhere.

24              MR. SWEET:  We do have -- looking at the measurements,

25    does -- I can just ask.

1   BY MR. SWEET:

2   Q.   Does -- 84.5 inches tall, does that sound about right?  I

3   can provide a picture of the (pause) --

4   A.   Yeah.  It's in the -- it's in the ballpark of how tall it

5   would have been, yes.  It was not something I could -- it was not

6   level with my eye.  It was above my head.  So I had to stand on a

7   ladder and, like, reach my phone up to look over the top of it.

8            THE COURT:  Thank you.

9            MR. SWEET:  Thank you.

10           THE COURT:  Any follow-up there?

11           MR. BERTHOLF:  I don't think so.  Thank you.

12           THE COURT:  All right.  Thank you very much.

13           THE WITNESS:  Thank you, Your Honor.

14           THE COURT:  Any further evidence?

15           MR. SWEET:  No further evidence, Your Honor.

16           THE COURT:  From the defense?

17           MR. BERTHOLF:  Not on this issue, Your Honor.

18           THE COURT:  All right.  Then argument on this issue.

19           MS. POTTER:  Just one -- I'm sorry, Your Honor.  I'm

20   just getting situated.

21           Okay.  Your Honor, I don't think the parties have any

22   dispute.  I don't think the Court probably has any confusion

23   about what the standard is here, but just for the record, it's

24   the Trom- -- *Trombetta*.  Ms. Miles may correct my pronunciation.

25   We had to show bad faith, which turns on the knowledge of the

1    exculpatory value of the evidence that's lost, and also show that

2    we are unable to obtain comparable evidence.

3          I think it's clear in this case that AV-1's credibility

4    is the key, whether -- what she says happened is -- is the entire

5    case.  What is critical about what she says about the cell is how

6    she describes getting herself out, which required pushing,

7    punching, you know, pushing on the structure to get out.  If the

8    structure was not secure, which it typically would not be if they

9    were stacked on top of each other that way, then the structure

10    should have been dismantled, but we have no way to test that.

11    There are some -- Special Agent Gluesenkamp testified that there

12    was caulking, but we have no idea what that was, we have no

13    receipts for that.  There's no ability to test how secure that

14    was.

15          And I think, just stepping back, there's a reason they

16    got another warrant and they went back in.  It's because they

17    knew the cell was critical.  I think what Special Agent

18    Gluesenkamp is saying is it wasn't just critical to AV-1, it was

19    critical to possible other victims, but either way, it was

20    critical evidence.  And failing to --

21          THE COURT:  So how critical is it?  I mean, does it

22    really matter if she crawled through the screen or she somehow is

23    able to kick a hole in the cinderblock or dismantle the door or

24    somehow go through the roof?  How is it critical to an element of

25    the offense charged here?

1        MS. POTTER:  Well, I'm not -- it's not critical, I

2   guess, to the element of the offense; it's critical to her

3   credibility, because if she was kicking on the door and the

4   structure wasn't secure, then she wasn't really -- then what she

5   says happened didn't happen, I guess is the point, is if she

6   wasn't really trapped in there --

7        THE COURT:  A pair of bloody hands, I mean, something

8   happened.

9        MS. POTTER:  But I think there'll be evidence at trial

10  that one of the officers didn't think her hands seemed as bad.

11  And I know the Court's seen the pictures, so I'm not going to

12  belabor the Court's view of the picture.

13       You know, one of the officers during the search said it

14  looked like a music studio.  So if she was just in there because

15  she needed a place to sleep until they could drive back to

16  Seattle, that's different than being, as the Government wishes to

17  characterize it, trapped in a cell.

18       THE COURT:  Well, if she was waiting for a drive back

19  to Seattle, I'm not sure why she would run out of the house with

20  a gun in her hand, but what prevents the defense really from

21  recreating this cell?

22       MS. POTTER:  We don't know what was used to hold it

23  together.

24       THE COURT:  In fact, you do.  And you don't have to

25  disclose that, but if in fact it was built as a music studio, you

1 know exactly what's holding it together. You go to your expert

2 and you rebuild portions of the whole thing if you want. Rebuild

3 it in the middle of the courtroom if you'd like, and we can test

4 its -- how solid it is, but the fact is, it would be very easy to

5 recreate this cinderblock structure and test its worthiness, I

6 suppose.

7 　　　　MS. POTTER: Obviously I disagree, Your Honor. That's

8 the purpose of the motion. I don't think I'm going to belabor

9 the point, because I think the Court has given me the indication.

10 I would just like to put on the record that the other option is

11 an adverse inference -- or, I mean, adverse instruction because

12 of destruction of the evidence.

13 　　　　I would at least request that we not be prevented from

14 at least submitting it when the time jury instructions comes

15 along. I mean, you can deny it today, but if we can also

16 resubmit it at that point, I think for the record, that's

17 important for us, and we'll do that then.

18 　　　　THE COURT: All right. We'll take that issue up at

19 that point, but I am going to find the defense cannot meet its

20 burden of showing the Government acted in bad faith by allowing

21 the homeowners to remove the cinderblock structure in their

22 garage.

23 　　　　The Government has, in fact, provided a wealth of

24 discovery documenting the structure. This includes approximately

25 250 photographs of the structure, 20 minutes of video footage

1    from inside and outside the structure, receipts for much of the

2    material used to construct the structure.  It's been measured.

3    Also available is the contractor who removed the structure over a

4    five-hour period and who documented the demolition with his own

5    photographs.

6          You know, I think his testimony in terms of its -- the

7    durability and the strength of the structure is certainly

8    material.  It sounds like it took a -- two people with sledge

9    hammers over a five-hour period of time to remove the structure,

10    and some of the cinderblocks, even as they fell, remained intact

11    with each other.  So there is -- and the contractor who

12    demolished the structure also kept -- made some of his own

13    photographs.

14          I do find that there's enough known about the

15    structure's construction and composition to allow the defense to

16    assess the structure's utility as a room built to imprison

17    somebody through the use of experts.  I think that expert is an

18    engineer or a contractor.  Certainly the defense can call someone

19    to the stand to talk to the durability of that structure, but I

20    think -- I think we also have to look at just the practicality of

21    the situation.  This is a structure, and I know it's probably in

22    the record here somewhere, I forget how many thousands of pounds

23    in a private home.  It does not seem practical to preserve the

24    structure elsewhere, and preserving it in somebody's private

25    property seems troublesome as well.

1          I think the Government -- law enforcement did

2   everything they could to capture what is needed to understand the

3   structure, understand its composition, and if necessarily -- if

4   necessary, give the defense experts an opportunity to comment on

5   the structure.

6          So the motion to dismiss for destruction of evidence is

7   denied.

8          MS. MILES:  Your Honor, I think, then, we're done with

9   any witnesses.  And I (pause) --

10          THE COURTROOM DEPUTY:  (Indiscernible).

11          THE COURT:  Okay.

12                **DEFENDANT'S MOTION TO DISMISS**

13          MS. POTTER:  I think we have two motions left.  I think

14   we're going to start with the kidnapping.  I think this can be

15   very brief, Your Honor.  We have submitted a brief.  The Ninth

16   Circuit has never officially held that kidnapping can be charged

17   based on an instrumentality of the crime.  I'm well aware, I

18   think I acknowledged in the briefing the way that the authority

19   is not on our side, however, this is an issue that remains

20   undecided, and there is at least one district court that has said

21   that that's not sufficient.

22          I think what's key for us is, particularly given the

23   allegations of the car, the cellphone, and the ATM, it's unclear

24   how all of those facilitated, and we intend to argue that at

25   trial.

1          There is a request -- I think the Government made a

2     request for a special verdict.  We obviously want that, and we

3     will work with them to submit it.

4          And I'm happy -- I mean, I can go into *Lopez* and the

5     different versions of the Commerce Clause.  I'm just not sure at

6     this point in the day the Court wants to hear all that.  So I --

7          THE COURT:  No.  And I understand specifically this

8     motion.  You know, this may be an area where the courts are going

9     to change position.  I mean, instrumentalities of commerce, I --

10    you know, what Congress intended, did they intend the use of an

11    ATM machine, a phone?  You know, maybe there'll be some

12    restrictions down the road by the courts on this, but at this

13    point, I do think the law favors the Government in this argument.

14         I don't mean to cut them off, but I will find, you

15    know, here the allegation that the defense is making is the

16    Government cannot sustain a federal kidnapping claim and that

17    Count 3 should be dismissed for lack of jurisdiction, because the

18    facts underlying Count 3 do not involve or impact interstate

19    commerce to a necessary degree.

20         In the alternative, the defense is asking that the

21    Government elect and prove the specific instrumentalities of

22    interstate commerce and prove how each facilitated the

23    kidnapping.

24         So here, the Government has alleged Mr. Zuberi in

25    committing the alleged kidnapping used mail or any means,

1    facility, or instrumentality of interstate commerce in the

2    committing or in the furtherance of the commission of the

3    offense, and here, kidnapping.  They intend to present facts at

4    trial that Mr. Zuberi used a car, phone, an ATM machine to

5    facilitate the kidnapping.  I think also, maybe I didn't catch

6    this, but maybe GPS mapping on his phone?

7              MS. MILES:  Yes.  In particular 282, I believe.

8              THE COURT:  Yes.  This is enough currently under Ninth

9    Circuit law to establish federal jurisdiction.  At trial, the

10   Government must prove that Mr. Zuberi used any means, facility,

11   or instrumentality of interstate or foreign commerce in

12   furtherance of the offense.  They are not required to

13   specifically describe the instrumentality in the indictment, nor

14   are they limited to the instrumentalities in the indictment, but

15   I certainly will take a look at any special verdict that the

16   parties want to present, if we want the jury to specify which

17   instrumentality they may find impacted or was used in furtherance

18   of the crime that was part of this interstate commerce.

19             Anything else we need to discuss on that?

20             MS. POTTER:  Not from the defense, Your Honor.

21             MS. MILES:  No, Your Honor.  Thank you.

22             THE COURT:  And we have the motion to dismiss Counts 4

23   through 7.

24             MS. POTTER:  Your Honor, we ask that that be deferred

25   until August.  That's the *Bruen* motion, so we're still waiting

1   for the Ninth Circuit to decide what they're going to do with the

2   *Duarte* case, and then we may get a -- something from the Supreme

3   Court on the domestic violence that could influence it, so we ask

4   that that be deferred until August.

5           THE COURT:  Okay.  That's fine.

6           We have a severance motion, too, correct?

7           MS. POTTER:  Yes.  That's the last one.

8           THE COURT:  And if I could just clarify, the

9   Government's agreeing with regard to the escape charge that that

10  will not be tried with this case?

11          MS. MILES:  I agree with that, Your Honor.

12          THE COURT:  Okay.

13          MS. MILES:  And, Your Honor, if I could, could I ask

14  for a break before we --

15          THE COURT:  Yes.  Sure.

16          MS. MILES:  Thanks.

17          THE COURT:  All right.

18          (Recess:  2:32 - 2:43)

19                    **DEFENDANT'S MOTION TO SEVER**

20          THE COURT:  Okay.  We have left the motion to sever the

21  crimes as they relate to Adult Victim 1 and Adult Victim 2.  Does

22  the Government want to be heard on that?

23          MS. MILES:  Yes, Your Honor.  Again, this is the

24  defendant's motion, so if you want to hear from the defense

25  first, that's fine, although I do recognize that we have embedded

1    affirmative motions under Rule 403 and Rule 413. So I'm happy to

2    start with --

3           THE COURT: Go ahead.

4           MS. MILES: Okay. I guess the severance motion comes

5    in two parts. The first part is whether the kidnapping counts

6    should be severed from one another. The second part is whether

7    the gun and ammo counts should be severed from the kidnapping

8    trial, whether that's two separate trials or one combined trial.

9    So I'm going to speak to the kidnapping charges and the severance

10   arguments about that. Mr. Sweet will handle the guns and

11   ammunition, if you have any questions on those.

12          It's the Government's position that these kidnapping

13   counts should not be severed, that joinder is appropriate here,

14   because the intertwining of the evidence is just so great. And

15   so really the test when we're looking at severance is what would

16   be accomplished by severance. If we have two separate trials,

17   are we simply going to be having two essentially identical

18   trials, in which case, the jury really isn't saved in either

19   trial from the prejudicial impacts of the other.

20          And so the question really that's put before the Court

21   is how much of the overlap in evidence would be admissible in

22   each trial. And I think that if we look at AV-1 and AV-2 as our

23   two key witnesses, that the evidence of each of the crimes

24   against them would be admissible in separate trials for the

25   other. So if we were only trying for Count 1, the evidence about

1  AV-2 would come in, and vice versa.  And that's true under three

2  evidentiary bases.

3          So the first is because each of them really carries

4  direct evidence about the crimes that occurred to the other.  And

5  Ms. Potter, I think, put it most succinctly when what she said

6  was that the credibility of AV-1 is the whole case.  And the same

7  is true when we get to AV-2.

8          In these cases, what we have are crimes against victims

9  that were not otherwise witnessed by anyone else, and so the

10  credibility of the victims themselves becomes absolutely

11  critical.  And in that regard, the overlap and the corroboration

12  of the accounts of each of these women and what Mr. Zuberi did to

13  each of them is critical corroborating evidence.

14          Each one of them has said that he used a yellow and

15  black taser in kidnapping them.  Each one said that he threatened

16  them with a gun.  Each one of them testified that he -- or will

17  testify that he put them into his Honda Pilot and transported

18  them to the same house in Klamath Falls.  Their testimony about

19  what the inside of that garage looks like corroborates one

20  another.

21          The progression of the building of the cell is

22  corroborative between AV-2 seeing the cinderblocks and the

23  building materials when she got there versus AV-1 seeing the

24  completed cell and that being used against her.  There also --

25  and this bleeds into our 404 argument, but what we also see is a

1    progression of the building materials to the completed cell.  The

2    comments to AV-2 that, "If I were to keep you, I don't know what

3    I would do with you," and so she ended up being kept for 12 hours

4    in the car in his garage as opposed to having a cell designed for

5    this very purpose for his very next victim.

6              So that kind of corroboration, and there's other points

7    as well, the money for sex, the comments about their value, the

8    cellphone and the foil wrapping around the cellphone, which, as

9    Your Honor noted, I don't know whether that works, either, but

10   that's a -- that's a unique technique.  So the backwards

11   sweatshirt, all of these things that corroborate each one

12   indicate a level of credibility testing for the other.  And so in

13   that regard, the -- these two witnesses, these two victims are

14   witnesses that are essential to the other one's case.

15             So we would posit that these cases should be joined,

16   because each of them is direct evidence against the other and

17   would be admissible that way.

18             Separate and apart from that is our 404(b).  And there,

19   we've briefed it.  I'm happy to talk about it in more detail.  I

20   think the critical piece with 404(b) is always what is the

21   non-propensity reason why we would bring this in.  And for each

22   one of them, what we are looking at is evidence of planning,

23   evidence of preparation, and evidence of intent.

24             And so even beyond the corroborating evidence about how

25   he planned and progressed to this crime from the handcuffs around

1   AV-2's ankles to the leg irons around AV-1's, there's also this

2   underlying evidence about his intent and his state of mind,

3   because really at core what this comes down to is that the only

4   viable defense is that these two women were engaged in consensual

5   sex with the defendant, and so evidence indicating that he had

6   every intent of overcoming resistance and evidence that each of

7   them put up resistance goes towards that state of mind.

8          And as we know from the Ninth Circuit's decision in

9   *Curtin*, when the defendant draws battle lines around state of

10  mind, around intent, this kind of corroborating evidence,

11  especially with 404(b), has a wider door to come through.

12         So I can answer any questions on 404(b).

13         THE COURT:  No.  I think I understand that piece.

14         MS. MILES:  Okay.  And then with regard to 413, it's

15  our position that 413 also comes into play in this case.  And

16  this one is a little bit trickier in terms of the legal concept

17  of it.  I don't know if you want me to just tell you my theory of

18  it or --

19         THE COURT:  Yeah.  Please.  I guess I haven't -- I

20  haven't really dealt with 413.  I mean --

21         MS. MILES:  Yeah.

22         THE COURT:  -- we're usually focused in on 404(b), and

23  I'm not sure how tested 413 is.  I mean, certainly there have

24  been some famous cases lately where bringing in prior, you know,

25  sexual misconduct of a famous defendant resulted in a mistrial,

1    or --

2              MS. MILES:  Right.

3              THE COURT:  -- resulted in now retrials of cases --

4              MS. MILES:  Yeah.

5              THE COURT:  -- because it really just appears to be

6    propensity evidence.

7              MS. MILES:  Well, and I think -- I think that in that

8    case, the problem there was that they were working under a 404(b)

9    corollary where propensity is still not allowed in, whereas my

10   understanding is that there wasn't a 413 corollary that came in.

11   I think there may have been in the California case, but I'm not

12   quite sure.  I don't always keep up on the news as much as I

13   should.  But where 413 really does allow propensity evidence to

14   come in, it does provide a much wider door.

15             To Your Honor's point --

16             THE COURT:  Specifically in sexual assault cases.

17             MS. MILES:  It is.  Specifically in sexual assault

18   cases, 413 says it can come in for any purpose, including

19   propensity.

20             So the question with 413 really is just whether the

21   charged crimes against AV-1 and AV-2 -- there's two-pieces of

22   413.  One is the triggering, whether 413 actually even applies,

23   and that's based on what the defendant is accused of in this

24   case, and so he needs to be accused of a sexual assault

25   currently.  And then if that accusation piece is met and 413 is

1  triggered, then evidence of prior sexual assaultive conduct can

2  come in.  So --

3          THE COURT:  Is there any case law that suggests at some

4  point things may be so remote, that it's almost a due process

5  violation?

6          MS. MILES:  Yes.  And they don't talk about it as a due

7  process violation in particular, but I think it's in the *Green*

8  case, which is a Nebraska case, it's a kidnapping case there, and

9  it stands in contrast with the *Ahmed* case, which came out of Iowa

10  that we cited as well.  And the difference between those two,

11  they were both kidnapping cases, but in the *Ahmed* case, the

12  kidnapping was for sexual assault, and all the evidence showed

13  that it was a kidnapping that led to the sexual assault.  And it

14  was, honestly, very similar in this case.  The defendant

15  kidnapped two different victims, took each one of them separately

16  into the woods and raped them.  And so the evidence of the sexual

17  assault was so inextricable from the kidnapping charge, that the

18  kidnapping charge was deemed to be a sexual assault allegation,

19  accusation.

20          In the *Green* case, what they held was that the

21  Government's accusations, the Government's evidence was that he

22  kidnapped his victims.  Sexual assault was one of the reasons

23  that he kidnapped, but there were other reasons as well.  And

24  they didn't go into what those other reasons were, but what the

25  court held there is where the sexual assault is not so

1    interlinked with the kidnapping that it forms the purpose of it

2    and needs to be told as part of the kidnapping story, that that

3    kidnapping can't qualify as being accused of a sexual assault.

4            THE COURT:  Okay.

5            MS. MILES:  But in all of these cases, what the courts

6    are agreeing with nationwide is that we don't apply the really

7    strict categorical approach.  We don't look at the elements of

8    the charge.  What we look at is the conduct that underlies it.

9    And so even if it's charged as a kidnapping, if the sexual

10   assault is so wrapped into that kidnapping, it still counts as

11   being accused of a sexual assault crime here.

12           And so our position is, as to AV-1, it's a little bit

13   simpler because we have a transportation for sexual activity as

14   one of the counts, and so that would trigger 413 in a case only

15   dealing with AV-1, which would then bring AV-2's sexual assault

16   in as 413 evidence in a case involving AV-1.  If we were looking

17   separately at a case just for Count 3, which is the AV-2 count,

18   that the kidnapping serves as that accused of sexual assault that

19   triggers 413 and then would allow us to bring in evidence of

20   AV-1's sexual assault.

21           And so in both of those cases, then, once 413 is

22   triggered, it's the Government's position that the California

23   victim and the sexual assault against the California victim would

24   also come in under 413 for both of those cases.

25           THE COURT:  Okay.

1        MS. MILES:  Separately -- and I'm sorry -- we also are

2    arguing and believe that the California victim's sexual assault

3    is linked enough to the sexual assaults of both of these victims,

4    that that sexual assault would come in under 404(b) as well.

5        THE COURT:  Okay.  Not that -- you know, my only

6    thought often with the Government's attempt at getting in a lot

7    of these other acts, which I understand the motive for wanting

8    them in, it does create, especially the California victim,

9    additional levels of appeal.  And I wonder sometimes if enough is

10   enough, but that's just me thinking a little bit out loud of what

11   kind of record we ultimately are creating, but that's something

12   to think about.

13       MS. MILES:  Well, Your Honor, I'd actually like to

14   address that if that's okay.

15       THE COURT:  Yeah.

16       MS. MILES:  And I think at this juncture, we're asking

17   the Court to rule on the legality of the admissibility of it.

18       THE COURT:  Not necessarily whether you're going --

19       MS. MILES:  Not necessarily the advisability and not

20   necessarily whether we're actually going to offer it.  So I don't

21   want Your Honor to feel sandbagged if you let it in and we decide

22   not to offer it, but I think that that really is a decision that

23   we are going to make down the line of whether we want to accept

24   that appellate risk, because I really appreciate that concern,

25   but I think purely as a legal matter, that it is legally

1    acceptable for --

2            THE COURT:  Right.

3            MS. MILES:  -- for this evidence to come in under these

4    rules.  And then whether we deal with limiting instructions or we

5    tailor the evidence down the line, those are separate questions

6    that I think we're going to be addressing at the pretrial

7    hearing.

8            THE COURT:  Sure.  All right.  Let me hear from the

9    defense on these.  Especially my greater concern is this last

10   area of Rule 413 and how far can it go and would it include the

11   previous California victim, which, if I understand correctly, was

12   the basis of the felony for felon in possession of a firearm.

13           MS. POTTER:  Yes, but the conviction for the California

14   was not a sexual assault conviction, it was just a pure assault,

15   to be clear.  The conviction is not for a sexual crime, which I

16   think is important.  So I guess if it's all right, Your Honor,

17   I'll back up just a little bit.

18           So there are three separate pockets here.  There's the

19   case against AV-1, the case involving AV-2, and then the

20   allegations involving -- we go back and forth, I think, between

21   "California victim" and "MV-1."  She was a minor at the time.

22   I'll just try and use "California victim" this entire time.

23           So in terms of just the pure joinder and whether

24   severance is appropriate for AV-1 and AV-2, that's, you know, the

25   first and -- kind of the first question.  We would argue that

1    while they point to some similarities, there's more differences

2    than similarities.  And part of the issue with the California

3    victim is it's the attempt to throw the California victim into

4    the mix to tie them all together in one line.

5            So, for example, there was an allegation for paying for

6    sex.  There's nothing -- AV-2 talks about her dog and there's an

7    ATM at the end.  There's no discussion of paying for sex at any

8    point initially.  She -- AV-2 is not a commercial sex worker.

9    AV-1 clearly was and so was the California victim, but then

10   they -- so that's a tie between those two.  And then they tie the

11   California victim to AV-2 by saying they performed a similar sex

12   act, which is in the sealed thing, and I don't necessarily need

13   to address what that was.  But we really need to take AV-1 and

14   AV-2 separately first and forget about the minor victim to talk

15   about severance.

16           So I would say they're not that similar.  Yes, there

17   was a taser, there was an allegation of a sweatshirt, but there

18   wasn't payment for sex, there wasn't -- I mean, just on the face

19   of the indictment, they're completely different kidnapping

20   allegations.  One involved interstate travel for AV-1, one

21   involved intrastate and instrumentalities of the crime.  One

22   involved taking up a commercial sex worker, throwing her in the

23   car, bringing her to -- that's the allegation -- to Klamath.  The

24   other involves meeting someone at a bar and bringing them home.

25   So they're very different acts altogether.

1          This notion that it's direct evidence because of a

2    plan, I mean, that's their theory, but there's really no other

3    evidence of the plan other than just there were allegation of

4    handcuffs and leg irons in one and just handcuffs in the other,

5    or this notion of the building of the music structure.

6          So I think -- of course, I don't think they're direct

7    evidence of each other.  The planning and preparation is not an

8    element.  They're not direct evidence.

9          In terms of the 404(b) -- and I think I really would

10   request that the Court, to the extent it's ruling, make very

11   clear whether it's 404(b), 413, or both, because, as Ms. Miles

12   pointed out, it's critical.  413 can be used for propensity.  So

13   if you let something in for 413, they can argue it shows a

14   pattern of behavior.  If it's only 404(b), they have to tie it to

15   non-propensity.

16          So I will agree with Ms. Miles that the charges against

17   AV-1, because there is a travel with intent to engage in illegal

18   sex, that triggers the 413 analysis.

19          Our dispute with 413 is with AV-2.  So even if this

20   Court were to hold that it was 404(b), and for the same reasons

21   that they're so dissimilar, I would say it's not intent, it's not

22   what she said, plan and preparation.  They're very different

23   incidents that happened far apart and in different ways, but to

24   the extent we get into the 413, AV-2, there's no sex allegation.

25          And the Ninth Circuit has never addressed whether for

1   413 purposes, the question is whether it's the offense that's

2   charged or just the allegations.  And the Seventh Circuit in the

3   *Foley* case, which the Government relies on, certainly did say

4   it's about, you know, what the third allegations are, but -- and

5   it's kind of inexplicable how this happened.  The Seventh Circuit

6   reached the exact opposite decision a couple of years earlier.

7   And there's no discussion in *Foley* as to how they could overturn

8   *Courtright*, but what's very interesting is between *Courtright* and

9   *Foley*, they stylistically change the rules of evidence.  And so

10  initially as written, it was -- it's in a criminal case in which

11  the defendant is accused of an offense of sexual assault.  And

12  they removed "offense of" in the stylistic changes, but

13  there's -- in the rules, it makes clear stylistic changes aren't

14  supposed to change the rule as a whole.  So when Congress -- and

15  Congress -- 413 was Congress actually passing something over the

16  objection of the Rules Committee.  They said it was for an

17  offense of sexual assault.

18          So our argument is because there's no offense of a

19  sexual assault charged against AV-2, it shouldn't be 413

20  evidence.  And, again, that's -- the reason -- even if the Court

21  was going to let it in under another theory, the reason that's

22  important is the reason they can use it.

23          So I'm happy to address the 413 if the Court has more

24  questions.

25          And then in terms of the California victim -- and that,

1    again, is completely distinct.  There's no allegation of

2    kidnapping in that case.  The charge there is simply an assault.

3    It was a commercial sex worker.  There just -- it's a very

4    distinct offense there and --

5          THE COURT:  But your position, it has to be charged as

6    the same offense?  We don't look at the -- just the underlying

7    facts of the offense itself?

8          MS. POTTER:  Sorry.  No.  For the underlying charge --

9    I mean, for 413, once you get past if it's admissible under 413,

10   you get to look at the underlying charges.  So, yes, but I'm

11   saying that the charges for the California victim are just so

12   different and so distinct, that they shouldn't be offered as

13   404(b) or 413.  They're simply offered to continue this argument

14   that, you know, Mr. Zuberi is a horrible person and that's why

15   the jury should convict.

16         And when you're talking about -- when you're talking

17   about the kind of allegations that are in this case and the

18   sensitive nature, it's critical that the jury not be just

19   provided evidence that is more prejudicial than probative.

20         And just to that point, the Court asked -- and I

21   believe there are cases that say 413 is still subject to the 403

22   balancing test.  So whether it's 404(b) or 413, the Court still

23   needs to look at whether it's so -- the probative value is

24   outweighed by the danger of unfair prejudice.

25         And particularly with respect to MV-1, again -- or the

1    California victim who was a minor at the time and was -- it was a

2    sex worker in California, that is unfairly prejudicial to the

3    defendant given the other evidence they have.  It's not that

4    similar.  It's simply offered to show, again, propensity.  And

5    while that 413 allows that, that doesn't mean the Court has to

6    allow it, and so we would ask that the Court not allow that.

7            If the Court has other questions, I'm happy to answer

8    them.

9            THE COURT:  I don't.

10            Any reply?

11            MS. MILES:  Yes.  I'd like to respond just to the

12    Seventh Circuit's authority first of all.  So interestingly

13    enough, Judge Posner was on both the *Courtright* and the *Foley*

14    cases, and so I disagree that they're irreconcilable.  I think it

15    would be unfair to read one judge being on both cases as being

16    inherently -- at least not thinking about the reconcilability.

17            THE COURT:  They can do that, though.  I find myself

18    reversing myself on cases I decided years ago and forgot about,

19    so (pause) --

20            MS. MILES:  That is -- fair enough.

21            THE COURT:  -- I have no doubt Justice Posner's doing

22    that.

23            MS. MILES:  But even when you look at what was actually

24    written in each of those cases, so what both of those cases deal

25    with is this question of the -- the wording in Rule 413 is, "in a

1  criminal case in which a defendant is accused of a sexual

2  assault."  And the question in both of those cases is what does

3  "accused" mean?  Does it mean charged or does it mean something

4  else?  Does it mean something broader?

5  And in the *Courtright* case, which is the earlier of the

6  two cases, what the court was looking at specifically is if a

7  defendant is verbally accused of sexual assault during the course

8  of an investigation into a separate offense, is that enough to

9  trigger 413.  And what they said there is, no, that the

10  accusation has to be part of the criminal charge.  So what they

11  said is when we're looking at "accused" and the word "accused,"

12  it should be read to mean charged.

13  Now, the next question is, how directly does it have to

14  be charged?  Does it have to be charged with a crime that has

15  sexual assault as an element, or does it just have to be

16  inextricable to the charge regardless of the elements of the

17  charged crime?  And that is the open question that was left after

18  *Courtright* and that's the open question that *Foley* decided.

19  And there, what they said is even if what we're saying

20  is that "accused" means charged, that doesn't mean that we're

21  applying a categorical approach, and we don't do that.  Under the

22  very rationale behind the rules of evidence, the rules of

23  evidence are about the underlying facts.  They're not about this,

24  you know, legalized test that we use for ACC or for other things

25  like that.

1          And so what *Foley* held is that if the sexual assault is

2     wrapped up in the charged offense, that counts as accused.  And

3     that's where the other cases that then have followed in that line

4     and applied it to kidnapping in particular or to other cases,

5     some of them have been online enticement of a minor, which

6     doesn't have sexual assault as an element, but there are cases

7     where the sexual assault was just part of the online enticement,

8     and that's the *Foley* case itself.  That's the line of cases that

9     comes in there, and that's what we're asking this Court to

10    follow.

11         It's true the Ninth Circuit hasn't talked about it yet,

12    it's true this carries an appellate risk without a doubt, but all

13    of the other circuits and cases that have looked at it, the

14    Eleventh Circuit, the Seventh Circuit, and then the district

15    courts underlying it, have all agreed with this broader ruling on

16    the word "accused" and how it comes into play and have embedded

17    the limits that Your Honor was talking about.

18         As to the similarity between the California victim and

19    these victims, I appreciate that the defense says over and over

20    again that we don't have any evidence that there's nothing

21    connecting those two things.  That's just simply not true.

22         When you look at the facts of what happened in the

23    California assault, it was charged as an aggravated assault

24    without a doubt, but that was Mr. Zuberi having made an

25    appointment with a commercial sex worker.  She happened to be

1    underage.  He got her into his car, he took her to a remote area,

2    and then he forced her to have sex.  And when she refused or put

3    up limits, he used physical violence against her.

4           And what we see in that case, too, as we compare that

5    in a progression with what we have, the similarities in his

6    planning, in his development, in his intent and his motive has

7    developed over time.  And what you see -- and I think one of the

8    key ones that Ms. Potter really hit on here is this kind of

9    progression from targeting a commercial sex worker in the

10   California victim, to trying his hand at just picking up somebody

11   who wasn't a commercial sex worker in AV-2.

12          And the evidence around AV-2, which Your Honor has not

13   heard a lot about, we're really proffering it here, is that he

14   tried to pick her up at a bar.  She didn't want to go with him.

15   There's a blank in her memory of how she ended up in his car, but

16   she ends up in his Honda Pilot.  And what you see in that is that

17   that attempt to find a non-commercial sex worker victim took a

18   lot more effort.

19          And then in AV-1, he came back to making an appointment

20   with a commercial sex worker so that he could get her into that

21   car as that easy first step and then hold her in there

22   afterwards.  And we think that that's a critical showing of the

23   progression.

24          What you also see when you look into the details of

25   what happened with the California victim, there's evidence there

1    that he -- there's no evidence he used a taser or a gun with her.

2    Instead, he beat her.  And one of the comments that she talks

3    about that he made after she -- he had bloodied her face was that

4    he expressed disgust.  He said, "Oh.  What can I do with you

5    now?"

6           And we see in the later two cases, he's using a taser

7    and he's using threats as a way of subduing his victims instead

8    of that kind of physical violence that mars their physical

9    appearance.  And those kinds of things are the connective tissues

10   that we are really relying on in showing how he has progressed in

11   this plan and preparation culminating in the AV-2 kidnapping.

12          THE COURT:  What was the year of the California --

13          MS. MILES:  It was two years prior.  And that's one

14   other point that I did want to make, is that Ms. Potter said that

15   the AV-1 and AV-2 incidents were very far apart.  They were two

16   months apart.

17          And what you see in Ninth Circuit case law over and

18   over again is separation of three years, of two years, even of

19   11 years in the *LeMay* case.  Especially in sexual assault cases,

20   that meets the recency requirement hands down.

21          THE COURT:  Okay.  Well, let's take up the motion to

22   sever as they relate first to AV-1 and AV-2.  Here, the defense

23   argues the kidnapping crimes involving AV-1 and AV-2 are separate

24   acts, that they would not otherwise be admissible if tried

25   separately, and would result in substantial prejudice to the

1    defense.  Additionally, they argue that the firearm charges and

2    the escape charge should be severed as separate crimes, whose

3    joinder prejudices the defense.  The Government is agreeing that

4    the escape charge will not be tried with these other counts in

5    October.

6          I agree with the Government that there is no way to

7    separate the facts involving the crimes of AV-1 and AV-2 from

8    each other such that the jury in each case would not hear the

9    evidence of both.  AV-1 and AV-2's testimony is direct

10   corroboration of each other's testimony in terms of their similar

11   observations of Mr. Zuberi, the vehicle in which they were

12   transported, a gun, a black and yellow taser, handcuffs, the

13   sweatshirt they were made to wear backwards with the hood pulled

14   over their face, the manner in which Mr. Zuberi wrapped their

15   cellphone in aluminum foil, the presence of cinderblocks.

16         The Government is not bringing this corroborative

17   evidence in as modus operandi that they were the exact same

18   crime.  They don't have to be exactly the same.  The same words

19   don't have to be said, the same places don't have to be visited,

20   but the evidence here is -- I mean, there's just an overwhelming

21   amount of evidence that is similar in this case, down to small

22   details like the aluminum foil around the phone, the hood over

23   the face.  I mean, these are the kinds of details that are going

24   to corroborate everything that's being attacked as to each victim

25   by the defense.  So I just -- this is direct evidence of what

1    truly occurred during their -- during the alleged crimes.

2         In addition to corroborating the credibility, their

3    testimony, along with other evidence, points to an ongoing scheme

4    of Mr. Zuberi to plan and engage in a pattern of sexual abuse of

5    women.  His behavior is not isolated, and the Government should

6    not be limited to providing the jury with isolated events.  The

7    sexual attack of each victim is woven into the facts of not only

8    each kidnapping, but to the overall pattern of a man who appears

9    to be preparing himself to -- to hunt women.  I don't know how

10   else to put it.  And these events were only two months apart.

11        The evidence also would come in not as propensity

12   evidence, but would be allowed under Rule 404(b).  The separate

13   kidnappings would be admissible at trial to show motive,

14   opportunity, intent, preparation, plan, knowledge, and absence of

15   mistake.

16        Certainly this notion that this is -- these are

17   consensual acts are rebutted by the testimony of AV-1 and AV-2

18   together.  So this isn't really propensity evidence under Rule

19   404.  It's really intent, preparation, plan, really absence of

20   consent.  I know that's not technically listed in 404(b), but

21   404(b) is not an exhaustive rule.  It allows other -- for other

22   relevant reasons, so certainly would come in for that.  AV-1 --

23   the acts against AV-1 and against AV-2 would come in for that

24   reason alone.

25        With regard to Rule 413 analysis, I can see a lot of

1   situations where I think it would be unduly prejudicial under a

2   403 analysis, but not here.  I am struck by the fact that

3   Mr. Zuberi's conviction in California was two years prior to

4   these events.  There are similarities.  It's a forceful sexual

5   act against a sex worker, where he brought her out to a remote

6   area.  That is similar enough under Rule 413 to be admissible in

7   a case both against AV-1, which is a sexual assault, and AV-2,

8   which is a sexual assault.

9           So, factually, I think 413 is satisfied.  Yes, it's

10  prejudicial, but the rule does allow it.  I think because it's

11  close enough in -- generally in time, this isn't an ancient event

12  with a lot of intervening years, and the similarity in terms of

13  the forcefulness, it would come in under Rule 413 both with

14  regard to AV-1 and AV-2.

15          You know, whether it will come in is an issue for the

16  Government to discuss among themselves, but I will allow it.

17          Obviously when it comes to the firearms, the firearms

18  are integral to both the kidnapping of AV-1 and AV-2, so the

19  felon in possession of a firearm shall not be severed from the

20  case, especially considering that I'm also allowing the

21  California incident to come in under 413.

22          Is there anything else we need to cover with regard to

23  severance?

24          MS. POTTER:  I -- Your Honor, I just -- I believe the

25  California case was three years, not two years.

1          THE COURT:  Yeah.  It would have to be over probably

2     five for me to really start putting some pause on whether it is

3     unduly prejudicial.

4          MR. SWEET:  Your Honor, may I ask just one question?

5          THE COURT:  Yes.

6          MR. SWEET:  I think this is implicit, but when the

7     Court said the felon in possession of a firearms -- firearm

8     counts aren't severed, there are two counts that are purely

9     ammunition as well.  Would those --

10          THE COURT:  Those would come in as well.

11          MR. SWEET:  Thank you.

12          THE COURT:  Or be tried together.

13          Anything else we need to discuss today with regard to

14     the case?  Am I forgetting anything?

15          MS. POTTER:  No, but can we just have a five-minute

16     break?  We may need to put something on the record, and we just

17     need a minute with our client before we discuss it.

18          THE COURT:  All right.  We can do that.

19          (Recess:  3:17 - 3:28)

20          MR. BOCCATO:  So, Your Honor, we had exhibits -- with

21     regard to the motion to suppress the search and seizure of the

22     Altima, the first six exhibits were attached to our response.

23     Exhibits 7 and 8 involve the surveillance footage from the

24     Merrill gas station.  We're only relying on the -- on those

25     exhibits to the extent that we elicited testimony from Detective

1    Snyder.

2              Exhibit 9 was a placeholder exhibit.  There is no

3    Exhibit 9.

4              And then Exhibits 10, 11, and 13 were offered into --

5    were pictures, and they were offered into evidence today.

6              We also referenced other photographs that were part of

7    the motion to dismiss the cell hearings -- or motion.  So that's

8    a summary of the exhibits

9              THE COURT:  All right.  And I have admitted 10

10   through 13 as well.

11             All right.  Mr. Sweet.

12             MR. SWEET:  Thank you, Your Honor.  And just briefly.

13   The parties have discussed some of the coming deadlines we have

14   and the coming August hearing.  We'll continue to do so.  There

15   are a few deadlines which I think may not be assigned yet.  We'll

16   confer, communicate with the Court, see if it's acceptable what

17   we're proposing, and do that soon.

18             THE COURT:  Okay.  I know we have, I think, three days

19   set aside in August, so maybe as you confer and get a better

20   sense, you can let the Court know if in fact we need all three of

21   those days, one or two of those days.  It's certainly helpful for

22   my scheduling.

23             MR. SWEET:  Yes, Your Honor, we'll do that.

24             THE COURT:  All right.  Thank you, everybody.  Thank

25   you, Mr. Zuberi.

1          MR. SWEET:  Thank you.

2          (Proceedings adjourned at 3:30 p.m.)

3

4                    **C E R T I F I C A T E**

5

6          I certify, by signing below, that the foregoing is a

7    true and correct transcript of the record, taken by stenographic

8    means, of the proceedings in the above-entitled cause.

9          A transcript without an original signature, conformed

10   signature, or digitally signed signature is not certified.

11

12         DATED this 11th day of July 2024.

13

14

15                    /s/ Kellie M. Humiston

16                    Kellie M. Humiston, RMR, CRR
                     Official Court Reporter
17                    Certificates Expire:  9/2024

18

19

20

21

22

23

24

25