NATALIE K. WIGHT, OSB #035576
United States Attorney
District of Oregon
**JEFFREY S. SWEET, OSB #994183**
Jeff.Sweet@usdoj.gov
**NATHAN J. LICHVARCIK**
Nathan.j.Lichvarcik@usdoj.gov
**MARCO A. BOCCATO, OSB #103437**
Marco.Boccato@usdoj.gov
Assistant United States Attorneys
405 East 8th Avenue, Suite 2400
Eugene, Oregon 97401
Telephone:  (541) 465-6771
Attorneys for the United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **1:23-cr-00254-MC** |
| **v.** | **GOVERNMENT'S EXPERT NOTICE** |
| **NEGASI ISHAIAH ZUBERI, aka JUSTIN JOSHUA HYCHE,** | |
| **Defendant.** | |

The United States of America hereby provides notice of its intent to call the following

expert witnesses at trial under Federal Rule of Criminal Procedure 16(a)(1)(G).  The United

States reserves the right to supplement its expert notices before or during trial.  A three-week

trial is currently scheduled to begin on October 7, 2024.

The United States intends to call the following expert witnesses at trial:

1.  Sam Suyehira, Special Agent, ATF, Medford Satellite Office (firearm nexus)

2. Heidi Wallace, Special Agent, ATF, Eugene Field Office (ammunition nexus)

3. Shelby Quick, Electronics Engineer, FBI, Operational Technology Division Electronic Device Analysis Unit (signal jammers)

4. Justin Lazenby, Master Digital Forensic Examiner, FBI, Northwest Regional Computer Forensics Laboratory (NWRCFL) (cellphones and devices)

5. Christi Winters, Digital Forensic Examiner, FBI, NWRCFL (computers and iCloud)

6. Sean Kennedy, Special Agent, FBI, Criminal Investigations Division (cellular site/geolocation data)

7. Lara Adams, Forensic Examiner, FBI, Laboratory Division (DNA)

8. Rachel Clay, Document Analyst-Forensic Document Examiner, FBI, Laboratory Division (handwriting)

9. Stephanie Stewart, Physical Scientist/Forensic Examiner, FBI, Laboratory Division (fingerprints)

10. Jeremy Stein, Jr. Systems Administrator/Custodian of Records, LandAirSea

11. Jeff Byram, Supervisory Special Agent, FBI, Operational Technology Division (iCloud data)

12. Paul Rettig, Digital Evidence Support Team Lead, FBI, Operational Technology Division (iCloud data)

13. Amie Walton, Sexual Assault Nurse Examiner (SANE) (examination of AV1)

The proposed expert testimony will assist the trier of fact in understanding the relevance and significance of the government's evidence. Fed. R. Evid. 702. The United States has provided, or will be providing, defendant with copies of the experts' CVs or resumes in discovery. In addition, the United States has provided in discovery signed copies of the reports underlying the testimony of each witness who produced a signed report. Each witness has reviewed, approved, and allowed the government to electronically sign their expert disclosures

below.  Fed R. Crim. Pro. 16(G)(v) (as amended).  Depending on stipulations and what evidence will be presented to the jury, the United States might not call each of the noticed experts.

1. **Sam Suyehira, ATF Special Agent (firearm nexus)**

Expected Testimony:  The United States intends to call ATF Special Agent (SA) Sam Suyehira to testify at trial about the firearms that were seized from Mr. Zuberi's Honda Pilot and trailer.  SA Suyehira will testify about his specialized training and experience in the field of nexus firearm investigations.  SA Suyehira will testify that he examined the following firearms:

1. KFPD Item #51: An HS Produckt (Springfield) Model XD-M, 9x19mm caliber pistol, serial number MG735197, imported by Springfield Armory USA.

2. FBI Item #1B64: E. R. Amantino (Stoeger), Model Condor Competition, 12 gauge shotgun, serial number R0677977-12, imported by Stoeger, Inc.

3. FBI Item #1B65: An Anderson Manufacturing, Model AM-15, MULTI caliber rifle, serial number 20103547.

4. FBI #1B66: A Remington Arms Company, Model 783, .308 Win caliber rifle, serial number RM32499G.

SA Suyehira will explain that the (1) HS Produckt (Springfield) Model XD-M, 9x19mm caliber pistol; (2) E. R. Amantino (Stoeger), Model Condor Competition, 12 gauge shotgun; (3) Anderson Manufacturing, Model AM-15, MULTI caliber rifle; and (4) Remington Arms Company, Model 783, .308 Win caliber rifle are firearms as defined by Title 18, United States Code, Chapter 44, Section 921(a)(3), and were not manufactured in Oregon.  Therefore, to be found in Oregon, the firearms were shipped or transported in interstate of foreign commerce.

Bases and Reasons:  SA Suyehira will testify that when he is asked to perform a nexus investigation, he typically examines the weapon in-person.  He will photograph the weapon's designs and markings.  He will record the make, model, caliber, and serial number.  He will consult with a nexus library that consists of manuals, bluebooks of gun values, encyclopedias,

and manufacturer-generated literature. He may also consult with other members of the nexus community – ATF agents who are also qualified as Nexus Experts, as well as members of the firearm industry. For example, most firearm manufacturers have an ATF compliance officer. He uses these tools and resources to make determinations on whether a weapon qualifies as a "firearm" under federal law and whether a firearm moved in interstate or foreign commerce or from a foreign nation to the United States.

Here, regarding the pistol, on July 20, 2023, SA Suyehira met with an evidence specialist at the Klamath Falls Police Department who provided him the pistol for examination. SA Suyehira examined the pistol and its markings and determined it was an HS Produckt (Springfield) Model XD-M, 9x19mm caliber pistol, serial number MG735197, imported by Springfield Armory USA. Regarding the shotgun and two rifles, on November 13, 2023, SA Suyehira met with an evidence control technician at the FBI Eugene Resident Office who provided SA Suyehira the shotgun and two rifles for examination. SA Suyehira examined the shotgun and two rifles and their markings, and determined they were an E. R. Amantino (Stoeger), Model Condor Competition, 12 gauge shotgun, bearing serial number R0677977-12, imported by Stoeger, Inc.; an Anderson Manufacturing, Model AM-15, MULTI caliber rifle, bearing serial number 20103547, and a Remington Arms Company; and a Model 783, .308 Win caliber rifle, bearing serial number RM32499G.

SA Suyehira is aware that "firearm" has a particular meaning in federal law: (A) any weapon which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or silencer or (D) any destructive device. Such term does not include an antique firearm. 18 U.S.C. § 921(a)(3). The weapons he examined qualify as firearms because they will, are designed to or

have been readily converted to expel a projectile by the action of an explosive; they are not an antique firearm. Due to their design and capability of being converted to expel a projectile by the action of an explosive, the weapons are firearms under federal law even if they are inoperable. They are not antique firearms because they were made after 1898, they use conventional ammunition, they do not use an antique ignition system, and they are not a muzzleloader type of firearm.

Based on the firearms' identifying information, markings, his training and experience, and research he conducted on the origins of the firearm, SA Suyehira concluded that these firearms were not manufactured in Oregon and traveled in interstate and/or foreign commerce.

Qualifications and Publications: SA Suyehira's full qualifications are outlined in his CV. He has been with the ATF since 2016 and has served as a Special Agent since joining the ATF. He became certified as an ATF Interstate Nexus Expert in 2021 after completing the ATF Firearms and Ammunition Interstate Nexus Training in Martinsburg, West Virginia. As part of his regular duties, he investigates violations of federal firearms laws; examines firearms to determine the manufacturer, model, caliber/gauge, serial number, place of manufacture, and status under the Gun Control Act and National Firearms Act; and prepares reports relating to identification, origin, and classification of firearms under the provisions of federal firearms laws. As a Nexus Expert, he has access to databases and literature regarding gun and ammunition manufacturers throughout the world. He has not authored any publications in the last ten years.

Prior Testimony: SA Suyehira has not testified as an expert at trial or by deposition in the past four years.

*/s/ Sam Suyehira        July 11, 2024*

/ / /

**2.** **Heidi Wallace, ATF Special Agent (ammunition nexus)**

Expected Testimony:  The United States intents to call ATF Special Agent (SA) Heidi Wallace to testify at trial about the ammunition that was seized from Mr. Zuberi's trailer, bedroom, garage, and from the firearm in his Honda Pilot.  SA Wallace will testify about her specialized training and experience in the field of nexus investigations.  SA Wallace will testify that she examined the following ammunition:

1. FBI Item #IB39: 246 cartridges in a box with headstamp "R-P dot 9mm Luger"

2. FBI Item #IB41: 30 cartridges with headstamp "HORNADY 6mm ARC"

3. FBI Item #IB43: 29 cartridges with a headstamp of "* symbol and 762x39"

4. FBI Item #IB55: 50 cartridges with a headstamp of "* symbol and 762x39"

5. FBI Item #IB56: 8 cartridges with a headstamp of "BLAZER 9mm LUGER"

6. FBI Item #IB67: 27 cartridges with a headstamp of "BLAZER 9mm LUGER" two cartridges with a headstamp of "R-P dot 9mm LUGER", one cartridge with a headstamp "HORNADY 9mm LUGER", sixteen cartridges with a headstamp of "NovX 9mm LUGER" and seventeen cartridges with a headstamp of "SIG 9mm LUGER"

7. FBI Item #IBI05: one cartridge with a headstamp "R-P dot 9mm LUGER"

8. FBI Item #IB206: 8 cartridges with a headstamp of "BLAZER 9mm LUGER", four cartridges with a headstamp "HORNADY 9mm LUGER", four cartridges with a headstamp of "NovX 9mm LUGER" and three cartridges with a headstamp of "SIG 9mm LUGER"

9. FBI Item #IB247: 121 cartridges with a headstamp of NATO symbol dot dot dot LC dot 22 dot dot dot", ten cartridges in a box with a headstamp of Winchester 12 GA four cartridges with a headstamp of "12 GA Federal" and four cartridges with a headstamp "Winchester 12 GA" (part of a box that could have contained 5 rounds)

10. FBI Item #IB68: One cartridge with a headstamp of "Winchester 12 GA" and one cartridge with a headstamp of "12 GA Federal"

11. FBI Item #IB69: 27 cartridges with a headstamp of "NATO symbol dot dot dot LC dot 22 dot dot dot"

12. FBI Item #IB202: includes 289 cartridges with a headstamp of "NATO symbol dot dot dot LC dot 22 dot dot dot", one cartridge with a headstamp of "HORNADY 6mm ARC", "* symbol and 762x39"

SA Wallace will explain that the above-referenced ammunition is ammunition as defined by Title 18, United States Code, Chapter 44, Section 921(a)(17)(A), ("ammunition" means ammunition or cartridge cases, primers, bullets, or propellant powder designed for use in any firearm) and was not manufactured in Oregon. Therefore, in order to be found in Oregon, the ammunition was shipped or transported in interstate of foreign commerce.

Bases and Reasons: SA Wallace will testify that when she is asked to perform a nexus investigation, she typically examines the ammunition in-person. She will photograph and/or sketch the ammunition headstamp, markings and composition. She will consult with a nexus library that consists of books, manuals, and manufacturer-generated literature. She may also consult with other members of the nexus community – ATF agents who are also qualified as Nexus Experts, as well as members of the firearm and ammunition industry. For example, most firearm and ammunition manufacturers have an ATF compliance officer. She uses these tools and resources to make determinations on whether ammunition qualifies as a "ammunition" under federal law and whether ammunition moved in interstate or foreign commerce or from a foreign nation to the United States.

Here, SA Wallace examined the above referenced ammunition in January and February of 2024. She also consulted the relevant literature as part of her examination about the origins of this ammunition.

SA Wallace is aware that "ammunition" has a particular meaning in federal law: ammunition or cartridge cases, primers, bullets, or propellent powder designed for use in any

firearm. 18 U.S.C. § 921(a)(17)(A).  The ammunition she examined qualifies as ammunition because it is ammunition that is designed for use in a firearm.

Based on the ammunition's identifying information, markings, her training and experience, and research she conducted on the origins of the ammunition, she concluded the following:

1. The cartridges with the headstamp of "R-P dot 9mm Luger" were manufactured by Remington Arms Co/Vista Outdoor in Arkansas or Ohio.

2. The cartridges with the headstamp of "* symbol and 762x39" were manufactured by Tula Cartridge Works in Russia.

3. The cartridges with the headstamp of "BLAZER 9mm LUGER" were manufactured by CCI in Idaho.

4. The cartridges with the headstamp of "HORNADY 9mm LUGER" were manufactured by Hornady Manufacturing in Nebraska.

5. The cartridges with the headstamp of "HORNADY 6mm ARC" were manufactured by Hornady Manufacturing in Nebraska.

6. The cartridges with the headstamp of "SIG 9mm LUGER" were manufactured by SIG ammunition in Arkansas.

7. The cartridges with the headstamp of "NovX 9mm LUGER" were manufactured by Shell Shock Technologies in Kentucky.

8. The cartridges with the headstamp of "Winchester 12 GA" were manufactured by Winchester in either Illinois or Mississippi.

9. The cartridges with the headstamp of "NATO symbol dot dot dot LC dot 22 dot dot dot" were manufactured by Lake City Arsenal in Missouri.

10. The cartridges with the headstamp of 12 GA Federal were manufactured by Federal in Anoka Minnesota.

As such, all the ammunition was manufactured outside of Oregon and traveled in interstate and/or foreign commerce.

Qualifications Including Publications: SA Wallace's full qualifications are outlined in her CV. She has been with the ATF since 2001 and has served as a Special Agent since 2003. She became certified as an ATF Interstate Nexus Expert in 2005 after completing the ATF Firearms and Ammunition Interstate Nexus Training in Martinsburg, West Virginia. As part of her regular duties, she investigates violations of federal firearms laws; examines firearms and ammunition to determine the manufacturer, model, cartridge/gauge, serial number, place of manufacturer, and status under the Gun Control Act and National Firearms Act; and prepares reports relating to the identification, origin, and classification of firearms and ammunition under the provisions of federal firearms laws. As a Nexus Expert, she has participated in multiple firearm and ammunition manufacturer tours in Arkansas, Missouri, Illinois, and New England. As a Nexus Expert, she has access to databases and literature regarding gun and ammunition manufacturers throughout the world. She has not authored any publications in the last ten years.

Prior Testimony: SA Wallace has not testified as an expert at trial or by deposition in the past four years.

*/s/ Heidi Wallace        July 12, 2024*

**3.      Shelby Quick, FBI Electronics Engineer (signal jammers)**

Expected Testimony: The United States intends to call Ms. Quick as an expert in the field of electrical engineering, specifically regarding the capabilities of certain electronic devices. Ms. Quick will address her examination of two black signal jammers, which were seized by the FBI from Mr. Zuberi's trailer, which she later reviewed and photographed. Regarding both devices, she identified them as functioning portable and battery powered signal jammers with multiple antennas. One signal jammer had sixteen antennas (sixteen channels) and the other had eight antennas (eight channels). The signal jammers she reviewed are designed to

be used within close range of a target device or network. The main components required to achieve radio signal jamming include tuning circuity, voltage-controlled oscillators, and amplification. The necessary circuity was present for both signal jammers. Ms. Quick utilized a spectrum analyzer to identify the operating frequency range for each of the channels. She noted both signal jammers were consistent with commercially available products.

Ms. Quick will explain that radio signal jamming is achieved when a device transmits a signal such as random noise or a repeated pattern at the same operating frequency as a targeted device or network. The signal being transmitted from the jammer needs to be at a higher power level than the signal being transmitted from the target device. This prevents the receiver from being able to properly interpret the target device's transmission. Based on her training and experience, she can also testify that wrapping a cell phone in aluminum foil is a signal preventive technique and about the impact it has on a cell phone.

<u>Bases and Reasons</u>: Ms. Quick's testimony is based on her examination of the two black signal jammers, as well as her training, education, experience, and expertise as an Electronics Engineer.

<u>Qualifications Including Publications</u>: Ms. Quick's full qualifications are outlined in her CV. Since February of 2023, she has been an electronics engineer with the FBI in Quantico, Virginia. She performs capability research and development and advanced forensics on various electronic devices, including radio frequency signal jamming devices. Prior to her work with the FBI, she worked for Northrup Grumman in Maryland as an engineer. She graduated from Pennsylvania State University with a Bachelor of Science in Electrical Engineering in 2018 and from Johns Hopkins University with a Master of Science in Electrical & Computer Engineering in 2021. She has not authored any publications in the last ten years.

<u>Prior Testimony</u>:  Ms. Quick has not testified as an expert at trial or by deposition in the past four years.

*/s/ Shelby Quick          July 11, 2024*

### 4.  **Justin Lazenby, FBI Master Digital Forensic Examiner (cellphones and devices)**

<u>Expected Testimony</u>:  The United States intends to call Mr. Lazenby as an expert in the field of digital forensic examination.  Mr. Lazenby received electronic devices, obtained forensic images or extractions of some of those devices, processed forensic copies with approved forensic tools, posted processed information into the Case Agent Investigative Review (CAIR) network, and conducted a preliminary review of the processed information to note device information and user information.  Mr. Lazenby received the following devices:

- Apple iPhone 11, model A2160 and SIM card;

- Apple iPhone 12 Pro Max, model A2342 and SIM card;

- 32 GB Samsung Galaxy S7 cell phone, model SM-G930V and SIM card;

- Garmin Dēzl GPS unit, model 770LM;

- 4 TB Western Digital My Passport external HDD, model WDBPKJ0040BBK-0A;

- 1 TB SimpleTech external HDD, model 96300-41001-170;

- 32 GB black PNY USB flash drive;

- 256 GB Tizomi USB flash drive, no visible model or serial numbers;

- 1 TB SimpleTech external HDD, model 96300-41001-170;

- blue and black action camera with no visible make, model or serial numbers, with the words "HD 1080P" printed on the front, and contained in a clear, plastic, waterproof housing;

- black/silver Ledger Nano X crypto-wallet; and

- black/white MakerFocus ESP8266 Deauthentication Detector, model V3.

Depending on the device, different steps were taken after receipt. For the Apple iPhone and Samsung Galaxy S7, Mr. Lazenby received the phones, physically documented the phones (including taking photographs), performed an extraction, processed the data, and staged it on the Case Agent Investigative Review (CAIR) network. Both phones also contained SIM cards, which were received with the phones. Mr. Lazenby documented the SIM cards, performed an advanced logical extraction of the SIM cards, and processed the data on the SIM cards with the phone. Mr. Lazenby is still working to complete a digital forensic extraction of the grey Apple iPhone that was seized near the Honda Pilot. For the Garmin GPS unit, Western Digital My Passport external hard drive (four terabytes), SimpleTech external hard drive (one terabyte), PNY USB flash drive (32 gigabytes), SimpleTech external HDD (one terabyte), and Tizomi USB flash drive (256 gigabyte), Mr. Lazenby received the items, physically documented the items, imaged the items, processed the data, and staged the data on CAIR. Mr. Lazenby determined the Tizomi flash drive contained approximately 27,000 Blink Camera videos. Regarding those videos, Mr. Lazenby used the Field Audio Video Program (FAVP) to enhance the videos, which included adding time stamps, camera names, and combining videos. Regarding the camera, Mr. Lazenby received it, documented it, and determined it contained no stored data because it lacked internal storage and, though it contained a slot for a micro-SD card, the slot was empty. Regarding the crypto wallet, Mr. Lazenby received it, documented it, and conducted research on how to extract data, but was ultimately unable to extract any data. Regarding the deauthentication detector, Mr. Lazenby received it, documented it, conducted research, and determined it was not a USB drive and that it was likely a deauthentication detector and did not store data.

**Government's Expert Notice**                                          **Page 12**

After completing a digital forensic examination of the items, for the devices accessed, Mr. Lazenby generated electronic reports of responsive information for review by the case agents. Based on his training and experience, he can also testify that wrapping a cell phone in aluminum foil is a signal preventive technique and about the impact it has on a cell phone. Specifically, that signals cannot leave a cell phone or be received by a cell phone when wrapped or contained in metal.

Bases and Reasons: Mr. Lazenby's testimony is based on the examination of the devices set forth above, as well as his training, education, experience, and expertise as a Digital Forensic Examiner.

Qualifications Including Publications: Mr. Lazenby's full qualifications are outlined in his CV. Mr. Lazenby has been employed by the FBI since 2015 at the RCFL in Portland, Oregon. He began as a Digital Forensic Examiner and is currently a Master Digital Forensic Examiner. Prior to working for the FBI, Mr. Lazenby was employed by the Oregon State Police (OSP) as a Forensic Scientist and Digital Forensic Examiner from 2004 to 2015. Mr. Lazenby has not authored any publications in the last ten years.

Prior Testimony: In the last four years, Mr. Lazenby has testified in federal and state court as an expert in digital forensics in the following cases:

| United States v. Jeremy Christian | District of Oregon | February 2020 |
|---|---|---|
| United States v. Jordan Stevens | District of Oregon | June 2021 |
| Oregon v. Dustin Allen Brown | Yamhill County Circuit Court | August 2021 |
| Oregon v. Douglas Grant Dickerson | Clatsop County Circuit Court | September 2021 |
| United States v. Erick Kelley | U.S. Coast Guard Court Marshal | May 2023 |
| Washington v. Anthony Edward Huff-McKay | Pierce County Superior Court | May 2024 |

*/s/ Justin Lazenby       July 11, 2024*

**5.**     <u>**Christi Winters, FBI Digital Forensic Examiner (computers and iCloud)**</u>

<u>Expected Testimony</u>:  The United States intends to call Ms. Winters as an expert in the field of digital forensic examination.  Ms. Winters received electronic devices, obtained forensic images or extractions of those devices, processed forensic copies with approved forensic tools, posted processed information into the Case Agent Investigative Review (CAIR) network, and conducted a preliminary review of the processed information to note device information and user account information.  Ms. Winters received the following devices and accounts:

- One HP Personal Computer Central Processing Unit (seized from Mr. Zuberi's home office);

- One HP laptop (seized from the 1997 Fleetwood Prowler trailer);

- One Apple laptop (seized from the 2012 Honda Pilot);

- One black laptop (seized from the 2012 Honda Pilot), and

- iCloud accounts associated with Mr. Zuberi.

Depending on the device or account, different steps are taken after receipt.   For the items Ms. Winters received, she made forensic copies, processed, and conducted a preliminary review of the above-referenced devices.  Thereafter, Ms. Winters generated electronic reports of responsive information for review by the case agents.

<u>Bases and Reasons</u>:  Ms. Winter's testimony is based on the procedures she took on the above-referenced devices and accounts, as well as her training, education, experience, and expertise as a Digital Forensic Examiner.

<u>Qualifications Including Publications</u>:  Ms. Winters' full qualifications are outlined in her CV.  Since 2016, Ms. Winters has worked at the RCFL in forensic examination, initially as a trainee (2016-2019), then a Task Force Officer (TFO), and then with the FBI as an Information

Technology Specialist-Digital Forensic Examiner. Prior to her work with the FBI, she was the Lead Probation Parole Officer/Computer Forensic Examiner for the Multnomah County Department of Community Justice from 2009 to 2021.

Prior Testimony: In the last four years, Ms. Winters has testified in state court as an expert in digital forensics in the following case:

| Oregon v. Michael Lee | Multnomah County Circuit Court | September 2022 |

*/s/ Christi Winters      July 11, 2024*

6. **Sean Kennedy, FBI Special Agent (cellular site data)**

Expected Testimony: The United States intends to call Special Agent (SA) Kennedy as an expert witness in the fields of call detail record analysis and historical cellular site analysis. SA Kennedy will explain cell tower data and the analysis conducted and conclusions reached regarding cell tower data received from accounts associated with Mr. Zuberi and AV1, including data received from both T-Mobile and Verizon. SA Kennedy will explain how cellular telephone networks operate, how historical cellular site data is preserved, and how it can be collected and analyzed to reveal the locations and travel of cellphones—based on the signal for a cell phone connecting with different cell towers. He will explain the interaction between cell phones and cell towers during communication events, including cell tower coverage areas, signal strength and radio frequency. He will explain how the communication event data is relayed and captured, and how to use this information to determine the approximate location of a particular phone at a particular time. SA Kennedy will further explain that historical cell site information does not enable identification of the precise location of a cell phone only the cell tower and sector used by the cellphone and distance that the phone was from that cell tower and sector.

Pursuant to an exigent request, SA Kennedy received Real Time Tool (RTT) data from Verizon and timing advance data from T-Mobile. Data was also received from both Verizon and T-Mobile pursuant to a search warrant, however Verizon did not initially provide RTT data and SMS content. Verizon recently provided the data; however, SA Kennedy expects to receive the data again pursuant to a new search warrant, which he will analyze to provide the general location of cellphones during the relevant times. In addition, SA Kennedy will testify regarding the data obtained from the Garmin GPS device and from LandAirSea and how that data corresponds with the historical cell site data. SA Kennedy will also testify regarding GPS/location data, which was stored on seized digital devices.

The analysis will be performed on call detail records, RTT, and timing advance data obtained from Verizon and T-Mobile for Mr. Zuberi and AV1's cellphones. The call detail records documented the network interaction to and from the cell phones. The historical cellular site data documented or is expected to document the cell tower and sector ("cell site") that served the cell phones during the relevant time periods and the distance from the cell tower. This information can illustrate an approximate location of the cell phones when they initiated contact with the network.

<u>Bases and Reasons</u>: SA Kennedy's testimony will be based on his review and analysis of the relevant call detail records and historical cellular site data (which includes RTT and timing advance data) from the accounts associated with Mr. Zuberi and AV1. His testimony is also based on his training, experience, and expertise in the fields of call detail record analysis and historical cellular site analysis.

<u>Qualifications Including Publications</u>: SA Kennedy's full qualifications are outlined in his CV. Since March 2021, SA Kennedy has been a Cellular Analysis Survey Team (CAST)

National Asset assigned to the FBI Headquarters CAST Unit.  In that role, he conducts historical call detail record analysis, drive testing, and training; responds to emergency situations to provide historical and active telephone location analysis; and provides CAST related case consultations to local, state, and federal law enforcement officers and prosecutors.  Prior to that, SA Kennedy was assigned to the FBI Portland Division and the FBI Baltimore Division for a combined six years, where he investigated violent crimes, including through the use of cell site analysis.  SA Kennedy graduated from the University of Southern California in 2008 with a Bachelor of Science in Biomedical (Biochemical) Engineering.  He has received over 400 hours of specialized training and expertise in cellular telephone analysis, including historical cell site analysis and digital mapping.  Since 2019, he has regularly taught local, state, and federal law enforcement partners about historical cell site analysis.  SA Kennedy has not authored any publications in the last ten years.

 Prior Testimony:  In the last four years, SA Kennedy has testified in federal and state court as an expert in analysis and mapping of cellular phone data in the following cases:

| California v. Tavner Cook | Los Angeles County Superior Court | June 2019 |
|---|---|---|
| United States v. Thrasher | District of Oregon | August 2019 |
| Maryland v. James Edward Jackson | Baltimore County Circuit Court | October 2019 |
| California v. Aaron Villanueva | Los Angeles County Superior Court | November 2019 |
| Washington v. Dominique Avington, Kenneth Davis and Darry Smalley | Pierce County Superior Court | October 2020 |
| Washington v. D'Anthony Leslie Williams | Cowlitz County Superior Court | November 2020 |
| United States v. Evans | District of Oregon | June 2021 |
| Washington v. David Yuriyevich Bogdanov | Clark County Superior Court | August 2021 |
| Oregon v. Jonathan Lee McDonald | Umatilla County Circuit Court | January 2022 |
| United States v. Moi | District of Alaska | February 2022 |
| Oregon v. Rickie Allen Miller | Lane County Circuit Court | May 2022 |

| Washington v. Christian Wayne Scott | Walla Walla County Superior Court | July 2022 |
|---|---|---|
| United States v. Rhodes et. al. | District of Oregon | September 2022 |
| Oregon v. Keith Michael Burton | Umatilla County Circuit Court | April 2023 |
| Washington v. Lawrence Isaiah Groce | Benton County Superior Court | April 2023 |
| Washington v. Emilio Ramon Pay-Pay andAli Jamaal Sharif | King County Superior Court | April 2023 |
| United States v. Beal | Central District of California | July 2023 |
| California v. Jude Kallner | Sonoma County Superior Court | July 2023 |
| Washington v. Lawrence Isaiah Groce | Benton County Superior Court | September 2023 |
| Washington v. Joseph Gioiosa | Pierce County Superior Court | October 2023 |
| United States v. Henline | Western District of Washington | November 2023 |
| South Dakota v. Dreau Rogers | Lawrence County Circuit Court | December 2023 |
| Oregon v. Kenneth Atkinson | Deschutes County Circuit Court | January 2024 |

*/s/ Sean Kennedy       July 16, 2024*

### 7.    **Lara Adams, FBI Forensic Examiner (DNA)**

Expected Testimony:  The United States intends to call Ms. Adams as an expert in the field of forensic serology and forensic DNA analysis.  She currently works in the FBI Laboratory DNA Casework Unit in Quantico, Virginia.  To obtain her position as a forensic examiner, Ms. Adams was required to successfully complete oral boards on the topics of serology, DNA, and population genetics and statistics, three moot court exercises to ensure that she can explain her findings to an audience and pass a competency test in DNA interpretation.  Since being qualified as a forensic examiner, Ms. Adams has been required to participate in at least two proficiency tests per year.  Ms. Adams has performed DNA analysis and interpretation on hundreds of criminal cases.  The probabilistic genotyping software, STRmix™ has been used by the FBI Laboratory DNA Casework Unit since 2015 to assist with the interpretation of evidence DNA profiles and statistical analysis.  In Ms. Adams' time at the FBI Laboratory, she has utilized STRmix™ in hundreds of criminal cases, to include the case at hand.

At trial, Ms. Adams will provide general background information regarding forensic DNA testing and will describe/define deoxyribonucleic acid (DNA), how DNA varies from person to person, how DNA may transfer from its original source to another person and or object, and what factors may affect the quality and or quantity of DNA detected. Ms. Adams will testify that when evidence is received at the FBI Laboratory for DNA analysis, a team of biologists process the evidence in accordance with the Standard Operating Procedures of such tests, the results of which are then reviewed by the Forensic Examiner in the DNA Casework Unit assigned to the case, to ensure no additional testing is needed.

Ms. Adams will provide her expert opinion that from the multiple samples submitted to her for analysis, DNA profiles were recovered. Ms. Adams will describe the process used to recover those profiles, which include collection, extraction, quantitation, amplification, analysis, and interpretation. This will also include describing the individualizing characteristics used to conduct a DNA analysis, i.e., short tandem repeats, how DNA typing is performed at the FBI Laboratory and the possible outcomes of a DNA examination. She will also explain how a DNA profile is interpreted, what factors may affect such interpretation, and the process for determining the number of contributors to an evidentiary profile.

Ms. Adams determined that the DNA profiles developed in this case were suitable for comparison and compared these DNA profiles using the applicable Quality Assurance Manual and Standard Operating Procedures in place at the time at the FBI Laboratory,[1] calculated statistics, and documented her conclusions in written reports. She will describe how such comparisons were performed and what possible conclusions may be reached in performing

---

[1] The Quality Assurance Manual and relevant Standard Operating Procedures used in this case have been produced in discovery.

forensic DNA examinations in accordance with the United States Department of Justice Uniform Language for Testimony and Reports.[2]

More specifically, the results to which Ms. Adams will testify regarding the examinations she conducted in this case are contained within her Laboratory Report of Examinations, which have been provided to defense.

The probabilistic genotyping software program called STRmix™, was used by Ms. Adams in this case. She will explain that the DNA profiles developed in this case were imported into the STRmix™ software, which calculates a statistical probability called a "likelihood ratio."[3] For an inclusion, the likelihood ratio describes how much more likely it is to obtain the DNA results if the person of interest is a contributor to the DNA profile, rather than if an unknown, unrelated person is a contributor to the DNA profile. Ms. Adams will further explain that the FBI Laboratory uses a qualitative verbal scale to describe the strength of support that likelihood ratio provides to the conclusion. She may explain that the Scientific Working Group on DNA Analysis Methods (SWGDAM) recommends these supplementary verbal qualifiers, which are reflected in the FBI Standard Operating Procedures.[4] She may also explain that the

---

[2] *See* Department of Justice Uniform Language for Testimony and Reports.
https://www.justice.gov/olp/uniform-language-testimony-and-reports

[3] A likelihood ratio (LR) is a statistic for the comparison of the probability of the evidence (E), given two competing propositions. The inclusionary proposition (H1), includes the person of interest and, for mixed samples, known and/or unknown, unrelated individuals. The total count of individuals included in the proposition is equal to the number of contributors interpreted to be in the sample. The exclusionary proposition (H2) generally consists of unknown, unrelated individuals, equaling the total number of contributors interpreted to be in the sample. *See Department of Justice Uniform Language for Testimony and Reports for Forensic Autosomal DNA Examinations Using Probabilistic Genotypic Systems. December 12, 2022.*

[4] Recommendations of the SWGDAM Ad Hoc Working Group on Genotyping Results Reported as Likelihood Ratios. https://www.swgdam.org/publications

STRmix™ software has been thoroughly validated, both developmentally by the manufacturer and internally by the FBI Laboratory prior to its use in forensic casework, and the software is used widely within the forensic community which means that numerous laboratories have tested the STRmix probabilistic genotyping software and found it to reliably produce accurate results. In addition, she may testify that the use of STRmix™ has been subject to extensive peer-reviewed publications. Ms. Adams may testify that the internal parameters and the protocol for using STRmix™ were developed based upon the FBI Laboratory's internal validation studies and can be found in the FBI Laboratory Procedures. Ms. Adams will testify that she used STRmix™ in accordance with those procedures, which was verified by another qualified Forensic Examiner during the technical review process.

Bases and Reasons: Ms. Adams' opinions are based on her personal examination of the results, which were produced in her 1A case file materials, as well as her training, education, experience, and expertise as a Forensic DNA Examiner. Ms. Adams' expert forensic opinions, and the basis for those opinions, are guided by Standard Operating Procedures and applicable Quality Assurance Manual and set forth more fully in her reports. Ms. Adams' may also rely on peer-reviewed literature to provide context to the DNA results, e.g., transfer, persistence, and recovery of DNA profiles on items of evidence.

Qualifications Including Publications: Ms. Adams' full qualifications are outlined in her CV. From 2010 to the present, Ms. Adams has served as a forensic examiner for the FBI, based in Quantico, Virginia. Prior to working for the FBI, she was a biologist for different laboratories in Charleston, South Carolina. She received a Bachelor of Science in Marine Biology from Stockton University in Pomona, New Jersey in 1997, and her Master of Science in Marine Biology from the University of Charleston, in Charleston, South Carolina in 2001. From 2018 to

the present, she has served as the Technology Transfer Program Manager.  In the past ten years, Ms. Adams has authored two publications, which are set forth in her CV.

Prior Testimony:  In the last four years, Ms. Adams has testified in federal and state court as an expert in a serology and/or DNA in the following cases:

| | | |
|---|---|---|
| Arkansas v. John Brandon Self | Saline County Circuit Court | 2021 |
| United States v. Rickey Claybron | Northern District of Illinois | 2021 |
| Mississippi v. CSO Norvell | DeSoto County Circuit Court | 2022 |
| United States v. Caballero-Bustamante et al. | District of Arizona | 2022 |
| Texas v. Carrendius Walker, Texas v. James Moore | Dallas County District Court | 2022 |
| Illinois v. Brodey I. Murbarger | Wayne County Circuit Court | 2022 |
| United States v. Zachary Scott | District of Columbia | 2022 |
| Wisconsin v. John A. Sarver | Wood County Circuit Court | 2022 |
| United States v. Sayfullo Saipov | Southern District of New York | 2023 |
| United States v. Robby Lee Robinson | Western District of Washington | 2023 |

*/s/ Lara Adams          July 10, 2024*

8. **Rachel Clay, FBI Forensic Document Examiner (handwriting)**

Expected Testimony:  The United States intends to call Forensic Examiner Rachel Clay to testify at trial about her analysis, comparison, and evaluation of handwriting contained in documents that are material to this case.  Ms. Clay is an expert in the field of questioned document examination. She currently works in the FBI Laboratory Division, Questioned Documents Unit (QDU) in Quantico, Virginia. She will describe the accreditation of FBI Laboratory facilities including her discipline, forensic document examination.  FBI Laboratory facilities are accredited by the ANSI National Accreditation Board (ANAB) as described on the FBI Laboratory ANAB Scope of Accreditation. The accreditation includes adherence to the ISO/IEC 17025:2017 (ISO 17025) and ANAB AR 3125 standards.

In order to obtain her position as a forensic document examiner, Ms. Clay was required to successfully complete an extensive training program to demonstrate competency, which included written tests, practical exercises, casework-like examinations, oral boards, moot court exercises, competency tests, and supervised casework.  Ms. Clay was required to successfully complete oral boards on the topics of handwriting, printing, and typewriting and passed competency tests in those areas.  Since being qualified as a forensic document examiner, Ms. Clay has been required to participate in at least two proficiency tests per year.  Ms. Clay has performed various types of questioned document examinations on hundreds of criminal cases.

Ms. Clay will provide general background information regarding questioned document examinations.  Ms. Clay will testify that when evidence is received at the FBI Laboratory for forensic analysis, the sample(s) is processed in accordance with the applicable Technical Procedures and Quality Assurance Manual in place the time at the FBI Laboratory.[5]

Ms. Clay will testify that handwriting comparison conclusions made by a forensic document examiner are based on the following three principles:

- no two writers share the same combination of handwriting characteristics;

- no one person writes exactly the same in each document he/she/they produces. Every individual develops subconscious habits which are repeatedly demonstrated in their writing.  The combination of these habits and characteristics enables a body of writing to be attributed to a particular writer;

- every writer naturally has a capability, or skill, of writing that cannot be dramatically changed.

---

[5] The Quality Assurance Manual and relevant Technical Procedures used in this case have been produced in discovery.

A handwriting examination is conducted utilizing proper lighting and magnification to allow the forensic document examiner to distinguish fine detail. The submitted documents, for both the questioned and known writing samples, are microscopically examined to determine if the handwriting is original, freely, and naturally prepared. Handwriting that is freely and naturally prepared typically represents the normal writing of an individual and is suitable for comparison. Examination of original writing is preferable; however, non-original writing may be suitable for comparison. Using a non-original sample may limit the forensic document examiner's analysis.

Natural writing typically lacks distortion and exhibits good line quality, speed, fluidity, and rhythm. These characteristics are represented by consistent slant and size of the writing, thinning and thickening of the writing line, varied pen pressure, and fluid curves. Alternatively, distorted writing has limited or no identifying characteristics, and may appear slow and awkward. Distorted writing lacks the features of natural writing and often displays tremor, blunt beginning and ending strokes, even pen pressure, hesitation, and overwriting. If the writing is not freely and naturally prepared, the sample(s) may not be suitable for a handwriting comparison or may limit the forensic document examiner's analysis.

Additionally, if the writing samples are suitable for comparison, the forensic document examiner will assess the range of writing and any variations demonstrated in the samples. Variation refers to the different, albeit slight, way(s) an individual can make a handwriting characteristic. Writings executed naturally will not be exact duplicates of each other since individuals do not write with machine-like precision. Variation is an integral part of natural writing that is expected to be observed in both the questioned and known writing samples. The

known writing sample should contain numerous repetitions in order to demonstrate a sufficient range of an individual writer's variation to compare to the questioned writing sample.

The methodology utilized when conducting a handwriting comparison involves a four-stage process by which a forensic document examiner can reach an opinion concerning whether two handwritten items were written by the same person. Forensic document examiners begin handwriting examinations from a point of neutrality.

This methodology is referred to as **ACE-V**. The steps of the ACE-V methodology are as follows:

- **Analysis:** The examination begins with the analysis of the item(s) submitted for comparison. A sufficient sample, in quantity and quality, for both the questioned and known writing must be comparable to conduct a meaningful handwriting examination. Known writing should contain the same or similar elements, such as words, numbers, symbols and/or letter combinations, as the questioned material. A forensic document examiner cannot compare words that do not contain comparable letters. For example, a forensic document examiner cannot compare the name "Sue Burkes" to "Ann Davis." No like letters or letter combinations in these two names, except for a terminal "s" at the end of each last name, can be compared.

- **Comparison:** A forensic document examiner conducts a side-by-side comparison of the questioned and known writing samples. Handwriting characteristics considered when conducting this comparison are writing formations and their relationship to one another, and include both obvious and subtle features of the writing, such as line quality, style of writing, overall formations, baseline alignment, arrangements/formatting, spacing, strikes, size, and slant.

Numerous features are compared in the questioned and known writing samples to determine if there are significant similarities or differences. A forensic document examiner may observe a similarity, a difference, and/or unexplained characteristic. A similarity is a writing characteristic that is observed in both the questioned writing and the known writing. A difference is an observed characteristic, which can be repetitive, in the questioned writing, but is not found in the known writing. A difference can also be a characteristic found to be outside the range of writing of a known individual. An unexplained characteristic is a characteristic that is observed in the questioned writing but not accounted for on the basis of the available known writing; however, the characteristic is either within the range of writing of an individual or it cannot be determined. An unexplained characteristic may limit the forensic document examiners' analysis.

- **Evaluation:** The forensic document examiner evaluates the significance of the nature and combination of the characteristics observed during the comparison (similarities, differences, unexplained characteristics) as well as any limitations that may be present as part of the examination. This evaluation is based on the examiner's training, knowledge, and experience. The weight of the document examiner's conclusion(s)/opinion(s) is/are determined by the significance attached to the various characteristics in the sample writing and, if applicable, any limitations.

Significant characteristics must be found to be in common between the questioned and known writing, with no significant differences and limitations observed, to identify the source of a body of questioned writing to a particular known writer. Each and every separate characteristic may not be attributed to a particular writer when considered by itself; however, when observed in combination with the other numerous and/or significant characteristics, the forensic document examiner can attribute the handwriting sample to a particular known writer (i.e., Source

Identification). Similarly, significant differences must be observed with no limitations when comparing the questioned and known writing samples to exclude a particular writer (i.e., Source Exclusion).

A forensic document examiner may not be able to render an opinion of source identification or source exclusion based on the presence of limitations in the questioned and/or known writing provided for examination. Some of these limitations can include a non-original (e.g., photocopied) item or items, which may yield poor detail and clarity, and prevent the forensic document examiner from properly assessing line quality, pen pressure, connecting strokes, breaks, letter formations, and beginning and ending strokes. Additional limitations include distorted/disguised writing, which does not exhibit the normal handwriting characteristics of the writer; limited quantity and/or quality of questioned and known writing, which may not allow proper assessment of skill level and identifying characteristics; and the lack of comparable known writing, which does not allow for a thorough comparison of the characteristics observed in the questioned writing.

A forensic document examiner can render a qualified opinion in instances when it is not possible to render definitive opinions of source exclusion or source identification. The conclusions used in the Questioned Documents Unit of the FBI Laboratory are source identification, support for common source, inconclusive, support for different source, and source exclusion.

- **Verification:** The final stage of the examination process is the verification of the forensic document examiner's analysis, comparison, and evaluation. In the FBI Laboratory Questioned Documents Unit, all comparisons are verified by another qualified forensic document examiner(s) using the same methodology described above. This verification is

conducted to ensure the technical accuracy of the forensic document examiner's conclusion. Additionally, each case is technically reviewed, and administratively reviewed.  Some cases are selected for Blind Verification as well.

She will describe how the examination was performed, the limitations of the examination, and what conclusions were reported as a result of the forensic examinations in accordance with the United States Department of Justice Uniform Language for Testimony and Reports.[6]  Ms. Clay will explain the verification procedures that were employed in this case, where another qualified forensic examiner from the FBI Laboratory verified her comparisons and conclusions. Upon completion of the verification, a technical review and administrative review was conducted on Ms. Clay's FBI Laboratory file records prior to the issuance of the Laboratory Report of Examination.  More specifically, the results to which Ms. Clay will testify regarding the examinations she conducted in this case are contained within her Laboratory Report of Examination.  As set forth in her report, Ms. Clay determined that Mr. Zuberi was the source of various documents and writings seized during the investigation.  Regarding other seized documents and writings, she determined that there was support for a common source (Mr. Zuberi) or that no conclusion could be reached.  Ms. Clay may update her conclusions upon receipt of additional known writings attributable to Mr. Zuberi.

Bases and Reasons:  Ms. Clay's opinions are based on the results of the examinations of the evidence, which are documented in her case file materials, as well as her training, education, experience, and expertise as a Forensic Document Examiner.  Ms. Clay's expert opinions, set forth more fully in her report, and the basis for those opinions, are guided by the applicable

---

[6] *See* Department of Justice Uniform Language for Testimony and Reports.
https://www.justice.gov/olp/uniform-language-testimony-and-reports

Technical Procedures and Quality Assurance Manual. Ms. Clay may also rely on peer-reviewed literature to provide context to the results of the examinations.

Qualifications Including Publications: Ms. Clay's full qualifications are outlined in her CV. Since March 2015, Ms. Clay has served as a Document Analyst/Forensic Examiner for the FBI. From 2013 to 2015, she was a Document Examiner Trainee, also for the FBI, during which she worked numerous cases. Prior to working with the FBI, she worked for the Secret Service from 2008 to 2013 as a counterfeit technician and investigative analyst. In 2005 she received her Bachelor of Science in Criminal Justice from the University of Texas Pan American/University of Texas Rio Grande Valley, and in 2012 received Master of Forensic Sciences from George Mason University. Ms. Clay has not authored any publications in the last ten years.

Prior Testimony: In the last four years, Ms. Clay has testified in federal and state court as an expert in a handwriting or obliteration in the following cases:

| United States v. Jennifer Rae McDonald | Western District of Virginia | September 2023 |
| Nebraska v. Nyir G. Kuek, | District Court of Douglas County | July 2023 |
| United States v. Lawrence Rudolph | District of Colorado | July 2022 |
| Georgia v. Gordon Anthony Evans and Durell Leeshon Lewis | Gwinnett Judicial Circuit Superior Court | August 2018 |
| United States v. Larry Padgett | Eastern District of New York | October 2018 |

*/s/ Rachel Clay          July 16, 2024*

### 9. **Stephanie Stewart, FBI Physical Scientist/Forensic Examiner (fingerprints)**

Expected Testimony: The United States intends to call Physical Scientist/Forensic Examiner Stephanie Stewart to testify at trial about her examination of various items and latent lifts for possible friction ridge detail or latent prints, including over thirty items located in Mr. Zuberi's trailer, residence, and vehicle. Ms. Stewart is an expert in the field of latent print

processing and comparison. She currently works in the FBI Laboratory Latent Print Operations Unit (LPOU) in Quantico, Virginia. She will describe the accreditation of the FBI Laboratory facilities, including her discipline, Friction Ridge (e.g., Latent Prints). FBI Laboratory facilities are accredited by the ANSI National Accreditation Board (ANAB) as described on the FBI Laboratory ANAB Scope of Accreditation. The accreditation includes adherence to the ISO/IEC 17025:2017 (ISO 17025) and ANAB AR 3125 standards.

In order to obtain her position as a physical scientist/forensic examiner, Ms. Stewart was required to successfully complete an extensive training program to demonstrate competency, which included written tests, practical exercises, casework-like examinations, oral boards, moot court exercises, competency tests, and supervised casework. Ms. Stewart was required to successfully complete oral boards on the topics of persistence and uniqueness of friction ridge skin, discriminability of friction ridge prints, Analysis, Comparison and Evaluation (ACE) of friction ridge prints, Next Generation Identification (NGI) searches, and quality assurance measures, and passed competency tests in evidence processing and friction ridge print comparisons. Since being qualified as a forensic examiner, Ms. Stewart has been required to participate in at least one proficiency test per year. Ms. Stewart has performed latent print processing and comparison on hundreds of criminal cases.

Ms. Stewart will provide general background information regarding latent print processing and examination, and the series of steps she employs to conduct a comparison. Ms. Stewart will testify how she received, processed, and conducted examinations (utilizing the ACE method) on the evidence submitted to her in accordance with the Technical Procedures and Quality Assurance Manual in place at the time at the FBI Laboratory.

Items of evidence submitted for friction ridge print examinations may be examined visually, with various forensic light sources, and/or processed with chemicals and powders to detect the presence of friction ridge prints. Different processing techniques are applied depending on the type and condition of the evidence. Latent prints are assessed after processing to determine if they are suitable for comparison, based on the quantity and clarity of the friction ridge detail of those latent prints. A computer program known as Photoshop is sometimes used to digitally process the images of latent prints. The digital processing enhances the contrast between the ridges and substrate (background), improving visualization for the examiner. A physical scientist/forensic examiner then conducts analyses, comparisons, and evaluations ("ACE") of such prints using a series of steps described more fully in Ms. Stewart's Laboratory Reports. Suitable latent prints can be compared to specific known prints or searched through an automated database.

At trial, Ms. Stewart will testify regarding the limitations of the examinations, and what her conclusions were. Ms. Stewart will explain the verification procedures that were employed in this case, where another qualified latent print examiner from the FBI Laboratory verified her comparisons and conclusions per policy. Upon completion of the verification, a technical review and administrative review was conducted on Ms. Stewart's FBI Laboratory file records prior to the issuance of her FBI Laboratory Reports. Specifically, the results to which Ms. Stewart will testify regarding the examinations she conducted in this case are contained within her Laboratory Reports. Her testimony will be provided in accordance with the FBI Approved Standards for

Scientific Testimony and Reports and the United States Department of Justice Uniform Language for Testimony and Reports.[7]

Ms. Stewart will explain that friction ridge skin consists of ridges, which are raised portions of skin, and furrows, which are valleys in between the ridges. Friction ridge skin is found on the fingers, palms, and soles of the feet, and friction ridge prints are two dimensional reproductions of the friction ridge features from when the skin touches an item. There are three levels of friction ridge detail in a latent print. Level 1 consists of the general ridge flow of a latent print—that is the general direction or change in direction that the friction ridges take. Level 2 detail consists of the minutiae in a latent print, such as the ridge endings, bifurcations, and dots. Level 3 detail consist of individual ridge attributes such as ridge shapes and ridge edges.

Ms. Stewart will opine that latent print examination can be used for purposes of identification. Ms. Stewart will explain the discriminability of friction ridge prints, and she will testify that an identification is an examiner's opinion that two friction ridge prints originated from the same source because the observed friction ridge features are in sufficient correspondence such that she would not expect to see the same arrangement of features repeated in a print that came from a different source.

Ms. Stewart is expected to testify about the FBI's national friction ridge print database, Next Generation Identification (NGI). NGI contains millions of known print records and contains a repository of unidentified latent prints. An examiner can search latent prints against the known records in the database. The database returns candidate images for the examiner to

---

[7] *See* Department of Justice Uniform Language for Testimony and Reports.
https://www.justice.gov/olp/uniform-language-testimony-and-reports

compare. NGI does not make identifications; an examiner will conduct a comparison to each returned candidate to reach a conclusion. Unidentified latent prints can be shared with partner agencies to be searched against their databases.

Ms. Stewart is still reviewing items for possible friction ridge or latent prints, including a notebook and papers, and updated discovery will be provided to defendant and his counsel upon completion.

Bases and Reasons: Ms. Stewart's opinions are based on the results of the examinations of the evidence and are documented in her case file materials, as well as her training, education, experience, and expertise as a Forensic Examiner. Ms. Stewart's expert opinions, set forth more fully in her reports, and the basis for those opinions, are guided by the applicable Technical Procedures and Quality Assurance Manual. Ms. Stewart may also rely on peer-reviewed literature to provide context to the results of the examinations.

Qualifications: Ms. Stewart's full qualifications are outlined in her CV. Since August 2009, Ms. Stewart has served as a Physical Scientist/Forensic Examiner in the Latent Print Operations Unit at the FBI Laboratory in Quantico, Virginia. Prior to that, she was a latent fingerprint examiner for the Crime Scene Investigation Unit of the Alexandria Police Department. She graduated from West Virginia University with a Bachelor of Science in Forensic and Investigative Science in 2007. Ms. Stewart has not authored any publications in the last ten years.

Prior Testimony: In the last four years, Ms. Stewart has testified in federal and state court as an expert regarding latent prints in the following cases:

| United States v. Leroy Henry Jr. | District of Virgin Islands | May 2021 |
| Florida v. David Manas | Palm Beach County Circuit Court | November 2021 |

| United States v. Michael Mills | Eastern District of Michigan | April 2022 |
| United States v. Harold Reynolds Jr | Middle District of Georgia | June 2022 |
| Florida v. David Manas | Palm Beach County Circuit Court | November 2022 |
| United States v. Rodvelt | District of Oregon | May 2023 |
| United States v. Matthew Chapman | District of Nevada | April 2024 |

*/s/ Stephanie Stewart          July 12, 2024*

### 10.    Jeremy Stein, LandAirSea

<u>Expected Testimony</u>:  The United States intends to call Mr. Stein at trial regarding the data received from LandAirSea, including GPS data.  He will explain that LandAirSea uses the SilverCloud application for their GPS tracking hardware.  Mr. Stein will be able to explain what information the SilverCloud application retains and provides.  Mr. Stein will explain that when a new device is added, the device name defaults to the serial number associated with the device and the device name can later be edited by the user.  Mr. Stein will explain that changes to a device name or geofences created by the user will be saved locally on a user's mobile device and not on the GPS device.  Changes to the device name or geofences are also stored on the LandAirSea servers while the device is active.  However, once the device is deactivated, the name is not saved on LandAirSea servers.  Mr. Stein will also explain that the GPS devices used by Mr. Zuberi have about a 150-meter margin for error in low signal areas.

<u>Bases and Reasons</u>:  Mr. Stein's testimony is based on his review of the relevant data, as well as his training, education, and experience, including his experience with the company LandAirSea and its products and application.

<u>Qualifications Including Publications</u>:  Mr. Stein's qualifications are outlined in his resume.  Mr. Stein began working with LandAirSea in September of 2022, initially in tech support but later transitioning to the role of Jr. Systems Administrator and Custodian of Records.

In this role, he took over handling all legal requests made to the company and assisting various government agencies and law firms in reviewing data and explaining GPS technology. Previously, he attended McHenry Community College and earned associate degrees in science and mobile app development.  Mr. Stein has not authored any publications in the last ten years.

Prior Testimony:  Mr. Stein has not testified as an expert at trial or by deposition in the past four years.

*/s/ Jeremy Stein          July 11, 2024*

## 11.    Jeff Byram, FBI Supervisory Special Agent (iCloud data)

Expected Testimony:  The United States will seek to admit an Affidavit in Support of Authentication of Evidence, pursuant to Fed. R. Evid. 902(13) and 902(14), setting forth information from Mr. Byram.  The proposed affidavit will be provided to defense counsel.  As an alternative, the United States will call Mr. Byram to testify regarding his verification of the authenticity of electronic data returned to the FBI from Apple pursuant to a court authorized search warrant on Mr. Zuberi's iCloud accounts.  Mr. Byram will explain that the FBI served Apple with a warrant authorizing the search of three iCloud accounts.  In response to the warrant, Apple gathered records, which were then encrypted by Apple.  Apple then makes the encrypted records available to law enforcement through an Apple-owned, internet accessible, and secure on-line storage facility.  Through a secure and automated system, the FBI downloads and decrypts the records from the Apple website and verifies the authenticity of the downloaded files.

The FBI's automated system authenticated the Backup and iCloud records received from Apple through a process of digital identification by rehashing the return and comparing the value to the value provided by Apple.  Additionally, the process of decrypting the Backup and iCloud

records received in response to legal process is designed to produce a true and accurate human readable version of the data received.

Bases and Reasons:  Mr. Byram's testimony and related opinions are based on his decryption of the relevant iCloud data and his understanding of the procedures used to decrypt and process iCloud data received from Apple.  Mr. Byram's testimony will also be based on his training, education, experience, and expertise.

Qualifications Including Publications:  Mr. Byram's full qualifications are outlined in his CV.  Mr. Byram began working with the FBI in 1997 as a Special Agent.  From 2005 until 2008, Mr. Byram worked within the Operation Technology Division (OTD) as a Supervisory Special Agent and as program manager for audio development.  After a detail, Mr. Byram returned to the OTD, eventually becoming the Unit Chief of the Telecommunications Intercept & Collection Technology Unit and Acting Unit Chief of the Operational Networks & Technologies Unit.  In October of 2022, Mr. Byram started his current position as the Supervisory Program Manager with the Federal Bureau of Investigation (FBI), currently serving at the Secure Technologies Exploitation Unit (STXU) in Quantico, Virginia.  The STXU is responsible for exploiting, analyzing, and providing access to inherently and explicitly protected electronic information in support of the FBI's investigative operations.  Mr. Byram holds a Bachelor of Science and a Master of Science in Mechanical Engineering both from the University of California at Santa Barbara.  Mr. Byram also holds a Master of Arts in Security Management from the American Public University.  Mr. Byram has not authored any publications in the last ten years.

Prior Testimony:  In the last four years, Mr. Byram has testified in state and federal court, almost exclusively via affidavit, in the following cases:

| United States v. Harvey Rodriguez | District of Massachusetts | June 2024 |
|---|---|---|
| United States v. Johnny Nash | District of Massachusetts | June 2024 |
| United States. Francis Forsyth | District of Massachusetts | June 2024 |
| United States v. Jeremy Gonzalez | District of Massachusetts | June 2024 |
| United States v. Schuyler Oppenheimer | District of Massachusetts | June 2024 |
| United States v. Eldridge Jackson, Dandre Wallace, Jermaine Weathersby, et al. | Eastern District of Virginia | February-March 2024 |
| United Stages v. Jacob Carter, Anwar Salahuddin, and Quadri Salahuddin | Southern District of New York | January 2024 |
| Donald J. Trump, Waltine Nauta, and Carlos De Oliveira | Southern District of Florida | November 2023 |
| United States v. James Garlick | Southern District of New York | May 2023 |
| United States v. Davoud Jafari | District of Columbia | March 2023 |
| United States v. Michael Jude Zacharias | Northern District of Ohio | February 2023 |
| United States v. Victor Alexander Rodriguez Del Giudice, et al. | District of Nebraska | December 2022 |
| United States v. Brian Kelsey | Middle District of Tennessee | October 2022 |
| United States v. Kendrick Ramon Page, et al. | Southern District of Iowa | June 2021 |
| United States v. Leslie Hood | Eastern District of California | April 2021 |
| California v. Stuart John Tsuneo Nagata | Superior Court of California, County of Merced | September 2020 |
| Oyontiketya v. Jones Jonathon Zakresky, et al. | Southern District of West Virginia | March 2020 |

*/s/ Jeff Byram          July 11, 2024*

## 12. Paul Rettig, FBI Digital Evidence Support Team Lead (iCloud data)

Expected Testimony: The United States intends to call Mr. Rettig regarding the processing of the iCloud data. Mr. Rettig will explain that Apple responded to the iCloud search warrant with two emails: one email contained links to a copy of the requested iCloud data and a second email contained a password necessary to download and decrypt the iCloud data. The emails were submitted to the FBI iCloud processing website known as LUCID. This submission started an automated processing workflow. The Data Intercept Technology Unit (DITU)

automatically downloaded a verified copy of the data from Apple.  DITU then automatically decrypted the downloaded data using a program provided by the Secure Technology Exploitation Unit (STXU) [see information above re: Jeff Byram].  The decrypted data was sent to the Multimedia Exploitation Unit (MXU).

MXU automatically processed the data in Analog and the Mobile Parsing Tool (MPT). FBI Digital Forensic Examiner Christi Winters requested a copy of the processed iCloud data from Mr. Rettig for review.  Mr. Rettig exported the process data from Analog into an Analog Portable Case and collected the processed data reports from the Mobile Parsing Tool (MPT). Mr. Rettig then collected all the processed data and transferred it to Ms. Winters using the FBI's internal secure file sharing tool.  Mr. Rettig also transferred a copy of the Fractal review tool to Ms. Winters.  The Fractal review tool is required to review MPT reports.  Analog, MPT, and Fractal are all FBI tools developed by the Multimedia Exploitation Unit and used for the parsing and review of digital data including social media returns.

Bases and Reasons:  Mr. Rettig's testimony and related opinions are based on his processing of the relevant iCloud data and his understanding of the procedures used to process iCloud data received from Apple.  Mr. Rettig's testimony will also be based on his training, education, experience, and expertise as a Forensic Examiner.

Qualifications Including Publications:  Mr. Rettig's full qualifications are outlined in his CV.  Mr. Rettig began working with the FBI in 2003 as a Senior Forensic Examiner in Chicago, Illinois.  In 2017, he became the Headquarters Forensic Program Coordinator in Quantico, Virginia, where he managed all aspects of the FBI's national digital forensic program as it related to the examination of Apple computers.  In April of 2022, he became the Headquarters Digital Evidence Support Team Lead based in Clarksburg, Virginia.  He currently manages a

team that provides training and operational support for the FBI's cloud forensic platform. Mr. Rettig graduated from St. Louis University in 1997 with a Bachelor of Science in Business Administration, Management Information Systems. He also received a Post-Baccalaureate Certificate of Major in Film and Video from Columbia College Chicago in 2010. Mr. Rettig has not authored any publications in the last ten years.

<u>Prior Testimony</u>:  Mr. Rettig has not testified as an expert at trial or by deposition in the past four years.

*/s/ Paul Rettig        July 16, 2024*

### 13.    <u>Amie Walton, SANE (examination of AV1)</u>

<u>Expected Testimony</u>:  The government intends to call Ms. Walton to testify regarding the sexual assault examination she conducted on AV1 on July 15, 2023. Ms. Walton's testimony will recount her physical examination of AV1, her interview with AV1, and her collection of hair and DNA swabs. Ms. Walton is also expected to testify regarding her training and experience, best practices for performing a medical forensic examination, how a sexual assault examination is conducted and what findings are made, AV1's behavior during the examination and common victim presentation, mechanisms of injuries and wounds, and related opinions.

<u>Bases and Reasons</u>:  Ms. Walton's testimony and related opinions are based on her examination of AV1, as well as her training, education, experience, and expertise as a nurse and certified sexual assault nurse.

<u>Qualifications Including Publications</u>:  Ms. Walton's qualifications are outlined in her resume. Ms. Walton has over twenty-five years of experience in healthcare. She is a certified gastroenterology Registered Nurse and is SANE certified. After working at Salem Hospital for approximately two decades, she started work at Providence Medford Medical Center in Medford,

Oregon in 2020 as a registered nurse.  She has served as a Forensic Nurse Examiner for the Jackson County Sexual Assault Response Team since 2022, and has served as a pediatric sexual assault nurse examiner with the Children's Advocacy Center in Medford, Oregon since 2023. Ms. Walton has not authored any publications in the last ten years.

Prior Testimony:  Ms. Walton has not testified as an expert at trial or by deposition in the past four years.

*/s/ Amie Walton          July 11, 2024*

Dated: July 16, 2024

Respectfully submitted,

NATALIE K. WIGHT
United States Attorney

/s/ *Marco A. Boccato*
MARCO A. BOCCATO
Assistant United States Attorney