1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF OREGON

3                      MEDFORD DIVISION

4

5

       UNITED STATES OF AMERICA,          )
6                                          )
                              Plaintiff,   )  No.
7                                          )  1:23-cr-00254-MC-1
                    v.                     )
8                                          )  August 20, 2024
       NEGASI ZUBERI, also known as        )
9      Justin Joshua Hyche, also known     )  Medford, Oregon
       as Sakima Zuberi,                   )
10                                         )
                              Defendant.   )
11

12

13

14

15                  **TRANSCRIPT OF PROCEEDINGS**

16          (Oral Argument and Pretrial Conference)

17

18       BEFORE THE HONORABLE MICHAEL J. MCSHANE

19       UNITED STATES DISTRICT COURT CHIEF JUDGE

20

21

22

23
   **COURT REPORTER:**
24   Kellie M. Humiston, RMR, CRR
       (503) 326-8186
25   Kellie_Humiston@ord.uscourts.gov

```
 1                    A P P E A R A N C E S - i

 2

 3    FOR THE PLAINTIFF:
                              U.S. ATTORNEY'S OFFICE
 4                            By:  Jeffrey S. Sweet
                              405 E. Eight Avenue
 5                            Suite 2400
                              Eugene, OR 97401
 6

 7    FOR THE PLAINTIFF:
                              U.S. ATTORNEY'S OFFICE
 8                            By:  Marco Boccato
                              310 W. Sixth Street
 9                            Medford, OR 97501

10

11    FOR THE PLAINTIFF:
                              U.S. ATTORNEY'S OFFICE
12                            By:  Nathan J. Lichvarcik
                              405 E. Eighth Avenue
13                            Suite 2400
                              Eugene, OR 97401
14

15    FOR THE PLAINTIFF:
                              U.S. ATTORNEY'S OFFICE
16                            By:  Suzanne A. Miles
                              1000 SW Third Avenue
17                            Suite 600
                              Portland, OR 97204
18

19

20

21

22

23

24

25
```

**A P P E A R A N C E S - ii**

FOR THE DEFENDANT:

                  ANGELI LAW GROUP
                  By:  Amy Elizabeth Potter
                  121 SW Morrison Street
                  Suite 400
                  Portland, OR 97204

FOR THE DEFENDANT:

                  LAW OFFICES OF MICHAEL P. BERTHOLF
                  By:  Michael Bertholf
                  108 Mistletoe Street
                  Medford, OR 97501

1    (August 20, 2024, 9:06 a.m.)

2              P R O C E E D I N G S

3

4         THE COURTROOM DEPUTY:  The United States District Court

5    is now in session.  The Honorable Michael McShane presiding.  The

6    case on the calendar is United States of America vs. Negasi

7    Zuberi, Case Number 1:23-cr-00254-MC.

8         THE COURT:  If I could have the attorneys please

9    introduce themselves for the record.  Let's start with the

10   Government.

11        MR. SWEET:  Good morning, Your Honor.  The United

12   States AUSA's Jeff Sweet, Suzanne Miles, Nate Lichvarcik, Marco

13   Boccato.  And also seated at counsel table is legal assistant,

14   Kayla Bouchard, who will be running our exhibits.

15        THE COURT:  Okay.  Thank you.

16        And for the defense.

17        MS. POTTER:  Good morning, Your Honor.  Amy Potter and

18   Michael Bertholf on behalf of Mr. Zuberi.  And with us at counsel

19   table is Cheryl Oakley, our paralegal.

20        THE COURT:  Thank you.  Mr. Zuberi, good morning.

21        THE DEFENDANT:  Good morning.

22        THE COURT:  You know, I've read through, I believe, all

23   the motions.  Mr. Sweet, I believe you maybe sent an e-mail

24   earlier that was forwarded to me by poor Mr. Svelund, who

25   unfortunately is home sick.  I think I'm prepared to address all

1    of the motions that you've laid out, maybe in a different order,

2    because I took them as they came.

3                Are there any matters that we need to discuss unrelated

4    to the motions, just preliminary matters?  From the Government?

5                MR. SWEET:  No, Your Honor.

6                THE COURT:  All right.  From defense?

7                MS. POTTER:  No, Your Honor, but I did want to make

8    sure you got the exhibit list with our objections since it'll

9    make that portion easier.  I know it was late.  I apologize.

10               THE COURT:  I did.  No, no, no.  It's fine.  I was

11   looking at it a little late last night.  It makes sense.  That

12   may be a more organic discussion than the other motions, but I

13   think we should be able to get through that exhibit list at some

14   point.  I think I should easily be able to pull it up.

15               MS. POTTER:  Okay.

16               THE COURT:  But with regard to, you know, the motions

17   in limine, the motions to consolidate, exclude evidence regarding

18   videos, you know, other issues around voir dire, I have read all

19   the submissions, but from the Government, is there any highlights

20   you'd like me to consider with regard to oral argument?

21               MR. SWEET:  Thank you, Your Honor.  And we do have some

22   of these issues divided amongst us.  If I can just address a

23   couple of the ones I think are very straightforward.

24               In terms of the defense motion in limine, I believe the

25   only matter that's outstanding is the use of the term "cell."

1    The Government will not use the term "cell."  We're not asking

2    that the jury instructions include that.  We'll amend the exhibit

3    lists so the one that goes to the jury doesn't say "cell," but

4    just as the defense should be able to call it a music studio, we

5    should be able to call it a cell.  So that's -- that's our

6    position on that, Your Honor.

7        THE COURT:  It's a reasonable comment on the evidence.

8    So I'm prepared to allow the Government to use that term "cell"

9    just as the defense will use their own phraseology to define the

10   structure.

11       MR. SWEET:  Thank you, Your Honor.  And just, again,

12   these are -- I'm just going to, if I can, just some very simple

13   ones.  Voir dire, jumping to voir dire, there was only one

14   question the Government wanted to flag with the Court, and that

15   had to do with beyond a reasonable doubt, the burden --

16   comparative burden of proof in different cases.

17       And I raise that, Judge, just because in the *Rodvelt*

18   case, the court did not allow a similar question to that, sort of

19   under that jury education theory.  And so that's the same thing

20   we wanted to just raise with the Court as well.

21       THE COURT:  Yes.  I'm prepared to rule on that.

22   Anything else from the Government?

23       MR. SWEET:  Your Honor, Ms. Miles is prepared to

24   address multiplicity and *Bruen* and -- and verdict form if the

25   Court wants to hear anything on that, if I can (pause) --

1          THE COURT:  I did have some questions about the verdict

2     form, and maybe we can get that after we address some of the

3     motions, but go ahead if -- in terms of multiplicity or *Bruen*.  I

4     mean, I'm not really sure what to think of *Bruen* other than I'm

5     going to fall back on the current Ninth Circuit precedent.

6          MS. MILES:  I think that's appropriate, Your Honor.

7     And I think the briefing really covers everything, so unless you

8     have any questions, I'm happy to rest on that.

9          THE COURT:  I don't.  It's obviously coming up in a lot

10    of our firearm cases.  And, you know, who knows what the future

11    might hold, but I know where we are today.

12         MS. MILES:  Thank you.

13         THE COURT:  All right.  Anything else from the

14    Government?  And certainly as I'm making my rulings -- I think

15    everybody here has been in trial in front of me, or most of

16    you -- I tend to jump right into rulings and make them without a

17    lot more discussion, but if there is something that you need

18    clarification, please feel free to interrupt, or if you're just

19    unhappy with what I'm saying, feel free to interject what you

20    need to put on the record.

21         Anything further from the Government, then?

22         MR. SWEET:  And, Your Honor, just to confirm, this

23    discussion now is separate from, I believe you said, the Reno

24    exhibits as well as 404(b)?

25         THE COURT:  I'm prepared to argue the 404 -- or rule on

1    the 404(b) issues, I believe.  If I'm done here and I haven't got

2    them, I'm sure that you'll bring that to my attention.

3            The exhibit list and objections to exhibits, we'll have

4    a discussion about that.  I think some of the rulings I'll make

5    regarding the video may help clarify some of that.

6            MR. SWEET:  Then if it's appropriate, Your Honor, can I

7    discuss 404(b) --

8            THE COURT:  Yes.

9            MR. SWEET:  -- just a bit, Your Honor?

10           MS. POTTER:  Your Honor, could I just make my record on

11   the other four quick ones so that we transition to 404(b), the --

12   I mean, *Bruen*, I just -- again, we're preserving our argument as

13   to *Bruen*.  I understand the Court's ruling.

14           THE COURT:  I'll make, I think, a more thorough ruling

15   on that in a moment.

16           MS. POTTER:  Oh, okay.

17           THE COURT:  This kind of may be jumping the gun to cut

18   off further argument on --

19           MS. POTTER:  I just want to make sure I make my record.

20   And then on multiplicity, I mean, I understand the Government's

21   position, and I don't disagree with it.  If it was a matter of

22   taking four charges down to one, I would be pushing a lot harder

23   at this stage to consolidate them.  We just want to preserve it.

24   It's required that we raise it pretrial so that once we -- if

25   there is an eventual conviction, we will re-raise that issue

1  based on the evidence.

2          In terms of the voir dire, I just want to clarify.  So

3  have you struck all of --

4          THE COURT:  I'm going to get to that.

5          MS. POTTER:  Okay.  Okay.

6          THE COURT:  And I'll certainly give you an opportunity

7  to get your objections on the record --

8          MS. POTTER:  Okay.

9          THE COURT:  -- when I'm -- when I'm done.

10          MS. POTTER:  Okay.  Thank you, Your Honor.

11          THE COURT:  Okay.  So let's go -- yes, go ahead,

12  Mr. Sweet.

13          MR. SWEET:  I'm sorry, Your Honor.  404(b), may I --

14          THE COURT:  Yes, 404(b).

15          MR. SWEET:  Thank you, Your Honor.  Your Honor, if I

16  could, then, just -- I just want to summarize a few points

17  regarding -- I want to focus on the "Operation Take Over" note

18  and the targets list.

19          I think, Your Honor, when you combine them and take

20  them together, and they were found in the same place, what they

21  say at their core is to target and control vulnerable women.

22  That's the essential message between the target list and

23  "Operation Take Over".  And that's what Mr. Zuberi did, Your

24  Honor.

25          When he took control of these women, when he kidnapped

them and sexually assaulted them, he was able to do so because he had a taser, he had a pistol, he had handcuffs, he had a signal jammer. Those didn't just spontaneously happen, Your Honor. Those were the product of work, of planning and preparation.

His writings are the product of his thinking on this. They show his planning. They show -- they show his motive. They show his intent.

And I know -- I know it's easy to say -- well, first, Your Honor, we're talking about this is 404(b). Our real position is, yes, it could fall under 404(b), but it's really direct evidence, it's really intertwined.

And I know it's easy to look at this case and say there's a lot of evidence, why would the Government need necessarily all of this, but I think it is important to emphasize the defense is mounting a vigorous defense. And while we have two kidnapping charges, it's uncontested that one of the victims got into the car voluntarily. The other victim was walking down the street with Mr. Zuberi. While he's charged with transporting for criminal sex acts, it's uncontested that one of the victims engaged in consensual sex with him first before it became an unconsensual encounter.

And, Your Honor, so in order to rebut what appears to be a consent-based defense, the claim that this is a music studio, a voir dire question brings up BDSM, presumably that can counter the handcuffs and injuries, it's important for the

 1    Government to be able to say this is direct evidence of what his

 2    intent was, these weren't consensual encounters, this was his

 3    plan from the start.

 4         And so "Operation Take Over" and the targets list do

 5    directly rebut that, Your Honor.  And just to emphasize a few

 6    other points.  They were found in his house where all sorts of

 7    evidence was found:  cell, victim's blood, purse, handcuffs.

 8    They were also both found in his master bedroom, master bedroom

 9    where a handcuff key was under his bed, where a key to the

10    deadbolt on the security door for the cell was, ammunition was, a

11    pistol case, a ballistic vest, police patches.  All of that -- or

12    at least a police patch.  All of that was in his master bedroom

13    along with these notes.

14         And just to highlight something that is easily

15    overlooked, Your Honor, obviously the targets list has a date of

16    July 2023.  That's when AV-1's kidnapped.  But what it also

17    has -- and I will move quickly, but if I could pull it up for the

18    Court just briefly.

19         THE COURT:  Go ahead.

20         MR. SWEET:  Thank you.  If we could pull up, please,

21    excuse me, 150-7.

22         When we look at the targets list, Your Honor, obviously

23    first we have the date.  If we could zoom in just a little bit on

24    the page with the writing.  Thank you.  So we have the date, but

25    then we have the phrase, "You must raise an army."

1    Well, Your Honor, when AV-2, the May victim, she
2  e-mailed law enforcement, one of the things she said was
3  Mr. Zuberi spoke about how he just wants to have multiple
4  children with multiple women for an army of his own.

5    Judge, that's a remarkably distinct and unique phrase,
6  "for an army of his own."  And then here he has, "You must raise
7  an army."

8    And so the notion that he wanted to have multiple
9  children with multiple women for an army, then we have a target
10 list with the words, "you must raise an army," the phrase, "must
11 raise an army," and then you have three women on that list,
12 Judge, I'm just going to say, Quinn, Quinn -- we've spoken to
13 Quinn; June, we've spoken to June.  Judge, that's -- that's
14 Quinn's birthday that's on the target list.  She is associated
15 with Everett, Washington.  She does have an OnlyFans page, she's
16 a bikini barista.  So we've called that sort of a commercial sex
17 adjacent or sex-adjacent-related industry.

18   June, Your Honor, June had a Tryst page.  June --
19 June's breasts were completely exposed in that page.  Part of the
20 page said, "Rates."  It's a dating site, but it certainly seems
21 to be more than just a dating site as well.

22   And so he's got two people, Judge, on the list we've
23 identified as real people who are in this commercial sex-related
24 industry.

25   Also, June was in the Portland area.  Our -- Adult

1   Victim 1, Judge, she's in the Everett, Washington, area, and she

2   was working as a commercial sex worker.

3           So -- so we have -- we have, Judge, for "Operation Take

4   Over", we have the date, we have the "raise an army," we have the

5   phrase "targets," which really speaks for itself.  This isn't a

6   fantasy football or some sort of innocuous targets.  We have two

7   of these women we've identified.  We don't know who, what looks

8   to be, Nessa Throat is.  The "throat" is a little suggestive.

9           And so, Your Honor, we have all that information, and

10  when you take that and you combine that with "Operation Take

11  Over" -- if we could pull up 76-4, please -- first of all, it's

12  "Operation Take Over."  Just like Operation Desert Storm

13  announces the -- announces its content, this is "Operation Take

14  Over".

15          If we could zoom in on that, expand that.  Perfect.

16  Thank you.

17          It's not Operation Find a Girlfriend, Go on a Date.

18  That's exactly what he did.  He took control of these women, and

19  he had the tools.

20          Now, it's not an exact match.  He did not leave his

21  phone at home, but he had at least one signal jammer with him,

22  Your Honor.  AV-1 reported in Seattle when she got in his car,

23  her phone stopped working, didn't work.  He told her later that's

24  because he had a tool.  She saw what she described as a

25  walkie-talkie with antennas.  And in his backpack in the trailer,

1  we found two signal jammers, Your Honor.  So he brought his

2  phone, but he also took steps to prevent -- to prevent phones

3  from working.  He wrapped AV-2's phone in tin foil.

4          And so, Your Honor, then there's the second -- the

5  second line, "Make sure they don't have" -- or second section --

6  "a bunch of people in their life.  You don't want any type

7  investigation."

8          Judge, he's not saying, "I don't want to get caught by

9  my girlfriend going out with somebody else."  "You don't want an

10  investigation," that screams criminal activity.  And "make sure

11  they don't have a bunch of people in their life," that's

12  targeting the vulnerable.

13          And, Judge, there aren't many people more vulnerable

14  than people in commercial sex work.  They're much more

15  susceptible to attack and more on the margins.

16          And so again, Your Honor, take both of those, and you

17  have target and control, vulnerable women.  That's what he did.

18          And, Your Honor, while AV-2 is not a commercial sex

19  worker, Mr. Zuberi took steps to make sure there wouldn't be an

20  investigation.  He threatened her, he beat her, he threatened to

21  kill her family, he took a picture of her driver's license, he

22  gave her money.  He said if there were a shootout, he would use

23  her as a human shield.  Judge, all of that was terrifying.

24          So I'm not saying -- we're not saying there was a

25  word-for-word following of all of these, but taken as a totality,

1   both of these, "Operation Take Over" and the targets list,

2   directly rebut a defense of consensual sex.  And there's -- and

3   we are saying those are direct evidence.

4         There's one other thing, and that's 76-5.  Right below

5   this, Your Honor, on the next page of this list was -- the

6   defense objects to this.  Judge, that is a similar-looking

7   structure to the one in his garage.  It says "concrete block" on

8   the bottom.  It has 20 blocks drawn out.  There's a text message

9   between Mr. Zuberi, or message between Mr. Zuberi and a friend

10   about building asking, "Can you use reinforced concrete blocks

11   for an underground house?  Would it support being 100 feet deep?"

12   Why does this matter, Judge?  Because no one would mistake this

13   for a music studio.

14         Defense is arguing the one in the garage is a music

15   studio.  There are a lot of similarities between the one in the

16   garage and what we see here.  Not an exact match.  That's why we

17   care about that, Your Honor.  And, again, we believe that is

18   direct evidence of that.

19         The last thing that we have under the 404(b) list, Your

20   Honor, is 373.  Exhibit 373, please.  And this is a message --

21   that's perfect.  There.  Thank you.  And it starts from the

22   bottom and then goes towards the top.

23         This was a message between Mr. Zuberi and Ms. Westfall.

24   And there's the phrase "women need to go back to being property"

25   and then there's the sort of sexual domination or sexual

1    treatment component of it.

2            Judge, one of the things that Mr. Zuberi said to AV-2

3    is that he spoke about how, "I am his property now."  She said

4    that in the same e-mail as the "raise an army," Judge.  She sent

5    that back in July of 2018.

6            Here we have this message, Judge, "women need to go

7    back to being property."  And then Mr. Zuberi really doubles down

8    on it:  "I don't care who you show.  This is my ideology.  I

9    stand by it and will die for it."

10           Your Honor, this is relevant to show, A, it

11   corroborates what AV-2 said.

12           THE COURT:  Weren't you a little worried, though,

13   Mr. Sweet, that it speaks to all women, including the women on

14   the jury?

15           MR. SWEET:  Judge, it is a -- it is a loaded statement.

16   There's a lot to it.

17           THE COURT:  There is.  And you certainly have a lot of

18   evidence about his attitude towards -- certainly towards the

19   alleged victims as women.  I am a little concerned about a more

20   generalized statement that "all you married women out there, this

21   is your role."  We've been hearing plenty of that lately in the

22   news, and it seems inflammatory.

23           MR. SWEET:  Yes, Your Honor.  And -- and there's always

24   the -- it doesn't always mean we would use it if the Court would

25   rule in our favor, and there is always possibly the ability to

1  parse it and remove the sexual component aspect of it, but I

2  understand what the Court's saying.

3         And to be candid, Your Honor, the targets list and

4  "Operation Take Over" are far more important for us in terms of

5  what we believe they show and as being direct evidence, and the

6  underground structure.  So I won't say anything more about this

7  unless the Court -- but I'm happy to answer any questions the

8  Court has regarding what we believe is direct evidence.

9         And we've also set forth in our reply all that we

10  wouldn't be seeking to get in unless Mr. Zuberi opened the door

11  on it.  And some of his statements about how he treats

12  Ms. Westfall, some of those do come out sort of in other parts of

13  the case, but we're not seeking to present them en masse.  They

14  may be parts of a text message to show effect on listener or

15  something like that, but I can answer anything else, but

16  otherwise, that's all I have.

17         THE COURT:  All right.  I appreciate that.  Thank you.

18         MR. SWEET:  Thank you.

19         THE COURT:  Does the defense want to be heard further,

20  then, on the 404(b) direct evidence issues?

21         MS. POTTER:  Yes, Your Honor, we would like to be

22  heard.  I mean, obviously we've briefed this for the Court.  And

23  so taking it in the same sort of order that Mr. Sweet did,

24  starting with "Operation Take Over" and the targets list, again,

25  these women weren't on the target list.  He met one of them in a

1    bar.  It was random.  They weren't targeted the way that they're

2    alleging these other two women were targeted.  The "Operation

3    Take Over" doesn't speak at all to what he was doing with respect

4    to AV-1 and AV-2.

5            So this -- this notion that it's all inextricably

6    intertwined, it's -- that's their story.  They've threaded

7    together all these things and have decided that Mr. Zuberi was on

8    this mission to go after women, but what we really have is two

9    incidents of kidnapping, alleged kidnapping, that they have

10   plenty of evidence, they don't need to get into "Operation Take

11   Over" and all of these other issues.

12           So I do agree that it's inextricably intertwined.  And

13   in terms of 404(b), I think when you do the balancing test, it's

14   unfairly prejudicial.  So it should not be admitted.

15           In terms of (pause) -- and particularly, I mean, we're

16   not talking -- I mean, they're planning to bring some of these

17   women to -- I mean, we're going to have a trial within a trial on

18   the notion of what was this target and what was he doing there.

19   So, I mean, again, part of the point of excluding some of this

20   evidence is also so we don't have a bunch of mini trials.  We're

21   going to have a long enough trial on Counts 1, 2 and 3 without

22   bringing in and having a separate trial on all these other

23   issues.

24           In terms of this message with Ms. Westfall, I mean, I

25   think the Court hits it exactly right.  I mean, this is to women,

1    even women, as the Court mentioned -- I mean, this has gotten a

2    lot of media press lately -- I think even some of those women

3    would struggle with this message even if they were of this -- I

4    think it's called trad -- trad wife.  I don't know what it is.

5    But I think this goes to such a level of inflammatory that it's

6    going to be difficult for the jury to look at this and then

7    actually assess the evidence on the charges.

8            I also think, generally, and they didn't get into all

9    of this, but there's a lot of evidence with regards to

10   Ms. Westfall.  And even in the Reno response, there's, you know,

11   the reference of maybe needing to impeach her.  Well, she's not

12   on their witness list, and if they call her, they don't get to

13   offer evidence to impeach.  You don't get to impeach a witness

14   before she's called.

15           I mean, there are things, I get it, if she testifies --

16   if we call her, they are going to have things to impeach her, but

17   they don't get to impeach her in advance of this trial.  So to

18   the extent some of this stuff is really going to her and whether

19   she's lying or what she is doing or whether she has a reason to

20   lie or to follow his lead, none of that should come in unless she

21   takes the stand and says something.  So I think --

22          THE COURT:  There is a lot.  I'm not sure what may or

23   may not be admissible as impeachment.  I think that's a

24   discussion we'll have if and when she decides to testify.  We'll

25   have that outside the presence of the jury.  So I assume after

1  the Government rests, you'll be letting us know --

2        MS. POTTER:  Yes.

3        THE COURT:  -- and we'll be taking a break to resolve

4  any further evidentiary issues.

5        MS. POTTER:  Exactly, Your Honor.  Thank you.  I

6  appreciate that.  And so just generally, though, to the extent

7  they want to offer -- and I get it.  There's a lot of things they

8  haven't chosen.  That doesn't mean the few things they have

9  chosen should be admitted because they've given up some other

10 things.

11       I think particularly, you know, getting into a

12 relationship that isn't at the core of this case, Ms. Westfall's

13 not one of the victims, you know, their relationship is -- some

14 people might find it different.  And, again, we don't need a

15 trial within a trial on that relationship, again, unless she

16 testifies, which we'll cross that bridge when we get to it, but

17 in terms of -- and I'm jumping ahead to exhibits.

18       We've tried to work with the Government in terms of

19 pre-admission and to smooth things along, but some of those

20 exhibits are precisely -- we're objecting for precisely that

21 reason, with the understanding that, hey, look, we might be in a

22 different boat later, but I would just say again, 373, in terms

23 of the case in chief, without Ms. Westfall testifying, without

24 any need to impeach her because she's willing to lie for him, I

25 don't see how it's not more inflammatory and unfairly

1    prejudicial.

2            I think -- I think that's all of the topic areas.  I

3    mean, I think when we get into exhibits, there may be some

4    parsing, but generally that's, I think, what we covered.

5            THE COURT:  Okay.  Great.  Thank you.

6            All right.  Let's take up the Government's motion

7    in limine first.  First motion is to preclude introduction of

8    undisclosed exhibits.  That is granted as to the -- if the

9    defense intends to introduce in its case in chief, those exhibits

10   need to be turned over after the Government rests.  If there is a

11   dispute about the admissibility, we will take up that matter

12   before the defense case begins and outside the presence of the

13   jury.  Impeachment evidence need not be disclosed, but the

14   evidence does need to be shown to the Government contemporaneous

15   with its presentation to the witness to give them an opportunity

16   to object.

17           Second motion in limine is the motion to exclude

18   specific instance of character evidence.  That's granted without

19   objection.

20           Motion to exclude exculpatory hearsay, that is granted

21   without objection.  The defense may supplement statements

22   introduced by the Government for completeness if appropriate.

23           There's the motion to admit impeachment evidence,

24   specifically the felony conviction for Assault With a Deadly

25   Weapon in California in the event Mr. Zuberi testifies.  I'll

1  defer ruling at this time and will determine its admissibility if

2  and when Mr. Zuberi testifies.

3          And in terms of determining really its relevance to

4  credibility, it's likely that the Court would need to actually

5  hear the testimony of Mr. Zuberi should he decide to testify to

6  be able to determine whether that conviction would come in as

7  impeachment evidence.  Obviously, the incident itself in

8  California I've already ruled will come into evidence.

9          Motion to exclude evidence of prior sexual history

10  under Rule 412 and prior mental health history, generally

11  granted.  Both the Government and the defense, I think, agree

12  that AV-1, Adult Victim 1, and Minor Victim 1 were commercial sex

13  workers at the time of their interaction with Mr. Zuberi is

14  relevant and will be before the jury.  The defense may not,

15  however, introduce evidence regarding the sexual activity or

16  behavior of Adult Victim 1, Adult Victim 2, or Minor Victim 1

17  apart from their interaction with Mr. Zuberi.

18          Now, if the defense believes that particular sexual

19  behavior or activity of one of the alleged victims is relevant

20  and admissible under the rule, they may raise that issue with the

21  Court outside the presence of the jury.

22          With regard to mental health history, I think the

23  defense is in agreement that they will make a proffer with the

24  Court outside the presence of the jury prior to admission if they

25  do seek to admit that evidence.  Any proffers with regard to this

1    motion regarding mental health history or sexual activity or

2    behavior will be in camera, in other words, outside public view,

3    and would be sealed, it would be a sealed record.

4            The defense -- anything else with regard to the

5    Government's motions in limine?  Did that cover it?  All right.

6    I'll take --

7            MR. SWEET:  No, Your Honor.

8            THE COURT:  -- the defense motions in limine, motion to

9    exclude reference to trial witnesses other than by name.  At

10   trial, the victims will be identified by name as opposed to an

11   anonymous moniker.  If their names are used on court documents,

12   such as the verdict form, the public version of those documents

13   will be redacted.

14           The parties are to do their best to refer to Mr. Zuberi

15   by his name and not "the defendant."  We all fail there, and even

16   defense counsel over the years I've noticed, despite making this

17   motion, sometimes we fall back and say "the defendant," but

18   generally I do think it's important that the jury hear in general

19   that we refer to the parties by name and not by "plaintiff" and

20   "defendant" as much as we can.

21           The prosecutor's use of the term "victim" is -- you

22   know, the case law is pretty clear, it's generally considered a

23   fair comment on the evidence, so certainly in their argument they

24   can use that term.

25           The same can be said of using the term "cell" to

describe the cinder block structure.  At issue is what is the structure.  Both sides have a different view of the evidence and have different theories to present to the jury, and they should be able to present that theory using the terms that they feel best describe their argument.

Anything else with regard to defense motions in limine?

MS. POTTER:  No.  The last was just a placeholder.

THE COURT:  Oh, I was -- well, we'll get to the verdict form later.  I'll wait on that.

All right.  Government's notice under Rule 404(b) and motion to admit other acts evidence.  Here, I agree with the Government.  The Government is not limited to the isolated facts involving the interaction between the victims and Mr. Zuberi. They are entitled to put the kidnappings in the context of what Mr. Zuberi was doing to effectuate the kidnappings and to rebut a notion that the interaction was an isolated sexual encounter that was consensual in nature or that was, I guess, simply reckless. For instance, maybe Mr. Zuberi recklessly believed this encounter was part of maybe a role playing activity.

Here, the Government may introduce evidence of a broader planning and preparation that went into the alleged kidnappings as both substantive evidence, direct evidence of the crime, and evidence of other acts under 404(b) to show intent, preparation, planning, knowledge, absence of mistake and motive. The evidence is material.  It is not remote in time.  It is

1    sufficient and tied to an act of Mr. Zuberi, and it is either

2    similar in nature to the alleged crimes or it is part of a scheme

3    to commit the alleged crimes.  And I agree with, I think, the --

4    the analysis of Mr. Sweet was all of this evidence that the

5    Government is seeking to introduce is to show that Mr. Zuberi was

6    targeting -- was to target and control vulnerable women.

7         I really don't see this all that different than many

8    cases where, you know, we can take a -- you know, a bank robbery,

9    for example, and, you know, if there was notes that said, "Let's

10   hit six banks for a robbery," and maybe the robbery was at a

11   different bank, it's certainly still evidence that the person

12   intended to rob a bank.

13        You know, a lot of this evidence really goes directly

14   towards this targeting of women, particularly vulnerable women,

15   women who are involved in commercial sex activities.  It paints,

16   I think, the full picture, and the Government should not have to

17   be limited to isolated assaults.

18        I'm not going to allow the 2023 (indiscernible)

19   regarding the role of women into evidence at this time.  It may

20   have more relevance certainly if Mr. Zuberi testifies.  Depending

21   on, I guess, how the evidence unfolds, it may be admissible down

22   the road, but for now, I think it does not add a lot of

23   evidentiary value.  I think the Government has more than

24   sufficient evidence to show Mr. Zuberi's attitude towards women,

25   especially these particularly vulnerable women, and bringing that

1    statement in adds a context of his view of all women, and I think

2    that prejudicial value is high, with the expectation that we're

3    going to have some women on the jury or some men who respect

4    women may find that very prejudicial.

5            I will reserve ruling on whether the Government can

6    introduce evidence regarding the treatment of Ms. Westfall by

7    Mr. Zuberi.  Much of this depends on, obviously, her test- --

8    whether she testifies and the extent of her testimony.

9            I do understand the Government may be in a position to

10   have to explain to the jury how events could happen, you know, in

11   a home where other people are living, including Ms. Westfall.  I

12   mean, that's certainly -- it's on my mind.  I can't imagine why

13   it would not be on the jury's mind, but it is a collateral issue.

14   It's not material to the case.

15           The Government can certainly make reasonable arguments

16   on how that could happen if it needs to be addressed.  And if it

17   becomes a central point, we can revisit what needs to come into

18   evidence with regard to Ms. Westfall.

19           So, you know, not -- and none of these evidentiary

20   matters are ironclad from here on out.  You know, it is a dynamic

21   trial and if, you know, the evidence begins to change, the

22   evidentiary value of some of these matters, we can revisit them

23   any time.

24           Then we have the motion to dismiss or consolidate --

25           Well, anything else under the 404(b) "other act"

1   evidence?  If I didn't make it specifically clear, my view is

2   this is both direct evidence and 404(b) evidence.  It would come

3   in either case.

4           Motion to dismiss or consolidate Counts 4 through 7,

5   the motion to dismiss is denied, as the defense has acknowledged

6   the panel decision in the Ninth Circuit in the *Duarte* case has

7   been vacated.  Right now the current precedent is laid out in

8   *U.S. vs. Vongxay*, 594 F.3d 1111, a Ninth Circuit case from 2010

9   holding that 18 U.S.C. 922(g)(1) does not violate the Second

10  Amendment when applied to convicted felons.  And I think the

11  defense has preserved that objection, obviously in anticipation

12  of a panel decision, and I'm not convinced the panel decision is

13  going to necessarily -- excuse me, the en banc decision, I'm not

14  convinced the en banc decision is necessarily going to follow the

15  panel decision and not Judge Smith's dissent in that case.  So we

16  are relying on the Ninth Circuit precedent as it is today.

17          There's a defense motion in limine to exclude evidence

18  from the arrest in Reno and objection to videos from arrest.

19  Mr. Zuberi's flight and interaction with the police during the

20  standoff are generally admissible and are evidence of guilt.  His

21  refusal to let his son out of his car and his suicidal ideation

22  have some bearing on his state of mind during his flight and they

23  rebut later statements that he was, for instance, on vacation.  I

24  mean, the overall picture is of someone who is in flight, who

25  knows that they are wanted for a crime, who believes that

1    whatever happened has led to the very desperate situation where

2    his life is over, and it shows a person who's going at great

3    lengths not to cooperate in his arrest.  It is a fair comment on

4    the evidence for the Government to argue that Mr. Zuberi was

5    using his child as a shield to avoid arrest.

6             That being said, there are some portions of the video

7    that I will order be redacted.  Officer Broadway's body cam,

8    23:25 to 24 minutes; references of -- the officer's reference not

9    wanting Mr. Zuberi's son to see him bleeding out and that what is

10   happening is traumatic for his son, I do think that's unduly

11   prejudicial.  You know, the jury's going to make their own

12   assessment of the trauma.  I don't think having an officer's

13   comment that, you know, he could bleed out in front of his son is

14   necessary.

15             Yes?

16             MS. POTTER:  Your Honor, I just wanted to let the Court

17   know that a lot of that has actually come out.

18             THE COURT:  Oh.

19             MS. POTTER:  Maybe we should -- we can turn to that

20   when we do the exhibits.

21             THE COURT:  Okay.

22             MS. POTTER:  But could I ask for just five minutes?  I

23   need to speak --

24             THE COURT:  Yes.

25             MS. POTTER:  -- with Mr. Zuberi.

1          THE COURT:  Certainly.

2          MS. POTTER:  Thank you.

3          THE COURT:  We'll be in recess for five minutes.

4          (Recess:  9:45 - 9:55)

5          MS. POTTER:  Your Honor, before we continue, Mr. Zuberi

6    has requested to be able to make a brief statement to the Court.

7          THE COURT:  Okay.  Mr. Zuberi, just remember that any

8    statement you make here in court is being recorded.  We do have a

9    court reporter who's working remotely from Portland, and any

10   statement you make can be used against you later during the

11   trial.  So you do need to be aware of that.  Obviously, you've

12   had an opportunity to speak with your lawyer, and if you wish to

13   make a statement based on that advice or against that advice,

14   you're welcome to do so, but you're not required to make any

15   statement whatsoever.

16         THE DEFENDANT:  I have learned that the Government is

17   planning to say something about my son that is factually untrue.

18   I raised my son from birth until the day they snatched me out of

19   his life to imprison me for these false allegations.  He is now

20   seven years old.  Those seven years of raising him, I have never

21   done anything to harm him.  I love my son more than I love

22   myself.  I have never hurt him and I never will.  It is

23   impossible to believe I would use him as a shield when there was

24   at least 30 men with guns aiming at us from all directions.  How

25   could any shield protect you from this guarantied slaughter?

1          Furthermore, the Government claims I was suicidal.

2    Common sense tells you a suicidal person is not interested in

3    using a shield to protect themselves from death.  That defeats

4    the purpose of being suicidal.  The unfounded notion makes no

5    sense.  The majority of this case makes no sense.  The only thing

6    that makes sense is that they're doing a remarkable job in making

7    no sense.

8          There should be some sort of ethics when making

9    arguments.  You should not be able to fabricate whatever.  The

10   Government is attempting to have a trial within a trial, as I

11   anticipate my words will be powerless and worthless.  The

12   Government does not care about the truth, the Government does not

13   care about justice.  This is political, it is about a conviction.

14   All they want is a win for the FBI and the United States

15   Attorney's Office.  The portrayal of me in the media will stay

16   the same, and life and death will go on.

17         I love both my sons with all my heart.  No matter what

18   you unethical so-called human beings say, you are all liars.

19   This is a fact.

20         THE COURT:  All right.  Moving on to portions of the

21   video, then.  It sounds like there's been some resolution between

22   the parties.  Why don't I just list the ones that gave me concern

23   that I would have removed, and then you can certainly supplement

24   with either argument about why it should stay in, there's not a

25   lot here, or other portions of the video that you've agreed to be

1    removed.

2          So, again, Officer Broadway's body cam, 23:25 to 24,

3    and this is the reference regarding the son seeing him bleed out

4    and what is happening is traumatic for his son; the same video

5    where an officer says, "Don't you love your son?"

6          Then we have officer -- and I'm not sure if it's

7    Greebel (phonetic) or Gribel's (phonetic) body cam, there's a

8    statement, "You are not a stranger to this, right?"  That should

9    come out.

10         At 25:17, there's some statements about undressing and

11   being arrested before.  I don't think there's any relevance to

12   that portion.

13         And then at 36:36, there are statements regarding STDs.

14   That should come out.

15         2:19:47, there's some statements regarding crypto and

16   building a house.  I don't think that's particularly relevant.

17         So let me hear from the Government.  Are those areas

18   that you've already excluded or are there some of these areas you

19   feel should be coming in, and are there other areas you've agreed

20   to exclude?  Yes, Mr. Boccato.

21         MR. BOCCATO:  Thank you, Your Honor.  I believe all

22   those areas have already been taken out of the video.  I

23   re-watched the redacted videos shortly after they were -- I mean,

24   they were generated essentially after close of business

25   yesterday, and I've re-watched them.  I don't recognize any of

1     those portions anymore.

2            And just for the Court's knowledge, these -- this is

3     a -- from the contact in Reno until, you know, he left the

4     hospital is about a five-hour time frame.  There were multiple

5     recordings going on of body cams and dash cams.  So the

6     Government worked hard to reduce it to 40 minutes initially, and

7     now we've reduced it to about 22 minutes, and there's still a lot

8     there.  So, you know, there's a lot of -- and it really tells the

9     whole story of his flight.

10           When you take the information from Klamath Falls and

11    Merrill, then down to Reno, it just tells a whole story of his

12    flight, and really this panicked atmosphere when he's finally

13    going to be held accountable for his crimes.  So thank you.

14           THE COURT:  All right.  Has the defense had an

15    opportunity to now view that redacted version, and is there any

16    addition -- other than a general objection that, you know, the

17    flight, the issues around his son should be kept completely out

18    of the presence of the jury, are there any specific areas that

19    the defense still thinks should be removed?

20           MS. POTTER:  Well, so I understand the Court's ruling,

21    they're going to talk about the flight.  And we would object to

22    showing the video at all even if they could talk about it,

23    because there's witness testimony.  If I'm taking it that the

24    Court's ruling against me on that as well, I'll move to the video

25    itself.

1          THE COURT:  Right.

2          MS. POTTER:  We do have some objections to some of

3     the -- there's still, I don't want to say a fair bit

4     comparatively, but there are some portions where Ms. Westfall

5     seems to be talking a little bit.  I was just able to view these

6     this morning, so I need to look at that one.

7          There is one reference to the probation violation in

8     Griebel's that caught my eye, but I'm going to acknowledge that

9     I'm not sure it can be removed in the way that the statement --

10    but I'm concerned about all the discussion about prior

11    convictions and probation, so I want to note that objection.

12         THE COURT:  Okay.

13         MS. POTTER:  If -- perhaps we could table the final

14    ruling on those.  If we're going to maybe have another break, we

15    can go through the rest of the exhibits so that I can actually

16    confer.  I just didn't have a chance to confer with them this

17    morning.

18         THE COURT:  Sure.  So with regard to this now redacted

19    version of the video involving the flight and arrest, I'll ask

20    the parties to continue to confer to see if there's other areas

21    that should be redacted.  And if there are areas in dispute, I

22    can certainly take those up, you know, either today or tomorrow,

23    I'm here also in the morning, or at a later hearing.  Certainly

24    prior to trial, we can talk more about specific evidentiary

25    matters.

1          Okay.  That, in my mind, covers evidentiary rulings.  I

2     want to talk about voir dire and the questionnaire, but am I

3     missing anything with regard to the evidence?

4          MS. POTTER:  Just to clarify, when you say "evidentiary

5     rulings," do you mean the broad ones, but we were still going to

6     work through some of the --

7          THE COURT:  Yes.

8          MS. POTTER:  Okay.  Then, no, I don't have anything

9     else on an evidentiary matter.

10         THE COURT:  Okay.  All right.  With regard to voir

11    dire, the Government's voir dire, I'm going to strike Question 3,

12    "Do you have an opinion on federal versus state prosecution of

13    crimes?"  I just don't think that's at all significant, given the

14    amount of time each of you will have with the panels of jurors

15    we'll be bringing into the courtroom, and we'll talk about

16    logistics in a little bit.

17         I also would rather you not have discussions under

18    Question Number 6.  Getting people to talk about how to figure

19    out Mr. Zuberi's intent, my fear is we're going to start having

20    them litigate the -- one of the central issues of the case by

21    talking about his intent and how they're going to go about

22    determining his intent.  So I'm going to strike Question 6.

23         With regard to proposed voir dire by defense, it's been

24    my longstanding general rule is that I do not allow the defense

25    to ask questions about proof beyond a reasonable doubt.  The

1    Court will instruct on reasonable doubt.  Questions just tend to

2    be really your opening and closing argument about what reasonable

3    doubt is or isn't, which you are more than welcome to discuss in

4    both your opening and closing statement, but to make a statement

5    about reasonable doubt and say, "Does everybody understand

6    this?," is really no different than just saying it when the case

7    starts.

8            With regard to presumption of innocence, certainly I

9    think that is an important area that you may want to inquire.  My

10   only caution is this:  Sometimes I see defense asking, "Can you

11   speculate about why somebody may not want to testify in their own

12   trial?"  The problem with that question is it also invites the

13   answer, "Because somebody might be guilty," and we really don't

14   want the jury speculating.  We instruct them not to speculate

15   about why somebody may decide not to testify.  We ask them not to

16   comment on it in any way.  So that's the only area I just want to

17   caution the defense, is to not ask the jury to start talking

18   about why somebody may not want to testify.  If you do, the

19   Government is entitled to come in and say, "Is it possible

20   somebody might be guilty and might not want to testify?," and I

21   don't want to open that door.

22           Section 4, Question 2, I'm not going to allow you to

23   ask jurors questions about their sexual experiences, including

24   their experiences with BDSM.  You can ask them if they would be

25   uncomfortable hearing about, I guess, sex in general, but please

1  let's not start putting the poor jurors in the position of having

2  to talk about their own sex lives.

3          With regard to the questionnaire, I genuinely thank

4  you.  I really appreciate the fact that you two have agreed on a

5  questionnaire.  There are some areas that I would like to strike.

6  Question 24, I'd rather not have jurors commenting on a national

7  political issue that is not relevant to this proceeding.  Of

8  course, I don't know if I -- oh, I do have the questionnaire in

9  front of me, so let me -- let me just clarify what I'm talking

10 about.

11         Question 24 is:  Do you believe that prosecutions are

12 often motivated by politics, race, or other matters that are

13 separate from the charged crime?

14         You know, we could get into a lengthy discussion with

15 the jurors about, you know, weaponizing DOJ and the Attorney

16 General's Office under various administrations.  I just -- I

17 mean, that's just not a conversation that seems applicable to

18 this case.  This is an alleged sexual assault.  I don't think the

19 jurors are going to be believing that this is politically

20 motivated, despite Mr. Zuberi's statement earlier.  If -- so I'm

21 going to strike 24.

22         Questions 35 through 42, the only thing that I really

23 would like to change here is (pause) -- I guess it's really 36.

24 All of the questions from 36 through 42 use the term "sexual

25 abuse."  I know this seems like a fine point.  I'd rather it say

1    "sexual assault."  And the reason for that is I think in the

2    questionnaire, if we put it in terms of "sexual abuse," most

3    jurors, and I think I would think this myself, would think this

4    case is about child sexual abuse.  I realize we do have a -- you

5    know, what we've described as a minor victim, but generally this

6    case is a sexual assault case involving Adult Victim 1 and Adult

7    Victim 2, and I don't want jurors to start self-selecting out of,

8    I guess, the discomfort of thinking this might be a child sex

9    abuse case.

10            You know, I assume in individual voir dire, that will

11    be maybe clarified, but I just -- my experience in child sexual

12    cases is a lot of people start self-selecting out, then, by -- by

13    changing their answers on their questionnaire out of just the

14    discomfort and horror of thinking they might be a juror on a case

15    involving child sex abuse.  So I'd like to keep it broader to

16    "sexual assault."

17            35, "child abuse," "sexual abuse," that has to do with

18    job-related experience in particular fields.  I think, D, saying

19    "child abuse" is fine, E should say "sexual assault."  It may be

20    I'm being a little too picky about that, but I just think we'll

21    have an easier time getting a jury together if we don't plant in

22    their mind this is a child sex abuse case.

23            That's all I really have on the questionnaire.  I do

24    appreciate folks working on that and getting it to me in advance.

25            That's all I have with regard to the specific motions.

1   I do probably need -- we need to talk about logistics.  We can do

2   that now to help maybe finalize it in the future.  We don't have

3   to have everything finalized.  Or we can jump into the objections

4   to the exhibits.  I may need a printout of -- I just have them --

5   let me see if I can or can't pull them up.

6            Why don't we talk a little bit just about logistics

7   first.  Is that okay?  With regard to voir dire --

8            MS. POTTER:  Your Honor, can I just ask one logistical

9   question on the questionnaire?

10           THE COURT:  Yes.

11           MS. POTTER:  Do you want us to make the edits and send

12  it back or just --

13           THE COURT:  Yes.

14           MS. POTTER:  Okay.  Thank you.

15           THE COURT:  I think the jurors are coming in the

16  Thursday before the trial.  I think the parties have agreed to

17  begin the trial on the Tuesday.  I'm open.  If you -- if the

18  parties think we're really pressed for time and we need to start

19  on Monday, we can.  I just -- I think both sides should have

20  enough time to review the jury questionnaires.  There'll be a lot

21  of them.  We're calling a lot of jurors.  And then you can

22  confer.  I mean, sometimes both sides will agree that certain

23  jurors should just be excluded, and we can call them, tell them

24  they don't need to come back that next Tuesday, but I do want

25  both sides to have enough time to review the questionnaires fully

1    without, you know, racing through your weekend trying to get it

2    done.  So my proposition was we start Tuesday.  Are the parties

3    okay with that?

4              MR. SWEET:  Yes, Your Honor.

5              MS. POTTER:  Yes, Your Honor.  And just on that, we had

6    requested -- we, I mean, the collective "we," four alternates.

7    Is the Court inclined to do that?

8              THE COURT:  How many chairs do we actually have in the

9    jury box?  Well, I was going to do three, but we can do four.

10   It's a long trial.  Everybody seems to be getting sick these

11   days, so we can do four alternates.  We have -- I counted -- did

12   I miscount one --

13             MR. SWEET:  I have 15 as well, Your Honor, but thank

14   you.  If the Court would be willing to do four alternates, we --

15             THE COURT:  Okay.  We'll add a chair.  I just don't

16   want alternates sitting outside the box itself.  All right.  We

17   will do four alternates.

18             So the jurors are going to come in, I believe, in two

19   waves.  One group will come in Thursday morning, fill out their

20   questionnaires, and leave.  We will collect their questionnaire,

21   take a photo, and put that on the cover of the questionnaire to

22   kind of help you remember who they are.  And then another -- a

23   second group will come in Thursday afternoon and fill out the

24   questionnaires, have their picture taken.

25             I'll work with our clerk's office on how we are getting

1   all of those questionnaires to both sides.  If I recall

2   correctly, in our last trial where we had questionnaires on a

3   separate day, we were able to put them all into some type of zip

4   drive to either send to you or have you pick up.  So we'll work

5   on that.  I'll probably be working with David, my clerk, and I

6   think Paul Bruch, who many of you know, will probably help

7   coordinate that piece of it.

8           And then my thought is with regard to bringing the jury

9   in -- I mean, I forget how many people I told them to summon,

10  but, I mean, I think it was -- we're summoning, like, 175 people

11  with the hope of getting, you know, a good 60 --

12          COURTROOM DEPUTY PEW:  Judge.

13          THE COURT:  Yes, Char, is that you?

14          COURTROOM DEPUTY PEW:  Yes.  You had directed 225.

15          THE COURT:  Okay.  Do we know -- well, I guess we won't

16  know right now, but we will know as we go along, you know, how

17  many people will be coming.  You know, we need obviously a

18  certain number of people here and we need a certain number of

19  people qualified.

20          So my thought is on Thursday, a group will be called in

21  the morning and a group will be called in the after -- this is on

22  Tuesday.  We'll bring them in probably 15 at a time, and you'll

23  each have 20 minutes.  I know that's not a ton of time, but I

24  really do want to get through voir dire quickly.  And then we'll

25  have -- that will give us, you know, two or three groups in the

1    morning, hopefully two or three groups in the afternoon.

2          Once we've qualified whatever that magic number is for

3    you to take your peremptories, we'll stop at that point.

4          MS. MILES:  Can I ask a quick question as well?

5          THE COURT:  Yes.

6          MS. MILES:  Will the Court do any culling of any of the

7    jurors, like, for scheduling issues or anything like that?  Is

8    there the process -- do you have a process by which you do that?

9          THE COURT:  Yes.  A lot of the jurors will be writing

10   to our jury coordinator, and then they present those letters to

11   me pretty routinely prior to trial.  You know, most of them are,

12   "I'm elderly and can't travel," you know, "This is my job.  I

13   simply can't be away," "I have no other childcare."  You know,

14   one of the more entertaining ones was, "I don't want to drive

15   into a big city like Medford.  It has too many one-way streets"

16   or something, you know, so -- so, yes, I will be typically

17   deferring jurors, or if it's a health issue, perhaps excusing

18   them altogether.

19         MS. MILES:  Can we just make sure we capture any of

20   those excusals on the record?

21         THE COURT:  Yes.  We don't -- I'm always surprised how

22   that often is not asked for, and we have done it in the past

23   without really, you know, releasing that information.

24         But Char, since you're on the line -- Char is my

25   courtroom deputy, for the record -- could you make sure that we

1   talk to the jury coordinator so that all of the requests for

2   deferrals and excusals are -- are captured and any ruling I make

3   as well are sent to the parties?

4           COURTROOM DEPUTY PEW:  Yes.  I'll have her -- yes.

5   They send those to me, and you generally respond.  And I can just

6   send them on to the parties.

7           THE COURT:  Okay.  It will be worth our while maybe,

8   you know, late Monday afternoon just to go over together those

9   that the parties want -- agree on.  I mean, sometimes people

10   are -- I mean, I don't mean to be disparaging.  Some people say

11   things that are so outrageous, it's clear that they are either a

12   difficult person, somebody with limited faculties, or they want

13   off this jury so badly, they're willing to do and say anything.

14   And so both sides may simply agree that there's some people that

15   should be removed for cause without them having to come in.  And

16   there may be some disagreement, you know, based on the

17   questionnaires whether the Court should or should not remove

18   somebody for cause, and I can take that up maybe the -- that

19   Monday afternoon, perhaps.

20           MS. POTTER:  Obviously we join the request that it be

21   maintained.

22           I have a couple of other procedural questions.  In

23   terms of the excusals, are they told when the summons goes out

24   how long the trial's anticipated to be, or that's going to be on

25   the --

1          THE COURT:  I thought we had it on the questionnaire.

2          MS. POTTER:  I know.  So none of that's coming --

3    you're not excusing people because they say they can't do three

4    weeks at this point?  That's just for the questionnaire?

5          THE COURT:  I believe there is -- are dates on the

6    summons, Ms. Pew?  Can you clarify that?  Does the summons

7    actually tell them the dates for which they're going to be

8    serving?

9          COURTROOM DEPUTY PEW:  I don't think so, but I can

10   go -- I'll go run and clarify real quick.

11         THE COURT:  Okay.  Thank you.

12         COURTROOM DEPUTY PEW:  Okay.

13         MS. POTTER:  And then just in terms of the procedure on

14   Thursday, they'll get the questionnaire, but we're not going to

15   be present.  There's not -- you're not going to -- are you

16   instructing them at this point or any -- okay.

17         THE COURT:  No.  I'm not going to be present.  I mean,

18   if -- it would be, I think, impossible in this courthouse, given

19   the number of people who are coming in, for us to get all of us

20   together and me in order to make some sort of general statement

21   to the jury.  So, you know, when we do it in Eugene, we have to

22   use the jury assembly room.  I think we've used the jury assembly

23   room in Portland as well, but here, I just don't think we have a

24   space to do it.  So nobody's going to be present.

25         What they're going to learn -- if you want the -- I'd

1   have to look at the questions.  Does the questionnaire really say
2   anything about the counts or the factual (pause) --

3        MS. POTTER:  No.  I think we deliberately tried to stay
4   away from that, and that's why I wanted to clarify if they were
5   going to get any other information other than the questionnaire.

6        THE COURT:  They're not going to get any other
7   information.  If it's on there, let's take it off.  I think it
8   would be better that we don't even have the name of Mr. Zuberi on
9   the questionnaire, because, you know, the less information they
10  have, the less information they can look up on the Internet.  I'm
11  sure the questionnaire says not to look up any information.  You
12  know, that's -- that's, in my mind, at best aspirational when the
13  only thing the jury has is they're showing up for a trial.  So I
14  think the less said, probably the better.

15       MS. POTTER:  And we agree.  I think that's what we were
16  trying to accomplish.  We'll go back over it.  That was certainly
17  the goal, and that's why I just wanted to clarify that issue.

18       THE COURT:  The jury will be here.  I will not.  And I
19  don't expect the attorneys or Mr. Zuberi to be in the court.

20       MR. SWEET:  Your Honor, if I may.  In terms of the
21  order, when we get the jury questionnaires, will that be the
22  order in which they're going to be seated?

23       THE COURT:  Yes.  I mean, that's my hope.  And I'll be
24  working -- we've done that in the past, so I don't see any reason
25  why we can't do it.  You'll have them in the order they will be

1    seated.

2            COURTROOM DEPUTY PEW:  Excuse me, Judge.

3            THE COURT:  Yes, Ms. Pew.

4            COURTROOM DEPUTY PEW:  Two things.  The letter, the

5    jury clerk said it would say the duration.  Do you want that left

6    out of the letter?

7            THE COURT:  Well, do we want the duration left out?  I

8    mean, I think it (pause) --

9            MR. SWEET:  I think it would be helpful.

10           MS. POTTER:  I mean, I think it would be helpful.  We

11   just wanted to clarify.  I just needed -- wanted to know if we're

12   going to -- well, I think we probably should give some warning;

13   however, if a significant number of people are come -- writing

14   saying, "I can't do three weeks," I mean, that's the only concern

15   I have, is that too many people are going to get, you know, lost

16   in the shuffle, when we can push them.  So I guess I'm thinking

17   out loud, Your Honor.  I'm --

18           THE COURT:  No.  I would hate to see them show up to

19   fill out the questionnaire and then go into shock --

20           MS. POTTER:  Right.

21           THE COURT:  -- and come up with reasons not to sit.  So

22   although we'll get more letters if we tell them that they may

23   serve up to -- they may be required to serve up to three weeks, I

24   think getting those in advance is probably better.

25           MR. SWEET:  The Government concurs, Your Honor.  That

1    way we can address with more numbers.

2            And then, Your Honor, in terms of -- if we're dealing

3    with 15 at a time, the first 15 that are seated, that's our jury

4    right there if nobody challenged anything and there are no

5    causes.  And then there'll be removals from there.  Is that how

6    it would work, Your Honor, because that would be the first 15

7    people in the box?

8            THE COURT:  Well, let's talk about that piece.  In the

9    past, I've always had us select the first 12, and then when we're

10   done selecting them, we go for the alternates.  We could just

11   simply decide the first 16 are our jurors, and then any -- I

12   mean, you would know that -- who the alternates are.

13           MR. SWEET:  Your Honor, and I probably should have been

14   more precise on the numbers.  I should have just said the first

15   12 of the folks in the box.

16           THE COURT:  Okay.  Got it.

17           MR. SWEET:  Thank you.  I think that makes sense.  The

18   full first 12 would be the jurors --

19           THE COURT:  Yes.

20           MR. SWEET:  -- and then we'll remove those from there

21   and then the next batch of 15 will come in.

22           THE COURT:  Yes.

23           MR. SWEET:  And Your Honor said 20 minutes for each

24   side?

25           THE COURT:  Yes.  We won't be doing -- I mean, there

1    may be for-cause challenges, but we won't be doing peremptories

2    until the very end.

3            MS. POTTER:  Okay.  That's -- I was confused.  I

4    thought that he was saying he wanted to do peremptories in each

5    round.  We would object to that.

6            THE COURT:  Okay.  No, no.  We'll wait until we have

7    enough qualified jurors, and I mean jurors that have survived

8    for-cause challenges in order to do our full peremptories.

9            MS. POTTER:  And just because there are different

10   peremptories for the jury and the alternates, we think we would

11   prefer to do them -- we prefer to get the 12 and then go through

12   the alternates, just because it'll be confusing.

13           THE COURT:  I think that's a good idea, and that's

14   generally how I've done it.  Here's the other piece.  You would

15   think I could remember how many peremptories and what order we go

16   in to slowly even them out.  I know in the past Mr. Sweet has

17   always done a very good job of getting that information to me.

18           So I would ask that you folks confer about the number

19   of peremptories and who's going to take how many each round.  And

20   typically we will simply do that back in the conference room.  Or

21   we can do it in the courtroom.  Mr. Zuberi probably would like to

22   be present.

23           MR. SWEET:  We'd like to do that as well on the record,

24   Your Honor.

25           THE COURT:  Okay.

1          COURTROOM DEPUTY PEW:  Judge, I had another -- another

2     thing to input.  The U.S. Attorney asked if that was the order

3     that the jurors were going to be, you know, the first 15 in.  We

4     don't do that random draw until the day everybody shows up.  So

5     as the questionnaires are mailed out, they'll be by probably

6     alphabetical order as far as the questionnaires.

7          THE COURT:  Okay.  But once we collect the

8     questionnaires -- well, once everybody shows up --

9          COURTROOM DEPUTY PEW:  Yes.  Then they'll get the --

10          THE COURT:  -- can we then run the order in which

11     they'll be called so that we know exactly who the first -- well,

12     we just need to know what order, so --

13          COURTROOM DEPUTY PEW:  Yeah.  Then they'll get the

14     judge's list with the first -- you know, with the order of --

15          THE COURT:  All right.  And do we put the

16     questionnaires in order?  We have in the past.

17          COURTROOM DEPUTY PEW:  Well, they'll get those

18     questionnaires before that list is done.  That list will be done

19     on Tuesday when everybody shows up for jury selection, because

20     you guys --

21          THE COURT:  Sure.  But as we collect the

22     questionnaires, we then have -- by then we've run what order

23     they're going to be called and we would -- we would put the

24     questionnaires together accordingly.

25          COURTROOM DEPUTY PEW:  Yes.  Yeah.  And their number on

1    the questionnaire should coordinate with the juror number that

2    will be listed on the judge's list.

3              THE COURT:  All right.  And, Ms. Pew, can we -- can we

4    break them into two groups, the morning and an afternoon group on

5    Tuesday, or is it simply going to be easier on us, as opposed to

6    the jury -- potential jurors, to simply call them all Tuesday

7    morning?

8              COURTROOM DEPUTY PEW:  I don't know that we'll be able

9    to fit them all there on Tuesday morning.

10             THE COURT:  That's true.

11             COURTROOM DEPUTY PEW:  I think it would be easier to

12   break them up.  And that's what we did in Portland.  You know, we

13   called them in three different waves.

14             THE COURT:  Okay.  So can we do a morning wave and an

15   afternoon wave on Tuesday?

16             COURTROOM DEPUTY PEW:  Yeah.  And Jackie is listening

17   in as well, and she's helping with that.

18             THE COURT:  Okay.  And the morning wave will be the

19   first -- you know, starting with Juror Number 1 versus, you know,

20   juror up -- up to Juror Number 45, for instance.

21             COURTROOM DEPUTY PEW:  Right.

22             THE COURT:  They'll be in that order, correct?

23             COURTROOM DEPUTY PEW:  Yes, yes.

24             THE COURT:  Okay.  All right.  We will keep working on

25   that piece of it.  And we'll have an IT person here, I know,

1   helping us, you know, operate the photograph piece.  We'll have a
2   number of folks from the clerk's office, you know, working with
3   the jurors as they fill out the questionnaires making sure
4   they've fully filled them out.  And for any jurors who may have
5   some difficulties, any disabilities, who need help with the
6   questionnaire, we'll have folks who can read questions to them
7   and write down whatever is answered.  So we'll -- I think we'll
8   have a pretty full team here managing that group.  It's a lot.
9   Hopefully -- it's always worked out.  I always worry about it,
10  but it always seems to work out.

11          In terms of the courtroom, I do think we'll probably --
12  I know it's -- there's not a lot of room here and we have this
13  kind of big, awkward podium in the middle.  I think the marshals
14  are going to prefer that Mr. Zuberi be on this side of the
15  courtroom (indicating).  We will put a skirt around all of the
16  tables so that shackles cannot be seen.

17          I have previously held that Mr. Zuberi will be in leg
18  shackles.  I will ask that he not be in arm shackles.  But the
19  only way the jury's not going to see that is if he's across from
20  them and not beside them.  So I do want to make sure that we're
21  careful about that.

22          Any other just logistic things we need to discuss?  And
23  certainly we can have these discussions fluidly as we proceed.

24          MS. POTTER:  Well, just for the record, Your Honor, and
25  I'm thinking ahead that we might have another hearing or at least

1  a check-in beforehand.  I just want to preview the Court.  I

2  think we will re-raise the shackling issue.  I understand the

3  Court's made a ruling, but we may want to re-raise that just for

4  the record and for that, but I'm not prepared to do that today.

5         So in terms of the logistics just as blocking out the

6  time, we're probably not starting with openings until Wednesday.

7         THE COURT:  Correct.

8         MS. POTTER:  Okay.  And so that's -- and so we'll open

9  Wednesday morning and then witnesses, and that's -- and then, you

10  know, just logistically, is it 9:00 to 5:00?  I know we have that

11  Monday holiday the 14th, but 9:00 to 5:00, and then all the days

12  through, I mean, with some flexibility?

13         THE COURT:  Yes.

14         MS. POTTER:  Okay.

15         THE COURT:  I know some judges take certain days off.

16  I think we -- at this point, we have two 4-day weeks just because

17  of the holiday and the fact we're starting on Tuesday, but, yes,

18  generally 9:00 to 5:00 with -- I'll be honest, I tend probably to

19  give you too short of a lunch.  I usually make it an hour.  It is

20  a little harder in Medford, because people do have to usually

21  walk somewhere, including the jury.

22         So probably we'll break from 12:00 to 1:30.  We'll have

23  15-minute breaks in the morning and the afternoon.  You know, if

24  we need to finish up a witness that's going to go into the lunch

25  hour or past 5:00, I'd just as soon finish them up.

1          MS. POTTER:  Absolutely.

2          THE COURT:  If we're about to start a four-hour witness

3     at a quarter to 5:00, I think we can all take the rest of the

4     evening off.

5          You guys might want to talk, too, about where you're

6     all staying and where you're having your witnesses stay.  I mean,

7     I just tell you, the last -- that was a Pendleton trial.  I was a

8     little surprised coming down for breakfast and seeing everybody

9     involved in the -- witnesses, the security folks, the jur- -- I

10    mean, everybody was in the same breakfast room.

11         So there's -- there's only so many choices.  I think,

12    in general, David and I are staying at the Hilton -- one of the

13    Hilton hotels, and we can get that information to you if you

14    don't want to be seeing me during this event.

15         So I think you should -- at least the attorneys should

16    be talking privately, without other people accessing the

17    information, as to maybe not where people are staying, but

18    where -- I'm trying to think of how -- I don't think we should be

19    telling anybody where witnesses are staying in a way that would

20    cause concern, but some kind of conversation so that, you know,

21    you aren't in an uncomfortable position of talking among

22    yourselves during a coffee in the morning and only realizing a

23    witness is hearing everything you're saying.

24         MS. POTTER:  I think the Government already knows where

25    our side is staying, but I'll clar- -- I mean, we have no problem

1   telling them where we're staying.

2              THE COURT:  Okay.  That might make it easy.

3              MS. POTTER:  Okay.

4              THE COURT:  Thank you.  I realized as I was saying out

5   loud, the Government obviously has an interest in people not

6   knowing where witnesses are, and I certainly understand that.

7              All right.  Before we jump into some additional exhibit

8   questions, is there anything else logistically we need to talk

9   about?  Is the Government pretty confident we're -- it's a

10  three-week trial?

11             MR. SWEET:  Yes, Your Honor.

12             THE COURT:  You have a lot of experts listed.

13             MR. SWEET:  We do.  And we're continuing to be in

14  discuss -- and candidly, Your Honor, there are some more expert

15  witness notices coming as well.  Some of those -- some of those

16  we do anticipate will be brief.  And some of them are noticed as

17  experts, however, as sort of in an abundance of caution on

18  experts.

19             THE COURT:  Okay.

20             MR. SWEET:  We will continue to discuss with the

21  defense, you know, potential statements and things that may

22  shorten and being efficient.  And it -- just in terms -- so the

23  short answer is, yes, Your Honor, we do think three weeks would

24  suffice.  And it did sound like the Court is open to having one

25  more two- to three-week out from the trial sort of --

1          THE COURT:  I think so.

2          MR. SWEET:  -- cleanup matters.

3          THE COURT:  Yeah.  I don't know -- Char, do I have a

4    September -- I do have a September date in Medford, correct?

5          COURTROOM DEPUTY PEW:  Yes.  September 19th.

6          THE COURT:  So we could try to meet around that

7    September 19th date or we could meet in Eugene.  It's really --

8    if you folks want to talk about it and decide.  A lot of it

9    depends on whether Mr. Zuberi wants to be present, which, of

10   course, he certainly is entitled to.

11         MR. SWEET:  We'll talk more, Your Honor, then consult

12   with Ms. Pew about dates that might work.  Thank you.

13         THE COURT:  Okay.  Is there a -- can I get a copy of

14   the exhibit list that, I think, the defense prepared?

15         MR. SWEET:  And does the Court have a copy of the

16   three -- oh, the three (pause) --

17         MS. POTTER:  Okay.

18         THE COURT:  Or I can make a copy.  I just don't have --

19         MS. POTTER:  We just made some markings after we got

20   some additional corrections, so I've kind of scratched through

21   mine now, but it looks like they have --

22         THE COURT:  Yeah.

23         MS. POTTER:  Okay.  I appreciate it.  Thank you.

24         THE COURT:  I can make a copy of that if that's needed

25   by one of the parties.  Thank you.

1      All right.  I appreciate you preparing this.  This is

2  really remarkably helpful to me to know that there's no

3  objections to a number of the exhibits.  Why don't we -- we'll go

4  through the defense objections.  And, Ms. Potter, do you want to

5  just -- ready to go?

6      MS. POTTER:  Yes, Your Honor.  And so I just want to

7  clarify.  I think I heard you confirm you have the binder.  Is

8  it --

9      THE COURT:  I have all the exhibits right here.

10      MS. POTTER:  Is that the easiest way, we'll just all

11  look at the binders, or do you want things pulled?  I mean, I

12  know videos we'll have to play, but can we --

13      THE COURT:  Yes.  I think --

14      MS. POTTER:  Okay.

15      THE COURT:  -- the easiest way is going to be pull them

16  up as we go and let me take a look if I'm not familiar with them.

17      MS. POTTER:  Okay.  So 1 through 7, we don't object.

18  Number 8 -- and, Your Honor, I think I am going to sit for this.

19  Number 8, we're just waiting on that.  We don't anticipate an

20  issue with that.

21      THE COURT:  Okay.

22      MS. POTTER:  So 1 through 7, I guess, can be

23  pre-admitted.  8, we'll get back to the Court once we actually

24  see it.  Number 9, tentatively, assuming that the witness

25  testifies, you know, we'll agree to pre-admission at that point.

1    Same with number 10.  Number 11, we will agree and agree to

2    pre-admission once the Government removes those -- they've agreed

3    to remove -- and I noted on there which parts of that exhibit

4    they're removing.

5             THE COURT:  Okay.

6             MS. POTTER:  12, 13, 14, no objection.  15, again,

7    they're removing portions of it.  16 to 25, no objection.  We'll

8    agree to pre-admission.

9             For 26, Your Honor, so this is a body cam of -- I think

10   it's the first search.  I can't remember which -- or the initial

11   entry into the house.  There's a bunch of commentary that goes on

12   that they've agreed to mute.  We just need to clarify.  They want

13   a little portion in the beginning.  And I think we'll reach an

14   agreement and just let the Court know, so I don't think there's

15   going to be anything for the Court, but that's what we're working

16   on on that one.

17            THE COURT:  Okay.

18            MS. POTTER:  27 we still need to get.  28 through 46,

19   there's no objection.  We agree to pre-admission.  47 has been

20   removed.  48 through 62, no objection, pre-admission.

21            For 63 -- for 63, actually it would be helpful, Your

22   Honor, to look at 62 first.

23            THE COURT:  Okay.

24            MS. POTTER:  So 62 is the -- it's the case for the

25   pistol, and it has the serial number and everything on it.  We

1    objected to 63 as cumulative.  It has to -- it's the same gun,

2    the serial numbers match.  Our objection -- I mean, I think, to

3    speak for the Government, they want it because it says -- and I

4    keep saying Prentice, but I'm not sure that's how it's said,

5    Mr. Smith's name.  The Court may recall that Mr. Smith was living

6    in the home.  He left property behind.  I think the Government --

7    I think most of the firearms belonged to him, and that's going to

8    be part of the argument.  And we just objected as relevance and

9    cumulative to -- you don't need that.  They've got the serial

10   number already matching the firearm that was found, and they're

11   going to bring Mr. Smith to testify that it's his gun.

12        THE COURT:  I guess what's the significance of somebody

13   else's gun?  I'm a little unclear maybe on why Mr. Smith's gun is

14   of interest.

15        MR. LICHVARCIK:  Mr. Smith used to rent from

16   Mr. Zuberi, so they knew each other.  And Mr. Zuberi essentially

17   ended up taking a number of items from Mr. Smith.  There's

18   another exhibit with some other items that he took, and the gun

19   was also one of the things that he took.

20        The gun itself is the handgun.  That's the one that is

21   both charged in the offense and was used with AV-1.  That's the

22   one that AV-1, when she was in the garage, Judge, she took out

23   and ran out with the firearm and handed it over to law

24   enforcement.

25        So what this is, is Ms. Potter referenced 62.  62 is

1    the box for that gun matching the serial number found in the

2    bedroom.  In that box is paperwork associated with Mr. Smith.  So

3    it's, again, the -- the relevance and the prejudice is much lower

4    than a lot of the items that we've been talking about, but it

5    further solidifies that this is Prentice Smith's firearm and

6    corroborates that his paperwork is inside of that box that's in

7    the bedroom.

8              THE COURT:  Okay.  I'll overrule the objection to

9    Government Exhibit 63.

10             MS. POTTER:  And, Your Honor, this brings up one

11   procedural issue I just want to clarify.  So, I guess, is the

12   Court allowing us to make these objections, we're going to

13   resolve these, and then we don't need to re-object at trial to

14   preserve it, or is the Court expecting us to object again at

15   trial to all of these?

16             THE COURT:  I'm not expecting you to object again at

17   trial, because, you know, I'm basically pre-admitting the

18   evidence now.

19             MS. POTTER:  Okay.

20             THE COURT:  So I think we are clear that you've

21   preserved your record on appeal that you're objecting to the

22   introduction of 63 and I've overruled that objection.

23             MS. POTTER:  Okay.  Thank you.  And then I'm going to

24   apologize to the Government in advance.  I'm going to spring one

25   on you that I'm going to make an objection to 65, which is a

1    firearm barrel and the upper receiver.  If you need more time on

2    this one, we're just going to object on relevance, because it's

3    not actually a firearm.

4                MR. LICHVARCIK:  No.  We can talk about that now.

5                MS. POTTER:  Okay.  That's -- I mean, that's our

6    objection.

7                THE COURT:  Okay.  Maybe the Government can help me a

8    little bit out with what is Exhibit 65.  It's a photograph of

9    what looks like the barrel of a rifle.

10               MR. LICHVARCIK:  Yeah.  65 is the upper receiver,

11   Judge.  It's a firearm component.  It was found in the same

12   master bedroom in the house.  It accompanies, and if it's put

13   together, I believe it's a 6-millimeter firearm.  And

14   6-millimeter ammunition ends up being seized as part of the case.

15               We also have what I thought was an unobjected to -- but

16   we're flexible, so if you need to object as well, but there's

17   also some Blink video showing Mr. Zuberi walking with a firearm

18   that fits the exact profile of this and he also is in the room

19   holding it.  So it just goes to ownership, but also to the

20   6-millimeter ammunition as well.

21               THE COURT:  I see.  All right.  I will, then, overrule

22   the objection to Exhibit 65 and it will be admitted.

23               MS. POTTER:  Okay.  So there's no objection to 66, Your

24   Honor.  For 67, the Government has agreed to -- they're going to

25   focus in on the check itself, and once that happens, we have no

1    objection to that being pre-admitted.  And by "the check," I

2    should clarify, focus in on the Home Depot check.  It's the check

3    underneath that we're going to -- okay.  So the next -- and then

4    this is --

5            THE COURT:  Let me clarify.  So it looks like it's a

6    check on top of a check.  They're going to, looks like --

7            MR. LICHVARCIK:  We're just going to (pause) --

8            THE COURT:  Redact that out?

9            MR. LICHVARCIK:  Yeah.  And then just so it shows the

10   Home Depot check with --

11           THE COURT:  Okay.

12           MR. LICHVARCIK:  -- Mr. Negasi's name on it and the

13   address.

14           THE COURT:  All right.  So Exhibit 67 will come in with

15   that redaction.

16           MS. POTTER:  So our next argument, and this is for

17   68 -- and I'll find the other one when we get to it.

18           MR. LICHVARCIK:  We can pull the other one up now.

19   It's 396.

20           MS. POTTER:  So -- but for 68-1 and 2, so both

21   pictures, along with this 396, it's a picture of a bulletproof

22   vest.  He wasn't -- there's no allegation he wore a bulletproof

23   vest during either alleged kidnapping.  There's no allegation

24   that he carried a bulletproof vest with him.  There's nothing

25   about a bulletproof vest related to the underlying allegations,

1    and so we would object as this being unfairly prejudicial, both

2    the fact that it's found in the house and then the picture of him

3    wearing it.

4              THE COURT:  All right.  For the Government.

5              MS. POTTER:  Oh, and also relevance.  Sorry.  And it's

6    not relevant.

7              MR. LICHVARCIK:  Judge, on your screen as well, I

8    think, is another photo that accompanies this.  And it's a minor

9    point.  You know, I don't know that it's a full bulletproof vest.

10   I think it's a ballistics vest.  Again, it's found in the

11   bedroom.

12             To the extent that ownership of other items in the

13   bedroom is relevant, we have to show that.  And this is one item

14   that's found in the bedroom that's in 68-1.  It's also in 68-2 as

15   well, which is just a second photo of it.  And then we have a

16   photo, as shown on the screen, that's 396 that shows Mr. Zuberi

17   wearing what appears to be the same ballistics vest.  So it goes

18   to ownership.

19             And then it goes to just a little bit more, and that is

20   in 68-1 and 68-2, you'll see two small green bags that are

21   affixed to the ballistics vest.  Inside of those are magazines

22   with 556 ammo.  It's not charged as its own count, but the 556

23   ammo is relevant because it works with at least one of the

24   firearms that's charged and found in the trailer.

25             THE COURT:  Okay.

1              MS. POTTER:  Your Honor, just two things there.  We're

2    not -- we aren't taking a position that he doesn't own things in

3    the master bedroom, so I don't think that is actually going to be

4    an issue in trial.  And if somehow they want to just offer the

5    fact that the ammunition exists and there -- we can work around

6    that.  It's -- it's really the vest that is the issue for us.

7              THE COURT:  I don't know if the -- I guess my feeling

8    is that 396, the evidentiary value, I believe, is outweighed by

9    the prejudicial effect in light of the fact that what I'm hearing

10   is the defense is not going to argue who possessed the vest or

11   the ammunition attached to the vest.

12             You know, the fear is we're -- we're portraying -- it

13   could portray Mr. Zuberi more as a terrorist than what he's

14   charged with or that he was looking for some kind of shoot-out.

15             I think if 68-1 and 2 are reduced down to show simply

16   the ammunition, the Government has its evidentiary need fulfilled

17   without going into the vest as long as there's no argument that

18   the ammunition did not belong to Mr. Zuberi.

19             So if the defense is willing to stipulate as to

20   possession, then I'd allow 68-1 and 68-2 to basically be zoomed

21   into the ammunition itself.

22             MS. POTTER:  Just to be -- what I heard them saying is

23   they need to show that stuff in the bedroom generally belongs to

24   Mr. Zuberi, and so they want to put in the bulletproof vest in

25   this picture to say he -- everything belongs in the bedroom.  And

1    we're just saying generally we're not having a big fight about

2    other people putting stuff in his bedroom, so this is an

3    unnecessary addition when they have all of the IDs.

4         The -- this ammunition is not charged.  My concern

5    right now is they're going to add a charge and then force me to

6    stipulate at trial.  And that -- all I'm saying is if they're --

7    if they're saying, "Oh, we need to offer this because they're

8    going to say, 'Oh, that stuff in the bedroom's not his,'"

9    that's -- that's not our theory of the case and that's not where

10   we're going.  And if we do that, then they can come back to the

11   Court and say, "Well, we get to put a bullet -- your guy in a

12   bulletproof vest."

13        But they have his passport, they have his check, they

14   have his notebook from "Operation Take Over" that I'm still going

15   to argue about, but I'm pretty sure is coming in at this point

16   based on the Court's ruling, so there's all these other things.

17        This isn't -- this is a minute addition to ownership in

18   the room.  And we agree that they can show this extra ammunition

19   and argue that ammunition ties to -- I'm sorry.  I forget which

20   gun and which count, but there -- I think the other argument they

21   want to make is this is a certain type of ammunition, it matches

22   with the gun that's in count whatever.  And they're -- so we're

23   fine.  Put in the ammunition, just not -- particularly not,

24   frankly, 396.

25        THE COURT:  Okay.  For now we'll keep 396 out.  I can

1    see, however, if on cross-examination there's questions about,

2    "You don't know who that belongs to," 396 is coming in pretty

3    quickly.  So it --

4              MR. LICHVARCIK:  Yeah.  We understand that.  And I'll

5    just say now, not in an attempt to, you know, argue any of this,

6    but just to the extent it becomes relevant later and while it's

7    fresh, and that is that the room was shared by Mr. Zuberi and

8    Alycia Westfall.  There's a lot of stuff scattered throughout.

9    There's some firearms purchases and some records in which Alycia

10   is actually purchasing things or attempting to purchase a

11   firearm.

12             And, again, I don't know -- again, I'm not trying to

13   overstate the complexities of the interwovenness of this, but we

14   appreciate that ruling.  And I would also say that this was the

15   less prejudicial of the multiple photos that we chose.  There

16   were some where he's actually pointing fictional firearms at the

17   camera, and we cut that out, but for now, 396 we understand is

18   out.

19             THE COURT:  Okay.

20             MS. POTTER:  I was just going to note for the record

21   that, you know, we just -- but in terms of possession, I mean,

22   obviously we can say that -- we can argue, I don't think we will,

23   that Ms. Westfall bought it all that -- all we want, and they're

24   going to say it was in constructive possession.  So I just -- I

25   don't think we need to belabor this.

1          So are you allowing 68-1 and 2 in, or are you still

2  holding that 68-1 and 2 are focused on the ammunition?  That's --

3          THE COURT:  I said 68-1 and 2 are in, but I'd like to

4  zoom in on the ammunition and not the vest.

5          MS. POTTER:  Okay.

6          MR. SWEET:  And just to clarify, I thought you said

7  that that happens only if we stipulate to the ammunition?

8          THE COURT:  Well, right now that's all that's coming

9  in.

10         MR. SWEET:  Okay.

11         THE COURT:  If on cross-examination there begins to be

12  a question about possession or a suggestion that the ammunition

13  or the guns belonged to somebody else, that's going to open up

14  other photographs that are going to prove possession.

15         MR. SWEET:  Thank you.

16         MS. POTTER:  Okay.  So I think -- unless the Government

17  has anything else, I think we're resolved on 68.  Okay.

18         69 and 70, there's no objection.  We agree to

19  pre-admission.

20         71, the initial picture, Your Honor, is a picture of

21  three passports.  One is Mr. Zuberi's and two are his children.

22  They're going to remove that and any reference to the children,

23  and we're just going to show the picture of his passport as 71.

24  And once that happens, we have no objection to that.

25         THE COURT:  Okay.

1        MS. POTTER:  72 through 75, no objection.  We agree to

2   pre-admission.

3        So that takes us to 76, which I know the Court has

4   already seen partially, but I'd still, if the Court will indulge

5   me, just go over a couple of things in here that we have concerns

6   about.

7        So for the record, we object to the admission of all of

8   76, because we think it's unfairly prejudicial and not relevant,

9   and also based on our 404(b).  My understanding is the Court's

10  ruled against us on that, and so now just taking the images one

11  by one, for 76-1 at this point, given the Court's ruling, I think

12  we're fine with that.  We were -- the Government did offer if we

13  saw anything that we thought needed to be redacted, so we're just

14  going to continue to look at that.  If we see something that

15  we -- obviously 76-2 is not objectionable.

16       THE COURT:  If we could go back to 76-1 just because

17  I'm sometimes unclear what I'm seeing may be not what's actually

18  there.  I thought I was seeing a baggie of marijuana, but I don't

19  know if that's -- it could be something completely different.

20       MS. POTTER:  I think that's the part they wanted us to

21  look at, and we just didn't have a chance yesterday to figure out

22  exactly what that is.  So that's not the focus.  The focus -- so

23  what you're seeing is, if you turn to 76.2 --

24       THE COURT:  Yes.

25       MS. POTTER:  -- that's the notebook when you open it

1  up, there's a legal pad inside, and that's the legal pad that --

2  and that is it being found in the bedroom, I believe.  So that's

3  what that is.  And that's why, again, we're just looking at the

4  end table, if we need to take anything off of there.  Obviously

5  we object to that -- the drawing as well, but the Court's ruled

6  against us.

7       THE COURT:  I've ruled on that.  So 76-1 will come in,

8  with the understanding the parties will confer, and if they're

9  concerned about some of the collateral matters in the photograph,

10  they can certainly address that.

11       MS. POTTER:  Okay.  So going to 76-3, so this is all on

12  the same legal pad, but this is another page of it.  And this was

13  not specifically, I don't think, referenced in the 404(b), or we

14  didn't talk about the contents of this.  We would object to the

15  contents of this as irrelevant, also unfairly prejudicial, and

16  also just on 404(b) grounds.

17       He's talking about -- they're talking about loans.  The

18  "430", I think we'll talk about that again.  430 is a number

19  he does -- that's used kind of frequently, and then this other

20  stuff.  So we don't think that page needs to stay in.

21       THE COURT:  Okay.  So when I -- I first looked at 76-3

22  and 76-6, I was a little confused about how they fit into a

23  theory of prosecution.  I think hearing from Mr. Sweet earlier

24  today, I'm beginning to understand, but could the Government

25  address these issues around underground civilization, cheap land,

1    loans for a piece of land?  I think I -- I'm beginning to

2    understand the theory, but let's hear it.

3           MR. LICHVARCIK:  There's not a relevance theory to some

4    things in here, like drone swarm attack.  I mean, there certainly

5    is, but these are all writings in one notebook.  And so we did

6    talk to defense about that.  We're a little resistant to get in

7    the practice of ripping pages out or removing things and editing,

8    but, for instance, 76-3, I think, is up on my screen if it is for

9    the Court, there are some things that are in there is relevant.

10   And this will touch on something that Mr. Sweet just touched on,

11   and that is four lines down, we've got another reference to an

12   army, an underground army.  And so I think we're going to hear

13   this either building an army or this army talk come up in -- both

14   from at least one victim and then in several writings.

15          We have -- on 76-3 is also what appears to be, "Sakima,

16   never accept a loan."  So, again, identity.  We see a 430 up at

17   the top.  And I remember the "43" is, again, not the relevance of

18   actually what's being said in some of those lines, but for

19   identity.

20          And then switching over to 76-6, I could put together a

21   relevance theory for why the Government thinks that that's in

22   there, but we don't intend to do it.  So 76-6, though, is

23   different plots of land that he's looking at.

24          THE COURT:  Sure.

25          MR. LICHVARCIK:  We're open, and we told defense if we

1    can figure out some way that we can redact this, we're just not

2    all that keen on just wanting to remove pages from a notebook.

3    And redacting it, a solution didn't come out immediately to us

4    yesterday.

5            THE COURT:  The idea behind these is, you know, is, I

6    guess, for the Government to portray a state of mind that at

7    least believes he can create this underground army on cheap land

8    somewhere that, quite frankly, is created through capturing women

9    and having children with them?

10           MR. LICHVARCIK:  That's --

11           THE COURT:  Saying it out loud, I know it sounds -- you

12   know.

13           MR. LICHVARCIK:  That's the part that I think we can

14   string that together if we want to.  I don't know that we're

15   going to, you know.  So when I argue relevance, for instance, for

16   that last -- for that 76-3, again, just the use of the word

17   "army," "underground army," you know, referencing an army, that

18   alone is a very particular thing that's referenced with a victim.

19   And then, again, we have "army" showing up in different writings.

20           And, again, "Sakima," the name on 76-3 helps establish

21   that whoever wrote in this notebook certainly seems to be

22   Mr. Zuberi, and it doesn't seem to be the writings of -- of

23   Ms. Westfall.

24           MS. POTTER:  Your Honor --

25           MR. LICHVARCIK:  Again, bottom line, I mean, we're

1    willing to figure out a way to redact 76-6.  I mean, we're not

2    trying to stretch this at this point to -- to what I think the

3    evidence supports, and that's what Your Honor touched on, but

4    we're willing to let go of 76-6 if we can figure out a way to

5    redact it.

6            MS. POTTER:  I mean, I would just say, because I --

7    this actually, I think, has become very relevant, turning to when

8    we're at 150, even if they offer the entire notebook at some

9    point, there's a difference between having the notebook in an

10   evidence bag that the jury may or may not open and also, you

11   know, flashing up every page of the journal in pictures.  So I

12   mean, even just at a minimum, removing 76-6 as an actual separate

13   picture exhibit is helpful.  If it's not -- if it's not relevant,

14   it shouldn't be in that exhibit.

15           The other thing just in terms of talking about

16   ownership and identity, I would just note that they're also going

17   to see all this when the handwriting expert comes, and she

18   examines the handwriting for a lot of these things.  So I'm not

19   sure that that's going to be a central issue, either, of who

20   wrote this notebook in terms of that being a reason to put in

21   extra prejudicial stuff.

22           And I'll rest there.  I think that's going to become

23   more significant when we get to some of this in the other

24   journal, so I'll -- I'm less concerned here as I will be on 150.

25           THE COURT:  All right.  Well, I mean, 76-3 does

1    reference the underground army and some of the things that had

2    been said that are related to Mr. Zuberi, so I think it does come

3    in.

4            76-6 is a list of cheap land.  You know, I do think the

5    Government has a reasonable argument that Mr. Zuberi was, in

6    fact, looking to build an underground, whether they want to call

7    it a cell, a bunker, or some sort of construction consistent with

8    the earlier diagram on property somewhere, that he was looking

9    for land to do that.  It's not a -- again, it ties into this

10   general theme that Mr. Zuberi is looking to create this operation

11   that he's referred to.  And these little pieces are maybe little

12   pieces of a puzzle that in and of themselves might mean very

13   little, but certainly tie the writings to him and to a

14   generalized theory of what his state of mind was going into these

15   alleged abductions.  So I'll overrule the objections to 76.

16           MS. POTTER:  Thank you, Your Honor.  For 77, the

17   Government has agreed to redact a portion that has to do with the

18   socks and a cuss word on the socks.  And then we have no

19   objection to 77.

20           78, we're back to the ballistic vest, Your Honor.  This

21   time it's on the bed with a bunch of other items.  I -- again, we

22   object to the ballistic vest.  And this, you know --

23           THE COURT:  Well, there's a lot of items in there.

24   Some of them look kind of relevant to me, I'm guessing.  I mean,

25   there's the -- I think the barrel, there's a belt with -- let me

1    hear from the Government in terms of what I'm seeing in

2    Exhibit 78.

3        MR. LICHVARCIK:  You're seeing a number of items that

4    were seized from the bedroom, including a couple we've talked

5    about.  You see that upper receiver.  That's the long black

6    cylindrical in the upper left.  You're seeing a holster, you're

7    seeing the gun box.  That's the long black case.  You're seeing

8    the police badge that's been referenced.  You're seeing some

9    various identifications.  And you're seeing at the very top, two

10   ammo boxes that's containing ammunition that's charged.

11       This is kind of a compilation photograph that assembles

12   a lot of the things that were -- that were seized in the bedroom,

13   including that black ballistic vest that we talked about with the

14   two green packages.

15       Again, to stay consistent with Your Honor's ruling,

16   if -- we're more than happy to redact this exhibit and perhaps

17   replace it with something else that removes the ballistic vest

18   idea but focuses on the two green bags of ammo.

19       MS. POTTER:  Yeah.  And I want to clarify my objection.

20   I mean, I think every single other piece in this picture -- so

21   they weren't found here.  Like, you know, they're piled on to

22   take a picture.  I think every single other piece of evidence is

23   in a separate picture, most of which we have agreed to admit with

24   no objection.  So this is just, as I said, a compilation picture,

25   so, you know, if a redaction is possible or if they have a

1    different compilation picture without it in there.

2            THE COURT:  Do we have pictures of all the other items

3    in 78 that are relevant?

4            MR. LICHVARCIK:  I'm hesitant to say.  We certainly

5    have a lot of pictures in, Judge.  I'm hesitant to say that we

6    have something that covers it.  Again, what I'll commit to is

7    that we'll -- we'll address this photograph and propose something

8    else.  I'm sure we will come to an agreement with the defense.

9            THE COURT:  I mean, even if you just clip off a couple

10   inches on the right of the photograph, at that point to me it

11   just doesn't look like a vest at all without that one shoulder

12   strap.  That may be enough.  I don't know if that driver's

13   license is significant.  It looks like, you know, his license.

14   We have a police -- a lot of this looks fairly significant to

15   what the Government is trying to prove, but if they have other

16   photographs and we're not talking about a vest, I think either

17   redact this a little bit, keep it out, and use other photographs

18   that will bring in everything, but I think, you know, this is a

19   small point of -- I've agreed to leave out the idea he's running

20   around in a vest.

21           MR. LICHVARCIK:  We'll work on this one, Judge.

22           THE COURT:  Okay.  Thank you.

23           MS. POTTER:  Okay.  Your Honor, then 79 through 90, no

24   objection.  Those can be pre-admitted.

25           For picture 91, the Government is removing a portion

1    that focuses on Mr. Smith's dog tags, and so they're just

2    removing that picture and they're going to change the name, as

3    I -- I think I struck it out, and then we would have no objection

4    to that amendment.

5              THE COURT:  Okay.

6              MS. POTTER:  For 92, we are in the same place, I think,

7    as the earlier video.  They've agreed to leave out all the audio

8    except for a brief portion in the beginning.  And I don't even

9    know that we've even talked about what portion that is.  I don't

10   think that's going to be a problem.  We'll just work on that

11   later.  So long as that stays consistent and we can agree on

12   that, that we'll agree to admission.

13             I think the other thing just so the record's clear, we

14   were initially going -- I think it was this one we were initially

15   going to log an objection just because it's so long -- or it's

16   long.  And my understanding is the Government's not going to just

17   play it from start to finish, they're going to, you know, jump to

18   portions.  So to the -- if that changes, we might raise an

19   objection simply to keep things moving during trial.

20             THE COURT:  All right.  So keep conferring about that,

21   and if we need to address it at our next hearing, we will.

22             MS. POTTER:  Okay.  For 93 through -- 93 through 98, we

23   just need to see them.  Once we see them, we don't anticipate an

24   objection, but we'll get back to the Court on those.

25             THE COURT:  Okay.

1          MS. POTTER:  Okay.  So Exhibit 99, those objections, we

2     would raise the same objections we made to 76.  So Exhibit 99 is

3     the physical exhibit that was -- pictures were taken on 76.  So I

4     assume the Court's making the same rulings it made for 76 as to

5     99, correct?

6          THE COURT:  Correct.

7          MS. POTTER:  Okay.  So 100 through 145, there's no

8     objection.  They can be pre-admitted.  146 has been removed by

9     the Government.

10          MR. LICHVARCIK:  That's correct.

11          THE COURT:  All right.  146 is out.

12          MS. POTTER:  147 and 148, no objection.  They can be

13     pre-admitted.

14          So 149 is the initial picture of the blue journal, but

15     the objection -- well, so first of all, we made a general

16     objection to the blue journal in total through the 404(b)

17     ruling -- or through the 404(b) motion.  We thought all of it was

18     irrelevant.  I understand the Court's ruled against us on that,

19     but we would preserve that objection to the entire exhibit.

20          But it's really 150 that we need to look at, Your

21     Honor, because we do have separate -- much like with 76, we have

22     separate objections to individual pages.  So we'll start with --

23     obviously 150-1 is just the cover.  If the Court's letting the

24     journal in, the cover comes in.  150-2, again, this is the

25     reference to 43.  We don't think it's relevant.  We think the "no

1    government" is more prejudicial than probative.  I suspect there

2    will be a reference to, it says, "Hyche," which is another name

3    in terms of identity.  I would just note that they -- there'll be

4    other places where they'll be able to argue identity and they

5    have a handwriting analysis, so we -- starting with -- do you

6    want me to go through every page and then have them answer, Your

7    Honor, or do you want to go page by page?

8            THE COURT:  Let me look through the pages right now, if

9    you'll give me just a moment.

10           MS. POTTER:  Okay.  Thank you.

11           THE COURT:  I mean, I've allowed already 150-7, right?

12           MS. POTTER:  Yes, Your Honor, that is correct.

13           THE COURT:  For the statement, "you must raise an

14   army," and lists specific targets.  There's a lot of other stuff,

15   though, in the (pause) --

16           MS. POTTER:  Yes, Your Honor.

17           THE COURT:  -- journal that I just don't understand its

18   relevancy.  And, you know, there's references to crypto, to STDs,

19   his relationship with Ms. Westfall, which may or may not be

20   significant if she does or doesn't choose to testify, but is the

21   Government seeking to introduce the entire journal?

22           MR. LICHVARCIK:  Yes, Judge.  A lot of this goes to

23   ownership.  Again, we don't have a stipulation, and nor do we

24   expect a stipulation on, "this is my," Mr. Zuberi's, journal.  We

25   have a journal, again, found in a room that could be written by

1    two different people. That's one of the reasons we have a

2    handwriting expert as one of the experts as well. And just

3    because we have more evidence of ownership -- again, I understand

4    that some of this could be prejudicial, but, for instance, 150-2,

5    again, when he writes his name, Hyche, on it, and, again, we'll

6    see that distinctive "43" that's also on the license plate of the

7    Honda Pilot that he -- that both women actually got into when

8    they were kidnapped.

9          THE COURT: Could you clarify that for me? I'm sorry.

10         MR. LICHVARCIK: Do you see on 150-2, there's "43" in

11   both numbers and written out?

12         THE COURT: Yes.

13         MR. LICHVARCIK: So 43 and (pause) -- is a number

14   that's special to Mr. Zuberi. It's a -- it's -- I believe it's

15   on his Twitter profile page, which I think we're going to get to

16   later. I believe it's also on the license plate for the Honda

17   Pilot. And the Honda Pilot is the vehicle that was used -- we'll

18   pull up a picture in a moment. The Pilot's a vehicle that was

19   used during both kidnappings, both women. AV-1 and AV-2 got into

20   the Honda Pilot, and allegedly they didn't come out the same,

21   Judge. So the 43 number is a distinctive number for identity.

22         Again, I'm not trying to overstate the identity aspect

23   of it. If there are parts, and we've expressed to defense this

24   journal, too, might be a little easier in terms of removal of

25   pages, and when we get to the "STD" pages, we're willing to make

1    some concessions.

2              On the screen now is 193 dash (pause) --

3              THE COURT:  I see.

4              MR. LICHVARCIK:  -- 2, and there's the "43" number that

5    we see again.

6              THE COURT:  Okay.  Well, here's what I think.  That's

7    starting to make more sense to me.  Thank you.  I appreciate

8    that, Mr. Lichvarcik.

9              167 is relevant.  It targets specific people.  And the

10   Government does have to prove that that, in fact, was written by

11   Mr. Zuberi.

12             The other portions of the journal are very specific

13   about the individual's relationship with Ms. Westfall, his

14   children, wanting to break up with her.  I mean, it does assist

15   the jury in reaching what seems to be the only conclusion, is

16   that Mr. Zuberi, in fact, wrote this journal.

17             The "43" piece of it certainly makes sense in terms of

18   relevance, also tying the journal to Mr. Zuberi.

19             So it has evidentiary value, certainly, to show that

20   that Exhibit 150-7 can be attributed to Mr. Zuberi.  There are

21   some things in it around maybe STDs that could be left out.

22   Maybe there's some things about breeding dogs that I -- just seem

23   somewhat -- somebody's positive for gonorrhea.

24             I'd like the parties to at least confer.  I mean,

25   generally it's coming in.  There may be sections of it that, you

1  know, just don't -- the jury doesn't need to see, especially that

2  language around crypto and STDs.  So, you know, we can talk more

3  about it at the next conference, but generally speaking, given

4  that the Government does have to show that that one page that

5  has, I think, a high degree of relevance is, in fact, written by

6  Mr. Zuberi, they need to bring in other pages to show that, in

7  fact, he is the author, but let's work on redacting the "STD"

8  issue.

9      MS. POTTER:  Thank you, Your Honor.  We'll work on 150,

10  and so we'll leave it open at this point.

11      Okay.  151 was removed by the Government.  152 --

12      THE COURT:  That'll be removed.  I just want to make

13  sure, Char, you're tracking the ones that are being removed?

14      COURTROOM DEPUTY PEW:  Yes, I am, Judge.

15      THE COURT:  Thank you.

16      MS. POTTER:  152, no objection, can be pre-admitted.

17  153 was removed by the Government.

18      THE COURT:  Okay.  153 will be removed.

19      MS. POTTER:  154, no objection.  It can be

20  pre-admitted.  155, the Government is going to redact the

21  guerilla warfare book, and once that's redacted, we have no

22  objection.

23      THE COURT:  Okay.

24      MS. POTTER:  It can be admitted.  And as I look at 156,

25  I will just note I know Mr. Sweet already said this, but -- and

1    it's in the beginning, but all of the references to "cell" will

2    be changed for the exhibit list that goes back to the jury.

3    It'll be just listed as a cinder block structure on the --

4              THE COURT:  Okay.

5              MS. POTTER:  -- physical exhibit list that goes back to

6    the jury.  But with that change, which we have that

7    understanding, 116 is -- 156 through 162 are all admitted, no

8    objection.

9              163, it's videos.  It's a walk-through of the house by

10   Special Agent Gluesenkamp.  We are working on redacting -- so

11   we're working on redacting a focus on the children's bedroom.

12   Our understanding is it will be edited so it'll show the swing

13   through, so the jury will see that the bedroom is there, but not

14   going into the bedroom, and then there's just a little bit of the

15   bathroom.  So we -- I mean, we'll tentatively agree to that once

16   we see the redacted version.

17             THE COURT:  All right.

18             MS. POTTER:  So 164 are the still images from the

19   video.  They've agreed to remove 164-17, which is the children's

20   bedroom.  And with that removal, we have no objection.  It can be

21   pre-admitted.

22             THE COURT:  I'll just clarify, 164-17?

23             MS. POTTER:  164-17 --

24             THE COURT:  All right.

25             MS. POTTER:  -- is going to be pulled.

1          165 to 167, no objection.  They can be pre-admitted.

2          168 is the blue journal that we've been discussing with

3   150.  It's the actual physical exhibit.  So if we could leave

4   that with 150, that we're going to work on trying to figure out a

5   redaction or something with that journal, we'll leave that one

6   open.

7          THE COURT:  All right.  We'll do that.

8          MS. POTTER:  Okay.  For 169 to 177, no objection.  They

9   can be admitted.

10         We're getting into now the -- the exhibits related to

11  Reno, Your Honor.  And what I -- if the Court's willing to

12  entertain the time, it's not a ton of time, I wonder if it would

13  be worthwhile just to play the redacted versions and you can just

14  rule that they're admissible or not and we can just move forward.

15  I mean, if that works for every -- I mean, if you guys can't play

16  them, that's fine, but if you have the redacted versions.

17         MR. BOCCATO:  We can do that.  It'll be about 20 --

18  just under 22 minutes.

19         THE COURT:  Okay.  Are you objecting to the redacted

20  version, though?

21         MS. POTTER:  Well, I'm objecting to --

22         Can I just have one second?

23         THE COURT:  Yes.

24         (Pause in proceedings)

25         MS. POTTER:  Your Honor, it would be extremely helpful

1    if we can just play the redacted versions, I can note my

2    objection, and if the Court -- I understand I'm asking for the

3    Court's time, but that would be helpful.

4              THE COURT:  All right.  I'm assuming Mr. Zuberi

5    probably hasn't had an opportunity to see them.

6              MS. POTTER:  He has not, and he would like them to be

7    viewed.

8              THE COURT:  I do need to let people know I have a noon

9    discovery matter in a civil case involving money, so (pause) --

10             MR. BOCCATO:  Just for the record, Your Honor, this is

11   Exhibit 180.

12             THE COURT:  180?  Thank you.  All right.  For the

13   record, we'll be playing the exhibit.

14             (Playing video, Government's Exhibit 180)

15             MS. POTTER:  So, Your Honor, just for the record, we've

16   objected to any mention of Reno.  We would note the objection to

17   this one being the mention of the child in the back twice.  I

18   understand the Court's prior ruling.  I just want on the record

19   on 180, but with that, if the Court's admitting the redacted

20   version.

21             THE COURT:  I am, yes.

22             MS. POTTER:  Okay.  With our objection preserved, no

23   problem.  Okay.  So --

24             MR. BOCCATO:  And I'll just note that this shorter clip

25   is helpful because it has the -- essentially immediately behind

1   Zuberi's vehicle, shows the context, shows the area.  It's,

2   again, the unique vehicle that's parked immediately behind the

3   Pilot.

4           The next video is to be Exhibit 181, which is the body

5   camera from Officer Staples.

6           (Playing video, Government's Exhibit 181)

7           MR. BOCCATO:  That's the end of Exhibit 181.  We have

8   182 and 183.  With regard to 182 and 183, we do have transcripts,

9   if the Court would like a copy.

10          THE COURT:  That could be helpful.

11          MS. POTTER:  And, Your Honor, while he's handing those

12  up, I'll just note my objection to 181.  The -- you know,

13  obviously I've already objected to this, but I'll object again to

14  reference to child in the back.  I also object just generally

15  when we see the younger child, I know that's not the child in the

16  car, I still have some concerns about the jury's reaction to

17  that.

18          And then just generally some of the Ms. Westfall on the

19  phone, to the extent that's going to be argued to impeach her

20  even if she doesn't testify, I think that's an improper use of

21  that.  I understand that there's a separate issue with his

22  responses to her, but I just want to make that very clear that

23  there's two portions to that.

24          THE COURT:  All right.  I'll overrule the objections.

25  I mean, I realize there's children, and that causes the Court

1    concern, but these are choices that are being made by Mr. Zuberi

2    at the time of his arrest, and that involved putting his children

3    in harm's way.  And not cooperating or -- I mean, the argument is

4    he has fled from the District of Oregon for a purpose with his

5    children and is not cooperating with police in a very significant

6    way.  So, I mean, the fact he made these choices to have his

7    children present and not surrender are -- is relevant to flight

8    and guilt, quite frankly.

9              Okay.  What's our next exhibit, then?  182?

10             MR. BOCCATO:  Yes, Your Honor.  182.

11             (Playing video, Government's Exhibit 182)

12             MR. BOCCATO:  And this is the body cam of Officer

13   Broadway, who is -- he had a role as a hostage -- kind of a

14   hostage negotiator at that time.

15             THE COURT:  Okay.  Thank you.

16             (Playing video, Government's Exhibit 182)

17             MR. BOCCATO:  Your Honor, I just want to note partially

18   for the record and just for the Court's edification, this is not

19   just a regular phone call, it's a FaceTime call.  And if you

20   watch the video, you can see Zuberi's face come in really just

21   depending on the glare.

22             THE COURT:  Okay.  Thank you.

23             (Playing video, Government Exhibit 182)

24             MR. BOCCATO:  Your Honor, I want you to note a couple

25   things.  Over the next 22 seconds, you can see Mr. Zuberi appear

1    to remove or to take off his phone piece and then slam it to the

2    ground.  So I just wanted to pay special attention to the Court

3    for that.

4          And obviously these aren't final versions of films.  We

5    haven't redacted children's faces.  That's something that we're

6    likely to talk to defense about.  I just wanted to mention that

7    since we are -- these aren't in final forms.  Thank you.

8          (Playing video, Government Exhibit 182)

9          MS. POTTER:  Okay.  Your Honor, obviously the same

10   objection.  I know the Court's ruled that, you know, the

11   reference to the children, some of Ms. Westfall speaking as well,

12   but we will waive playing of 183.  Though it's similar, I would

13   just note there is a reference to probation in there that is

14   concerning to defense.

15         And then what I would propose, if the Court is willing,

16   I know the Court said that you have a discovery conference at

17   noon, I think we could get through -- I could just list my

18   objections to all the other items from Reno for the Court to make

19   a ruling and then we could pause at that point, because I would

20   like the opportunity to confer on the jail calls, which are the

21   other sort of big issue.  We might be able to get pretty far on

22   that if we could do that, if that works for the Court.  Would

23   that (pause) --

24         MR. BOCCATO:  Your Honor, I do want to touch on 183.

25   It's about a five-minute clip, so it's a little bit shorter than

1    the last one.  If the Court wants to watch it, we're more than

2    happy to play it.  It puts the probation violation statement in

3    context, because I believe, if my recollection is correct,

4    Zuberi's response is, "Is that it?"  And that's a pretty

5    significant response, and that was part of the reason we -- we

6    tried to omit other references to prior crimes or the judicial

7    system, and there were many throughout the video, but that was

8    the one we kept, because it's important.

9         THE COURT:  All right.  I will overrule the objection

10   to that reference.  It is relevant to Mr. Zuberi's knowledge of

11   other matters.  I'll overrule the objection to Exhibit 182,

12   Officer Broadway's body cam.  It did remove some of the concerns

13   I previously had had.  So I will allow both Exhibit 182 and 183.

14   I've reviewed the transcript, and I will allow it over objection

15   of defense.

16        MS. POTTER:  Your Honor, just -- I want to skip back.

17   We had objected to 179, which are images from the surveillance

18   photo, and 178, which is a map of the placement of the cars.

19   That objection was based on our general objection to Reno.

20        THE COURT:  Those will be overruled.

21        MS. POTTER:  Okay.  So 184 -- 184, 185, 186 -- 184,

22   185, and 186 are, again, stills from the videos.  We raise our

23   Reno objection.

24        THE COURT:  And, again, that will be overruled.  You

25   know, it may be helpful to have stills so the jury does not

1    during deliberations have to go through all of the videos if they

2    find that the stills are helpful.

3         MS. POTTER:  187 and 188 were removed by the

4    Government.

5         THE COURT:  All right.  187 and 188 will be removed.

6         MS. POTTER:  189, we have no objection.  The Government

7    is removing 189-3, which was just cumulative pictures.  So with

8    that removal, we have no objection to 189.

9         THE COURT:  All right.  189-3 will be out.

10        MS. POTTER:  190 is a photo of the blood and knife

11   inside the Honda, is the focus.  This was, I would say, just

12   generally our Reno objection and then also the objection to the

13   reference to suicide as evidence of guilt.  That's the basis for

14   that objection.

15        THE COURT:  All right.  I think the Government gets to

16   make a reasonable inference that the suicide and attempted

17   suicide was, in fact, a conscious decision to avoid

18   responsibility for the crime.

19        MS. POTTER:  191 is another image from the videos.

20   That would be the Reno objection, which is -- the Court's

21   overruled, I believe.

22        THE COURT:  Do we need 191?  Is it (pause) --

23        MR. LICHVARCIK:  Judge, 191 is relevant.  AV -- AV-1

24   specifically describes Mr. Zuberi after she escapes, and she

25   notes a couple things, but one of them is the large baggy eyes

1    underneath the eyes that she recalls, and this picture shows that

2    in some detail. And it also shows what -- or it confirms what

3    our evidence is going to show, and that is that he's been running

4    hot for the last 36 hours or so between going up to Seattle from

5    Klamath Falls, kidnapping a woman, driving her back down, keeping

6    her in a cell, getting out, going through a lot of the escape

7    stuff that we're going to be talking about, spending a night down

8    in Tulelake, California. And this is the tail end of a lot of

9    energy expenditure and travel and lack of sleep and fatigue. So

10    for those two reasons, that's why we have 191.

11            THE COURT: All right. I'll overrule the objection.

12            MS. POTTER: 192, I think, just for the record, we're

13    all agreeing. You know, the transcripts are marked for clarity

14    and for the record, but the transcripts of videos won't go back

15    with the jury. And so with that understanding, we don't have a

16    problem with them being used, and subject to our review, of

17    course.

18            THE COURT: Okay. Is the idea that the transcripts

19    will be given to the jurors to read along as the video's being

20    played?

21            MR. BOCCATO: The idea is that the transcripts will be

22    probably superimposed on the video itself.

23            THE COURT: Oh, I see. Okay.

24            MR. BOCCATO: I think that's the current plan, Your

25    Honor.

1        THE COURT:  All right.

2        MS. POTTER:  193, we have no objection.

3        194, we objected.  It's 194-7.  Is a close-up of the

4   knife that he allegedly used to cut himself.  That's part of the

5   suicide objection.

6        THE COURT:  That will be overruled for the same reasons

7   as the Court previously stated.

8        MS. POTTER:  Thank you, Your Honor.  195, we have no

9   objection, but the Government's removing 195-1 and 195-3.

10        THE COURT:  All right.  195-1 and 3 will be removed.

11        MS. POTTER:  Then I think we'll just take -- if we

12   could just do the next two, and then I think we'll maybe stop.

13   Well, I guess we have more time than I thought.

14        196 we just object to as cumulative and relevant,

15   because 196 is included in the same area as in 195.  And I'll

16   turn to the Government, because I can't recall exactly why

17   there's a -- I don't know the relevance.

18        THE COURT:  It does look a little cumulative, but

19   what -- does it show something specific that the jurors need to

20   be aware of?

21        MR. LICHVARCIK:  Judge, my recollection of our

22   conversation and our agreement was that we were going to use 196

23   in place of 195-1.

24        THE COURT:  That makes sense.  All right.

25        MS. POTTER:  So, Your Honor, I apologize.  I think I

1   forgot that from yesterday.

2          THE COURT:  Okay.

3          MS. POTTER:  He's correct.  Now that he says that, that

4   reminds me.  So no objection to 196.

5          197, there is pepper spray found in the Pilot, and 197

6   is a picture of that pepper spray.  We object, because there's

7   no -- well, I don't want to say there's no allegation.

8          My understanding is that there's going to be an

9   allegation from AV-1 that Mr. Zuberi took pepper spray from her,

10  but I think, and I don't want to -- my understanding is there's

11  not going to be an argument that this pepper spray is that pepper

12  spray.  I understand if they were the same pepper spray, I'd have

13  no argument, but since that's not the same pepper spray in the

14  car, our argument would be it's irrelevant and unfairly

15  prejudicial.

16         THE COURT:  All right.  Mr. Lichvarcik.

17         MR. LICHVARCIK:  It might be irrelevant.  We want to

18  confirm with AV-1 on that, and if it's -- she doesn't identify it

19  as (indiscernible) because she did not have the one that she had

20  on her on the night that she was kidnapped, but if it's not hers,

21  we'll pull these out.

22         THE COURT:  Okay.  So we'll reserve a ruling on that.

23  Thank you.

24         MS. POTTER:  198 to 208, no objection, pre-admit.

25         209 are photos of tire spikes found in a backpack in

1  the Pilot.  There's no allegation that tire spikes were ever used

2  in any of these incidents, the alleged incidents, so we would

3  object as it being irrelevant and unfairly prejudicial.

4  THE COURT:  All right.  I assume the Government's

5  introducing them to show some planning for any contingencies

6  given the nature of the crimes, and if that's the case, I'll

7  overrule the objection.

8  MR. LICHVARCIK:  That's correct, Judge.  I don't know

9  the exact reason, but those certainly can be used in an offensive

10  or defensive way and can certainly assist in flight as well.

11  THE COURT:  All right.  Again, I'll allow 209.  I'll

12  allow 1, 2, and 3.

13  MS. POTTER:  And, Your Honor, I mean, we can -- do you

14  want to keep going or --

15  THE COURT:  Yeah.  We're doing well.  Thank you,

16  Ms. Potter, for getting through this so quickly.

17  MS. POTTER:  Okay.  210 through 216, no objection.

18  They can be admitted.

19  217 is a receipt from a Safeway on Aurora Avenue.

20  Aurora Avenue is where -- is near where AV-1 was picked up, but

21  we are objecting to irrelevant, because this is a week before.

22  So this isn't during the incident, it's a week before, so we're

23  objecting as irrelevant.

24  THE COURT:  Government?

25  MR. LICHVARCIK:  A couple points of relevance.  Without

1   giving the impression I'm trying to overstate this receipt, but

2   when Mr. Zuberi -- and, again, this is all allegedly, but when --

3   AV-1 is expected to testify when he put the cuffs on her in the

4   car and -- and detained her, he was pretending to be a police

5   officer.  And he said some statements to her such as, you know,

6   "We" -- "they've been watching you for some time," and gave her

7   the impression that this had been some sting, that she had been

8   targeted.  And he made some other statements such as he tried to

9   get some other girls or see some other girls that night, but they

10  wouldn't get into the Honda Pilot.

11          So the fact that he was -- this receipt, what it does

12  is it shows that he was up in the same general vicinity of Aurora

13  Avenue the week before.  So it shows both that that's an area

14  that he had been possibly scouting, possibly other stuff, but it

15  certainly ties in to that statement.

16          And this is kind of minor relevance, but you'll see

17  this, and I think this will come up every once in a while, and

18  that's -- I believe this is for the purchase of Fiji water

19  bottles.  And Fiji water bottles are a -- are a specific type of

20  water that Mr. Zuberi likes a lot.  We'll see Fiji water bottles,

21  I believe, in the cell, we'll see them throughout

22  (indiscernible), we'll see them in the car, but, again, a minor

23  relevance there, but more major relevance is the fact that he was

24  up in Aurora Avenue the week before, possibly on a hunting trip.

25          THE COURT:  All right.  And then Aurora Avenue -- I

1  have a lot of friends and family in Seattle, but my

2  understanding, Aurora Avenue has some significance because the

3  hotels are used for prostitution and it's been kind of a little

4  prostitution/sex worker corridor in the Seattle area.

5       MR. LICHVARCIK:  That's exactly right.  I understand

6  this section is colloquially known as the (indiscernible), and

7  it's an area that -- that men tend to bring money to to get

8  sexual pleasure.

9       THE COURT:  All right.  I'll overrule the objection,

10  finding that there is a reasonable inference that Mr. Zuberi had

11  been in the area previous to this, the area in which he allegedly

12  abducted AV-1.

13       MS. POTTER:  Thank you, Your Honor.  218, no objection.

14  It can be pre-admitted.

15       219 is another receipt like 217, the same day, same

16  area.  So obviously I'll re-raise the relevance objection.  We

17  also are raising it on prejudice -- sorry, an unfair prejudice

18  objection based on the fact that it's for a strip club.

19       THE COURT:  Okay.  I'm going to overrule the objection

20  on the same grounds as earlier.  And I do realize that it may be

21  a strip club, but the Government's, of course, overriding theory

22  is that Mr. Zuberi is specifically targeting sex workers, or I

23  think the term they use is sex-adjacent -- sex workers adjacent.

24  I'm not -- that's the first time I've heard that phrase, but I

25  think it kind of captures their idea that there's a particular

1    type of victim that Mr. Zuberi is looking for, and they tend to

2    be people working in the -- for better use of the term, the sex

3    industry.

4            MR. LICHVARCIK:  And on this exhibit, Judge, very

5    similar to the last one, it really has to do also just with the

6    fact that he was up in that area on the same day showing that --

7    this address is approximately, I want to say, two miles away or

8    so from -- from the location of where he kidnapped AV-1.

9            THE COURT:  Okay.  All right.  So objection to 219

10   overruled.

11           MS. POTTER:  220 through 225, no objection.  They can

12   be pre-admitted.  226 was removed by the Government.

13           THE COURT:  All right.  226 is removed.

14           MS. POTTER:  227 and 228, no objection.  They can be

15   pre-admitted.

16           I want to confirm with the Government, 229 has been

17   removed?

18           MR. LICHVARCIK:  Correct.

19           MS. POTTER:  229 has been removed by the Government.

20           THE COURT:  All right.  229 is out.

21           MS. POTTER:  230 to 232, no objection.  They can be

22   pre-admitted.

23           233 and 234 were physical exhibits the Government's

24   decided won't go back to the jury, the knife and the pepper

25   spray.  Correct?  So those are removed.

1          THE COURT:  Okay.

2          MS. POTTER:  235 through 243, no objection.  They can

3     be pre-admitted.  244, the Government's also not sending that

4     physical exhibit.  They've removed that physical exhibit, the

5     tire spikes.

6          THE COURT:  All right.  We'll just have the photograph.

7          MR. LICHVARCIK:  That's correct.

8          MS. POTTER:  245 is a physical exhibit dealing with a

9     bunch of paperwork related to a name change.  We don't object to

10    that point.  If we decide to stipulate to the felony conviction,

11    we may talk to the Government about trying to remove some of

12    these documents as unnecessary and cumulative.

13         THE COURT:  Okay.  We'll reserve, then, rulings on

14    those.

15         MS. POTTER:  246 to 249, no objection, can be

16    pre-admitted.  250 has been removed.

17         THE COURT:  All right.  I'm sorry.  250?

18         MS. POTTER:  250.

19         THE COURT:  250 is the physical exhibit, but the

20    photograph is coming in.  That'll be a Dream Girls receipt.

21         MS. POTTER:  251 through 260, there's no objection.

22    They can be pre-admitted.

23         261, I was unable -- I haven't had an opportunity.  The

24    full exhibit's, like, four hours.  We're only playing the

25    excerpt.  I'm sure there's no objection.  I just need to

1    obviously review that, Your Honor, and I haven't had an

2    opportunity.

3           THE COURT:  Okay.  Reserve ruling on 261.

4           MS. POTTER:  262 and 263, no objection.  They can be

5    pre-admitted.

6           264 and 265, no objection.  We just need to -- we don't

7    anticipate an objection.  We haven't reviewed the exhibit, so

8    we'll hold on those.

9           THE COURT:  Okay.  We'll reserve on 2 (pause) --

10          MS. POTTER:  264 and 265, Your Honor.

11          THE COURT:  264 and 265.

12          David, I'm assuming you're writing these down.

13          MS. POTTER:  266 to 269, no objection.  They can be

14    pre-admitted.

15          270 to 271, we don't anticipate an objection, but we'll

16    hold.  We don't have it yet.

17          THE COURT:  All right.  270 and 271 we'll reserve

18    ruling.

19          MS. POTTER:  272 through 275, no objection.  They can

20    be pre-admitted.

21          276, again, I don't think we're going to have a

22    problem.  I just need to view it.  So we'll hold on that one.

23          THE COURT:  Is that the one where -- it seems like I've

24    seen that one before.

25          MS. POTTER:  I think you've seen excerpts from the

1    motion to suppress hearing, Your Honor.

2            THE COURT:  Yes.  All right.  We'll reserve ruling.

3            MS. POTTER:  I think they've provided it.  I just

4    haven't had a chance --

5            MR. BOCCATO:  We -- it's been -- it was recently

6    provided, so --

7            THE COURT:  Okay.

8            MR. BOCCATO:  But it's just about a five-minute clip

9    of --

10           MS. POTTER:  And, again, I don't think this is

11   something we need to take up with the Court.  We'll let the Court

12   know once I --

13           THE COURT:  Okay.  We'll reserve ruling on 276.

14           MS. POTTER:  277 to 292, no objection.  They can be

15   pre-admitted.

16           293 is a video walk-through of the trailer.  Again, we

17   don't object to the video.  We object to any audio, and the

18   Government has agreed to mute all of the audio on that one, I

19   believe.

20           MR. LICHVARCIK:  That's correct.

21           THE COURT:  All right.  With that, 293 will be

22   admitted.

23           MS. POTTER:  294 to 301, no objection.  Pre-admitted.

24           302 is photos of paperwork from -- well, actually, I

25   don't want to say it's photos of 245, but it's photographs of

1  name change paperwork.  We don't object to that, but we may ask

2  it be removed if we ultimately stipulate to the felony.

3            THE COURT:  All right.  It'll be received, but it can

4  be re-raised at a later time.

5            MS. POTTER:  303 to 343, no objection, can be

6  pre-admitted.

7            344 we're not going to object to, but it is -- it's no

8  longer a physical exhibit.  It -- they're going to actually just

9  put in a photo of the photo.  So we've seen that.  We don't

10  object, but just so the Court knows, it's not going to be a

11  physical exhibit now.

12            THE COURT:  Okay.

13            MS. POTTER:  345, again, no -- we're holding ruling on

14  these, because it's the -- it's the same name change paperwork.

15  We don't object, but if we stipulate, it may become unnecessary.

16            346 the Government's removing, correct?

17            MR. LICHVARCIK:  Correct.

18            THE COURT:  All right.  346 will be removed.

19            MS. POTTER:  347 we don't object to, but the version

20  that's currently in has highlights in it.  Those highlights will

21  be removed.

22            THE COURT:  All right.  Those will be removed, but 347

23  will be received.

24            MS. POTTER:  348 to 350, no objection.  They can be

25  pre-admitted.

1          351, we need to review that, so we'll reserve ruling if

2    the Court would indulge us.

3          THE COURT:  Okay.  We'll reserve on 351.

4          MS. POTTER:  352 to -- 352 to 355, no objection, can be

5    pre-admitted.

6          356 we don't object to so long as the witness who

7    drafted it comes to trial and testifies to it.

8          THE COURT:  All right.  With that understanding, it'll

9    be -- we'll reserve, I guess, ruling based on a foundation.

10          MS. POTTER:  357 to 363, no objection.

11          364 is a video with a third party in it.  We have no

12    objection so long as that person comes to trial --

13          THE COURT:  All right.

14          MS. POTTER:  -- and testifies.

15          THE COURT:  It'll be allowed with foundation.

16          MS. POTTER:  Okay.  365 and 366, no objection.

17          367, as submitted, is two separate clips from a Blink

18    video, Your Honor.  One Blink -- well, actually, so one Blink

19    video is going to be out altogether.  It's a discussion -- is

20    that (pause) -- no.  Sorry.  I'm sorry.

21          367 is going to be admitted in part.  They are going to

22    remove all references -- or all video of Ms. Westfall and the

23    child from that video.  So it'll just be a video, Blink video, of

24    Mr. Zuberi carrying what the Government alleges is a weapon.  Is

25    that correct?

1        MR. LICHVARCIK:  That's correct.  And, you know, a

2   couple of these Blink videos, and I think this will come up in

3   jail calls, too, we've had robust discussions about them in an

4   attempt to pare them down.  This is an incident -- frankly, I

5   won't go too much into it, but it's an incident in the house soon

6   after the -- AV-2 was kidnapped in which Mr. Zuberi and Alycia

7   are in an argument, and Mr. Zuberi -- and I guess just to pause

8   real quick, this case does have evidence from inside the house.

9   There's Blink cameras that's catching footage inside.  It's got,

10  you know, obviously video footage that we talked about from

11  outside the house.  So there's a lot of different angles of

12  things happening.  And so we actually -- there's evidence about

13  what happens inside of Mr. Zuberi's house soon after he kidnaps

14  AV-2.  And one of the things that happens is this incident where

15  they get in an argument, and it gets a little -- a little

16  intense, to the point where he grabs a firearm, there's a crying

17  child in the kitchen, and they play a game of chase almost in

18  which Ms. Westfall and Mr. Zuberi run around the house, and he

19  locks her out, and at one point he's looking through the window

20  sill and trying to make sure that the windows are all closed.

21  The whole time, he's holding the firearm.  At various points he's

22  looking at the camera.

23        So we understand there's some shrieking involved by

24  Ms. Westfall, and so we're trying to pare that down to the point

25  where we have those videos but there's not Ms. Westfall shrieking

1    and running around scared or a child crying in the kitchen.

2    THE COURT:  Okay.  So you're introducing it primarily

3    to show possession of the firearm as opposed to maybe the

4    domestic violence incident that --

5    MR. LICHVARCIK:  That's correct.

6    THE COURT:  -- seems to be occurring?

7    MR. LICHVARCIK:  That's correct.

8    THE COURT:  Okay.  With those changes, it'll be

9    allowed, but certainly the defense will have an opportunity to

10   review the redacted version.

11   I'm wondering if we can break for just a moment.  This

12   is a very brief, you know, 5- to 10-minute discovery conference.

13   I assume they're -- if they're not waiting on the phone, they

14   will be in just a moment.

15   I have some other criminal matters this afternoon, so

16   I'm wondering if we can just wrap up in maybe ten minutes, give

17   you folks a little break, and come back, wrap up the exhibits.

18   MS. POTTER:  I might need, like, 15 to discuss the jail

19   calls with them, but --

20   THE COURT:  Fifteen.  All right.

21   MS. POTTER:  -- you know, if we can just -- I just need

22   to have a few discussions with the Government on those, and then

23   we -- I think we can.  I mean, it's gone more quickly than I

24   thought, so, yes.

25   THE COURT:  All right.  I really appreciate the work

1    you've done to keep this moving much quicker than I had

2    anticipated, so thank you.

3              MS. POTTER:  Thank you, Your Honor.

4              MS. MILES:  Your Honor, can I ask one question?

5              THE COURT:  Yes.

6              MS. MILES:  Do you think that we will address either

7    the verdict form or the jury instructions today?  I have another

8    matter that I need to take care of.

9              THE COURT:  Jury instructions very unlikely.  Just --

10             MS. MILES:  Okay.

11             THE COURT:  I don't typically address those early on.

12             I do have a question about the verdict form.  I'll ask

13   the question now, and you can talk about it.  I guess I'm not

14   sure why the Government, when it comes to the firearm possession,

15   is simply not electing a single theory, I don't know, one gun on

16   one count, some ammunition on a second count, to just get a

17   unanimous verdict as opposed to having them lay out each one.

18   And there may be a very good explanation for that.  It just seems

19   like there's a very easy way to present that to the jury if the

20   Government were willing to elect a single -- I guess a single

21   item on each count, but I'm not telling you you have to.  It just

22   seems easier.  So think about that, and we'll talk more about it

23   when we come back.

24             MS. MILES:  Okay.

25             THE COURT:  And we can defer on that if people need to

1  be elsewhere.

2          (Recess:  12:03 - 12:27)

3          THE COURT:  Okay.  We're back on the record in the

4  Zuberi case.  Where we left off on the break is we were

5  discussing some of the Blink videos inside the home.

6          The Government had agreed that with regard to

7  Exhibit 367, they would redact that video to focus on

8  Mr. Zuberi's possession of a firearm as opposed to maybe what

9  appears to be a domestic situation that's occurring in the home.

10          So where are we going next?  Ms. Potter?

11          MS. POTTER:  360 -- okay.  So I'm sorry.  Did we do

12  368, the images that follow, that there's no objection?

13          MR. SWEET:  No objection.

14          MS. POTTER:  Okay.  So we're on 368.  No objection.

15  That can be pre-admitted.

16          THE COURT:  Okay.

17          MS. POTTER:  369 is -- so 368 was the images of 367.

18  Actually, I should say that the Government's removing 368-1,

19  which is a picture of Ms. Westfall.  So with that removed,

20  there's no objection on 368.

21          THE COURT:  368-1 will be removed.

22          MS. POTTER:  369, that was the one, actually, that's

23  two separate Blink videos.  There's one where there's a

24  discussion of someone potentially being in the children's bedroom

25  in one of the videos, and the second video is a discussion of

1     what happened at The Pikey.  They've agreed to remove the

2     discussion of the children's bedroom, and we don't object to the

3     portion about The Pikey.

4             THE COURT:  About the what?

5             MS. POTTER:  The Pikey.  The -- oh, sorry.  The bar.

6             THE COURT:  Oh.  I see.  Okay.

7             MS. POTTER:  The bar (pause) --

8             THE COURT:  All right.  Well, then, with that redaction

9     by the Government, 369 will be admitted.

10            MS. POTTER:  370 through 372, there's no objection.

11    Those can be admitted.

12           373, that is actually from the 404(b).  My

13    understanding is for 373, at least now the Court has excluded

14    that with the caveat that if she testifies or he testifies, they

15    can re-raise it.  Right?

16            THE COURT:  So I have sustained the objection to 373.

17    It can be -- if the Government believes it becomes relevant, they

18    can revisit that.

19            MS. POTTER:  Okay.  Excuse me one moment.  Okay.  374,

20    there's no objection, with the redaction.  They're going to make

21    a redaction.  And I'm having a moment as to what the redaction

22    is, but they've agreed to redact and I think we have an agreement

23    as to the redaction.

24            THE COURT:  Okay.  374 will be admitted as long as it's

25    redacted, and we can certainly review that redaction.

1        MS. POTTER:  375, no objection.  376 has been removed.

2    I can -- you all confirmed that.

3        THE COURT:  All right.  376 is removed.

4        And, Char, I just want to clarify, because there's so

5    many exhibits, I'm not going to have them renumbered.  I think

6    that will be too confusing.

7        MS. PEW:  Yes.

8        THE COURT:  We're simply going to remove -- we'll

9    remove the exhibits where the parties have agreed to remove them,

10    and then there's some that are still subject to review.

11        And just to clarify if I haven't said this already,

12    those exhibits that are not being objected to or I have overruled

13    the objection will be deemed admitted and can be referred to in

14    opening argument and can be admitted certainly without further

15    foundation, with the exception of the -- there's a few exhibits

16    where the defense is seeking specific foundation, I think, having

17    specific witnesses testify, and then they would be admissible.

18        MS. PEW:  Your Honor, can I get clarification on 374?

19    Was that admitted as redacted?

20        MS. POTTER:  Yes.

21        THE COURT:  It'll be redacted and, yes, it will be

22    admitted with the redaction.

23        MS. PEW:  Okay.  That's what I thought I heard.  Thank

24    you.

25        MS. POTTER:  377, there's no objection, can be

1       admitted.  378 has been removed by the Government.

2              THE COURT:  All right.  378's to be removed.

3              MS. POTTER:  379 they've pulled up.  So this is a text

4       message exchange between Mr. Zuberi and Tyler Archibald, and

5       they're talking about constructing an underground concrete

6       structure.

7              Our argument is that it's not relevant, because he

8       didn't actually construct an underground concrete structure.

9       It's -- oh, sorry.  I got distracted by the train.

10             It's unfairly prejudicial because it seems to go to

11      this notion of larger plans, and I also raised a 404(b).  I'm not

12      sure it was actually listed in 404(b), but, you know, we consider

13      it sort of a 404(b) issue.  So that's our argument on 379.

14             THE COURT:  All right.  And so for the same reasons,

15      I'll overrule the objection to 379.  It does go to this overall

16      kind of -- I forgot now the name of the operation.  Operation

17      (pause) --

18             MR. SWEET:  "Operation Take Over", Your Honor.

19             THE COURT:  -- "Operation Take Over" evidence that's

20      being introduced.

21             MS. POTTER:  Okay.  380 is similar.

22             THE COURT:  Yes.  And I will overrule the objection to

23      380 -- or -- yes, overruled.

24             MS. POTTER:  381, there's no objection.

25             382 is similar to 379, 380.  It's a -- asking about a

1    concrete structure that a person can't break with their hands.

2    We object for those -- for the reasons.

3              THE COURT:  All right.  That'll be overruled.

4              MS. POTTER:  383 and 384, no objection.

5              385 is a video of Mr. Zuberi holding a pistol.  The

6    Government has agreed to remove the audio.  It's our position

7    that they could simply use stills to show him in possession of

8    the -- what they allege is a firearm as opposed to playing the

9    video.  I realize I've raised that objection before and the

10   Court's overruled it, but I want to make it again.

11             THE COURT:  Okay.  I'll allow them to play the video

12   with the understanding that the audio will be muted.

13             MS. POTTER:  And so the same objection -- 386 and 387

14   are the same issue, Your Honor.  They've agreed to remove --

15   actually, I think one of them has an audio, but they'll remove

16   the audio from all of them and then they can play the video.

17             THE COURT:  All right.  386 and 387 will be admitted

18   without audio.

19             MS. POTTER:  388, no objection.  389, they've removed.

20   Is that correct?

21             MR. LICHVARCIK:  Correct.

22             THE COURT:  389 will be removed.

23             MS. POTTER:  390 through 395 are no objection.  396 is

24   the body armor the Court's already ruled -- the body armor

25   picture that you've already ruled on.

1              THE COURT:  I sustain the objection to 396.

2              MS. POTTER:  397 through 404, no objection.  405 is a

3    picture of Mr. Zuberi crying in the Honda Pilot.  It's from the

4    Reno.  They've redacted the child's face.  I think it's a picture

5    he took himself, which is why I think it's here as opposed to

6    earlier in the exhibit list.  We would just object on the Reno

7    principles.

8              THE COURT:  Okay.  Reno evidence will come in.  I'll

9    allow 405.

10             MS. POTTER:  406 is an image of Mr. Zuberi's Twitter

11   profile page.  We object on relevance.  I mean, there's no

12   discussion of Twitter or anything in this case, and unfair

13   prejudice.  I will note we didn't object to the -- I believe it's

14   Instagram where AV-2 took a screen shot of Instagram.  So it's in

15   part because no one says they saw his Twitter or anything about

16   the Twitter.

17             THE COURT:  All right.  So I guess I'm not fully

18   understanding the relevance of 406.  It just looks like a -- you

19   know, a (pause) --

20             MR. SWEET:  Your Honor, if I may, this is sort of a

21   watered-down version of the "women are property" and --

22             THE COURT:  Right.

23             MR. SWEET:  I mean, "As a man, you must take what you

24   want or at least attempt.  If you don't, you will die in

25   tribulation."  It gets less objectionable.  It is, Your Honor,

1    though, however, and when you add in affluency and power, which

2    are power and control, money, domination, those are all themes of

3    Mr. Zuberi, and that's why we're seeking it.

4           THE COURT:  I understand they're themes, but I think

5    the relevance is relatively small.  What I don't want the

6    Government to do through, you know, some of these kind of

7    anti-government kind of Tweets and, of course, the photo of him

8    in the vest, it starts looking like more he's an anti-government

9    terrorist than what we're really focused on here.  So I will

10   sustain the objection to 406.

11          MR. SWEET:  Yes, Your Honor.  We'll remove that.

12          MS. POTTER:  407, there's no objection.  408 --

13          THE COURT:  What is 407?  I'm just kind of curious,

14   because I can't make out much in that picture.

15          MS. POTTER:  It's a picture from -- well, I'm sorry.

16          MR. SWEET:  It's a picture from Tulelake, Your Honor.

17   And after Mr. Zuberi fled the residence on July 15th, he went and

18   spent the night seemingly in Tulelake, California, while his

19   family was also there.

20          THE COURT:  All right.  Thank you.

21          MR. SWEET:  That's a picture from there.

22          MS. POTTER:  Our objection to 408 is the Reno

23   objection, Your Honor.  So (pause) --

24          MR. SWEET:  And to be clear, Ms. Potter, just so you

25   know, we did cut 408.  We will remove 408-2.

1        MS. POTTER:  You're right.  Dash 2 is being removed.

2        THE COURT:  All right.  408-2 is being removed, but

3  otherwise I will admit 408-1, which appears to -- is that

4  Mr. Zuberi's view from his vehicle?

5        MS. POTTER:  Yes.  It's inside.  It's inside.  And then

6  the third picture, which will become the second picture, is the

7  image of the injury, Your Honor.

8        THE COURT:  All right.  I'll allow 408-1 and 3.

9        MS. POTTER:  Actually, on that, Your Honor, just to

10  clarify with the Government so I understand, I know we're not

11  renumbering big numbers, but, like, in this situation where

12  they've removed 408-2, could we renumber and just (pause) --

13        MR. SWEET:  We will.  Our intent was, again, if we cut

14  396, we'll just leave 396 as blank, but when we cut 408-2, we'll

15  go -- we'll just have 401-1, 401-2.

16        THE COURT:  That's fine.

17        MR. SWEET:  Okay.  Thank you.

18        MS. POTTER:  Okay.  409 and 410, we just need to see

19  them.  We don't anticipate any issues with those.

20        THE COURT:  All right.  We'll reserve on 409 and 410

21  until defense can review.

22        MS. POTTER:  411 to 414, no objection.

23        THE COURT:  All right.  411 through 414 will be

24  allowed.

25        MS. POTTER:  415 to 417, we don't object to the video,

1    and the Government has agreed to mute the audio for those videos.

2              THE COURT:  All right.  With that understanding, those

3    will be received.

4              MS. POTTER:  418, no objection.  419 has been removed.

5              THE COURT:  All right.  419 does appear already to be

6    removed, yes.

7              MS. POTTER:  420 to 423, no objection.  424 has been

8    removed.

9              THE COURT:  It does appear to be removed.  Thank you.

10             MS. POTTER:  425 and 426, no objection.

11             427, so this is a video, and I do -- are we going to

12   pull up this video or (pause) -- okay.  I just didn't want to --

13   if you were planning --

14             THE COURT:  We can if you need to.

15             MR. LICHVARCIK:  Well, our preference, Judge -- it's a

16   video that AV-2 made of herself.  We certainly can if you'd like.

17             THE COURT:  Is the idea she was attempting to capture

18   her injuries?

19             MR. LICHVARCIK:  Yeah.  That's --

20             MS. POTTER:  Okay.

21             MR. LICHVARCIK:  -- what -- yeah.  So what happened

22   was, and I won't get into too much of the alleged details, but

23   she was hit on the head pretty hard by Mr. Zuberi multiple times

24   while she was handcuffed, and tased and restrained.  And then

25   thereafter, she took a kind of a selfie video of herself that's

1    relatively short, and she talks about a couple different things.

2    And she labels it on the top, I'm going to butcher it a little

3    bit, "Concussions are stupid, bro," or some version of that.  It

4    says, "Concussions are stupid," and then she's holding her head

5    and she references -- it's very short.  And our position is that

6    it's -- I think they don't object to the video, but they don't

7    want that banner that she put on the top that says, "Concussions

8    are stupid, bro."  And --

9            THE COURT:  I'm not sure if that hurts you necessarily.

10   It might mean she's taking it less seriously.  I don't know.

11           MS. POTTER:  You know, and there are a couple of things

12   where we're just -- we're not sure how it's playing out, so, you

13   know, I think we could probably revisit 427.

14           THE COURT:  All right.  Let's -- we'll reserve on 427,

15   but certainly the -- the video of the injuries would be

16   admissible and I would allow that.  You know, whether the caption

17   should or should not be in, I'll allow the defense to think about

18   that one.

19           MR. LICHVARCIK:  I'll just flag the exception, Judge.

20   I believe it's 803(6), which is then existing mental, emotional,

21   physical statement.  And it's about their bodily injury and the

22   mental injury that she sustained right there as it's happening.

23   So that's our position.

24           THE COURT:  I don't think it's being offered for the

25   truth, so I don't -- I don't know if you really need an

1    exception.

2              MS. POTTER:  428, there's no objection.  429, I -- I

3    actually -- I apologize to the Court.  I wasn't able to re-review

4    that one.  I need to make sure -- they are -- they want to offer

5    just a little portion to show her reaction to being told that

6    Mr. Zuberi is in custody, and they have an exception, and I

7    can't -- as to why that -- her emotional reaction to that.  And I

8    just need to --

9              THE COURT:  It's the -- okay.  From Adult Victim 2.

10   Okay.

11             MS. POTTER:  It's from AV-2 when she's interviewed the

12   second time around by the police.  And I need to review that, so

13   can we hold on that one, please?

14             THE COURT:  Yes.  We'll reserve on 429.  I might want

15   to look at that one.

16             MS. POTTER:  And, Your Honor, I will confess that I

17   promised Ms. Moore 15 minutes, and I think we're going a little

18   over.

19             THE COURT:  That's fine.

20             MS. POTTER:  Okay.

21             THE COURT:  I thought I was starting back up at 1:30,

22   and it turns out I'm not starting back up until 3:30, so --

23             MS. POTTER:  Okay.

24             THE COURT:  I have some criminal matters later in the

25   afternoon that will --

1          MS. POTTER:  Okay.  Okay.  So -- but if other -- I

2    mean, we're happy to take a break if other folks need it.  I

3    just -- we can keep going.

4          Okay.  So 430, 431, and 432, we have no objection to

5    them, but if we end up stipulating to the felony conviction, we

6    may ask the Government to remove them, because they're -- it's

7    all the name change documents.

8          THE COURT:  Okay.  So they're admitted as of now, but

9    we can revisit depending on a stipulation.

10         MS. POTTER:  Okay.  So 433 is the digital file of the

11   conviction documents for California.  The problem with those --

12   the way those documents come is they tend to reference -- they

13   don't reference just the conviction, they reference the

14   underlying charges.  So the Court understands that includes

15   kidnapping of a minor.

16         I should -- this is the one I meant to confer with the

17   Government.  I think we're working on potential redactions, so it

18   may be that we should hold on this one or -- but I'm looking to

19   the Government to see if that's right or if they want a ruling as

20   to whether the whole thing is admissible.

21         MR. BOCCATO:  No.  I think -- I think we'd like to

22   revisit this --

23         THE COURT:  Okay.

24         MR. BOCCATO:  -- to look at --

25         THE COURT:  It includes -- is that also the transcript

1   of his plea?

2              MS. POTTER:  Yes.

3              THE COURT:  I see.

4              MS. POTTER:  You can see on the first page, Your Honor,

5   where it lists the allegations.

6              THE COURT:  Yes.  I see that.  We need to probably have

7   a further discussion about 433.

8              MS. POTTER:  Okay.

9              MR. BOCCATO:  We are hopeful we can reach some sort of

10  compromise.

11             THE COURT:  Okay.

12             MS. POTTER:  Okay.  434 to 430 -- 437, no objection.

13  We're still discussing a possible stipulation to interstate

14  commerce.  Those probably would be unnecessary if that happened.

15             THE COURT:  Okay.

16             MS. POTTER:  438, 439, 440, and 441, similar.  We

17  actually haven't seen those yet, but we don't anticipate an

18  objection, but if we stipulate, those might come out.

19             THE COURT:  Okay.  So 435 through 441 are admitted, but

20  with the understanding there may be a stipulation that would lead

21  to their removal.

22             MS. POTTER:  Okay.  442, no objection.  443, the

23  Government's removed.  444 and 445, no objection.

24             446 to 448, no objection, but these are -- these are

25  the physical name change documents.  The same theory:  If we

1    stipulate, we might want to remove them.

2              449 is the physical version of 433, so we'd reserve on

3    that.  We'll obviously make them consistent.

4              450, we haven't seen this.  It's a Taser Pulse.

5              THE COURT:  All right.  We'll reserve on 450.

6              MS. POTTER:  Just for purposes of the record, 451 and

7    452, those are documents for the handwriting expert.  Just -- we

8    object to them to the extent they contain the information and the

9    notebooks that we previously objected to and the Court has

10   overruled.

11             THE COURT:  All right.  So 4-- that's 451 and 452?

12             MS. POTTER:  Yes.

13             THE COURT:  Those will be received.

14             Can I go back to 450?  What is the demonstration of the

15   Taser Pulse?

16             MS. POTTER:  I don't think -- I don't think we have it

17   yet, do we?

18             MR. LICHVARCIK:  No.

19             THE COURT:  Do we know what it is, though?  I'm just

20   curious.

21             MR. BOCCATO:  We are working to retain an expert from

22   the taser corporation who can talk about how the Taser Pulse

23   operates, and we're hoping we can create a demonstration video on

24   how --

25             THE COURT:  I see.  Was the taser used on one of the

1    victims?

2              MR. BOCCATO:  Yes, Your Honor.

3              THE COURT:  All right.  That's all I needed to know.

4    Thank you.  So, again, we'll reserve on 450.

5              MS. POTTER:  Okay.  And we're now on 453, no objection.

6              454, the objection is the same.  It's another one of --

7    piece from the journal, just to the extent that that contains

8    that writing.  I know the Court's overruled that.

9              THE COURT:  All right.  I'll allow 454.

10             MS. POTTER:  455 to 457, no objection.  458 and 459, we

11   don't have yet, so we'll just reserve.  I don't anticipate an

12   objection, but --

13             THE COURT:  We'll reserve on 458 and 459.

14             MS. POTTER:  460, no objection.

15             And so what I think would be helpful, Your Honor, if

16   the Court is willing, so for 4 -- 461 through -- well, let me --

17   461 through 463 are jail calls.  464 is being removed.

18             THE COURT:  All right.  464 will be removed.

19             MS. POTTER:  So 461 to 463 and 465 and 466 are all jail

20   calls that we're still working through.  It would be helpful to

21   guide those negotiations if the Court could just place on the

22   record that you're overruling our previous objections to

23   statements about suicide, and to the extent we objected sort of

24   generally to lots of statements by Ms. Westfall, not statements

25   about the role of women, but just generally, if you could just

1    confirm that those will carry over just to the jail calls, then

2    we can work through some of our issues.

3          THE COURT:  All right.  Certainly with regards to my --

4    any questions, issues, or statements made on the jail calls

5    about, "My life is over," certainly there is a reasonable

6    inference the Government can make that that is a statement of

7    guilt.

8          I'm not sure what else I can direct you on, but

9    certainly some of the calls, I know from previous experience,

10   involved issues around the victims, of -- of some of these events

11   and either getting ahold of them or putting things onto social

12   media.  Those would be admissible.  They could be either evidence

13   of tampering or trying to intimidate witnesses.  I don't know if

14   that's helpful, but I would find those kind of statements

15   admissible.

16         MS. POTTER:  That is helpful.  And so I think our

17   proposal for those, Your Honor, is we may try and actually do

18   some of it through writing once we have transcripts and stuff.

19   We'll submit and we can note even -- we're objecting to this, if

20   the Court can just issue a minute order, and we might not have to

21   go back through all of this.

22         THE COURT:  All right.  We'll do that.  But we'll

23   reserve, then, on -- I guess it's specifically the calls would be

24   4 (pause) --

25         MS. POTTER:  It's 461 to 463 and then 465 and 466.

1            THE COURT:  Okay.  And 464 is being removed?

2            MS. POTTER:  Yes, Your Honor.

3            THE COURT:  Okay.

4            MS. POTTER:  And then 467 is the transcripts for those

5    calls.  So we'll obviously submit the transcripts that go with

6    what is admitted.

7            THE COURT:  Okay.

8            MS. POTTER:  468 -- I apologize.  That actually should

9    be no objection, but they've agreed to redact a portion of it.

10           MR. LICHVARCIK:  That's correct, we have.

11           THE COURT:  Okay.  So 468 will be received.

12           MS. POTTER:  469 has been removed, correct?

13           MR. LICHVARCIK:  Yes.  469 is removed.

14           THE COURT:  All right.  469 will be removed.

15           MS. POTTER:  470, there will be some redactions.  And

16   there's also highlight in there that's a function of the search

17   that was done for the e-mails.  That highlight's going to come

18   out.

19           THE COURT:  Okay.  The highlight will come out.  With

20   redactions, 470 will be received.

21           MS. POTTER:  And then 471, same thing.  There's going

22   to be some redactions, but other than that (pause) --

23           THE COURT:  All right.  With the appropriate

24   redactions, 471 will be received.

25               And I will ask that the court reporter -- I think it's

1    probably going to be helpful for both sides to simply have a

2    transcript of today's hearing so that we're all on the same page

3    as to which exhibits are in, which are out, which we need to

4    clarify.

5              MS. POTTER:  Your Honor, so Ms. Miles had to step out,

6    so we would ask to reserve the verdict form until the next one,

7    but I think we just want to make sure we understand exactly what

8    the Court is asking, because I think there's some confusion.

9              Is what the Court is asking is if the Government would

10   say for Count -- well, Count 4's a bad example.  For Count 5,

11   just pick one of the list of items and only list that on the

12   verdict form or not list anything at all?

13             THE COURT:  I was thinking to -- they would elect one

14   just to make it easy, like, the most obvious one, but I'm not

15   telling the Government that I'm forcing them to elect.  It

16   just -- it seems like if you have confidence that a gun was found

17   in a particular room and it's associated with Mr. Zuberi, why

18   have them go through a whole list of other things in order to get

19   a conviction on a particular count.  It's just easier, I think,

20   to both present to the jury and to argue.

21             That said, if there are legal reasons in federal cases

22   that I'm just not familiar with where you present a catalogue of

23   ammunition and firearms underneath a count, that's perfectly

24   appropriate too, I suppose.

25             MS. POTTER:  Okay.  And we'll get -- I think we'll get

1    back.  I mean, I think I know what Ms. Miles is going to say, but

2    I'll get back to the Court on that.

3         THE COURT:  It's something I have no experience with.

4    And it did look -- it just -- having had no experience with it,

5    it looks a little odd to me to present to a jury, but I'm not --

6    I don't want to get overly involved in that piece of it.

7         MS. POTTER:  And we may need to have some other

8    discussions about the verdict form, too, so we'll just table the

9    rest of that.

10         In terms of jury instructions, all we were asking, if

11   the Court would be willing today, so there's an introductory

12   charge, which we've agreed to everything in the introductory

13   charge except the reference to the indictment.  We just don't

14   want to talk about the indictment.  There's -- we don't think

15   there's any need, but --

16         THE COURT:  I typically leave out the indictment

17   language.  I don't send the indictment back to the jury.  I think

18   maybe that practice is done in different districts, maybe with

19   different judges, but I don't know -- I myself don't send the

20   indictment back.  I don't think it's necessary to reference an

21   indictment.  It's neither here nor there to the jury who's

22   determining the counts in front of them.

23         MS. POTTER:  All right.  I think that we just wanted

24   that one since that --

25         THE COURT:  There was a name issue, though.  Did -- for

1    some reason I thought Mr. Svelund had told me there's a question

2    about the names listed on the verdict form.  Is it three names,

3    two names?

4         MS. POTTER:  We would ask all three names be used.  And

5    I guess I had forgotten.  I think we added Sakima.  That's -- and

6    I actually think way back when the Court actually added that, I

7    don't think it's, you know, carried through, but I think it got

8    added because that's what he prefers to be called.  At one point

9    I think the Court said that that was one of the names in the

10   case, so (pause) --

11        MR. SWEET:  Your Honor, we do agree that all names

12   should be on the verdict form and also really the indictment, and

13   so I think -- I believe the defense was concurring in terms of

14   amending the indictment to add -- and, Ms. Potter, I want to make

15   sure that's correct, you were discussing adding Sakima as well,

16   but we also do have the name Justin Hyche, which appears at

17   various times, so we could add that as well so we would have the

18   three last names on there.

19        MS. POTTER:  I'm -- so I actually thought the Court had

20   already amended.  I guess now that I'm being asked for -- could

21   we just get back to you on that, Your Honor?  I'm sure --

22        THE COURT:  Yeah.  Yeah.  We can get -- we talk about

23   that.  I can't remember.  I have a vague memory that maybe we did

24   add at least Sakima, I thought.

25        MS. POTTER:  Yeah.  I think we definitely added Sakima,

1    but I thought that had already been accomplished, but if I could

2    just confer on that.

3              THE COURT:  Okay.

4              MS. POTTER:  And so I think with that, I think we've

5    dealt with the issues.  I think the only thing we kind of just --

6    I don't know that we're ready to pick a date unless the Court

7    feels strongly about picking a date for September right now.  I

8    do know the Court is very, very busy, so if there's only a couple

9    of dates, maybe we can figure them out and Ms. Pew could send

10   them to us so we can start getting on the calendar.

11             THE COURT:  Look to see if there's something around the

12   19th if you want to have the arguments here.  But things have

13   opened up a little bit in Eugene.  There was -- the Anastasia

14   case, I think, was scheduled in September, and that's gone away.

15   So I think we have a little more time in September than I had

16   maybe three weeks ago.

17             MS. POTTER:  Okay, Your Honor.  And it may not be

18   necessary.  And it may not be so much argument as just doing some

19   of this work, which is helpful to do prior to trial and to get

20   some just clarification on.

21             I guess the only other thing is leading up to that, how

22   would the Court -- does the Court want additional briefing on

23   topics?  Is it okay?  We've -- I know we've been e-mailing with

24   Mr. Svelund sort of what our ideas are on topics.  Is that -- are

25   you okay with us reaching out --

1    THE COURT:  That works perfectly fine.  If there's

2  something that, you know, you're informally discussing and you

3  simply want a minute order entered with the Court's ruling, we

4  can do that, but, you know, if it's something that needs to be

5  preserved, probably a brief memo would be appropriate.

6    MS. POTTER:  Okay.

7    MR. SWEET:  Your Honor, the -- when we did the trial

8  documents, because of all the extensive briefing, we did not

9  submit a trial memo.  If it's acceptable to the Court, we could,

10  as we get closer, submit a very streamlined trial memo, since I

11  think so much has already been addressed individually.

12    THE COURT:  I don't think a trial memo's necessary, to

13  be honest.  I know we're spending a lot of time now on exhibits.

14  I think I have a pretty clear idea factually what's occurred.

15  And I just -- quite frankly, I don't think it's going to be all

16  that helpful.  Typically it helps me understand what the

17  evidentiary issues are and what the, you know, different factual

18  presentations are going to be.  You know, I don't think the

19  defense is prepared to present a factual presentation.  So I

20  don't think it's -- to be honest, I'd rather have you spend your

21  time preparing for trial.

22    MR. SWEET:  Your Honor, then we won't submit a trial

23  memo.  Any individual issues that need to be addressed such as

24  forfeiture or something, that will either be addressed

25  individually or talk with counsel and raise at our status

1     conference.

2           THE COURT: Okay. And, again, I know I tend to hold

3     off on jury instructions. If there is an instruction that you

4     feel I need to rule on, and to be honest with you, there's not a

5     whole lot of divergence here, but in order to, you know, present

6     your opening statement, for example, I'm happy to give you a

7     pretrial ruling on any one instruction, but typically we'll be

8     getting you a draft of instructions probably after about week one

9     of the trial.

10           MS. POTTER: And Ms. Miles and I have been conferring.

11     She and I were both gone leading into this, so we just have -- I

12     think actually based on our preliminary discussions this morning,

13     we might not have -- we might not need to do much of anything.

14     So we will definitely keep the Court in the loop. Like, that's

15     the kind of stuff if we can just e-mail David and say, okay, we

16     agree with the one we submitted, instead of resubmitting them,

17     we'll just do that and let the Court know.

18           THE COURT: Okay. Anything else we need to discuss?

19           MR. SWEET: Nothing for the Government, Your Honor.

20     Thank you.

21           MS. POTTER: Nothing from the defense.

22           THE COURT: Okay. Well, it's a remarkable compilation

23     of exhibits and a remarkable fact that the defense went through

24     them and really produced a document that was very helpful for me

25     and I think for my staff when we're kind of clarifying which

1   exhibits are in and out and how we've ruled.  So I really do want

2   to thank both sides for a remarkable amount of work that went

3   into this up to this point.

4          And with that, we'll be in recess.  Thank you.

5          MR. SWEET:  Thank you, Your Honor.

6          MS. PEW:  Ms. Potter, I missed 467.  Can you (pause) --

7          MS. POTTER:  Hold on one second.  She has a question.

8          MS. PEW:  Yeah.  467.

9          MS. POTTER:  Oh.  I apologize.  We will submit

10   transcripts that match up with the jail calls we agreed on.  So

11   we don't have that yet.

12          MS. PEW:  Okay.

13          MS. POTTER:  And also, like all the other transcripts,

14   they won't go back to the jury.  We'll get to a point where

15   there's no objection.

16          MS. PEW:  All right.  Thank you.

17          MS. POTTER:  We're not there yet.  Sorry.  Thank you.

18          MS. PEW:  No.  Just wanted to be clear.

19          (Proceedings adjourned at 1:00 p.m.)

20

21

22

23

24

25

**C E R T I F I C A T E**

1

2

3          I certify, by signing below, that the foregoing is a

4   true and correct transcript of the record, taken by stenographic

5   means, of the proceedings in the above-entitled cause.

6          A transcript without an original signature, conformed

7   signature, or digitally signed signature is not certified.

8

9          DATED this 20th day of September 2024.

10

11

12                         /s/ Kellie M. Humiston

13                         Kellie M. Humiston, RMR, CRR
                           Official Court Reporter
14                         Certificates Expire:  9/2024

15

16

17

18

19

20

21

22

23

24

25